**[ORAL ARGUMENT SCHEDULED FOR JUNE 5, 2026]**

**Nos. 26-5123, 26-5134**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,
Plaintiff-Appellee/Cross-Appellant,

v.

NATIONAL PARK SERVICE, *et al.*,
Defendants-Appellants/Cross-Appellees.

---

On Appeal from the United States District Court
for the District of Columbia

---

## JOINT APPENDIX

---

Gregory B. Craig
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel. (202) 223-1200
gcraig@foleyhoag.com

Thaddeus A. Heuer
Matthew F. Casassa
Kevin Y. Chen
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

BRANTLEY T. MAYERS
*Attorney*
*Civil Division, Room 3632*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 890-9874*

*(counsel information continued on following page)*

Boston, MA 02210
Tel. (617) 832-1000
theuer@foleyhoag.com
mcasassa@foleyhoag.com
kchen@foleyhoag.com

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant
Attorney General*

# TABLE OF CONTENTS

District Court Docket Entries ............................................................. JA1

Complaint
    (Dec. 12, 2025) (Dkt. No. 1) ..................................................... JA20

Declaration of Elizabeth S. Merritt
    (Dec. 12, 2025) (Dkt. No. 2-2) ................................................ JA67

Declaration of Alison K. Hoagland
    (Dec. 12, 2025) (Dkt. No. 2-3) ................................................ JA73

July 31, 2025 Press Release
    (Dec. 12, 2025) (Dkt. No. 2-14) .............................................. JA80

October 21, 2025 Letter from National Trust for Historic
    Preservation in the United States
    (Dec. 12, 2025) (Dkt. No. 2-16) .............................................. JA85

Defendants' Motion for Leave to Submit Declaration *Ex Parte, In
    Camera*
    (Dec. 15, 2025) (Dkt. No. 13) .................................................. JA88

Declaration of Jessica Bowron
    (Dec. 15, 2025) (Dkt. No. 14-1) .............................................. JA92

National Park Service, Finding of No Significant Impact
    (Dec. 15, 2025) (Dkt. No. 14-2) .............................................. JA97

National Park Service, White House East Wing Modernization
    and State Ballroom Environmental Assessment
    (Dec. 15, 2025) (Dkt. No. 14-3) .............................................. JA114

Declaration of John Stanwich
    (Dec. 15, 2025) (Dkt. No. 14-6) .............................................. JA145

Declaration of Matthew C. Quinn
    (Dec. 15, 2025) (Dkt. No. 14-11) ............................................ JA153

Memorandum Order Denying TRO
(Dec. 17, 2025) (Dkt. No. 17) ................................................ JA156

Transcript of December 16, 2025 Hearing
(Dec. 17, 2025) (Dkt. No. 18) ................................................ JA160

Annex 1 to Trust's Supplemental Memorandum
(Dec. 29, 2025) (Dkt. No. 20-1) ............................................. JA198

Declaration of William J. Bates
(Dec. 29, 2025) (Dkt. No. 20-2) ............................................. JA213

Defendants' Notice of Submitting Supplemental *Ex Parte*
Declaration *In Camera*
(Jan. 15, 2026) (Dkt. No. 25) ................................................ JA219

Declaration of Joshua Fisher
(Jan. 15, 2026) (Dkt. No. 30-1) ............................................. JA221

Declaration of Heather Martin
(Jan. 15, 2026) (Dkt. No. 30-2) ............................................. JA227

Supplemental Declaration of Jessica Bowron
(Jan. 15, 2026) (Dkt. No. 30-3) ............................................. JA244

Declaration of Professional Engineer
(Jan. 15, 2026) (Dkt. No. 30-4) ............................................. JA248

Declaration of Matthew C. Quinn
(Jan. 15, 2026) (Dkt. No. 30-5) ............................................. JA251

Declaration of Jonathan B. Jarvis
(Jan. 20, 2026) (Dkt. No. 33-1) ............................................. JA254

Transcript of January 22, 2026 Hearing
(January 26, 2026) (Dkt. No. 38) ........................................... JA268

Defendants' Notice of Submitting Second Supplemental *Ex Parte*
Declaration *In Camera*
(Feb. 2, 2026) (Dkt. No. 40) .................................................. JA316

Memorandum Opinion Denying First Preliminary Injunction
Motion
(Feb. 26, 2026) (Dkt. No. 47) ................................................. JA318

Order Denying First Preliminary Injunction Motion
(Feb. 26, 2026) (Dkt. No. 48) ................................................. JA340

Second Amended Complaint
(Mar. 1, 2026) (Dkt. No. 50) ................................................. JA341

Supplemental Declaration of Tammy Stidham
(Mar. 12, 2026) (Dkt. No. 52-1) ............................................. JA401

Supplemental Declaration of Heather Martin
(Mar. 12, 2026) (Dkt. No. 52-2) ............................................. JA408

Second Supplemental Declaration of Jessica Bowron
(Mar. 23, 2026) (Dkt. No. 55-2) ............................................. JA411

Second Supplemental Declaration of Heather Martin
(Mar. 23, 2026) (Dkt. No. 55-3) ............................................. JA419

Transcript of March 17, 2026 Hearing
(March 26, 2026) (Dkt. No. 57) ............................................. JA423

Defendants' Notice of Submitting Third Supplemental *Ex Parte*
Declaration *In Camera*
(Mar. 30, 2026) (Dkt. No. 59) ................................................. JA459

Memorandum Opinion Granting Second Preliminary Injunction
Motion
(March 31, 2026) (Dkt. No. 60) ............................................. JA461

Order Granting Second Preliminary Injunction Motion
(March 31, 2026) (Dkt. No. 61) ............................................. JA496

Declaration of Matthew C. Quinn
(Apr. 16, 2026) (Dkt. No. 69-1)............................................. JA499

Memorandum Opinion on Motion for Clarification
     (Apr. 16, 2026) (Dkt. No. 72) ................................................. JA502

Order on Motion for Clarification
     (Apr. 16, 2026) (Dkt. No. 73) ................................................. JA512

Notice of Appeal
     (Apr. 16, 2026) (Dkt. No. 74) ................................................. JA515

Notice of Conditional Cross-Appeal
     (Apr. 21, 2026) (Dkt. No. 76) ................................................. JA517

APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–04316–RJL

NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES v. NATIONAL PARK SERVICE et al
Assigned to: Judge Richard J. Leon
Related Case: 1:26–cv–00029–RJL
Case in other court: USCA, 26–05101
                USCA, 26–05108
                USCA, 26–05123
                USCA, 26–05134
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 12/12/2025
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES** | represented by | **Thaddeus A. Heuer**<br>FOLEY HOAG, LLP<br>155 Seaport Boulevard<br>Boston, MA 02210<br>617–832–1187<br>Fax: 617–832–7000<br>Email: theuer@foleyhoag.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Jack C. Smith**<br>FOLEY HOAG, LLP<br>155 Seaport Boulevard<br>Boston, MA 02210<br>617–832–1119<br>Email: jcsmith@foleyhoag.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew Casassa**<br>FOLEY HOAG, LLP<br>155 Seaport Boulevard<br>Boston, MA 02210<br>617–832–1116<br>Email: mcasassa@foleyhoag.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Gregory Bestor Craig**<br>FOLEY HOAG LLP<br>1717 K Street, NW<br>Suite 1200<br>Washington, DC 20006<br>202–261–7415<br>Fax: 202–785–6687<br>Email: gcraig@foleyhoag.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **NATIONAL PARK SERVICE** | represented by | **Mark James Widerschein**<br>U.S. DEPARTMENT OF JUSTICE<br>Natural Resources Section<br>150 M St. NE |

JA1

Washington, DC 20002
202–532–5803
Email: mark.widerschein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
DOJ–Enrd
P.O. Box 7611
Washington, DC 20044
202–598–6660
Email: michelle.m.ramus@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW
Washington, DC 20530
771–220–9755
Email: stanley.woodward@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
DOJ–Enrd
Environment and Natural Resources
Division
950 Pennsylvania Ave NW
Washington, DC 20530
202–718–0703
Email: adam.gustafson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
DOJ–Civ
950 Pennsylvania Avenue NW
Washington, DC 20530
202–890–9874
Email: brantley.t.mayers@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
DOJ–Civ
1100 L Street NW
Room 12310
Washington, DC 20005
585–694–1124
Email: eitan.r.sirkovich@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
U.S. DEPARTMENT OF JUSTICE
Natural Resources Section
150 M Street, N.E.
Suite 2.900
Washington, DC 20002
202–598–0414
Email: gcumming@democracyforward.org
*TERMINATED: 03/27/2026*
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
1717 Poplar Lane NW
Washington, DC 20012

JA2

617–921–9132
Email: yaakov.m.roth@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
U.S. DEPARTMENT OF JUSTICE
ENRD
P.O. Box 7611
Washington, DC 20044–7611
(202) 305–0470
Email: marissa.piropato@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**JESSICA BOWRON**                          represented by    **Mark James Widerschein**
*in her official capacity as ACTING*                         (See above for address)
*DIRECTOR, NATIONAL PARK*                                    *LEAD ATTORNEY*
*SERVICE*                                                    *ATTORNEY TO BE NOTICED*

   **Michelle M. Nkeng**
   (See above for address)
   *LEAD ATTORNEY*
   *ATTORNEY TO BE NOTICED*

   **Stanley Edmund Woodward , Jr.**
   (See above for address)
   *LEAD ATTORNEY*
   *ATTORNEY TO BE NOTICED*

   **Adam R.F. Gustafson**
   (See above for address)
   *ATTORNEY TO BE NOTICED*

   **Brantley Mayers**
   (See above for address)
   *ATTORNEY TO BE NOTICED*

   **Eitan Sirkovich**
   (See above for address)
   *ATTORNEY TO BE NOTICED*

   **Gregory Martin Cumming**
   (See above for address)
   *TERMINATED: 03/27/2026*
   *ATTORNEY TO BE NOTICED*

   **Jacob M. Roth**
   (See above for address)
   *ATTORNEY TO BE NOTICED*

   **Marissa Ann Piropato**
   (See above for address)
   *ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN STANWICH**                           represented by    **Mark James Widerschein**
*in his official capacity as*                                (See above for address)
*SUPERINTENDENT, THE WHITE*                                  *LEAD ATTORNEY*
*HOUSE AND PRESIDENT'S PARK*                                 *ATTORNEY TO BE NOTICED*

   **Michelle M. Nkeng**
   (See above for address)
   *LEAD ATTORNEY*
   *ATTORNEY TO BE NOTICED*

JA3

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026*
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF THE INTERIOR**    represented by    **Mark James Widerschein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026*
*ATTORNEY TO BE NOTICED*

JA4

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOUGLAS BURGUM**
*in his official capacity as SECRETARY*
*OF THE INTERIOR*

represented by **Mark James Widerschein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026*
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GENERAL SERVICES**
**ADMINISTRATION**

represented by **Mark James Widerschein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA5

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026*
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL J. RIGAS**
*in his official capacity as ACTING*
*ADMINISTRATOR, GENERAL*
*SERVICES ADMINISTRATION*

represented by **Mark James Widerschein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026*
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as PRESIDENT
OF THE UNITED STATES*

represented by **Mark James Widerschein**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026
ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EXECUTIVE OFFICE OF THE
PRESIDENT**

represented by **Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026
LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY
ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA7

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **SUSIE WILES** | represented by | **Gregory Martin Cumming**<br>(See above for address)<br>*TERMINATED: 03/27/2026*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michelle M. Nkeng**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stanley Edmund Woodward , Jr.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brantley Mayers**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Eitan Sirkovich**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jacob M. Roth**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **OFFICE OF THE EXECUTIVE RESIDENCE** | represented by | **Gregory Martin Cumming**<br>(See above for address)<br>*TERMINATED: 03/27/2026*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michelle M. Nkeng**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stanley Edmund Woodward , Jr.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brantley Mayers**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Eitan Sirkovich**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jacob M. Roth** |

JA8

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT DOWNING**                    represented by   **Gregory Martin Cumming**
(See above for address)
*TERMINATED: 03/27/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle M. Nkeng**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stanley Edmund Woodward , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brantley Mayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob M. Roth**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/12/2025 | 1 | COMPLAINT against JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP ( Filing fee $ 405 receipt number ADCDC–12131689) filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Summons – National Park Service, # 2 Summons – Jessica Bowron, # 3 Summons – John Stanwich, # 4 Summons – Department of the Interior, # 5 Summons – Douglas Burgum, # 6 Summons – General Services Administration, # 7 Summons – Michael J. Rigas, # 8 Summons – Donald J. Trump, # 9 Civil Cover Sheet)(Craig, Gregory) (Entered: 12/12/2025) |
| 12/12/2025 | 2 | MOTION for Temporary Restraining Order *and Preliminary Injunction* by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Elizabeth S. Merritt, # 3 Declaration of Alison K. Hoagland, # 4 Declaration of Gregory B. Craig, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D, # 9 Exhibit E, # 10 Exhibit F, # 11 Exhibit G, # 12 Exhibit H, # 13 Exhibit I, # 14 Exhibit J, # 15 Exhibit K, # 16 Exhibit L, # 17 Exhibit M, # 18 Exhibit N, # 19 Exhibit O, # 20 Exhibit P, # 21 Exhibit Q, # 22 Exhibit R, # 23 Exhibit S, # 24 Exhibit T, # 25 Exhibit U, # 26 Exhibit V, # 27 Exhibit W, # 28 Exhibit X, # 29 Exhibit Y, # 30 Exhibit Z, # 31 Exhibit AA, # 32 Exhibit BB, # 33 Exhibit CC, # 34 Exhibit DD, # 35 Exhibit EE, # 36 Text of Proposed Order for Temporary Restraining Order, # 37 Text of Proposed Order for Preliminary Injunction)(Craig, Gregory) (Entered: 12/12/2025) |
| 12/12/2025 |  | Case Assigned to Judge Richard J. Leon. (zmtm) (Entered: 12/12/2025) |
| 12/12/2025 | 3 | NOTICE of Appearance by Jack C. Smith on behalf of NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES (Smith, Jack) (Entered: 12/12/2025) |

JA9

| 12/12/2025 | 4 | SUMMONS (8) Issued Electronically as to All Defendants. (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 12/12/2025) |
|---|---|---|
| 12/12/2025 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses– U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zmtm) (Entered: 12/12/2025) |
| 12/12/2025 | 5 | REQUEST FOR SUMMONS TO ISSUE *Attorney General Pamela Bondi* filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Summons Jeanine Ferris Pirro, U.S. Attorney for the District of Columbia)(Craig, Gregory) (Entered: 12/12/2025) |
| 12/12/2025 | 6 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (mg) (Entered: 12/12/2025) |
| 12/12/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Thaddeus Alan Heuer, Filing fee $ 100, receipt number ADCDC–12133043. Fee Status: Fee Paid. by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Exhibit A – Declaration of Thaddeus Alan Heuer, # 2 Exhibit B – Proposed Order)(Smith, Jack) (Entered: 12/12/2025) |
| 12/12/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Matthew Francis Casassa, Filing fee $ 100, receipt number ADCDC–12133071. Fee Status: Fee Paid. by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Exhibit A – Declaration of Matthew Francis Casassa, # 2 Exhibit B – Proposed Order)(Smith, Jack) (Entered: 12/12/2025) |
| 12/12/2025 | | MINUTE ORDER. Regarding plaintiff's 2 Motion for a Temporary Restraining Order and Preliminary Injunction, defendants are hereby ORDERED to file a response by Monday, December 15, 2025 at 5:00 PM. The Court will hold a hearing on the motion on Tuesday, December 16, 2025 at 3:30 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 12/12/2025. (lcrjl2) (Entered: 12/12/2025) |
| 12/12/2025 | 9 | NOTICE of Appearance by Michelle M. Ramus on behalf of All Defendants (Ramus, Michelle) (Entered: 12/12/2025) |
| 12/12/2025 | 10 | NOTICE of Appearance by Mark James Widerschein on behalf of All Defendants (Widerschein, Mark) (Entered: 12/12/2025) |
| 12/12/2025 | 11 | NOTICE of Appearance by Gregory Martin Cumming on behalf of JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP (Cumming, Gregory) (Main Document 11 replaced on 12/15/2025) (mg). (Entered: 12/12/2025) |
| 12/15/2025 | 12 | NOTICE of Appearance by Adam R.F. Gustafson on behalf of All Defendants (Gustafson, Adam) (Entered: 12/15/2025) |
| 12/15/2025 | 13 | MOTION for Leave to File *DECLARATION EX PARTE, IN CAMERA* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP. (Widerschein, Mark) (Entered: 12/15/2025) |
| 12/15/2025 | 14 | Memorandum in opposition to re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP. (Attachments: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 1B, # 4 Exhibit 1C, # 5 Exhibit 1D, # 6 Exhibit 2, # 7 Exhibit 2A, # 8 Exhibit 2B, # 9 Exhibit 3, # 10 Exhibit 4, # 11 Exhibit 5)(Widerschein, Mark) (Entered: 12/15/2025) |
| 12/15/2025 | 15 | ERRATA *Notice* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP |

JA10

| | | re 14 Memorandum in Opposition,,. (Attachments: # 1 Errata Memorandum in Opposition)(Cumming, Gregory) (Entered: 12/15/2025) |
|---|---|---|
| 12/16/2025 | 16 | NOTICE of Appearance by Marissa Ann Piropato on behalf of All Defendants (Piropato, Marissa) (Main Document 16 replaced on 12/17/2025) (mg). (Entered: 12/16/2025) |
| 12/16/2025 | | MINUTE ORDER. Upon consideration of plaintiff's 7 Motion to Admit Thaddeus Alan Heuer Pro Hac Vice, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Thaddeus Alan Heuer be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Richard J. Leon on 12/16/2025. (lcrjl2) (Entered: 12/16/2025) |
| 12/16/2025 | | MINUTE ORDER. Upon consideration of plaintiff's 8 Motion to Admit Matthew Francis Casassa Pro Hac Vice, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Matthew Francis Casassa be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Richard J. Leon on 12/16/2025. (lcrjl2) (Entered: 12/16/2025) |
| 12/16/2025 | | MINUTE ORDER. Upon consideration of defendants' 13 MOTION for Leave to File Declaration Ex Parte, In Camera, it is hereby ORDERED that the motion is GRANTED. SO ORDERED. Signed by Judge Richard J. Leon on 12/16/2025. (lcrjl2) (Entered: 12/16/2025) |
| 12/16/2025 | | Minute Entry for Motion Hearing held on 12/16/2025 before Judge Richard J. Leon. Oral arguments submitted on Plaintiff's Motion 2 for Temporary Restraining Order and Preliminary Injunction . Court takes matter under advisement. Forthcoming Order. Court Reporter: Lisa Edwards. (zljn) Modified text to correct event type on 12/18/2025 (zljn). (Entered: 12/16/2025) |
| 12/17/2025 | 17 | MEMORANDUM ORDER denying in part and deferring in part 2 Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. See attached Memorandum Order for details. Consistent with the attached Memorandum Order, a hearing on plaintiff's motion for preliminary injunction is set for January 15, 2026 at 3:30 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. The parties shall file supplemental briefing as follows: Plaintiff's brief due December 29, 2025. // Defendants' response due January 8, 2026. // Plaintiff's reply due January 12, 2026. SO ORDERED. Signed by Judge Richard J. Leon on 12/17/2025. (lcrjl2) (Entered: 12/17/2025) |
| 12/17/2025 | 18 | TRANSCRIPT OF MOTION HEARING before Judge Richard J. Leon held on December 16, 2025; Page Numbers: 1–38. Date of Issuance: December 17, 2025. Court Reporter/Transcriber Lisa Edwards, Telephone number (202) 354–3269, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/7/2026. Redacted Transcript Deadline set for 1/17/2026. Release of Transcript Restriction set for 3/17/2026.(Edwards, Lisa) (Entered: 12/17/2025) |
| 12/29/2025 | 19 | AMENDED COMPLAINT against All Defendants filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Summons Executive Office of the President, # 2 Summons Susie Wiles, # 3 Summons Office of the Executive Residence, # 4 Summons Robert B. Downing, # 5 Summons |

| | | U.S. Attorney General Pamela Bondi, # 6 Summons U.S. Attorney for the District of Columbia Jeanine Pirro)(Smith, Jack) (Entered: 12/29/2025) |
|---|---|---|
| 12/29/2025 | 20 | SUPPLEMENTAL MEMORANDUM to re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Appendix, # 2 Declaration of William J. Bates, # 3 Exhibit A to Bates Declaration, # 4 Text of Proposed Order)(Smith, Jack) (Entered: 12/29/2025) |
| 12/30/2025 | 21 | SUMMONS (6) Issued Electronically as to ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF THE EXECUTIVE RESIDENCE, SUSIE WILES, U.S. Attorney and U.S. Attorney General (mg) (Entered: 12/30/2025) |
| 12/30/2025 | 22 | MOTION to Modify *Schedule* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Text of Proposed Order)(Cumming, Gregory) (Entered: 12/30/2025) |
| 12/31/2025 | 23 | Memorandum in opposition to re 22 MOTION to Modify *Schedule* filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Exhibit A)(Smith, Jack) (Entered: 12/31/2025) |
| 12/31/2025 | | MINUTE ORDER. Upon consideration of 22 defendants' Motion to Modify Schedule, it is hereby ORDERED that defendants' motion is GRANTED in part and DENIED in part. It is further ORDERED that defendants shall file their supplemental memorandum by January 15, 2026. Plaintiff shall file its reply by January 20, 2026. It is hereby ORDERED the hearing currently set for January 15, 2026 at 3:30 PM is VACATED and CONTINUED to January 22, 2026 at 3:30 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 12/31/2025. (lcrjl2) (Entered: 12/31/2025) |
| 01/02/2026 | 24 | NOTICE of Appearance by Matthew Casassa on behalf of NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES (Casassa, Matthew) (Entered: 01/02/2026) |
| 01/15/2026 | 25 | NOTICE *of Lodging Supplemental Ex Parte Declaration* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES re Order on Motion for Leave to File (Cumming, Gregory) (Entered: 01/15/2026) |
| 01/15/2026 | 26 | NOTICE of Appearance by Jacob M. Roth on behalf of All Defendants (Roth, Jacob) (Entered: 01/15/2026) |
| 01/15/2026 | 27 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Engineering Declaration, # 2 Text of Proposed Order Proposed Order)(Cumming, Gregory) (Entered: 01/15/2026) |
| 01/15/2026 | 28 | NOTICE of Appearance by Brantley Mayers on behalf of All Defendants (Mayers, Brantley) (Entered: 01/15/2026) |
| 01/15/2026 | 29 | NOTICE of Appearance by Eitan Sirkovich on behalf of All Defendants (Sirkovich, Eitan) (Entered: 01/15/2026) |
| 01/15/2026 | 30 | SUPPLEMENTAL MEMORANDUM to re Order on Motion to Modify,,, Set/Reset Deadlines/Hearings,, filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. |

JA12

| | | |
|---|---|---|
| | | RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Exhibit A– Fisher Declaration, # 2 Exhibit B– Martin Declaration, # 3 Exhibit C– Bowron Declaration, # 4 Exhibit D– Redacted Engineering Declaration, # 5 Exhibit E– Quinn Declaration)(Cumming, Gregory) (Entered: 01/15/2026) |
| 01/20/2026 | 31 | MOTION for Order *Permitting Expert Inspection of the Ballroom Project Site* by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Attachment A)(Smith, Jack) (Entered: 01/20/2026) |
| 01/20/2026 | 32 | Memorandum in opposition to re 31 MOTION for Order *Permitting Expert Inspection of the Ballroom Project Site* filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Sirkovich, Eitan) (Entered: 01/20/2026) |
| 01/20/2026 | 33 | REPLY to opposition to motion re 2 Motion for TRO, filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Declaration of Jonathan B. Jarvis)(Smith, Jack) Modified event on 1/29/2026 (mg). (Entered: 01/20/2026) |
| 01/21/2026 | 34 | NOTICE of Appearance by Thaddeus A. Heuer on behalf of NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES (Heuer, Thaddeus) (Entered: 01/21/2026) |
| 01/21/2026 | | MINUTE ORDER. Regarding defendants' 27 Sealed Motion for Leave to File Under Seal, it is hereby ORDERED that the motion is GRANTED. Regarding plaintiff's 31 Motion for Expert Inspection of the Ballroom Project Site, it is hereby ORDERED that the motion is DENIED for lack of good cause and in light of the national security concerns raised by defendants. SO ORDERED. Signed by Judge Richard J. Leon on 1/21/2026. (lcrjl2) (Entered: 01/21/2026) |
| 01/21/2026 | 35 | MOTION to Strike 33 Supplemental Memorandum, *Jarvis Declaration* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Cumming, Gregory) (Entered: 01/21/2026) |
| 01/21/2026 | 36 | Memorandum in opposition to re 35 MOTION to Strike 33 Supplemental Memorandum, *Jarvis Declaration* filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Smith, Jack) (Entered: 01/21/2026) |
| 01/21/2026 | 37 | SEALED DOCUMENT (DECLARATION) filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (This document is SEALED and only available to authorized persons.)(mg) (Entered: 01/22/2026) |
| 01/22/2026 | | Minute Entry for Preliminary Injunction Hearing held on 1/22/2026 before Judge Richard J. Leon. Oral arguments submitted on Plaintiff's Motion 2 for Preliminary Injunction. Court takes matter under advisement. Forthcoming Order. Court Reporter: Timothy Miller. (zljn) (Entered: 01/22/2026) |
| 01/26/2026 | 38 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING before Judge Richard J. Leon held on 1–22–26; Page Numbers: 1–48; Date of Issuance: 1–26–26; Court Reporter: Timothy R. Miller, Telephone Number (202) 354–3111. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. |

JA13

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 2/16/2026. Redacted Transcript Deadline set for 2/26/2026. Release of Transcript Restriction set for 4/26/2026.(Miller, Timothy) (Entered: 01/26/2026) |
| 02/02/2026 | 39 | MOTION to Stay *Any Preliminary Injunction Pending Appeal* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Sirkovich, Eitan) (Entered: 02/02/2026) |
| 02/02/2026 | 40 | NOTICE *of Lodging Second Supplemental Ex Parte Declaration* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES (Sirkovich, Eitan) (Entered: 02/02/2026) |
| 02/04/2026 | 41 | MOTION to Strike 39 MOTION to Stay *Any Preliminary Injunction Pending Appeal* by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Casassa, Matthew) (Entered: 02/04/2026) |
| 02/04/2026 | 42 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 12/15/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 2/13/2026.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JESSICA BOWRON served on 12/29/2025; DOUGLAS BURGUM served on 12/30/2025; DEPARTMENT OF THE INTERIOR served on 12/30/2025; GENERAL SERVICES ADMINISTRATION served on 12/29/2025; NATIONAL PARK SERVICE served on 12/29/2025; MICHAEL J. RIGAS served on 12/29/2025; JOHN STANWICH served on 12/29/2025; DONALD J. TRUMP served on 1/7/2026, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 12/16/2025. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Casassa, Matthew) (Entered: 02/04/2026) |
| 02/05/2026 | 43 | Memorandum in opposition to re 41 MOTION to Strike 39 MOTION to Stay *Any Preliminary Injunction Pending Appeal* filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Sirkovich, Eitan) (Entered: 02/05/2026) |
| 02/06/2026 | 44 | Unopposed MOTION for Extension of Time to *Respond to Plaintiff's Amended Complaint* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Ramus, Michelle) (Entered: 02/06/2026) |
| 02/17/2026 | 45 | Memorandum in opposition to re 39 MOTION to Stay *Any Preliminary Injunction Pending Appeal* filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Casassa, Matthew) (Entered: 02/17/2026) |
| 02/18/2026 | | MINUTE ORDER. Upon consideration of the defendants' 44 Unopposed Motion for Extension of Time to Respond to Plaintiff's Amended Complaint, it is hereby ORDERED that the motion is GRANTED nunc pro tunc. Defendants shall answer or otherwise respond to plaintiff's 19 Amended Complaint fourteen (14) days after the |

JA14

| | | |
|---|---|---|
| | | Court rules on plaintiff's 2 Motion for Preliminary Injunction. SO ORDERED. Signed by Judge Richard J. Leon on 2/18/2026. (lcrjl2) (Entered: 02/18/2026) |
| 02/20/2026 | 46 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 1/5/2026., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 1/5/2026. ( Answer due for ALL FEDERAL DEFENDANTS by 3/6/2026.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ROBERT DOWNING served on 2/9/2026; EXECUTIVE OFFICE OF THE PRESIDENT served on 1/14/2026; OFFICE OF THE EXECUTIVE RESIDENCE served on 1/15/2026; SUSIE WILES served on 1/14/2026 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Casassa, Matthew) (Entered: 02/20/2026) |
| 02/26/2026 | 47 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 2/26/2026. (lcrjl2) (Entered: 02/26/2026) |
| 02/26/2026 | 48 | ORDER. Consistent with the attached, plaintiff's 2 Motion for Preliminary Injunction is DENIED. See Order for details. Signed by Judge Richard J. Leon on 2/26/2026. (lcrjl2) (Entered: 02/26/2026) |
| 02/27/2026 | 49 | MOTION for Leave to File *Second Amended Complaint* by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Casassa, Matthew) (Entered: 02/27/2026) |
| 03/01/2026 | | MINUTE ORDER. Upon consideration of the plaintiff's 49 Motion for Leave to File Second Amended Complaint, it is hereby ORDERED that the motion is GRANTED. See Fed. R. Civ. P. 15(a)(2). The Clerk is directed to docket plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief [49–1]. SO ORDERED. Signed by Judge Richard J. Leon on 3/1/2026. (lcrjl2) (Entered: 03/01/2026) |
| 03/01/2026 | 50 | Second AMENDED COMPLAINT against All Defendants filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES.(mg) (Entered: 03/02/2026) |
| 03/05/2026 | 51 | Second MOTION for Preliminary Injunction by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Casassa, Matthew) (Entered: 03/05/2026) |
| 03/05/2026 | | MINUTE ORDER. Regarding plaintiff's 51 Second Motion for Preliminary Injunction, defendants are hereby ORDERED to file a response no later than Thursday, March 12, 2026 at 5:00 PM. Plaintiff shall file a reply, if any, no later than Monday, March 16, 2026 at 5:00 PM. The Court will hold a hearing on the motion on Tuesday, March 17, 2026 at 3:30 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 3/5/2026. (lcrjl2) (Entered: 03/05/2026) |
| 03/12/2026 | 52 | Memorandum in opposition to re 51 Second MOTION for Preliminary Injunction filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Declaration Ex. A – Suppl. Stidham Decl., # 2 Declaration Ex. B – Suppl. Martin Decl.)(Sirkovich, Eitan) (Entered: 03/12/2026) |
| 03/13/2026 | 53 | NOTICE *OF AVAILABILITY OF IN–PERSON INSPECTION* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES re 51 Motion for Preliminary Injunction (Sirkovich, Eitan) (Entered: 03/13/2026) |
| 03/16/2026 | 54 | REPLY to opposition to motion re 51 Motion for Preliminary Injunction filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED |

| | | |
|---|---|---|
| | | STATES. (Casassa, Matthew) (Entered: 03/16/2026) |
| 03/17/2026 | | Minute Entry for Preliminary Injunction Hearing held before Judge Richard J. Leon on March 17, 2026. Oral arguments submitted on Plaintiff's Second Motion 51 for Preliminary Injunction. Court takes matter under advisement. Forthcoming Order. Court Reporter: Timothy Miller. (zljn) (Entered: 03/17/2026) |
| 03/23/2026 | 55 | MOTION for Leave to File *Supplemental Declarations* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Proposed Order, # 2 Second Suppl. Bowron Declaration, # 3 Second Suppl. Martin Declaration)(Mayers, Brantley) (Entered: 03/23/2026) |
| 03/25/2026 | 56 | NOTICE *of Intent to File Opposition and Supplemental Declaration* by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES (Casassa, Matthew) (Entered: 03/25/2026) |
| 03/26/2026 | 57 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING before Judge Richard J. Leon held on 3–17–26; Page Numbers: 1–36; Date of Issuance: 3–26–26; Court Reporter: Timothy R. Miller, Telephone Number (202) 354–3111. Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 4/16/2026. Redacted Transcript Deadline set for 4/26/2026. Release of Transcript Restriction set for 6/24/2026.(Miller, Timothy) (Entered: 03/26/2026) |
| 03/27/2026 | 58 | NOTICE OF WITHDRAWAL OF APPEARANCE as to JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. Attorney Gregory Martin Cumming terminated. (Cumming, Gregory) (Entered: 03/27/2026) |
| 03/30/2026 | 59 | NOTICE *of Lodging Third Supplemental Ex Parte Declaration* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES (Mayers, Brantley) (Entered: 03/30/2026) |
| 03/31/2026 | 60 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 3/31/2026. (lcrjl2) (Entered: 03/31/2026) |
| 03/31/2026 | 61 | VACATED and SUPERSEDED PURSUANT TO 73 ORDER FILED 4/16/2026.....ORDER. Consistent with the attached, plaintiff's 51 Motion for Preliminary Injunction is GRANTED. See Order for details. Signed by Judge Richard J. Leon on 3/31/2026. (lcrjl2) Modified docket text on 4/16/2026 (zljn). (Entered: 03/31/2026) |
| 03/31/2026 | 62 | ENTERED IN ERROR.....NOTICE of Appeal as to 61 Order on Motion for Preliminary Injunction, Order on Motion for Leave to File, 60 Memorandum & |

JA16

| | | |
|---|---|---|
| | | Opinion by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Sirkovich, Eitan) Modified on 4/1/2026, refiled at docket entry 63 (mg). (Entered: 03/31/2026) |
| 03/31/2026 | 63 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 61 Order on Motion for Preliminary Injunction, Order on Motion for Leave to File, 60 Memorandum & Opinion by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. Fee Status: No Fee Paid. (mg) (Entered: 04/01/2026) |
| 04/01/2026 | 64 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 63 Notice of Appeal to DC Circuit Court. (mg) (Entered: 04/01/2026) |
| 04/01/2026 | | USCA Case Number 26–5101 for 63 Notice of Appeal to DC Circuit Court, filed by ROBERT DOWNING, JOHN STANWICH, DONALD J. TRUMP, DOUGLAS BURGUM, OFFICE OF THE EXECUTIVE RESIDENCE, DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, JESSICA BOWRON, EXECUTIVE OFFICE OF THE PRESIDENT, SUSIE WILES, MICHAEL J. RIGAS, GENERAL SERVICES ADMINISTRATION. (mg) (Entered: 04/01/2026) |
| 04/01/2026 | 65 | MOTION to Clarify *Preliminary Injunction* by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Casassa, Matthew) (Entered: 04/01/2026) |
| 04/08/2026 | 66 | NOTICE OF CROSS APPEAL as to 48 Order, Preliminary Injunction, 47 Memorandum & Opinion by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. Filing fee $ 605, receipt number ADCDC–12347960. Fee Status: Fee Paid. Parties have been notified. (Craig, Gregory) (Entered: 04/08/2026) |
| 04/08/2026 | 67 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 66 Notice of Cross Appeal,. (znmw) (Entered: 04/08/2026) |
| 04/08/2026 | | USCA Case Number 26–5108 for 66 Notice of Cross Appeal, filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (zjm) (Entered: 04/08/2026) |
| 04/11/2026 | 68 | MANDATE of USCA as to 66 Notice of Cross Appeal, filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, 63 Notice of Appeal to DC Circuit Court, filed by ROBERT DOWNING, JOHN STANWICH, DONALD J. TRUMP, DOUGLAS BURGUM, OFFICE OF THE EXECUTIVE RESIDENCE, DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, JESSICA BOWRON, EXECUTIVE OFFICE OF THE PRESIDENT, SUSIE WILES, MICHAEL J. RIGAS, GENERAL SERVICES ADMINISTRATION ; USCA Case Number 26–5101. (Attachments: # 1 USCA Order 4/11/2026)(mg) (Entered: 04/13/2026) |
| 04/13/2026 | | MINUTE ORDER. In light of the court of appeals' requirement that this Court respond promptly to its per curiam order, see Order, Nat'l Tr. for Historic Pres. v. NPS, No. 26–5101 (D.C. Cir. Apr. 11, 2026), if the defendants intend to respond to plaintiff's 65 Motion to Clarify, defendants are ordered to file their response no later than Tuesday, April 14, 2026 at 4:00 PM. SO ORDERED. Signed by Judge Richard J. Leon on 4/13/2026. (lcrjl2) (Entered: 04/13/2026) |
| 04/13/2026 | 69 | Memorandum in opposition to re 65 MOTION to Clarify *Preliminary Injunction* filed by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, |

JA17

| | | |
|---|---|---|
| | | OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Quinn Declaration)(Mayers, Brantley) (Entered: 04/13/2026) |
| 04/14/2026 | 70 | REPLY to opposition to motion re 65 Motion to Clarify filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (Casassa, Matthew) (Entered: 04/14/2026) |
| 04/14/2026 | 71 | MOTION to Stay *Preliminary Injunction* by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Text of Proposed Order)(Mayers, Brantley) (Entered: 04/14/2026) |
| 04/16/2026 | 72 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 4/16/2026. (lcrjl2) (Entered: 04/16/2026) |
| 04/16/2026 | 73 | ORDER. Consistent with the attached, the Court's 61 Order is hereby VACATED and SUPERSEDED by this Order. It is further ORDERED that plaintiff's 65 Motion for Clarification is GRANTED and defendants' 71 Motion to Extend Administrative Stay of Preliminary Injunction is GRANTED in part and DENIED in part. See Order for details. Signed by Judge Richard J. Leon on 4/16/2026. (lcrjl2) (Entered: 04/16/2026) |
| 04/16/2026 | 74 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 73 Order on Motion to Clarify,, Order on Motion to Stay, by DOUGLAS BURGUM, JESSICA BOWRON, GENERAL SERVICES ADMINISTRATION, DONALD J. TRUMP, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, NATIONAL PARK SERVICE, MICHAEL J. RIGAS, SUSIE WILES, JOHN STANWICH, OFFICE OF THE EXECUTIVE RESIDENCE, DEPARTMENT OF THE INTERIOR. Fee Status: No Fee Paid. (Sirkovich, Eitan) (Entered: 04/16/2026) |
| 04/16/2026 | 75 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 74 Notice of Appeal to DC Circuit Court. (mg) (Entered: 04/16/2026) |
| 04/16/2026 | | USCA Case Number 26–5123 for 74 Notice of Appeal to DC Circuit Court, filed by ROBERT DOWNING, JOHN STANWICH, DONALD J. TRUMP, DOUGLAS BURGUM, OFFICE OF THE EXECUTIVE RESIDENCE, DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, JESSICA BOWRON, EXECUTIVE OFFICE OF THE PRESIDENT, SUSIE WILES, MICHAEL J. RIGAS, GENERAL SERVICES ADMINISTRATION. (mg) (Entered: 04/20/2026) |
| 04/21/2026 | 76 | NOTICE OF CROSS APPEAL by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. Filing fee $ 605, receipt number ADCDC–12374753. Fee Status: Fee Paid. Parties have been notified. (Casassa, Matthew) (Entered: 04/21/2026) |
| 04/22/2026 | 77 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 76 Notice of Cross Appeal. (mg) (Entered: 04/22/2026) |
| 04/24/2026 | | USCA Case Number 26–5134 for 76 Notice of Cross Appeal filed by NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES. (mg) (Entered: 04/24/2026) |
| 04/27/2026 | 78 | NOTICE of Appearance by Stanley Edmund Woodward, Jr on behalf of All Defendants (Woodward, Stanley) (Entered: 04/27/2026) |
| 04/27/2026 | 79 | MOTION Indicative Ruling Dissolving the Court's Injunction re 73 Order on Motion to Clarify,, Order on Motion to Stay, by JESSICA BOWRON, DOUGLAS BURGUM, DEPARTMENT OF THE INTERIOR, ROBERT DOWNING, EXECUTIVE OFFICE OF THE PRESIDENT, GENERAL SERVICES ADMINISTRATION, NATIONAL PARK SERVICE, OFFICE OF THE EXECUTIVE RESIDENCE, MICHAEL J. RIGAS, JOHN STANWICH, DONALD J. TRUMP, SUSIE WILES. (Attachments: # 1 Exhibit Quinn Declaration, # 2 Text of Proposed Order)(Woodward, Stanley) |

JA18

(Entered: 04/27/2026)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES**,
600 14th Street N.W., Washington, D.C. 20005,

     *Plaintiff*,

     v.

**NATIONAL PARK SERVICE**,
1849 C Street, N.W., Washington, D.C. 20240;

**JESSICA BOWRON, in her official capacity
as ACTING DIRECTOR, NATIONAL PARK
SERVICE**,
1849 C Street, N.W., Washington, D.C. 20240;

**JOHN STANWICH, in his official capacity as
SUPERINTENDENT, THE WHITE HOUSE
AND PRESIDENT'S PARK**,
1849 C Street, N.W., Washington, D.C. 20240;

**DEPARTMENT OF THE INTERIOR**,
1849 C Street, N.W., Washington, D.C. 20240;

**DOUGLAS BURGUM, in his official capacity
as SECRETARY OF THE INTERIOR**,
1849 C Street, N.W., Washington, D.C. 20240;

**GENERAL SERVICES ADMINISTRATION**,
1800 F Street, N.W., Washington, D.C. 20405;

**MICHAEL J. RIGAS, in his official capacity
as ACTING ADMINISTRATOR, GENERAL
SERVICES ADMINISTRATION,**
1800 F Street, N.W., Washington, D.C. 20405;
and

**DONALD J. TRUMP, in his official capacity
as PRESIDENT OF THE UNITED STATES**,
1600 Pennsylvania Avenue, N.W., Washington,
D.C. 20500,

     *Defendants*.

Civil Action No. _____

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

**INTRODUCTION**

1.      With its modest neoclassical design, the White House has served as a symbol of the United States for over two hundred years. In late October 2025, at the direction of President Donald J. Trump, the defendants in this action (together, "Defendants") demolished the East Wing of the White House in order to build a 90,000-square-foot ballroom ("Ballroom") on its site ("Ballroom Project"). They did so without seeking approval from Congress; without requesting review and approval from the federal commissions charged with oversight of development in the nation's capital; without conducting the required environmental studies; and without allowing the public any opportunity for input. Within days, the East Wing and its colonnade—a version of which was first built on the site during the presidency of Thomas Jefferson—were completely destroyed.

2.      The Defendants did not stop with the demolition of the East Wing. Recent reporting describes the former location of the East Wing as a bustling construction site, with dozens of workers driving piles, stockpiling materials, and amassing heavy machinery. Just last week, a towering construction crane was erected on the White House grounds, and President Trump recounted that work on the Ballroom Project was audible all night. Yet the Defendants *still* have not sought review of the Ballroom Project or obtained the necessary approvals. And the American public, to whom the White House belongs, *still* has had no chance to provide its input.

3.      No president is legally allowed to tear down portions of the White House without any review whatsoever—not President Trump, not President Biden, and not anyone else. And no president is legally allowed to construct a ballroom on public property without giving the public the opportunity to weigh in. President Trump's efforts to do so should be immediately halted, and work on the Ballroom Project should be paused until the Defendants complete the required

2

JA21

reviews—reviews that should have taken place *before* the Defendants demolished the East Wing, and *before* they began construction of the Ballroom—and secure the necessary approvals.

4. Plaintiff, the National Trust for Historic Preservation in the United States ("National Trust"), is a private charitable, educational non-profit corporation chartered by Congress in 1949. *See* Pub. L. 81-408, 63 Stat. 927 (Oct. 26, 1949). The purpose of the National Trust is to further the historic preservation policy of the United States and to promote the public's awareness of and ability to comment on any activity that might damage or destroy our nation's architectural heritage. *See* 54 U.S.C. § 312102. The Trust is obligated by its charter "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." *Id.* § 312102(a). In furtherance of those goals, the Trust has brought historic preservation suits across—and against—numerous Presidential administrations.

5. Upon learning of the Defendants' sudden, unilateral, and unlawful decision to destroy the East Wing of the White House, the National Trust immediately wrote to the National Park Service, the National Capital Planning Commission ("NCPC"), and the Commission of Fine Arts ("CFA") on October 21, 2025, urging the cessation of demolition and initiation of the review procedures for the plans for the Ballroom Project. The National Trust received no response. The National Trust brings this action to compel the Defendants to comply with procedural requirements that inform the public and protect the public's opportunity to comment on the Ballroom Project.

6. The Defendants were required to submit their plans to the NCPC, the CFA, and Congress for review before they began work on the demolition of the East Wing and the construction of the Ballroom. *See* 40 U.S.C. §§ 8106 ("A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."), 8722(b) ("[A] federal . . . agency, before preparing

3

JA22

construction plans the agency originates for proposed developments and projects . . . shall advise and consult with the [NCPC] as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital."), 8722(d) ("[T]he location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of the [NCPC]."); 45 C.F.R. § 2101.2(b) ("Officers and departments of the federal government responsible for finally approving or acting upon proposed projects [for certain development within the District of Columbia] are required first to submit plans or designs for such projects to the [CFA] for its advice and comments."). And they were required to secure the approval of the NCPC and Congress. *See* 40 U.S.C. §§ 8106; 8722(d). Yet it appears that site preparation and preliminary construction of the proposed new Ballroom is proceeding without any review by either commission or by Congress, and without the necessary approvals.

7.      By evading this required review, the Defendants are depriving the public of its right to be informed and its opportunity to comment on the Defendants' proposed plans for the Ballroom Project. This public involvement, while important in all preservation matters, is particularly critical here, where the structure at issue is perhaps the most recognizable and historically significant building in the country.

8.      The National Trust therefore brings this action for declaratory and injunctive relief. Specifically, the National Trust requests that this Court declare that the Defendants' commencement of, and continued work on, the Ballroom Project violates numerous federal statutes, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; certain statutes requiring review of the project by the NCPC and the CFA, and approval by the NCPC, *see* 40 U.S.C. §§ 8721-8722, 9102; *see also* 45 C.F.R. §§ 2101.1-2101.2; a statute requiring

4

JA23

construction of the Ballroom to be expressly authorized by Congress, *see* 40 U.S.C. § 8106; and the National Environmental Policy Act ("NEPA"), *see* 42 U.S.C. § 4332(2)(C). The National Trust further requests that the Defendants be enjoined from continuing work on the Ballroom Project until the necessary federal commissions have reviewed and approved the project's plans; adequate environmental review has been conducted; and Congress has authorized the Ballroom's construction.

### PARTIES

9.      Defendant National Park Service is a federal agency within the Department of the Interior that is charged with the management of most of the country's national parks, including the national park known as "The White House and President's Park" (hereinafter "President's Park") in Washington, D.C., within which the White House is located. The National Park Service is headquartered in Washington, D.C.

10.      Defendant Jessica Bowron was appointed Acting Director of the National Park Service in or about January 2025. Defendant Bowron is the highest-ranking official of the National Park Service. As such, she is responsible for overseeing the National Park Service's management of the country's national parks, including President's Park in Washington, D.C. Acting Director Bowron is also responsible for ensuring that the National Park Service complies with all laws in its operations. Acting Director Bowron is sued in her official capacity.

11.      Defendant John Stanwich is Superintendent of President's Park. In that capacity, Superintendent Stanwich is responsible for overseeing the management of President's Park in Washington, D.C. Superintendent Stanwich is sued in his official capacity.

12.      Defendant Department of the Interior is an executive department charged with the management and conservation of most federal lands, including President's Park in Washington, D.C. The Department of the Interior is headquartered in Washington, D.C.

JA24

13.    Defendant Douglas Burgum is the Secretary of the Interior. As head of the Department of the Interior, he is responsible for the Department's management and conservation of federal lands, including President's Park in Washington, D.C. Secretary Burgum is also responsible for ensuring that the Department of the Interior complies with all laws in its operations. Secretary Burgum is sued in his official capacity.

14.    Defendant General Services Administration ("GSA") is an independent agency that assists in the management of federal property. Among other things, GSA manages and supports federal construction projects. GSA is headquartered in Washington, D.C.

15.    Defendant Michael J. Rigas is the Acting Administrator of GSA. As Acting Administrator, he is responsible for overseeing and directing GSA's operations. Acting Administrator Rigas is also responsible for ensuring that GSA complies with all laws in its operations. Acting Administrator Rigas is sued in his official capacity.

16.    Defendant Donald J. Trump is the President of the United States. President Trump planned and directed the demolition of the East Wing and is planning and directing the construction of the Ballroom on its site. President Trump is sued in his official capacity.

17.    Plaintiff, the **National Trust for Historic Preservation in the United States**, is a private charitable, educational, non-profit corporation headquartered in Washington, D.C. The National Trust protects America's historic sites through stewardship, advocacy, and direct assistance. It stewards twenty-seven historic sites, all of which are open to the public. The National Trust owns the historic Stephen Decatur House on Lafayette Square, which is managed by the White House Historical Association pursuant to co-stewardship agreements. The Trust helps neighbors, partners, and individuals across the country protect threatened historic sites in their own communities. And it takes legal action to protect threatened sites where necessary. For example,

6

JA25

the National Trust has filed suit numerous times over the years to stop highway projects that would have destroyed historic neighborhoods and communities. *See, e.g., Coalition Against a Raised Expressway v. Dole,* 835 F.2d 803 (11th Cir. 1988); *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d 700 (11th Cir. 1985); *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 770 F.2d 423 (5th Cir. 1985); *City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106 (C.D. Cal. 1999).

18.     The National Trust has thousands of members across the country. Members of the National Trust use, enjoy, derive personal and professional benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park. For example, one Trust member—a professor emerita at a university where she taught history and historic preservation, and a member of the boards of various historic-preservation organizations—resides in Washington, D.C., and frequently visits the White House neighborhood in order to enjoy the historic buildings and the beauty of the city's design, in which the White House prominently features. The interests of this Trust member, and those of other members, have been impaired by the destruction of the East Wing of the White House by the Defendants, and will be impaired further by the construction on the East Wing's former site of a ballroom substantially similar to that which the Defendants propose to build. If given the legally required opportunity, the National Trust would provide comments expressing its and its members concerns regarding the Ballroom Project, the substance of which is described further herein.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action presents federal questions under the Constitution and the laws of the United States. An actual, justiciable

JA26

controversy now exists between the National Trust and the Defendants, and relief may be granted under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

20.    Venue is proper in this district because the parties reside in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(c), (e).

**FACTUAL BACKGROUND**

**The White House**

21.    The White House is the official residence of the President of the United States. It is located in President's Park, a federal park administered by the National Park Service in Washington, D.C. President's Park encompasses the White House and its grounds, the Ellipse, Lafayette Square, the Eisenhower Executive Office Building, and the Treasury Building.

22.    Conceived by the capital's initial planner, Pierre Charles L'Enfant, as a grand presidential palace, the White House owes its modest yet iconic profile to James Hoban, an Irish-born architect whose winning submission to an architectural competition served as the plans for the new building. Hoban's surviving sketches depict a structure, on the scale of what would then have been a large country house, that substantially resembles the Executive Residence today.



*Figure 1 – Plan drawn by James Hoban circa his 1793-1794 designs for the White House. The White House Historical Association.*

8

JA27

23.     Construction of the White House according to Hoban's plans began in the 1790s and, in 1800, near the end of his presidency, President John Adams moved into the still unfinished building. In 1801, President Adams was succeeded in the presidency—and in the White House— by Thomas Jefferson. Every president since has resided in the White House while in office.

24.     President Jefferson, a talented self-trained architect, took an active interest in the White House, remodeling the residence's interiors, adding fencing, and developing its grounds. Perhaps his most significant improvement, however, was the construction of colonnades extending east and west from the White House, initial plans for which the President sketched himself. These colonnades were likely inspired by Renaissance villas with which President Jefferson was familiar, and were similar to structures that he had previously built at Monticello, his personal residence in Virginia.



*Figure 2 – "Elevation of the South front of the President's house, copied from the design as proposed to be altered in 1817," Benjamin Henry Latrobe. The colonnades are depicted on the left and the right of the main structure. Library of Congress.*

25.     President Jefferson's colonnades, along with much of the rest of the White House, suffered substantial damage during the War of 1812.  After the war, the White House—including its colonnades—was rebuilt under the supervision of Hoban, with input from then-former President

9

JA28

Jefferson. The White House returned to use by 1818, and reconstruction of the east and west colonnades continued through the remainder of the decade.

### The East and West Wings of the White House

26.     In 1902, the East and West Wings were added at the ends of new east and west colonnades. The West Wing was constructed as an executive office building; today, it houses the Oval Office, the Cabinet Room, and office space for the President and executive staff. Initially, the East Wing served as a receiving area for visitors and guests attending functions at the White House.

27.     The East Wing was expanded in 1942 to increase its footprint, add a second story, and construct a bunker underneath the building. The bunker provided the President and staff with a secure meeting place in the event of an emergency during the war, and continued to serve that purpose in the decades thereafter.

28.     The principal function of the modern East Wing, however, has been to house the offices of the First Lady. By the 1930s, First Lady Eleanor Roosevelt was using the East Wing for official functions and news conferences. Subsequent presidential spouses kept their own staff and offices in the East Wing. This arrangement, by then commonplace, was formalized in the latter part of the century by the White House Personnel Authorization Act of 1978, Pub. L. 95-570, § 105(e), 92 Stat. 2445, 2446 (Nov. 2, 1978), which made available to the First Lady funds for an office and staff.

29.     In addition to offices for the First Lady and her staff, the East Wing contained a small theater. Constructed during the 1942 renovations, the theater was used by many presidents, their families, and guests for more than eighty years to show movies and watch major sporting events.

JA29

 

*Figure 3 (left) – "President George W. Bush Speaks to the Attendees of the Screening of 'United 93' in the White House Family Theater." National Archives Catalog / George W. Bush Library.*

*Figure 4 (right) – President Bill Clinton, family, staffers, and guests watching the Super Bowl in 1993. Clinton Library.*

30.    Located on the grounds outside of the East Wing was a garden, constructed shortly after the East Wing itself. Dating to 1903, but dedicated to former First Lady Jacqueline Kennedy in 1965, the Jacqueline Kennedy Garden balanced the Rose Garden on the west side of the White House. The Jacqueline Kennedy Garden, depicted below, featured a defined central lawn bordered by a brick walk and various botanical specimens. A pergola designed by the architect I.M. Pei was located at its west end. Like the Rose Garden, the Jacqueline Kennedy Garden was used to host events and receptions. Along with the East Wing, the Kennedy Garden was demolished in its entirety by the Defendants.



*Figure 5 – Jacqueline Kennedy Garden (2023). National Park Service / Kelsey Graczyk.*

11

JA30

31.     Around the East Wing and the Jacqueline Kennedy Garden were several commemorative trees, including a silver linden planted by former First Lady Laura Bush and two magnolias planted in the middle of the twentieth century and dedicated to the memory of President Warren Harding and President Franklin D. Roosevelt, respectively. On information and belief, one or more of these trees were also destroyed by the Defendants.

**The Defendants Announce Plans for the Ballroom**

32.     On July 31, 2025, the White House issued a press release (the "July 2025 Press Release") announcing plans to build a "White House State Ballroom" on the White House grounds. The purpose of the Ballroom, as announced by the July 2025 Press Release, was to host "substantially more guests" at the White House than could presently be accommodated indoors. The press release stated that the Ballroom would be "approximately 90,000 total square feet of ornately designed and carefully crafted space, with a seated capacity of 650 people – a significant increase from the 200-person seated capacity in the East Room of the White House."

33.     According to the July 2025 Press Release, the Ballroom "will be substantially separated from the main building of the White House, but at the same time, it's [sic] theme and architectural heritage will be almost identical." The press release stated that "[t]he site of the new ballroom will be where the small, heavily changed, and reconstructed East Wing currently sits."

34.     The July 2025 Press Release announced that "[t]he project will begin in September 2025" and was "expected to be completed long before the end of President Trump's term" in January 2029. The press release stated that McCrery Architects would serve as the lead architect on the project; that the construction team would be headed by Clark Construction; and that the engineering team would be led by AECOM.

12

JA31

35.    Included at the bottom of the July 2025 Press Release was a series of six images. Five of the images appeared to depict a structure on the east side of the White House, roughly on the site where its East Wing then stood. The structure shown in the images was substantially larger than the East and West Wings, and out of proportion to the Executive Residence to which it appeared to be attached. The sixth image depicted what was presumably the interior of that structure—a large room with oversized windows and gold trim on the ceiling.

 

*Figure 7 (left) – Rendering of the exterior of the planned Ballroom. July 2025 Press Release.*
*Figure 8 (right) – Rendering of the interior of the planned Ballroom. July 2025 Press Release.*

36.    The July 2025 Press Release did not specify whether the Defendants intended to replace the East Wing with the planned Ballroom, or instead incorporate some or all of the East Wing into the larger structure.

37.    However, on or about July 31, 2025, President Trump stated that the proposed Ballroom "won't interfere with the current building. . . . It'll be near it, but not touching it, and pays total respect to the existing building, which I'm the biggest fan of."

38.    The Defendants also gave no indication that they planned to ignore or to attempt to circumvent the statutorily required review processes for the Ballroom Project. For example, the White House Chief of Staff, Susie Wiles, was quoted in the July 2025 Press Release as saying that "[t]he President and the Trump White House [we]re fully committed to working with the

13

JA32

appropriate organizations to preserving [sic] the special history of the White House" while building the Ballroom.

39.    The July 2025 Press Release also stated that, "[i]n recent weeks, President Trump ha[d] held several meetings with members of the White House Staff, the National Park Service, the White House Military Office, and the United States Secret Service to discuss design features and planning"—meetings which, in the normal course, would be followed by the legally required submission of design plans for the Ballroom Project to the federal commissions responsible for oversight of the construction of public buildings in the District of Columbia.

40.    However, during the months following the July 2025 Press Release, none of the agencies responsible for the Ballroom Project submitted plans or proposals for the Ballroom Project to the NCPC or the CFA, or sought Congressional approval for the project.

41.    Rather, the Defendants and their associates began to suggest that they intended to proceed without the required reviews. In September 2025, William Scharf, a lawyer and aide for the President who had also been serving as chairman of the NCPC since his appointment two months prior, stated that, in his opinion, what the NCPC "deal[t] with [wa]s essentially construction, vertical build"—not demolition. And at a dinner for donors on or about October 15, 2025, President Trump said that he had been told by two men that, as President, he could "do anything [he] want[ed]" to the White House.

42.    During this time, the planned size of the Ballroom, already out of proportion to the rest of the White House, appeared to increase substantially. On September 13, 2025, President Trump stated in an interview with NBC News that he was "making [the Ballroom] a little bigger." Under the President's new plan, the Ballroom would accommodate 900 people—more than a 30 percent increase from the 650-person capacity announced in the July 2025 Press Release. The size

14

of the proposed new Ballroom increased further in October 2025, as the President, while speaking to a group of donors, stated that it would now be capable of accommodating nearly 1,000 people.

43.     During this same period, several architectural groups sought to persuade the Defendants to engage in the required reviews before beginning work on the Ballroom Project.  In an August 5, 2025 letter, the American Institute of Architects ("AIA") urged defendant Stanwich, in his capacity as Executive Secretary for the Committee for the Preservation of the White House—an advisory committee responsible for matters concerning the preservation of the building—"to allocate the time necessary for a rigorous process" and "ensur[e that] decisions" concerning the White House were "made with the utmost care and consideration."  The White House, the AIA's letter noted, was "not a private building," and "[a]ny modifications to [the White House]—especially modifications of th[e] magnitude [of the Ballroom]—should reflect the importance, scale, and symbolic weight of the White House itself."  To that end, the AIA urged a review process that "r[o]se to the significance of the building and the proposed alterations," including, among other things, a transparent and publicly accountable historic-preservation review.

44.     Similarly, in an October 16, 2025 statement, the Heritage Conservation Committee for the Society of Architectural Historians ("SAH") "expresse[d] great concern over the proposed ballroom addition to the White House." Although "recogniz[ing] that the White House [wa]s a building with evolving needs," the SAH noted that "the proposed ballroom w[ould] be the first major change to [the White House's] exterior appearance in the last 83 years," "since the East Wing in its current form was built in 1942." "[S]uch a significant change to a historic building of this import," the SAH urged, "should follow a rigorous and deliberate design and review process." The SAH requested that a comprehensive preservation review be undertaken; that the impacts of

15

JA34

the Ballroom Project on the White House grounds be evaluated; and that the broader national impacts on historic preservation be considered.

45. It is not unusual for even minor structures proposed to be built on the White House grounds to be subject to extensive review. For example, in 2016, defendant the National Park Service submitted concept plans to the NCPC for the installation of a new perimeter fence around the White House. The National Park Service's proposal included three options for the fence's finials and the design of its base, and two variations of the size and spacing of its pickets. The NCPC's executive director prepared a lengthy evaluation of the National Park Service's proposal, with detailed analysis and comments regarding how the various picket styles cohered with the design of the White House, the potential for the new fence to obstruct the public's view of the building, and other matters. Notably, this evaluation, although favorable, was not an approval of the National Park Service's project—for that, the National Park Service had to submit preliminary and then final project plans for further review by the NCPC.

46. Further, in 2019, during President Trump's first term, the National Park Service submitted multiple sets of plans to the NCPC in connection with its proposed replacement of a small building on the White House grounds housing a restroom and storage space with a new tennis pavilion. The NCPC approved the National Park Service's final construction plans. A report prepared by the executive director in connection with the proposal concluded, after thorough consideration, that the pavilion would "improve the existing restroom facility, provide a connection between the Children's Garden and the tennis court, and w[ould] not impact any historic resources or prominent vistas," and recommended its approval.

JA35

**<u>The Defendants Demolish the East Wing</u>**

47.     Despite not having sought review of the plans for the Ballroom Project—a much more significant project than either the new fence or the tennis pavilion—and despite the public's concerns, the Defendants forged ahead. On October 20, 2025, President Trump posted a statement to social media announcing that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." President Trump stated that "the East Wing"—which he characterized as "[c]ompletely separate from the White House itself"—was "being fully modernized as part of this process, and will be more beautiful than ever when it is complete!"

48.     During a press conference in the East Room of the White House that same day—while destruction of the East Wing was actually underway—President Trump confirmed that the demolition of the East Wing was happening "right behind us" and "might [be] hear[d] periodically."

49.     On October 21, 2025, various media outlets reported on the demolition of the East Wing. Images published by the New York Times showed heavy machinery tearing down the East Wing's façade.



*Figure 9 – Demolition of the East Wing of the White House. Alex Kent / The New York Times.*

JA36

50.     Later that day, the National Trust submitted a letter to Commissioner Scharf, in his capacity as the chairman of the NCPC; the chair of the CFA; and defendant Bowron, in her capacity as Acting Director of the National Park Service.

51.     In the letter, the National Trust explained that its congressional charter obligated it to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." The National Trust expressed its "deep[] concern[] that the massing and height of the proposed new construction w[ould] overwhelm the White House itself . . . and m[ight] also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings." The National Trust's letter further explained that "[t]he federally recognized Secretary of the Interior's Standards for Rehabilitation offer[ed] clear guidance for construction projects affecting historic properties," specifically "provid[ing] that new additions should not destroy the historic fabric of the property and that the new work should be compatible with existing massing, size, scale, and architectural features."

52.     The National Trust "respectfully urge[d] the Administration and the National Park Service to pause demolition until plans for the proposed ballroom [went] through the legally required public review process, including consultation and review by the [NCPC] and the [CFA], and to invite comment from the public." These processes, the Trust explained, "provide[d] a crucial opportunity for transparency and broad engagement—values that ha[d] guided preservation of the White House under every administration going back to the public competition in 1792 that produced the building's original design."

53.     The National Trust received no response to its letter.

54.     Despite the Trust's concerns, and those of the public, the Defendants did not pause demolition of the East Wing or engage, however belatedly, in the legally required review process.

18

JA37

Rather, that same day, the White House issued a press release asserting that "unhinged leftists and their Fake News allies" were "manufactur[ing] outrage" and "clutching their pearls" over President Trump's "visionary addition of a grand, privately funded ballroom to the White House."

55.    The next day, October 22, 2025, President Trump showed renderings of the Ballroom to members of the press and other persons gathered in the White House during a meeting with NATO Secretary General Mark Rutte. A three-dimensional model on a table in front of President Trump displayed the Ballroom on the site of the East Wing.



*Figure 10 – Three-dimensional rendering of the Executive Residence and of the planned Ballroom displayed by President Trump in the Oval Office.*

56.    President Trump stated that the East Wing was "a very small building" that was "never thought of as being much." "Over the years, many presidents have made changes," President Trump claimed, while showing renderings of the Ballroom. "This," he continued, referring to the ongoing razing of the East Wing, "obviously would be the biggest change."

57.    President Trump did not explain why it had been determined that the East Wing would have to be razed to accommodate the Ballroom except to say that, "[i]n order to do it properly, we had to take down the existing structure." Nor did President Trump divulge when it

JA38

had been decided that the East Wing would be razed; who had been consulted; or why the statutorily required processes had not been followed.

58.     The updated renderings of the Ballroom displayed by President Trump showed marked differences from the images in the July 2025 Press Release, including the number of large exterior windows, the number of columns in the proposed northeast portico, and the design of the staircase leading from the Ballroom to the South Lawn. Other aspects of the October renderings suggested a haphazard design process—the exterior trim of two windows appeared to collide, for instance, and a set of stairs led to no apparent landing.

59.     On or about the same day, October 22, 2025, a White House official confirmed to the press that the "entirety" of the East Wing would be "modernized and rebuilt." The same official acknowledged that "[t]he scope and size of the ballroom project ha[d] always been subject to vary as the process develop[ed]."

60.     Within days, the Defendants had demolished the entirety of the East Wing. An aerial photograph taken on October 23, 2025, reflected the demolition of the East Wing and the east colonnade.



*Figure 11 – Aerial photograph of President's Park and the surrounding area on October 23, 2025. The site of the former East Wing is to the right of the remainder of the White House.  ABC News / Katie Harbath.*

JA39

61.     A satellite photograph likewise depicted cleared space where the East Wing previously stood.



*Figure 12 (left) – Satellite photograph of the White House and grounds taken on September 26, 2025. Planet Labs PBC.*

*Figure 13 (right) – Satellite photograph of the White House and grounds taken on October 23, 2025. Planet Labs PBC.*

62.     And photographs taken from near the White House showed the demolition of nearly the entire East Wing and east colonnade.



*Figure 14 – Photograph of debris at the East Wing taken on October 23, 2025.  Jacquelyn Martin / AP.*

63.     Debris from the demolished East Wing was dumped at a nearby public park. Photographs of the dumping of the debris were published by media organizations. On information

21

JA40

and belief, the dumping of debris at the park was done by or at the direction of one or more of the Defendants or their agents.

64.     In a press conference held on October 23, 2025, Press Secretary Karoline Leavitt, when asked by a reporter why the public had not been informed of the decision to demolish the East Wing, stated that, "[w]ith any construction project, changes come" and claimed that the press and public had been "ke[pt] . . . apprised" by having been shown renderings of the Ballroom.

65.     Press Secretary Leavitt explained that "the President heard counsel from the architects and the construction companies who said that in order for the East Wing to be modern and beautiful for many, many years to come, for it to be a truly strong and stable structure, this phase one that we're now in"—presumably a reference to the demolition of the East Wing—"was necessary." Press Secretary Leavitt did not explain why the Defendants had not also sought counsel from the federal commissions charged with reviewing such projects.

66.     When asked by another reporter if the President could "tear down anything he wants" at the White House "without oversight," Secretary Leavitt stated her opinion that approval was needed only for vertical construction, not demolition, echoing statements previously made by Commissioner Scharf and President Trump.

67.     The Defendants have provided no information about the results of any environmental review or the safety precautions, if any, that were undertaken in connection with the demolition of the East Wing and the disposal of the debris. Insofar as the Defendants have conducted an environmental assessment under NEPA, they have failed to publish that assessment, despite being required by statute to publish it, *see* 42 U.S.C. § 4336(b)(2). Nor, on information and belief, have the Defendants prepared an environmental impact statement, despite the potential environmental impacts from the demolition of a building as old as the East Wing, its replacement

JA41

by a structure of the magnitude of the Ballroom, and the transport of debris that is substantially

likely to be contaminated to be dumped in a public park.

**The Defendants Begin to Construct the Ballroom Without Submitting Plans for Review**

68.    Although more than a month has passed since the demolition of the East Wing, on

information and belief, the Defendants have not submitted any plans for the Ballroom Project to

the NCPC, the CFA, or Congress for review and approval as of the filing of this complaint.

69.    The CFA has not met since all its members were dismissed by President Trump on

or about October 28, 2025. As of the filing of this complaint, the CFA has no sitting members and

is not scheduled to meet again until January 2026.

70.    As for the NCPC, although Chair Scharf stated at the NCPC's December 4, 2025

meeting that he had "been told by colleagues at the White House . . . that the ballroom plans will

be submitted to NCPC this month, in December," he acknowledged that he had been "screened

from planning itself over there." Plans for the Ballroom Project were not reviewed at the December

4, 2025 meeting, and the Ballroom Project was not on the list of projects anticipated for review

over the next six months issued by the NCPC prior to that meeting. The NCPC is not scheduled to

meet again until January 2026.

71.    The Defendants have never publicly acknowledged their obligation to secure

Congress's express authorization for the Ballroom Project, and on information and belief have not

sought such authorization or submitted any project plans to Congress.

72.    Despite having failed to obtain (or even request) review and approval of their plans

for the Ballroom Project, the Defendants have begun construction at the site of the East Wing. The

White House's website announces that "construction commence[d]" in "September 2025" and

invites the reader "to check back here for completed phases of renovation."  None of the White

JA42

House's listed stages of the Ballroom Project include review or approval by the NCPC, CFA, or Congress.



73.    Recent public reporting describes the location of the former East Wing as "a bustling project site . . . almost entirely fenced off from public view" and "contain[ing] dozens of workers and materials ready to be installed, including reinforced concrete pipes and an array of cranes, drills, pile drivers and other heavy machinery."

74.    In late November 2025, it was reported that President Trump had been "holding frequent meetings about [the Ballroom's] design and materials"; clashing with James McCrery, then the project's lead architect, over the President's desire to keep increasing the size of the Ballroom; personally selecting the project's contractors and handling details of their contracts, including amounts of payment; and telling people working on the project that they did not need to follow permitting, zoning, or code requirements because the structure was on White House grounds.

JA43

75.    On December 4, 2025, it was reported that President Trump had chosen a new architect, Shalom Baranes, to replace McCrery.

76.    In recent days, heavy construction machinery and construction materials, including concrete pipes, pile drivers, and drills, have been installed at the former site of the East Wing. A construction crane anchored to a concrete paddock now towers above the fences surrounding the site. President Trump told his cabinet that the pile drivers operate "all night," and that he had rebuffed requests from the First Lady to cease the pounding, stating: "Sorry, darling, that's progress."

## STATUTORY AND REGULATORY BACKGROUND

### The National Capital Planning Act

77.    Enacted in 1952, the National Capital Planning Act established the NCPC "as the central planning agency for . . . the appropriate and orderly development and redevelopment of the National Capital and the conservation of the important natural and historical features thereof." National Capital Planning Act of 1952, Pub. L. No. 82-592, § 2(a), 66 Stat. 781, 782 (July 19, 1952) (codified as amended at 40 U.S.C. § 8711(a) ("The [NCPC] is the central federal planning agency for the Federal Government in the National Capital, created to preserve the important historical and natural features of the National Capital . . . .")).

78.    The NCPC consists of twelve members. *See* 40 U.S.C. § 8711(b). Seven—the Secretary of the Interior, the Secretary of Defense, the General Services Administrator, the Mayor of the District of Columbia, the chair of the Council of the District of Columbia, the chair of the Committee on Governmental Affairs of the Senate, and the chair of the Committee on Government Reform of the House of Representatives—are *ex officio* and ordinarily appoint alternates in connection with NCPC business. *See id.* The other five members of the NCPC are "citizens with

25

experience in city or regional planning" appointed by either the President or the Mayor of the District of Columbia. *Id.*

79.    The NCPC is charged by statute with "preparing, adopting, and amending a comprehensive plan for the federal activities" in the District of Columbia and its federal environs, and with "making related recommendations to the appropriate developmental agencies." *Id.* § 8711(e)(1); *see id.* § 8721. The comprehensive plan (the "Comprehensive Plan"), which must by law be made available to the public, *see id.* § 8721(g), is published on the NCPC's website, *see* Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025). The most recent version of the Comprehensive Plan, issued in 2024, contains hundreds of pages of detailed guidance for construction and development in and around the District of Columbia. *See* Comprehensive Plan for the National Capital: Federal Elements, available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025).

80.    One of the principal elements of the Comprehensive Plan is the historic preservation of the capital district. *See id.* at 1. The Comprehensive Plan explains that "[t]he federal government's goal is to preserve, protect, and rehabilitate historic properties in the National Capital Region and promote design and development that is respectful of . . . the symbolic character of the capital's setting." *Id.* at 266. It identifies "[t]he protection and management of historic properties" as "critical elements to successful historic preservation planning." *Id.* at 272. To that end, the Comprehensive Plan instructs the federal government to "[s]ustain exemplary standards of historic property stewardship." *Id.* at 273; *see also id.* at 271 (stating that federal agencies should "be careful stewards of the historic properties under their care or affected by their decisions"). The federal government is obligated to "[r]ecognize the role historic properties . . . have in defining the

JA45

national capital and its image" and to "[p]lan carefully for appropriate uses and compatible design in and near the monumental core to protect and preserve the nation's key historic properties." *Id.* at 276.

81.     Before "any revision" to the Comprehensive Plan "is adopted," the NCPC must present the revision "to the appropriate federal or District of Columbia authorities for comment and recommendations." 40 U.S.C. § 8721(e)(1). The NCPC and the Mayor of the District of Columbia must "jointly . . . establish procedures for appropriate meaningful continuing consultation throughout the planning process for the National Capital." *Id.* § 8721(h)(1). The NCPC "may provide periodic opportunity for review and comments by nongovernmental agencies or groups through public hearings, meetings, or conferences, exhibitions, and publication of its plans," and may, "in consultation with" the Council of the District of Columbia, "encourage the formation of citizen advisory councils." *Id.* § 8721(e)(2).

82.     The Comprehensive Plan's requirements reflect Congress's desire, as expressed in federal statutes governing the NCPC and its operations, for carefully managed development of the capital district, "proceed[ing] along the lines of good order [and] good taste, and with due regard to the public interests involved." *Id.* § 8104(a). Construction in the capital district has broadly adhered to the Comprehensive Plan and these congressional goals, and the district's present state of development stands as evidence of their enduring value.

83.     In addition to promulgating and maintaining the Comprehensive Plan, the NCPC is charged with reviewing agencies' "development programs" for the District of Columbia and its federal environs; "advis[ing] as to [their] consistency with the [C]omprehensive [P]lan"; and ultimately approving, or disapproving, of various elements of proposed development projects. *Id.*

JA46

§§ 8711(e)(2), 8722(d). Federal buildings proposed to be built in the District of Columbia must receive the NCPC's approval. *Id.* § 8722(d).

84.     An agency intending to engage in development in the District of Columbia must "advise and consult" with the NCPC "before preparing construction plans the agency originates for proposed developments and projects," and must thereafter continue to advise and consult with the NCPC as it "prepares [its] plans and programs in preliminary and successive stages." *Id.* § 8722(b)(1).

85.     "After receiving the [federal agency's] plans," the NCPC is tasked with "promptly . . . mak[ing] a preliminary report and recommendations to the agency." *Id.* The agency then has the opportunity, if it disagrees with the NCPC's preliminary report and recommendations, to advise the NCPC of the reasons for its disagreement. *Id.* Thereafter, the NCPC must make a final report and ruling on the project. *Id.*; *see id.* § 8722(d).

86.     The NCPC considers proposed projects in open, public sessions. On its website, the NCPC states that it "welcomes public comment" both prior to and during these sessions. How to Comment, NCPC, https://www.ncpc.gov/participate/guidelines/#written (last visited Dec. 10, 2025). The NCPC's website allows members of the public to submit written comments on "projects, plans, or initiatives where NCPC has a lead or shared responsibility." *See* Public Comment Opportunities, NCPC, https://www.ncpc.gov/participate/notices/ (last visited Dec. 10, 2025). It offers a description of pending projects and information about the type of input the NCPC is seeking, *see id.*, and gives "Commenting Tips" to help members of the public craft their submissions, *see* How to Comment, NCPC, https://www.ncpc.gov/participate/guidelines/#written (last visited Dec. 10, 2025).

JA47

87.    The NCPC's website also allows members of the public to register to speak at NCPC meetings. *See id.* Under the heading "Commission Meeting 101," the website offers guidance on various aspects of speaking at NCPC meetings, from how and when to submit testimony in advance of the meeting to where in the NCPC's meeting room the podium at which the public should address the NCPC can be found. *See id.*

88.    The NCPC's advise-and-consult process is mandatory for agency programs that would "affect the plan and development" of the District of Columbia or its federal environs, *see* 40 U.S.C. § 8722(b)(1), with exceptions made only for buildings within the Capitol grounds and structures erected by the Department of Defense on military installations during wartime, *see id.* § 8722(b)(2)(A). Further, "[i]n order to ensure the orderly development" of the capital district and its federal environs, "the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around [such] buildings" must be "approv[ed]" by the NCPC. *Id.* § 8722(d).

### The Commission of Fine Arts

89.    The CFA is an independent federal agency established by Congress in 1910 to advise on matters of fine art within the District of Columbia. *See* An Act Establishing a Commission of Fine Arts, Pub. L. 61-181, 36 Stat. 371 (May 17, 1910) (codified as amended at 40 U.S.C. §§ 9101-9104). Like the NCPC, the CFA plays an important role in shaping the District of Columbia and the historic buildings it contains.

90.    The CFA is composed of "seven well-qualified judges of the fine arts" appointed by the President for four-year terms, 40 U.S.C. § 9101(a), who are assisted in their duties by a secretary and by "staff as authorized by the [CFA]," 45 C.F.R. § 2101.10; *see* 40 U.S.C. § 9103. As of the filing of this complaint, all seven seats on the CFA are vacant, President Trump having dismissed each of the six then-sitting members on or about October 28, 2025.

JA48

91.    Federal agencies intending to undertake development or construction projects in the capital district must seek the advice of the CFA on matters concerning fine arts. *See* 40 U.S.C. § 9102(a); 45 C.F.R. § 2101.1(a)(1). "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the designs" "before final approval" of the plans or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1); *see also id.* § 2102.10(a) (requiring submission to the CFA "when concept plans for the project are ready but before detailed plans and specifications or working drawings are prepared").

92.    The agency's submission to the CFA should state, among other things, "the nature, location, and justification of the project" regarding which the CFA's advice is sought, "including any relevant historical information about the building or other structure to be altered or razed," as well as, to the extent relevant, "area studies, site plans, building and landscape schematics, renderings, models, depictions or samples of exterior materials and components, and photographs of existing conditions to be affected by the project." 45 C.F.R. § 2102.10(b)(1). The information submitted must "be sufficiently complete, detailed, and accurate as will enable the [CFA] to judge the ultimate character, siting, height, bulk, and appearance of the project, in its entirety, including the grounds within the scope of the project, its setting and environs, and its effect upon existing conditions and upon historical and prevailing architectural values." *Id.* § 2102.10(b)(2).

93.    After receiving an agency's proposal, the CFA will "comment[] and advise[] on the plans and on the merits of the designs" of the proposed "public building[]." *Id.* § 2101.1(a)(1). The CFA is generally required to "conduct its deliberations and reach its conclusions" in open meetings, *id.* § 2102.1, and must keep "detailed record[s]" of these meetings and of its decision-making, *see id.* § 2102.5.

JA49

94.     Notice of the CFA's meetings must be published in the Federal Register. *See id.* § 2102.3. "Interested persons are permitted to attend meetings of the [CFA], to file statements with the [CFA] at or before a meeting, and to appear before the [CFA] when it is in meeting" to present their views on "the matter or issues then before the [CFA]." *Id.* § 2102.4.

95.     The only buildings excepted from the advise-and-consult requirement are the Capitol Building and the Library of Congress buildings, *see* 40 U.S.C. § 9102(c); in all other cases, seeking the CFA's advice is mandatory. Further, even if the agency's project is to proceed in multiple stages, "information about the eventual plans should accompany" the agency's initial submission, regardless of whether the first stage only seeks "approval for razing or removal of a building or other structure." 45 C.F.R. § 2102.10(c).

## The National Environmental Policy Act

96.     NEPA, codified as amended at 42 U.S.C. § 4321 *et seq.*, has long been described as the "basic national charter for protection of the environment." *Los Angeles v. Nat'l Highway Traffic Safety Admin.,* 912 F.2d 478, 491 (D.C. Cir. 1990) (quoting 40 C.F.R. § 1500.1(a)). The statute, which is intended "to inform agency decisionmaking," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025), requires federal agencies to take a "hard look" at the environmental consequences of their proposals before approving or taking action on them, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). It also requires agencies to make their environmental analyses available to the public. *See* 42 U.S.C. §§ 4332(2)(C), 4336(b)(2).

97.     NEPA is "a purely procedural statute." *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 235 (D.C. Cir. 2025). As such, it does not "force . . . agenc[ies] to change the course of action [they] propose[]"; instead, it obligates them to make "fully-informed and well-

31

JA50

considered" decisions. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (first quoting *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008); and then quoting *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799-800 (D.C. Cir. 2022)). In order to carry out that obligation, agencies must "have available, and . . . carefully consider, detailed information concerning significant environmental impacts" of their proposed actions, and share such information with "the larger audience that may play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

98.     In furtherance of those aims, NEPA requires federal agencies to prepare a "detailed statement" for any "major Federal action[]" that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major" federal actions are those that the responsible agency "determines [to be] subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

99.     If a proposed major federal action does not have "a reasonably foreseeable significant effect" on the quality of the human environment, or if the significance of its effects are unknown, the agency must prepare an "environmental assessment." *Id.* § 4336(b)(2); *see also* 43 C.F.R. § 46.210. In form, the agency's environmental assessment must be "a concise public document" that "set[s] forth the basis of" the agency's findings. 42 U.S.C. § 4336(b)(2). In substance, the environmental assessment must reach one of two conclusions: either that the proposed action has "no significant impact" or "that an environmental impact statement is necessary." *Id.* The agency may issue a finding of no significant impact only if a contemplated action has no reasonably foreseeable significant effects on the quality of the human environment, *see id.* §§ 4332(2)(C), 4336(b)(2); in all other cases, the agency must prepare an environmental impact statement ("EIS").

32

JA51

100. The agency's EIS must take the form of a "detailed written statement," *id.* § 4336e(6), that describes the "reasonably foreseeable environmental effects of the proposed agency action," including "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented," *id.* § 4332(2)(C)(i), (ii).

101. Effects of a proposed agency action "are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (alteration in original) (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)). They need not be direct or immediate effects of the agency's action to qualify as "reasonably foreseeable." *See id.*

102. The agency's EIS must also propose "a reasonable range of alternatives to the proposed agency action," including a no-action alternative. 42 U.S.C. § 4332(2)(C)(iii); *see* 43 C.F.R. § 46.30. This alternatives analysis, long referred to as "the heart of the environmental impact statement," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (quoting 40 C.F.R. § 1502.14), requires the agency to "look hard" at its options to "bring about the ends of the federal action" proposed, *id.* at 195-96. The agency must "consider[] the relevant factors" and "define goals for its action that fall somewhere within the range of reasonable choices." *Id.* In so doing, the agency may not define "the objectives of its action in terms so unreasonably narrow that only one alternative would accomplish the goals of its action." *Sierra Club v. FERC*, 145 F.4th 74, 88 (D.C. Cir. 2025) (quoting *Citizens Against Burlington*, 938 F.2d at 196) (citation modified).

103. Throughout its analysis, the agency must consider the proposed project as a whole—from the demolition through to the completion of construction, taking into account all

JA52

reasonably foreseeable effects. An agency impermissibly "segments" its NEPA review when it divides "connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "The justification for the rule against segmentation is obvious: it 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (alteration in original) (quoting *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)). The rule also prevents agencies from evading NEPA review with respect to one or more portions of a larger and ostensibly separate project for which the agency has prepared, or will prepare, an EIS.

<u>**Administrative Procedure Act**</u>

104.    The APA affords federal judicial review of agency action. *See* 5 U.S.C. §§ 701-706. It provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).

**CLAIMS FOR RELIEF**

<u>**Count I – Violation of Administrative Procedure Act (Failure to Advise and Consult with the NCPC and to Obtain NCPC Approval, 40 U.S.C. §§ 8721, 8722)**</u>

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

105.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

106.    Federal agencies that "originate[ plans] for proposed developments and projects" that "affect the plan and development of the National Capital" must "advise and consult" with the NCPC with respect to those plans. 40 U.S.C. § 8722(b)(1). Specifically, such federal agencies must

34

JA53

"advise and consult" with the NCPC "before preparing construction plans" and "as the agency prepares plans and programs in preliminary and successive stages." *Id.*

107.    Separately, the federal agency must also secure the NCPC's approval of various aspects of the proposed project, namely its "location, height, bulk, number of stories, and size . . . and the provision for open space in and around" the proposed development. *Id.* § 8722(d).

108.    The Defendants are federal agencies, heads or senior officials thereof, and an executive department having authority over a defendant agency.

109.    The Defendants' Ballroom Project is a "proposed development[]" or "project." *Id.* § 8722(b)(1).

110.    The Ballroom is a major building proposed to be located in the monumental core of the District of Columbia, and as such "affect[s] the plan and development of the National Capital." *Id.*

111.    The Defendants have commenced work on the Ballroom Project without submitting project plans to the NCPC. Consequently, they have neither advised or consulted with the NCPC, nor have they secured the NCPC's approval of the Ballroom Project. *Id.* § 8722(b)(1), (d).

112.    If the Defendants had submitted project plans to the NCPC, the National Trust would have submitted comments on those plans. The National Trust's comments would have informed the NCPC of its concerns with the Ballroom Project, which include but are not limited to the Ballroom's size, which threatens to overwhelm the White House itself, and the Ballroom's permanent disruption of the carefully balanced classical design of the White House, with its central Executive Residence and two smaller, and lower, East and West Wings.

113.    The National Trust's comments would have also explained that the Trust stands ready to assist the White House, the National Park Service, and relevant review agencies in

35

JA54

exploring design alternatives and modifications that would accomplish the objectives of the administration while preserving the historic integrity and symbolism of the White House.

114.     The Defendants' Ballroom Project also alters the NCPC's Comprehensive Plan for the capital district. *See id.* § 8721.

115.     The Comprehensive Plan explains that the capital district's "iconic cityscape is distinguished through the close relationship between its form and the functional and visual symbols of national civic life." Comprehensive Plan for the National Capital: Federal Elements, 50 available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025). This "symbolic identity," the Comprehensive Plan states, "expresses itself in a number of ways," including a visual hierarchy "that emphasizes symbols and structures, particularly the . . . White House" and several other major buildings and monuments. *Id.*

116.     The Comprehensive Plan cautions against "infrastructure solutions" that would "permanently alter[]" "symbolic views of . . . the White House." *Id.* at 18. And it instructs that "the preeminence of the . . . White House" and other significant structures should be "[v]isually reinforce[d]" "by protecting the visual frame around them." *Id.* at 55. The effect of these admonitions is to elevate to a "guiding urban design principle[]" the "[p]reserv[ation of] the physical preeminence and visual hierarchy of the most significant civic structures within the city, including the White House." *Id.* at 38 (capitalization removed).

117.     Simply put, demolishing the East Wing and erecting the Ballroom on its site is not just a "project[]" or a "proposed development[]"—it is also a "revision" of basic principles underpinning the Comprehensive Plan. 40 U.S.C. §§ 8721-8722.

118.     The NCPC's responsibilities therefore do not end with its review of the plans for the Ballroom Project. Rather, the NCPC must present the "revision" to the Comprehensive Plan

36

JA55

that the Ballroom Project has effected "to the appropriate federal or District of Columbia authorities for comment and recommendations." *Id.* § 8721(e)(1). The NCPC must also, "jointly" with the Mayor, "establish procedures for appropriate meaningful continuing consultation" regarding the revision to the Comprehensive Plan. *Id.* § 8721(h)(1).

119.    The National Trust would participate in this consultation process, and would provide comments similar to those detailed above.

120.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the NCPC violates 40 U.S.C. § 8722, and that any further work on the Ballroom Project without plans having been submitted to the NCPC, and the NCPC's approval of those plans having been secured, is unlawful, in violation of 40 U.S.C. §§ 8722 and 8721.

121.    The National Trust is further entitled to an injunction against the performance of any further work on the Ballroom Project until the Defendants have submitted plans for the project to the NCPC; the National Trust has had the opportunity to comment on those plans; until the revision to the Comprehensive Plan caused by the Defendants' proposal has undergone the review process required by 40 U.S.C. § 8721; and until both the proposed project plans and the revision to the Comprehensive Plan have been approved by the NCPC and any other relevant authorities.

### Count II – Violation of Administrative Procedure Act
### (Improper Segmentation of NCPC Review)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

122.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

123.    Defendant President Trump and Press Secretary Leavitt have suggested or stated that the NCPC's review is not necessary for demolition of the East Wing, or for demolition of other portions of the White House.

JA56

124. Insofar as the Defendants failed to submit plans for the Ballroom Project to the NCPC for review prior to the demolition of the East Wing because they believe that such review is not required for demolition, but only for vertical construction, the Defendants are wrong.

125. The NCPC is the zoning authority for federal public buildings in the District of Columbia. *See* 40 U.S.C. § 8722(d). "[T]he location, height, bulk, number of stories, and size of federal public buildings," as well as "the provision for open space in and around federal public buildings" are therefore subject to the NCPC's approval, "[i]n order to ensure the orderly development" of the capital district. *Id.*

126. To that end, the NCPC requires the submission of "construction plans" for its review. *Id.* § 8722(b). Where, as here, construction of a new building is proposed to take place on the site that an old building already occupies, "construction plans" for the new building necessarily include demolition of the old building. *Id.*

127. Insofar as the Defendants rely on the opinion of Commissioner Scharf, or on other legal opinions previously produced by the NCPC, that adopt the position that "construction" for the purposes of the NCPC's review encompasses only vertical build, and not demolition, such opinions are entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

128. The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the NCPC before demolishing the East Wing violates 40 U.S.C. § 8722, and an injunction against any further demolition at or around the site of the East Wing until the Defendants have submitted plans for the project to the NCPC; the National Trust has had the opportunity to comment on those plans; the revision to the Comprehensive Plan caused by the Defendants' proposal has undergone the review process required by 40 U.S.C. § 8721; and both

38

JA57

the proposed project plans and the revision to the Comprehensive Plan have been approved by the NCPC and any other relevant authorities.

**<u>Count III – Violation of Administrative Procedure Act</u>**
**<u>(Failure to Request Advice from Commission of Fine Arts, 40 U.S.C. § 9102)</u>**

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

129.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

130.    Federal agencies intending to undertake development or construction projects in the capital district, including demolition in furtherance thereof, must seek the advice of the CFA on matters concerning fine arts.  *See* 40 U.S.C. § 9102. "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the designs" "before" the plans are "final[ly] approv[ed]" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1).

131.    The Ballroom affects the appearance of the city and is a "public building[] to be erected in the District of Columbia by the federal government." *Id.* As such, it is a structure for which the CFA's review is required under 40 U.S.C. § 9102.

132.    The Defendants have commenced work on the Ballroom Project, including demolition in furtherance thereof, without submitting plans for the project to the CFA or otherwise advising and consulting with the CFA in connection with the project.

133.    If the Defendants had submitted plans for the Ballroom Project to the CFA, the National Trust would have provided comments on those plans. The National Trust's comments would have informed the CFA of its concerns with the Ballroom Project, including the demolition of the East Wing, and the excessive massing and height of the proposed new building.

JA58

134.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the CFA violates 40 U.S.C. § 9102 and 45 C.F.R. § 2101.1 and that the performance of any further work on the Ballroom Project without having advised and consulted with the CFA, including by submitting plans for the project to the CFA, is unlawful. The National Trust is further entitled to an injunction against the performance of any further work on the Ballroom Project until the Defendants have submitted plans for the Ballroom Project to the CFA, and the National Trust has had the opportunity to provide comments on those plans.

### Count IV – Violation of Administrative Procedure Act
### (Inadequate Environmental Assessment, 42 U.S.C. § 4336)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

135.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

136.    The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action."  42 U.S.C. § 4336e(10)(A).

137.    As a major federal action, the Ballroom Project requires that the Defendants prepare an environmental assessment. Notwithstanding that the environmental assessment is required to be a "concise *public* document," the environmental assessment conducted by the Defendants, if any, has not been made public, and the National Trust therefore does not know the scope or contents of the environmental assessment, if one was prepared at all. *Id.* § 4336(b)(2) (emphasis added).

138.     However, given that no EIS was published following the environmental assessment, if any, conducted by the Defendants, the National Trust must conclude that the Defendants, insofar as they conducted an environmental assessment, found that the Ballroom Project would have no significant impact on the quality of the human environment. *See id.*

40

JA59

139.    Insofar as the Defendants reached this conclusion, it was arbitrary and capricious, and otherwise improper. When the East Wing was demolished, it was over 120 years old, and many buildings of similar age contain environmental hazards—such as, for example, asbestos and lead paint—that must be properly handled. The building was also one of great historical significance, which the environmental assessment would have to consider. Further, debris from the East Wing has been dumped at a public park, with no apparent plan or regard for its potential hazards.  And the proposed Ballroom itself is a large building in a dense urban area that will, if constructed, have significant aesthetic and other effects on its historic surroundings. Under these circumstances, a finding of no significant impact cannot be supported.

140.    The National Trust is entitled to a declaration that the environmental assessment performed by the Defendants, if any, is inadequate, and an injunction against the performance of any further work on the Ballroom Project until the Defendants have conducted an appropriate environmental review, and published said review.

### Count V – Violation of Administrative Procedure Act
### (Failure to Prepare an Environmental Impact Statement, 42 U.S.C. § 4336)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

141.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

142.    The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." *Id.* § 4336e(10)(A).

143.    As a major federal action, the Ballroom Project required the Defendants to prepare at least an environmental assessment. *See id.* §§ 4332(2)(C), 4336(b).

144.    As alleged above, the Defendants' environmental assessment, if any was prepared, was improperly conducted, and their finding of no significant impact was not supported.

41

JA60

145.   The Defendants were therefore required to prepare an EIS in connection with the Ballroom Project.

146.   No EIS has been published in connection with the Ballroom Project and, on information and belief, no EIS for the project has been prepared.

147.   The National Trust is entitled to a declaration that the Defendants must prepare and publish an EIS in connection with the Ballroom Project, and an injunction against the performance of further work in connection with the Ballroom Project until the Defendants have prepared and published such an EIS.

### Count VI – Violation of Administrative Procedure Act
### (Improper Segmentation of NEPA Review)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

148.   The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

149.   The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." 42 U.S.C. § 4336e(10)(A).

150.   As a major federal action, the Ballroom Project required the Defendants to prepare at least an environmental assessment. *See id.* §§ 4332(2)(C), 4336(b).

151.   As alleged above, the Defendants' environmental assessment, if any was prepared, was improperly conducted, and their finding of no significant impact was not supported.

152.   Insofar as the Defendants conducted an environmental assessment and found no significant impact based on their review of the *demolition* of the East Wing of the White House alone (that is, without consideration of the construction of the Ballroom, the disposal of debris, and other pertinent factors) or, alternatively, found no significant impact based on their review of

JA61

the *construction* of the Ballroom alone (without consideration of the impacts of the demolition of the East Wing, the disposal of debris, and other pertinent factors), the Defendants improperly segmented their NEPA review.

153.    Insofar as the Defendants (a) limited their environmental assessment, if any, to the demolition of the East Wing; (b) limited any such assessment to the construction of the Ballroom; or (c) otherwise failed to account for the impacts of the Ballroom Project on the human environment as a whole, the National Trust is entitled to a declaration that the Defendants' environmental assessment was improperly segmented and an injunction against the performance of further work in connection with the Ballroom Project until the Defendants perform and publish a comprehensive environmental assessment for the Ballroom Project and, subsequently, prepare and publish an EIS.

### Count VII – Violation of Administrative Procedure Act (40 U.S.C. § 8106)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas)**

154.    The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

155.    Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

156.    President's Park comprises the White House and its grounds, and is the planned site of the Ballroom.

157.    President's Park is owned by the Federal Government, managed by the National Park Service, and located in the District of Columbia. It is within the statutory meaning of a "reservation, park, or public grounds." *Id.*

JA62

158.   The Defendants intend to "erect[]" the Ballroom—a "building or structure"—on the grounds of President's Park. *Id.* That work has already begun: recent reporting has revealed that the site of the East Wing is a bustling project site filled with dozens of workers and materials pertaining to construction, not demolition.

159.   Congress has not authorized, expressly or otherwise, the construction of the Ballroom in President's Park. *See id.*

160.   The National Trust is entitled to a declaration that construction of the Ballroom violates 40 U.S.C. § 8106, and an injunction prohibiting the Defendants from performing further work on the Ballroom Project or proceeding with the erection of any building or structure similar to the Ballroom in President's Park without having first obtained express authorization to do so from Congress.

<u>Count VIII – Violation of the Separation of Powers</u>
<u>(Property Clause, U.S. Const. Art. IV, § 3, cl. 2).</u>

**(Against Defendant President Donald J. Trump)**

161.   The National Trust incorporates by reference the allegations in paragraphs 1 to 104.

162.   The Constitution divides the powers of the federal government between and among its three branches. The Property Clause vests in Congress the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2.

163.   Congress's power over federal property is exclusive. Nothing in the Constitution gives the President overlapping authority to dispose of federal property. As a result, only Congress may authorize the demolition or construction of federal buildings. The President, acting unilaterally, is wholly without constitutional authority to build or demolish anything on federal grounds.

JA63

164.    President's Park and the White House, located therein, are "Property belonging to the United States." *Id.*

165.    President Trump, and others acting at his direction and subject to his control, have demolished the East Wing and are building the Ballroom.

166.    There is no statute that provides the President with the authority to demolish the White House or construct a ballroom on the White House grounds. And the President has pointed to no statute giving him such authority. Any justification for the President's actions must therefore rest in his inherent constitutional authority. But, as noted, the President has no constitutional authority to dispose of federal property—that authority rests exclusively with Congress. *See id.*

167.    By nevertheless demolishing the White House and beginning to construct the Ballroom, President Trump has unconstitutionally invaded Congress's prerogative to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *Id.*

168.    President Trump has thereby violated the separation of powers and the Property Clause. *See id.*

169.    The National Trust is entitled to a declaration that President Trump's actions and omissions violate the separation of powers and the Property Clause. The National Trust is further entitled to an injunction against President Trump and/or all those operating or acting at his direction or in concert with him prohibiting further work on the Ballroom Project.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the National Trust for Historic Preservation in the United States, respectfully requests that this Court grant the following relief:

45

JA64

i.   Declare that the commencement of, and continued work on, the Ballroom Project by defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas violates the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; and 40 U.S.C. §§ 8106, 8722, and 9102;

ii.  Enjoin defendants the National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, and Rigas, and anyone acting at their direction or in concert therewith, from performing any additional work on the Ballroom Project until an EIS has been prepared and published; the NCPC and the CFA have reviewed the plans for the Ballroom Project; the NCPC has approved the plans for the Ballroom Project; Congress has expressly authorized the Ballroom's construction; and the public has had time and opportunity to comment;

iii. Declare that President Trump has violated the separation of powers by purporting to exercise constitutional powers vested exclusively in Congress by the Property Clause, U.S. Const. Art. IV, § 3, cl. 2, and enjoin defendant President Trump, and anyone acting at his direction or in concert with him, from performing further work on the Ballroom Project;

iv.  Award the National Trust reasonable fees, costs, and expenses, including attorneys' fees; and

v.   Grant any such other relief that the Court deems just and proper.

Respectfully submitted,

_____
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice* forthcoming)
Matthew F. Casassa (*pro hac vice* forthcoming)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000

47

JA66

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES,

Plaintiff,

v.

NATIONAL PARK SERVICE, *et al.,*

Defendants.

Civil Action No. _____

## DECLARATION OF ELIZABETH S. MERRITT

1.     My name is Elizabeth S. Merritt, and I am Deputy General Counsel at the National Trust for Historic Preservation in the United States ("National Trust"). I have served in the National Trust's Law Department for more than 41 years, focused on advocacy to protect historic places throughout the nation, in both the administrative and judicial arenas.  As a result, I am very familiar with the National Trust's programs, and especially its advocacy and litigation activities. The facts set forth in this declaration are based upon my personal and professional knowledge and, if called as a witness in this proceeding, I could and would testify competently thereto under oath.

2.     The National Trust is a private charitable, educational, nonprofit corporation chartered by Congress in 1949 to further the historic preservation policies of the United States, and to facilitate public participation in the preservation of historic properties. See 54 U.S.C. § 312102(a).

3.     As part of the National Trust's public interest advocacy program, the National Trust has often participated in litigation to enforce federal, state, and local laws that protect historic places.  Since 1970, the National Trust has formally participated in hundreds of cases in

JA67

state and federal courts around the country, both as a plaintiff and as *amicus curiae*, and occasionally as an intervening defendant.

4. The National Trust has a long history of active involvement in the federal project and planning review processes conducted by the National Capital Planning Commission ("NCPC"). For example, the National Trust has previously submitted testimony or comments to the NCPC over the course of many years regarding the following matters:

- Opposing demolition of historic officers' housing at Fort McNair (Feb. 2, 2023);
- Adverse impacts of McMillan Park development on President Lincoln's Cottage (Nov. 7, 2014);
- Comments regarding the Height Act (Oct. 25 and Nov. 19, 2013);
- Master Plan for Homeland Security Department headquarters at St. Elizabeths Hospital campus (Nov. 1, 2007 and Jan. 8, 2009);
- Proposed Vietnam Veterans Memorial Visitor Center (Dec. 6, 2007);
- Courtyard roof for Old Patent Office Building (June 2, 2005); and
- Closing of Pennsylvania Avenue in front of the White House (Mar. 12, 2003).

5. In addition, I personally have submitted written or in-person testimony to NCPC on behalf of the National Trust regarding the following matters:

- Redevelopment of the McMillan Park site (Nov. 6, 2014);
- Proposed Vietnam Veterans Memorial Visitor Center (Aug. 3, 2006 and June 3, 2009);
- Courtyard roof for Old Patent Office Building (Sept. 8, 2005); and
- Washington Monument security and visitor facilities (May 1, 2003).

6. The National Trust is also routinely and actively involved in review of environmental assessments ("EA") and environmental impact statements ("EIS") prepared by federal agencies pursuant to the National Environmental Policy Act ("NEPA").

7. The National Trust frequently submits comments on NEPA documents, and is often involved in enforcing federal agency compliance with NEPA. *See, e.g., National Parks*

*Conservation Ass'n, et al. v. Semonite,* No. 18-5179 (D.C. Cir. Mar. 1, 2019); *Coalition Against a Raised Expressway (CARE), et al. v. Dole,* 835 F.2d 803 (11th Cir. 1988); *Druid Hills Civic Ass'n, et al. v. Federal Highway Admin.,* 772 F.2d 700 (11th Cir. 1985); *Citizen Advocates for Responsible Expansion, Inc. (I-CARE), et al. v. Dole,* 770 F.2d 423 (5th Cir. 1985); *City of South Pasadena, et al. v. Slater*, 56 F. Supp. 2d 1106 (C.D. Cal. 1999).

8.    In my decades of personal experience at the National Trust, the National Trust's commentary and advocacy before the NCPC and other governmental entities (whether federal, state, or local) has been highly influential. The National Trust's advocacy often results in modifications to proposed projects.

9.    The National Trust follows developments in preserving and interpreting the White House through, among other things, the White House Historical Association, and a representative of the National Trust serves as an ex officio member of the board of the Association.  The White House Historical Association is also co-steward, with the National Trust, of Decatur House. Decatur House, located adjacent to President's Park in Lafayette Square and owned by the National Trust since 1956, is itself a historic building and the first private residence built in the White House neighborhood. When the National Trust conducts board meetings in Washington, D.C., they are frequently held at Decatur House.

10.    On October 21, 2025, in response to the initiation of demolition of the White House East Wing, the National Trust's President and CEO, Carol Quillen, sent a letter to the Chair of the NCPC, the Acting Director of the National Park Service, and the Chair of the CFA. The letter expressed serious concerns about the failure to comply with the public review process for the Ballroom Project, and urged the Administration and the National Park Service to cease

demolition until after the required review procedures for the Ballroom Project had been completed.

11.    Because of the National Trust's concern regarding the failure to initiate review by the NCPC, I personally reached out to Meghan Hottel-Cox, General Counsel and Secretary at the NCPC, to inquire as to whether the NCPC had received any submissions regarding the White House Ballroom Project. And on December 3, 2025, I specifically mentioned my concern by email that construction of the Ballroom has already been initiated. Ms. Hottel-Cox responded by email on December 5, 2025 that "NCPC has not yet received a submission for the Ballroom project."

12.    Assuming that the Defendants do submit plans for the Ballroom Project to the NCPC and CFA, the National Trust intends to participate actively in the public comment process. In addition, the National Trust intends to submit comments in response to any NEPA document that is released to the public regarding the Ballroom Project. Among other things, the National Trust intends to express a concern that the massing and height of the proposed new construction will overwhelm the White House itself and may also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings, and to urge the NCPC and CFA to take these concerns into consideration. The ongoing demolition and construction activities severely harm the interests of the National Trust by foreclosing alternatives and modifications to the Ballroom Project that could avoid, minimize, and/or mitigate the adverse effects of the Project on the historic significance of the White House.

13.    In connection with the National Trust's request for injunctive relief in this case, the National Trust requests a waiver of any security bond requirement.

14.    Because of the National Trust's nonprofit status and limited funds, we have a policy against paying attorneys' fees, other than out-of-pocket expenses, when we participate in advocacy litigation. Instead, we rely on *pro bono* representation when outside counsel is needed, as in this case, or public interest lawyers whose discounted fees can be covered by other organizations.

15.    When the National Trust seeks injunctive relief in a case, the Trust has always requested (and virtually always received) a waiver of the security bond requirement based on the "public interest" nature of our litigation. The National Trust's litigation program is aimed at enforcing and vindicating the rights of the public as a whole, which are reflected in federal, state, and local laws protecting historic properties. This policy is in furtherance of the National Trust's congressional charter, directing the Trust to "facilitate public participation" in historic preservation. 54 U.S.C. § 312102(a).

16.    The doctrine allowing a waiver of the security bond is based on the recognition that organizations such as the National Trust, acting as private attorneys general, have no personal or financial stake in the enforcement litigation and therefore prosecute lawsuits that benefit the public as a whole.

17.    The imposition of a security bond—as a condition for obtaining injunctive relief to temporarily delay construction or demolition activities that would harm historic resources— would have a direct chilling effect on the ability of the National Trust, and other public interest plaintiffs, to advance the public interest and enforce compliance with historic preservation laws through litigation. If the financial burden of vindicating public rights were to fall on nonprofit organizations that bring enforcement actions, such as the National Trust, then the incentives intentionally created by Congress to encourage citizen suits and private attorney general actions,

(*see, e.g.,* 54 U.S.C. § 307105 (NHPA); 28 U.S.C. § 2412 (EAJA)), would be significantly reduced or eliminated.

18.    The National Trust could not post a substantial injunction bond without diverting funds intended for other historic preservation programs.

19.    Alternatively, the National Trust would simply not be able to post such a bond at all, and would be unable to secure the injunction on which it was conditioned.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 11th day of December, 2025.


_Elizbeth S. Merritt_
Elizabeth S. Merritt

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,** *Plaintiff,* v. **NATIONAL PARK SERVICE**, *et al.,* *Defendants*. | Civil Action No. _____ |

## DECLARATION OF ALISON K. HOAGLAND

I, Alison K. Hoagland, declare as follows:

1.     The facts set forth in this declaration are based upon my personal and professional knowledge, and if called as a witness in this proceeding, I could and would testify competently thereto under oath.  As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.     I am a member of the National Trust for Historic Preservation in the United States ("National Trust").  I have been a member of the National Trust for more than 40 years.  I am currently a Trustee of the National Trust and serve on its Executive Committee.  In that role, I advise on the governance and policy-making of the organization.  I have also previously served as an advisor to the National Trust on matters relating to Washington, D.C.'s interests in the formation of Trust policy.

3.     In addition to my work as a trustee and advisor, I am an active individual member of the National Trust.  The National Trust's members, including myself, use, enjoy, derive benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park, which have been impaired by

JA73

the destruction of the East Wing of the White House by the defendants in this action, and will be impaired further by the construction on the East Wing's former site of a ballroom substantially similar to that which the defendants propose to build.

4.      Apart from my work with the National Trust, I am professor emerita at Michigan Technological University, where I taught history and historic preservation from 1994 to 2009.  I received my BA from Brown University and my MA in American Studies, with a concentration in historic preservation, from George Washington University.  I have written six books on various aspects of American vernacular architecture; my most recent is The Row House in Washington, DC: A History (University of Virginia Press, 2023).

5.      Prior to my professorship, I was the senior historian at the Historic American Buildings Survey of the National Park Service, where I worked from 1979 to 1994.  The Historic American Buildings Survey ("HABS") documents significant historic buildings with measured drawings, large-format photographs, and written histories, which are then made available to the public at the Library of Congress and online.  Buildings documented by HABS are located nationwide and include major monuments and memorials in Washington, as well as the White House itself.

6.      In my past capacity as a volunteer and also Vice President of the DC Preservation League (formerly Don't Tear It Down!), I oversaw projects, undertook research, and prepared landmark nominations concerning downtown Washington.  Designation of the Downtown Historic District and the Fifteenth Street Financial Historic District (adjacent to the White House) resulted in part from my work.  Alterations and demolitions of buildings in these historic districts, just as for any locally designated historic landmark, must be reviewed by the Historic Preservation Review Board before permits are granted.

7.      I have previously served on the boards of various organizations engaged in history and historic preservation work, several of which have a particular focus on historic preservation in Washington, D.C.  Among these, I have chaired the board of the Delaware Historical Society, chaired the Keweenaw National Historical Park Advisory Commission in Calumet, Michigan, and served as president of the Vernacular Architecture Forum.  I have also served on the boards of the National Council on Public History, the Michigan State Historic Preservation Review Board, on the Committee of 100 on the Federal City, and on the board of the DC Preservation League.

8.      I have also given walking tours for the Smithsonian Institution and public presentations to local groups on various aspects of Washington's historic architecture.  In addition, I have published scholarly articles on the topic, including "Nineteenth Century Building Regulations in Washington, D.C.," Records of the Columbia Historical Society 52 (1989): 57-77, and "The Washington Public Library on Mount Vernon Square," Washington History 2, No. 2 (Fall 1990): 74-89.

9.      I live on Capitol Hill, about 2 miles from the White House.  I first moved to DC in 1977 and stayed until 1994, then returned in 2009 and have been here ever since.  I travel to the White House neighborhood frequently to attend meetings, view exhibits, and have medical appointments.  In the past year alone I have attended two rooftop gatherings with views of the White House.  I regularly walk through portions of President's Park, including Lafayette Square, in order to enjoy the historic buildings, the beauty of the L'Enfant Plan (which placed the President's House on axis with 16th Street), and the innovative preservation project concerning the buildings surrounding Lafayette Square (overseen by Jacqueline Kennedy).  I also regularly view the White House from the south side, whether driving by on Constitution Avenue or walking on the Mall.

JA75

10.    Built beginning in the eighteenth century, the White House is one of the most historically significant buildings in the country.  The White House was designed to be a symbol of the new nation, and debates occurred about its style, size, precedents, and name.  As built, the "President's House" was a neoclassical building, akin in size to an English country house.  The selection of this design through a competition shows George Washington's preference for a fairly modest building, not a palace.  As such, the White House in its current form embodies some of the ideals on which the nation was founded.  Architectural historians look for meaning in architecture, and the White House is one of the clearest examples of a building constructed with the explicit intention of imparting meaning with its style, size, and scale.  The symbolic nature of the White House never fails to impress me, my students, and my out-of-town visitors.  Further, the preservation of its essential nature—its republican simplicity—through many alterations and renovations of the building also reflects the attitudes and beliefs of subsequent occupants.

11.    The White House affects my own research on more locally focused architecture in two ways.  As one of the first prominent government buildings in the new capital city, it drove development around it, helping to define commercial and residential areas while also serving as a landmark defining L'Enfant's plan for the city, and attesting to the promise that city construction would follow.  Secondly, as the most important house in the city, the White House was also on the leading edge of all improvements—running water, water closets, electricity, etc.  A study of Washington's architecture without the White House as a reference point would be incomplete.

12.    As a resident of Washington, D.C., I intend to continue to travel to the area around the White House, to walk through Lafayette Square, to attend functions in neighboring buildings, and to continue to be impressed by this iconic building.  In the past I have had reason to be in the area about once a month, and I expect that pattern to continue.  In addition, when the National

JA76

Trust holds its board meetings in Washington, which it does at least annually, it usually holds them at the Decatur House on the northwest corner of Lafayette Square. I plan to attend those meetings in 2026.

13. If a ballroom were constructed, similar to that which the defendants in this action have proposed to be built on the former site of the East Wing, it would cause permanent and irreparable harm to the White House and President's Park. To have an adjacent structure overshadowing the White House, exceeding it in height and massing, would diminish the primacy of the White House, which makes its architectural statement through its singularity on the landscape. No longer would the eye be drawn to the jewel of the building in the center, declaring to viewers that our president lives in a *house*.

14. Accordingly, I would suffer both professional and personal injuries, including to my aesthetic, cultural, and historical interests, if a ballroom of the proposed form and scale were constructed on the site of the former East Wing.

15. In the past, I have personally participated in public comment periods and public review meetings—across a variety of venues—considering building plans that would alter or impact sites of historic significance. As an example, I submitted comments to the National Capital Planning Commission and the D.C. Historic Preservation Review Board in 2013 and 2014 when those agencies were considering alterations to the Carnegie Library at Mount Vernon Square to accommodate the Spy Museum, a project that ended up not happening. I would intend to participate in any public review processes and comment periods made available for any project of significant scale at the White House, including the ballroom project that has been discussed by the defendants in this action, to provide insight and express concern regarding the adverse impact of such a project on a site of such historical import to its local and national community.

JA77

USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 84 of 525

16.     As with the rest of the American public, I have so far been denied the opportunity to participate in or comment on this project in any formal setting.  The abrupt demolition of the East Wing has both deeply saddened me personally and affronted my professional work.  But in particular, the project's proceeding without any of the legally mandated consultations and opportunity for public input presents a unique and irreparable harm to the public, one that I feel acutely as an architectural historian who has dedicated her career to studying the relationship between local people and their buildings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Alison K. Hoagland

Executed this 11th day of December, 2025.

# EXHIBIT J

Case 1:25-cv-04316-RJL     Document 2-14     Filed 12/12/25     Page 2 of 5

USCA Case #26-5134      Document #2172336      Filed: 05/07/2026      Page 87 of 525

*The* WHITE HOUSE

**BRIEFINGS & STATEMENTS**

The White House Announces White House Ballroom Construction to Begin

The White House

July 31, 2025

**Washington, D.C.** — For 150 years, Presidents, Administrations, and White House Staff have longed for a large event space on the White House complex that can hold substantially more guests than currently allowed. President Donald J. Trump has expressed his commitment to solving this problem on behalf of future Administrations and the American people.

The White House is one of the most beautiful and historic buildings in the world, yet the White House is currently unable to host major functions honoring world leaders and other countries without having to install a large and unsightly tent approximately 100 yards away from the main building entrance. The White House State Ballroom will be a much-needed and exquisite addition of approximately 90,000 total square feet of ornately designed and carefully crafted space, with a seated capacity of 650 people — a significant increase from the 200-person seated capacity in the East Room of the White House.

In recent weeks, President Trump has held several meetings with members of the White House Staff, the National Park Service, the White House Military Office, and the United States Secret Service to discuss design features and planning.

President Trump has chosen McCrery Architects as lead architect, which is well-known for their classical architectural design and based in our nation's capital. CEO Jim McCrery said: "Presidents in the modern era have faced challenges hosting major events at the White House because it has been untouched since President Harry Truman. I am honored that President Trump has entrusted me to help bring this beautiful and

JA81

Case 1:25-cv-04316-RJL    Document 2-14    Filed 12/12/25    Page 3 of 5
USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 88 of 525

necessary renovation to The People's House, while preserving the elegance of its classical design and historical importance."

The construction team will be headed by Clark Construction, and the engineering team will be led by AECOM.

The project will begin in September 2025, and it is expected to be completed long before the end of President Trump's term.

President Trump, and other patriot donors, have generously committed to donating the funds necessary to build this approximately $200 million dollar structure. The United States Secret Service will provide the necessary security enhancements and modifications.

The White House Ballroom will be substantially separated from the main building of the White House, but at the same time, it's theme and architectural heritage will be almost identical. The site of the new ballroom will be where the small, heavily changed, and reconstructed East Wing currently sits. The East Wing was constructed in 1902 and has been renovated and changed many times, with a second story added in 1942.

The White House Chief of Staff Susie Wiles said the following: "President Trump is a builder at heart and has an extraordinary eye for detail. The President and the Trump White House are fully committed to working with the appropriate organizations to preserving the special history of the White House while building a beautiful ballroom that can be enjoyed by future Administrations and generations of Americans to come."

The White House will continue to provide the American public with updates on this project at whitehouse.gov/visit.

  

JA82

Case 1:25-cv-04316-RJL    Document 2-14    Filed 12/12/25    Page 4 of 5
USCA Case #26-5134        Document #2172336        Filed: 05/07/2026        Page 89 of 525

  

 



Subscribe to The White House newsletter

| Your email | **SIGN UP** |
|---|---|

Text POTUS to 45470 to receive updates

NEWS                          ADMINISTRATION

WIRE                          GALLERY

ISSUES                        VIDEO LIBRARY

CONTACT                       AMERICA 250

VISIT                         FOUNDING FATHERS

JA83

Case 1:25-cv-04316-RJL    Document 2-14    Filed 12/12/25    Page 5 of 5
USCA Case #26-5134        Document #2172336                Filed: 05/07/2026      Page 90 of 525

EOP

THE SIGNERS

THE WHITE HOUSE

1600 Pennsylvania Ave NW

Washington, DC 20500

WH.GOV

Copyright

Privacy



JA84

# EXHIBIT L



October 21, 2025

Mr. William Scharf, Chair
National Capital Planning Commission
401 Ninth Street NW, Suite 500N
Washington, DC 20004

Ms. Jessica Bowron
Acting Director, National Park Service
National Park Service
1849 C Street NW
Washington, DC 20240

Ms. Billie Tsien, Chair
Commission of Fine Arts
401 F Street NW, Suite 312
Washington, DC 20001-2728

*Re: Proposed Construction of White House Ballroom*

Mr. Scharf, Ms. Bowron, and Ms. Tsien,

The National Trust for Historic Preservation in the United States ("National Trust") is a private charitable, educational, nonprofit corporation headquartered in Washington, D.C. and chartered by Congress in 1949 to further the historic preservation policy of the United States. 54 U.S.C. § 312102(a). This Congressional charter obligates the National Trust to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." Our mission is to protect America's significant historic sites and to advocate for historic preservation as a core public value.

President Trump has proposed the construction of a 90,000-square-foot ballroom on the east side of the White House campus, adjacent to the historic Treasury Building. Site preparation is already underway, including the demolition of a portion of the existing East Wing.

While the National Trust acknowledges the utility of a larger meeting space at the White House, we are deeply concerned that the massing and height of the proposed new construction will overwhelm the White House itself—it is 55,000 square feet—and may also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings.

600 14th Street NW  Suite 500  Washington, DC 20005
E info@savingplaces.org  P 202.588.6000  F 202.588.6038  SavingPlaces.org

JA86

The federally recognized Secretary of the Interior's Standards for Rehabilitation offer clear guidance for construction projects affecting historic properties. The Standards provide that new additions should not destroy the historic fabric of the property and that the new work should be compatible with existing massing, size, scale, and architectural features.

Owned by the American people, the White House was designed by Irish architect James Hoban, whose winning proposal was selected by President George Washington. The building respects Georgian and neoclassical principles. It is a National Historic Landmark, a National Park, and a globally recognized symbol of our nation's ideals.

We respectfully urge the Administration and the National Park Service to pause demolition until plans for the proposed ballroom go through the legally required public review processes, including consultation and review by the National Capital Planning Commission and the Commission of Fine Arts, and to invite comment from the public. These processes provide a crucial opportunity for transparency and broad engagement—values that have guided preservation of the White House under every administration going back to the public competition in 1792 that produced the building's original design. Doing so will help ensure that the project both honors the exceptional historic significance of the White House and acknowledges the investment that the American people have in the preservation of this beloved place.

The National Trust stands ready to assist the White House, the National Park Service, and relevant review agencies in exploring design alternatives and modifications that would accomplish the objectives of the Administration while preserving the historic integrity and symbolism of the People's House.

As we approach the 250th Anniversary of our country's founding, the preservation of historic places that represent our nation's history has never been more relevant or important. We urge you to take into account the deep reverence that all Americans hold for this iconic place, and to initiate the review process that can ensure the preservation of the historic White House for future generations.

Sincerely,

Dr. Carol Quillen
President and Chief Executive Officer

2

JA87

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

       Plaintiff,

    v.                                                               Case No. 1:25-cv-04316-RJL

NATIONAL PARK SERVICE, *et al.*,

       Defendants.

**DEFENDANTS' MOTION FOR LEAVE TO SUBMIT DECLARATION EX PARTE, IN
CAMERA IN SUPPORT OF DEFENDANTS' RESPONSE
IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1

Defendants hereby move to submit an *ex parte*, *in camera* declaration in support of Defendants' opposition to Plaintiff's motion for temporary restraining order and preliminary injunction. As grounds for this motion, Defendants state as follows.

This lawsuit was filed on December 12, 2025, principally challenging activities related to the White House East Wing Modernization and State Ballroom Project ("the Project"). As explained in Defendant's forthcoming opposition to the Plaintiff's motion, there are national security concerns inherent in any pause to this Project. In addition, the Defendants are providing an unclassified declaration from the Secret Service on the public docket. To elaborate on the discussion of the national security concerns, Defendants seek leave to submit an *in camera*, *ex parte* classified declaration. The sensitive and classified information that would be contained in the declaration cannot be publicly filed or shared with opposing counsel without compromising the interests of national security. Accordingly, the declaration can only be submitted to the Court *in camera* and *ex parte*.

The Court has inherent authority to examine the information that would be contained in such a declaration as part of Defendants' opposition to Plaintiffs' motion for preliminary injunction. *See Jiffry v. Federal Aviation Admin.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("the court has inherent authority to review classified material *ex parte, in camera* as part of its judicial review function"). For instance, this procedure has been employed in Freedom of Information Act cases involving the application of Exemption 1, the exemption addressed to national security information. *See, e.g., Montgomery v. IRS*, 40 F. 4th 702, 713-14 (D.C. Cir. 2022) (recognizing that in camera declarations are permissible under FOIA "'when (1) the validity of the government's assertion of exemption cannot be evaluated without information beyond that contained in the public affidavits and in the records themselves, and (2) public

2

JA89

disclosure of that information would compromise the secrecy asserted.'"); *Rosenberg v. U.S. Dep't of Immigr. Customs & Enforcement*, 13 F. Supp. 3d 92, 109-10 (D.D.C. 2014) (proper for agency to supplement its explanation for a claimed FOIA exemption through an *in camera, ex parte* submission). This procedure also has been employed in other contexts where classified declarations are submitted in litigation to defend challenged government action. *See, e.g., Abdollahi v. National Iranian Tanker Company*, Civ. A. No. 19-3688 (ABJ) (D.D.C.), Order (ECF No. 28) at 3 (permitting the government to submit an *in camera, ex parte* declaration explaining why records requested in a subpoena are classified).

Accordingly, given the security concerns raised by the relief requested by Plaintiff, Defendants seek leave to submit an *in camera*, *ex parte* declaration. As the hearing on Plaintiff's motion is scheduled for December 16, 2025, Defendants have lodged the declaration with the Justice Command Center (JCC), which has hand-delivered the document to the Court.

Pursuant to Local Rule 7(m), undersigned counsel attempted to confer with counsel for Plaintiff regarding the relief requested in this motion. Plaintiff's counsel has not responded as of the time of filing, and their position is unknown.

December 15, 2025

Respectfully submitted,

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General

Marissa A. Piropato
Deputy Chief

Gregory Cumming
Senior Attorney

*/s/ Mark J. Widerschein*
Mark Widerschein
Michelle Ramus
Trial Attorneys

3

JA90

Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov

*Counsel for Defendants*

4

JA91

USCA Case #26-5134   Document #2172336   Filed: 05/07/2026   Page 98 of 525

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-04316-RJL |

**DECLARATION OF JESSICA BOWRON, COMPTROLLER OF THE NATIONAL PARK SERVICE EXCERCISING THE DELEGATED AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron declare as follows:

1. I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025 delegation of that authority from the Acting Secretary of the Interior, and subsequent extension of that authority by the Secretary of the Interior. I have been employed by NPS since 2007 and served as NPS comptroller since 2017.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System nationwide, as well as all NPS programs, NPS directorates, and regional offices. The White House and President's Park ("the Park") is an administrative unit within the National Park System in the NPS National Capital Region ("NCR") comprised of the

White House, Lafayette Park, Sherman Park, the First Division Monument, and the Ellipse.

4. NPS's mission is to preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations.

5. Under the NPS Organic Act of 1916, the NPS was authorized to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. This authority generally extends to historic preservation and construction activities at individual park units in furtherance of the purpose of the park unit at issue.

6. The NPS Organic Act also supplies NPS with the authority to accept donations, including "patented land, rights-of-way over patented land or other land, buildings, or other property within a [National Park] System unit" and "money that may be donated for the purposes of the System." 54 USC § 101101.

7. In 1961, Congress enacted the Park's enabling legislation and directed that the President's Park enclosure, which includes the White House, its wings, the grounds within the White House fence and facilities located on those grounds, be administered pursuant to the NPS Organic Act. Pub. L. No. 87-286 (1961). Congress directed that in carrying out NPS's responsibilities under its Organic Act, "primary attention shall be

given to the reservation and interpretation of the museum character of the principal corridor on the ground floor and principal public rooms on the first floor of the White House." *Id.* However, Congress further directed that "nothing done under [the Park's enabling legislation] shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." *Id.*

8. In my current position, I have been and continue to be regularly briefed by John Stanwich, the NPS Liaison to the White House, and members of the Park's staff regarding the East Wing Modernization and State Ballroom project ("the Project"), the purpose of which is to establish a permanent, secure event space within the White House grounds that meets presidential priorities for capacity and dignified official functions and eliminates reliance on temporary tents and associated infrastructure strains.

9. On August 28, 2025, and pursuant to the requirements of the National Environmental Policy Act ("NEPA"), I signed and approved a Finding of No Significant Impact ("FONSI") for the White House East Wing Modernization and State Ballroom Environmental Assessment. The FONSI determined that that the selected action, establishing a permanent, secure event space within the White House grounds by replacing the then-existing East Wing of the White House with a new building that will house the White House State Ballroom, will not cause significant adverse effects requiring the preparation of an environmental impact statement. A Non-Impairment Determination prepared in compliance with NPS's 2006 Management Policies and the NPS Organic Act was attached as Appendix A. The FONSI, together with Appendix A, are attached to this declaration as Exhibit A and available online on the NPS's Planning,

Environment & Public Comment (PEPC) website at: ParkPlanning - White House East Wing Modernization and State Ballroom Environmental Assessment.

10. The conclusions in the FONSI were based on the analysis in an August 2025 Environmental Assessment ("EA") prepared by NPS for the Project. A copy of the August 2025 EA is attached to this declaration as Exhibit B and available online on the PEPC page for the Project.

11. NPS also documented compliance with Section 106 of the National Historic Preservation Act ("NHPA") for the limited activities associated with the East Wing Modernization Project that would take place outside of the White House and its Grounds. The White House and its grounds are exempted from the NHPA. 54 U.S.C. § 307104. A Memorandum to File documenting, pursuant to 36 CFR 800.3(a)(1), a finding of no potential for those activities to cause effects on historic properties is attached to this declaration as Exhibit C and available online on the PEPC page for the Project.

12. NPS also documented compliance with Section 7 of the Endangered Species Act. A Memorandum to File finding that the East Wing Modernization Project had no effect on federally listed species or their habitats is attached to this declaration as Exhibit D, and available online on the PEPC page for the Project.

13. The Executive Residence at the White House is handling project management for the Project, which means that that it is in control of all aspects of the day-to-day execution of the Project, including its scope, schedule, budget, design, and completion. However, the Executive Residence is coordinating with NPS staff regarding the Project, in particular with respect to potential impacts on NPS operations at the White House.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December

15, 2025.

JESSICA
BOWRON

Digitally signed by
JESSICA BOWRON
Date: 2025.12.15
16:07:55 -05'00'

Jessica Bowron

National Park Service
US Department of the Interior

The White House and President's Park



# Finding of No Significant Impact

## White House East Wing Modernization and State Ballroom Environmental Assessment
Washington, DC

NPS-25012

Recommended:

Frank W Lands

2025.08.28 14:48:32 -04'00'

_____

Frank Lands
Deputy Director, National Park Service

Approved:

JESSICA BOWRON

Digitally signed by JESSICA BOWRON
Date: 2025.08.28 14:53:50 -04'00'

_____

Jessica Bowron
Comptroller, Exercising the Delegated Authority of the Director, National Park Service

## Introduction

The National Park Service (NPS) prepared an environmental assessment (EA) consistent with the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 et seq.), the Department of the Interior (DOI) NEPA regulations, 43 CFR part 46, and the 2025 DOI Handbook of NEPA Implementing Procedures (516 DM 1 Handbook). This Finding of No Significant Impact (FONSI) documents the final determinations and approvals for NPS actions related to the East Wing modernization and State Ballroom construction. The statements and conclusions reached in this FONSI are based on documentation and analysis provided in the EA and associated decision file.

Congress established the White House and its grounds as a unit of the National Park System in 1961 and it is managed by the NPS through President's Park. The White House itself has expanded since its original construction and has been subject to many major and minor renovations since its first cornerstone was laid in 1792.  Although the White House has undergone expansions and many presidents have proposed large changes to the White House, its design remains a timeless representation of stability and resilience in our nation (Bushong 2005). The White House sits within President's Park, which includes Lafayette Square, the First Division Monument, Sherman Park, and various sites in and around the Ellipse.

## Purpose and Need for Action

The purpose of the proposed action is to establish a permanent, secure event space within the White House grounds that meets presidential priorities for capacity and dignified official functions, eliminates reliance on temporary tents and associated infrastructure strains, and protects the historic integrity and cultural landscape of the White House and its grounds while maintaining a high-quality visitor experience.

The Comprehensive Design Plan for the White House and President's Park (2000) identified the need for expanded event space to address growing visitor demand and provide a venue suitable for significant events. Successive administrations have recognized this need as an ongoing priority. To meet this need, the Executive Office of the President outlined three functional goals for any permanent event space: (1) immediate adjacency to the Executive Mansion (2) a direct ceremonial procession from the East Room into the venue, and (3) secure second-story access from the Executive Residence.

## Selected Action

The selected action will establish a permanent, secure event space within the White House grounds. This will be accomplished by replacing the existing East Wing of the White House with a new building that will house the White House State Ballroom.

<u>Deconstruction and Design</u>

The existing East Wing and East Colonnade will be deconstructed. Prior to deconstruction, the NPS will remove all museum collections, artifacts, and paintings (collectively "museum objects") from the East Wing and some museum objects from the Executive Mansion. Museum objects

JA98

from the East Wing may be relocated to other areas within the White House, which could result in temporary removal or modification of interior designs or museum objects in those spaces. If removed from the White House, all items will be stored in accordance with White House standards to ensure proper preservation and accountability.

The interiors and exteriors of the East Wing and East Colonnade have been evaluated to identify historic fabric with potential for salvage and possible reuse. Both buildings will be documented as outlined in the Documentation section below prior to removal of any features or finishes. Selected interior features will be documented, removed, and stored for potential reinstallation including wood paneling, light fixtures, movie theater elements, and interior columns. Selected exterior features, such as exterior columns, Seneca sandstone, the East Wing commemorative cornerstone and bronze plaque from the 1942 renovation, wrought iron fencing and gate, the Kennedy Garden arbor, two fanlight windows from the East Colonnade, and cobblestone paving, will be documented, removed, and stored for potential reinstallation. Some interior and exterior features will be reinstalled at and around the new building.

The new building will be approximately 90,000 square feet and will be connected to the Executive Mansion through the East Colonnade. The East Colonnade will be renovated to include an enclosed second story that will provide direct access from the East Room to the State Ballroom, while maintaining ground-floor access to and from the Executive Mansion. Limited portions of the east façade of the Executive Mansion will be carefully removed to tie in both levels; stones removed for this work will be cataloged and reinstalled.

The exterior design of the new East Wing building will be compatible with the Executive Mansion through classical elements such as columns and pediments. Materials will include a white painted exterior, historically compatible windows and doors, and an architecturally compatible roof. Interior finishes will include stone slab flooring, decorative plaster moldings, and high-quality finishes for elevator cabs. Mechanical, electrical, and plumbing (MEP) upgrades will include custom chandeliers, fixture updates, and architectural grilles, along with advanced audio-visual (AV) system enhancements.

The second floor will contain the State Ballroom with capacity for over 1,000 guests, depending on final design configuration. The State Ballroom will allow flexible staging on the south or east sides and provide views to the west, south, and east. A flat tray ceiling with decorative chandeliers is proposed. The first floor will continue to serve as the visitor entrance to the building with monumental stairs to the ballroom and will house storage, mechanical equipment, and mission space. Ground-floor restrooms will support events on the South Lawn.

Construction and Staging

A temporary construction zone will be established near the East Wing until project completion (summer 2028). This zone will close Madison Place NW from H Street NW to E Street NW and portions of Pennsylvania Avenue NW, extending approximately 260 feet east and 350 feet west from the Madison Place NW centerline to non-construction or emergency vehicles. The construction area will extend south from the East Colonnade, with the South Drive as the western boundary and East Executive Drive as the eastern boundary. The construction zone will

JA99

extend south to Hamilton Avenue. The construction will not impede visitation to other parts of President's Park.

A tower crane will be erected on site, with its final location determined upon completion of the final design documents. Other heavy construction equipment will be used, and contractors will employ ground protection to prevent turf and utility damage. Given the project's size and duration, turf replacement and ground remediation, such as decompaction of compacted topsoil, are expected to occur during project closeout, along with the repaving of affected roadway areas.

Landscaping

The selected action will expand the footprint of the East Wing, resulting in adjustments to landscaping in the project area. To accommodate the larger building, a variety of ornamental trees and shrubs will be removed from the project site. The commemorative Southern Magnolias on the east front of the East Wing will be removed due to the proposed footprint of the building (north magnolia planted in 1947, south magnolia planted in 1942 by Franklin D. Roosevelt). The East Garden will be carefully removed during construction and reinstalled similar to its existing design. The arbor in the East Garden will be removed, restored, and reinstalled in the East Garden once exterior construction is complete.

The brick pavers along the garden paths will be carefully removed. The bricks will be stored and ready to be relaid as part of the garden reinstallation. The fountain, including its statue, a centerpiece of the garden, will also be carefully dismantled and preserved for future reinstallation. Meanwhile, the Laura Bush Silver Linden Tree will be fenced and protected with a rigid barrier to ensure its safety throughout the construction period.

Documentation

The NPS will continue to survey and record the current interior and exterior conditions of the East Wing, East Colonnade, and Jacqueline Kennedy Garden (East Garden) of the White House. The documentation consists of two components:
1. Digital Survey: A 3-dimensional digital survey of the property using Light Detection and Ranging (LiDAR) laser scanning equipment will be completed. Scanning will be conducted using Leica P50 and RTC360 terrestrial laser scanners. A Leica TS16i total station will be used to create a control network for the scanned data. A single three-dimensional model of the building and site will be completed.
2. High-Resolution Digital Photography: The NPS will capture high-resolution digital photographs of the building and site to include the primary interior and exterior spaces, significant features, and contextual views. Photographs will be taken using a Phase One medium-format digital system and a Canon R5 full-frame digital mirrorless system.

## Finding of No Significant Impact

A description of all potential environmental effects associated with the selected action and no action alternative is included in the EA, incorporated by reference herein. Consistent with the DOI NEPA Handbook, Section 1.2(b), the NPS evaluated the significance of the selected action, identified as the proposed action in the EA, by analyzing the potentially affected environment and the degree of the effects of the selected action. Significance is determined solely in relation to reasonably foreseeable adverse effects. The degree of effect is considered by evaluating both short-and-long term effects, both beneficial effects and adverse effects, effects on public health and safety, economic effects and effects on the quality of life of the American People. The NPS only completes a significance determination for the selected action and does not determine the significance of unselected alternatives.

The EA discloses the reasonably foreseeable effects of the selected action, including the combined effects of the selected action with those of past, ongoing, and anticipated future actions on the park's cultural resources and on visitor access and experience. While other park resources may experience some effects, those effects are minimal and were determined not to warrant detailed analysis in the EA. Accordingly, these resources are not discussed further here, as the anticipated effects are so minor that they have no potential to reach a level of significance. For a detailed description of impact topics considered but dismissed, see Appendix A of the EA.

Potentially Affected Environment

A more detailed description of the potentially affected environment is included in the EA under the subheadings Current and Expected Future Conditions of the Environment if No Action is Taken.

The White House is the oldest public building in the District of Columbia and has served as the home and office of every U.S. president except George Washington. Together with its wings and grounds, the White House functions as the residence of the First Family, the workplace of the President and staff, a national park, and an evolving museum.

The White House and President's Park include three distinct cultural landscapes that were identified as contributing features to the L'Enfant Plan of the City of Washington, DC, a historic district listed in the National Register of Historic Places (NPS 1997): Lafayette Park, White House Grounds and The Ellipse. These cultural landscapes are fundamental to the park and provide the setting for the "President's Park" as defined by Pierre L'Enfant in 1791. Situated on a high point within the city, the White House is a focal point on the principal north-south axis of L'Enfant's plan. Views and vistas were among the most essential features of L'Enfant's plan. The White House grounds are dynamic, changing with the seasons and the needs of the Executive Office of the President. Vegetation is frequently moved or removed, and at times temporary event tents obstruct views of the White House and other features of President's Park.

The Executive Mansion encompasses approximately 55,000 square feet, not including the West and East Wings and colonnades. This historic main building is organized into three primary sections: the Ground Floor, the State Floor, and the Executive Residence floors.  The East Wing, constructed in 1942, has undergone multiple renovations and provides office space for the First Lady and her staff, including the White House Social Secretary, Graphics and Calligraphy Office, and correspondence teams. It also serves as the public entrance for White House tours and special events held at the White House.

The White House hosts major public events such as the Garden Tours, the Easter Egg Roll, and the National Christmas Tree Lighting. President's Park offers open space for recreation, First Amendment expression, and community programming. The NPS provides visitor access, interpretation, and educational services throughout these areas (NPS 2014).

Short and Long-term Beneficial and Adverse Effects

*Cultural Resources[1]- Cultural Landscapes*

Under the selected action, the White House Grounds Cultural Landscape, which was originally designed by Thomas Jefferson and later modified by the designs of Andrew Jackson Downing, Frederick Law Olmsted Jr., and others, will be altered through an expansion of the White House footprint and the addition of a larger structure on its east side. These changes will result in long-term adverse effects on the cultural landscape. Similarly, views of the White House from Lafayette Park and the Ellipse will be permanently altered due to the modifications to the East Wing. In the short term, construction activities, including the presence of equipment and the removal and replanting of vegetation, will result in temporary adverse effects on these landscapes. However, the EA also identifies long-term beneficial effects from eliminating the need for temporary tents and other temporary facilities to support large events.

Despite the adverse impacts identified in the EA, the selected action will not result in significant adverse impacts to the park's cultural landscapes. The selected action will not permanently alter the park's most critical view, the long vista connecting the White House, Washington Monument, and Jefferson Memorial. In addition, mitigation measures such as replanting historically significant trees, salvaging and reusing historic materials, and preserving or reinstalling garden features will help maintain continuity between the site's historic character and its contemporary functions. These measures ensure that significant elements of the landscape are preserved and adapted for continued use, supporting the conclusion that the selected action will not result in significant impacts to cultural landscapes. Finally, the historical significance of the park's cultural landscape reflects its continuous adaptation to meet the evolving needs of the Executive Office of the President. The selected action continues a long-standing tradition reflected in the park's enabling legislation of adapting the White House

---

[1] This Decision Document does not address compliance with Section 106 of the National Historic Preservation Act. Section 106 does not apply to the White House or its grounds, because 54 U.S.C. § 307104 expressly exempts the White House grounds (along with the Supreme Court and Capitol) from all requirements of that statute. Undertakings occurring outside the White House or its grounds may be subject to Section 106 review.

JA102

grounds to accommodate essential executive functions. Thus, changes to the landscape for this purpose are consistent with its historic character and are not considered significant.

*Cultural Resources - Historic Buildings*

The White House is designated as a National Historic Landmark (NHL). Under the selected action, the existing East Wing will be deconstructed and replaced with a new building, resulting in the permanent loss of a component that has been integral to White House operations since 1942. This change will disrupt the historical continuity of the White House grounds and alter the architectural integrity of the east side of the property. The new building's larger footprint and height will dominate the eastern portion of the site, creating a visual imbalance with the more modestly scaled West Wing and Executive Mansion. Adding a second story to the East Colonnade will further modify the setting, contrasting with the single-story design of the West Colonnade and changing the traditional spatial organization and sightlines of the grounds. These changes will adversely alter the design, setting, and feeling of the White House and the grounds over the long-term. In addition, construction activities will also introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features.

The selected alternative will also provide long-term benefits by reducing reliance on temporary event infrastructure, minimizing wear on the grounds, and improving functionality for large gatherings through the addition of a permanent ballroom.

The selected action will result in a substantial change to one portion of the NHL. However, the essential features that make it nationally significant, particularly its role in establishing the nation's capital and its resilience during the War of 1812, will remain unchanged. Moreover, the NHL documentation identifies the period of significance as 1792-1955, a period that saw significant changes in the configuration of the White House, namely the addition of the East and West Wings. Therefore, the overall impact will not significantly affect the property's significance as an NHL and it retains the qualities that caused it to be designated as an NHL.

Further, mitigation measures, including documentation of the current East Wing as well as salvage and storage of some of the existing historic building materials, will be reused in the new modernized East Wing, and to ensure their availability for future preservation or restoration projects at the White House or for other significant buildings in the district. These efforts will support preservation efforts by providing hard-to-replicate or replacement building materials that can be used at the White House and other historic buildings in the area, including the Smithsonian Castle, limiting potential significant adverse impacts to these resources in the future.

The White House is also unique in that, while it is a historic structure, it continues to evolve to meet the operational needs of the Executive Office of the President. This ongoing adaptation is part of its historical significance. Thus, the selected action will not result in a significant adverse impact to historic buildings.

*Visitor Access and Experience*

President's Park, excluding the White House and its grounds, is open to the public without the need for a scheduled tour, however, temporary area closures may be in place due to events and activities. U.S. Secret Service operations may also temporarily affect access to areas of the park to ensure necessary security and safety for the adjacent White House grounds, its occupants, and the public. These closures are frequent, given the high level of activity that occurs in and around the park.

Under the selected alternative, certain areas within both President's Park and the White House and its grounds will become temporarily inaccessible. Visitors to these areas will also experience increased noise and visual intrusions, resulting in adverse effects. However, these impacts are expected to be temporary and will conclude with the completion of construction, anticipated to be summer 2028, limiting the duration and extent of the adverse impacts.

Construction will interrupt normal tour flow through the East Wing, necessitating rerouting (e.g., alternate entry point) or postponement. Historically, tours have been suspended or altered during renovations or heightened security conditions. At the time of the EA's preparation, new tour bookings have been paused while a collaborative group of White House, NPS, and U.S. Secret Service staff work to determine the best way to ensure public access to the White House as this project begins and for the duration of construction. While the selected alternative will temporarily alter the existing White House tour route and potentially reduce tour availability during construction, tours will continue in some capacity and will include access to the State Floor of the Executive Mansion. This will help minimize the overall impact on visitors seeking to tour the interior of the White House. Because these closures are temporary, limited to the construction period, and consistent with previous renovation practices, they do not constitute significant adverse impacts.

The removal of the current East Wing will result in a permanent adverse impact for those who value the experience of this specific space. However, in the long term, the selected alternative will provide a modernized East Wing and a permanent ballroom designed to enhance functionality, accessibility, and visitor amenities, while reducing reliance on temporary event spaces. Additionally, the documentation of the East Wing before deconstruction and potentially during the construction process will provide a new interpretive opportunity in the future. As a result, the loss of the existing structure is not considered a significant adverse impact. Collectively, these improvements will strengthen the White House's capacity to host large indoor events, reinforce its status as a national landmark, and contribute to an improved long-term visitor experience.

Effects on Public Health and Safety

The selected action will not result in significant adverse effects on public health and safety. As detailed in Appendix A of the EA, the project's limited grading area, short duration of construction equipment use, and minimal vehicle trips will not significantly affect regional air quality. Emissions will remain below applicable pollutant thresholds.

JA104

Vehicle traffic is already restricted on streets near the project area, and additional restrictions will be clearly marked and enforced to ensure public safety. Pedestrian access may also be limited or rerouted in certain areas, as described in the EA under Visitor Access and Experience, to maintain a safe environment during construction. Finally, the selected action does not involve the release of hazardous or solid waste or other hazards to human health.

Economic Effects

NPS considered socioeconomic impacts but dismissed them from detailed analysis, as explained in Appendix A of the EA. While White House tours and visits to President's Park offer valuable experiences, they are not major economic drivers for the region. These sites are typically one of many stops for visitors, and temporary changes to tour availability or site access are not expected to significantly affect the regional economy, tourism sector, or local employment. Although construction may generate some limited opportunities for local businesses, these effects are expected to be minor and likely undetectable.

Effects on the Quality of Life of the American People

As described in the EA, the selected action will affect visitor access and experience, resulting in both adverse and beneficial impacts. In the short term, temporary site closures and reduced tour capacity will create adverse effects. However, over the long term, these areas will reopen and remain accessible, benefitting the American people. The selected action will not significantly alter educational opportunities or public understanding of the park. As noted, White House tours will continue, allowing visitors to engage with the park's purpose and unique resources. The modernized East Wing and new State Ballroom will directly benefit the American people by expanding the White House's ability to host large indoor events, celebrate America's history through new interpretive opportunities, and create a symbolic space for events of national importance, reinforcing shared civic identity and pride. It will also directly benefit the American people by providing comfort facilities that may be used for outdoor events on the South lawn. The selected action will also indirectly benefit the American people by providing modern office space for the Executive Office of the President.

The selected action will not restrict the public's ability to consume, purchase, or use products from public lands. It will also have no impact on public services, traditional land and water use practices, or the cultural heritage of Native American communities. Additionally, the selected alternative will not affect passive recreational use of ecosystems.

## Rationale for the Decision

The proposed action to modernize the White House East Wing and construct a new State Ballroom is the selected action. The EA evaluated two alternatives: a no action alternative and proposed action, which is the selected action. In addition, the Executive Office of the President and the NPS considered several other options for renovating the East Wing and creating space for large events. These alternatives were dismissed from detailed analysis because they did not adequately support the functional goals identified by the Executive Office of the President. The no action alternative was not selected because it does not meet the project's purpose and

JA105

need, as it lacks a permanent, secure event space within the White House grounds, and will continue reliance on temporary tents and associated infrastructure.

As described in the EA, successive administrations, including the current one, and existing planning documents have consistently recognized the need for a secure event space capable of hosting large official functions without reliance on temporary tents and associated infrastructure. The selected action fulfills this need by providing permanent facilities to support the operational needs of the Executive Office of the President, including both office and large event space, in a manner consistent with the park's enabling legislation, described below.

Congress established the White House as a unit of the National Park System in 1961 and it is managed by the NPS through President's Park. The enabling legislation (Pub. L. No. 87-286, 75 Stat. 586 (1961)) directs the NPS to prioritize the preservation and interpretation of the museum character of the principal corridor on the ground floor and the main public rooms on the first floor of the White House. The legislation provides that NPS management of the park shall not conflict with the administration of the Executive Offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and their family or for official purposes.

Although the number and format of White House tours will differ from past practice resulting in some temporary effects to the NPS's ability to interpret the unit, tours will resume as soon as practicable and will continue to include access the principal ground floor corridor and the public rooms on the State Floor of the Executive Mansion, consistent with the enabling legislation of the park. Some ground floor rooms adjacent to construction zones or temporarily repurposed as offices for East Wing staff will be unavailable during construction, but this limitation will be temporary, lasting only for the duration of construction. As a result, the selected action will continue to preserve and interpret the museum corridor and principal public rooms of the White House, ensuring that visitor access and the park's core interpretive mission are maintained.

Additionally, under the selected action, museum objects on display in the East Wing and some objects in the Executive Mansion will be relocated or removed. Items not currently in use or on display are curated or stored. The routine removal of museum objects from the White House and off-site storage of those objects when they are not in use or being displayed is consistent with the park's enabling legislation and institutionalized through longstanding regular practice.

As described in the EA, the White House is unique in that, while it is an historic building, it is also a building that has evolved over time. Since 1805, Presidents have expanded and updated the White House to meet the needs of the Executive Office of the President. The selected action is consistent with this historic pattern of use and with the park's enabling legislation. Finally, as further explained in the NPS's Non-Impairment Determination (Appendix A), the action will not result in impairment of, or unacceptable impacts to, the park's resources.

JA106

In summary, the selected action best meets the project's purpose and need by providing permanent, secure space for large official events within the White House grounds, eliminating reliance on temporary tents. It aligns with the long-standing functional goals of the Executive Office of the President, meets the current operational needs of the Executive Office of the President, and is consistent with the White House's historical evolution and the park's enabling legislation. The action maintains public access to key interpretive areas, and ensures that the museum character of the principal ground floor corridor and State Floor public rooms is upheld. As documented in the EA and the Non-Impairment Determination attached, the selected action will not result in significant environmental impacts or impair the park's resources, allowing the NPS to continue fulfilling its stewardship and interpretive mission.

## Decision

Based on the information contained in the EA and described above, the NPS has determined that the selected action does not constitute a major federal action meeting the criteria that normally requires preparation of an environmental impact statement (EIS). Therefore, an EIS will not be required. Lastly, the NPS certifies that it has considered all relevant information raised during the NEPA process and that the NEPA process is closed (516 DM 1 Handbook § 4.1).

JA107

## Appendix A
## Non-Impairment Determination

**Compliance with National Park Service (NPS) Management Policies
Unacceptable Impacts and the No-Impairment Standard**

As described in 2006 NPS Management Policies (Management Policies) (NPS 2006), Section 1.4.4, the National Park Service Organic Act of 1916 (54 USC 100101) prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (NPS 2025) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The NPS completed a non-impairment analysis for the White House East Wing Modernization and State Ballroom EA and determined that it will not result in impairment of park resources, or in unacceptable impacts as described in § 1.4.7.1 of Management Policies. Sections 1.4.5 and 1.4.6 of Management Policies further explain impairment.

Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values.

An impact to any park resource or value may, but does not necessarily, constitute an impairment, but an impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is:

- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park;
- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance (NPS 2006, 1.4.5).

Section 1.4.6 of Management Policies identifies the park resources and values that are subject to the no-impairment standard. These include:

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

JA108

- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor access and experience, socioeconomics, public health and safety, environmental justice, land use, park operations, wilderness, etc., as these do not constitute impacts to park resources and values subject to the no-impairment standard under the Organic Act. See Management Policies § 1.4.6.

## Non-Impairment Determination for the Selected Action

As a basis for evaluating the potential for unacceptable impacts or impairment on the park's resources, the NPS relied on the EA which is incorporated by reference herein. The EA includes analysis of impacts to cultural resources, including cultural landscapes and historic buildings and visitor access and experience. The NPS analyzed a no action alternative and proposed action in detail in the EA.

The proposed action was selected for implementation, because the Executive Office of the President identified the selected action as the only alternative that meets its functional goals and operational needs. The proposed action is referred to as the selected action in this document. The selected action will establish a permanent, secure event space within the White House grounds. This will be accomplished by replacing the existing East Wing of the White House with a new building that will house the White House State Ballroom. The selected action will necessitate some modifications to the existing landscape.

Under the selected action, the existing East Wing and portions of the East Colonnade will be largely deconstructed. Prior to deconstruction, the NPS will remove all collections, artifacts, and paintings (collectively "museum objects") from the East Wing of the White House and some museum objects from the Executive Mansion. Museum objects will be either re-displayed or properly stored.

The new building will be approximately 90,000 square feet and will be connected to the Executive Mansion through the East Colonnade. The East Colonnade will be renovated to include a secure second story that will provide direct access from the East Room to the State Ballroom, while maintaining existing ground-floor access to and from the main Executive Mansion. The second floor of the new building will feature a State Ballroom, while the first floor will accommodate guest suites, executive offices, restrooms, and a visitor entrance with expanded interpretive areas.

Purpose and Fundamental Resources and Values of The White House and President's Park

JA109

The purpose of the park and its fundamental resources and values are important context for a non-impairment determination. The purpose of the White House and President's Park is described in the enabling legislation. The enabling legislation states:

> *Primary attention shall be given to the preservation and interpretation of the museum character of the principal corridor on the ground floor and the principal public rooms on the first floor of the White House, but nothing done under this Act shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes* (Pub. L. No. 87-286, 75 Stat. 586 (1961)).

The White House and the surrounding cultural landscapes are fundamental resources of the park as well as visitor experience and public access, First Amendment activities, museum collections, and the park's iconic views and vistas. The park is also significant for its historical importance and its enduring role as a symbol of democracy (NPS 2014). The EA discusses impacts to the White House building and cultural landscapes in detail and acknowledges the importance of views and vistas as part of the cultural landscape. The analysis below further addresses these resources in the context of the Organic Act.

Other park resources subject to the no-impairment standard may experience some effects; however, these effects are minimal and were determined not to warrant detailed analysis in the EA. Museum collections and objects, which are fundamental resources of the park, were not carried forward for detailed analysis. As described in the EA, museum objects will be properly stored to ensure their preservation for the future enjoyment of the American people. Also, resources such as noise, wildlife and wildlife habitat, archeology and air quality are not discussed further here, as the anticipated effects are so minor that they have no potential to result in unacceptable impacts or impairment. For a detailed description of park resources considered but dismissed from detailed analysis, see Appendix A of the EA.

As noted above, the NPS does not include a non-impairment analysis for visitor access and experience, as it is not identified in Section 1.4.6 of Management Policies as a resource subject to the no-impairment standard. However, as described in the Finding of No Significant Impact (FONSI) and in greater detail in the EA, the selected action does not permanently restrict visitor access to the White House. While some areas of the White House and grounds will be temporarily restricted or closed, White House tours and events are expected to occur in some capacity. Thus, this fundamental value will be maintained under the selected action.

In most cases, the evaluation of unacceptable impacts or impairment to the resources discussed in this document, specifically cultural landscapes and historic buildings, considers the extent to which the selected action changes characteristics from the period of significance, such as whether a building still reflects its appearance during an important historical event or period. In this case, however, the analysis must be guided not only by the preservation requirement in the Organic Act, but also by the park's unique enabling legislation and its primary purpose, which recognizes the White House as both a residence and a workplace. The Organic Act's preservation mandate is constrained by the purposes of the park to support the use and

JA110

occupancy of the buildings and grounds by the President and First Family, and to facilitate official Executive functions. As described in the FONSI, the selected action meets the needs identified by the Executive Office of the President. The non-impairment analysis below appropriately considers potential impacts not only through the lens of the Organic Act and NPS Management Policies, but also consistent with the park's enabling legislation.

Cultural Resources Non-Impairment Analysis

*Cultural Resources – Cultural Landscapes*

The White House and President's Park include three distinct cultural landscapes that were identified as contributing features to  the L'Enfant Plan of the City of Washington, DC, a historic district listed in the National Register of Historic Places (NPS 1997). The White House Grounds Cultural Landscape, which was originally designed by Thomas Jefferson and later modified by the designs of Andrew Jackson Downing, Frederick Law Olmsted Jr., and others, will be altered through an expansion of the White House footprint and the addition of a larger structure on its east side. Similarly, views of the White House from Lafayette Park and the Ellipse will be permanently altered due to the modifications to the East Wing. In the short term, construction activities, including the presence of equipment and the removal and replanting of vegetation, will result in temporary adverse effects on these landscapes.

While the selected action introduces adverse impacts to the park's cultural landscapes, these impacts do not rise to the level of impairment, particularly in relation to the historic views and vistas central to the L'Enfant Plan of 1791. The long vista, connecting the White House, Washington Monument, and Jefferson Memorial, has been a defining feature of Washington D.C. for over two centuries. The White House, situated at a prominent high point, has undergone many modifications over time, including the construction of the East and West Wings. These changes, while altering the immediate setting, did not compromise the broader visual and spatial relationships that define the L'Enfant Plan. The selected action is consistent with these past changes in that it does not obstruct or diminish the visual connection between these landmarks. The integrity of the long vista, a defining element of the original city plan, remains unobstructed, and thus unimpaired, under the selected action.

Under the selected action, the White House Grounds Cultural Landscape will be affected by a reduction in architectural symmetry and alterations to the manicured environment and built features of the landscape. However, as noted in the EA, mitigation measures such as replanting historically significant trees, salvaging and reusing historic materials, and preserving or reinstalling garden features will help maintain continuity between the site's historic character and its contemporary functions. These measures ensure that significant elements of the landscape are preserved and adapted for continued use, eliminating the potential of impairment.

Most importantly, the historical significance of the park's cultural landscape reflects its continuous adaptation to meet the evolving needs of the Executive Office of the President. The selected action continues a long-standing tradition reflected in the park's enabling legislation of adapting the White House grounds to accommodate essential executive goals. The changes to

JA111

the cultural landscapes for this purpose are consistent with its historic character and thus do not rise to the level of impairment.

*Cultural Resources – Historic Buildings*

The White House was designated as a National Historic Landmark (NHL) in 1960. Under the selected action, the existing East Wing will be removed and replaced with a new building, resulting in the permanent loss of a component that has supported White House operations since 1942. The second story addition on the East Colonnade will further modify the traditional spatial organization and sightlines of the grounds. These changes will adversely alter the design, setting, and feeling of the White House and its grounds over the long term. Also, the selected action may introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features.

While the selected action will alter the design, setting, and feeling of the White House and its grounds, mitigation measures, including HABS, LiDAR, and photographic documentation and the salvage and storage of select historic building materials, will preserve important elements of the historic fabric. These materials are intended to be reused in the modernized East Wing or retained for future preservation or restoration efforts. Thus, despite the changes, these historic building materials will remain available for the appreciation and benefit of the American people.

Finally, the White House is unique in that, although it is a historic structure, it continues to evolve to meet the operational needs of the Executive Office of the President, a quality that contributes to its historical significance. Indeed, when the NHL was designated, the East Wing had existed in its current form for only 18 years. Under the selected action, the White House retains its designation as an NHL, along with its historical value and iconic status. The modernized East Wing and new State Ballroom will directly benefit the American people by expanding the White House's ability to host large indoor events, celebrate America's history through new interpretive opportunities, and create a symbolic space for events of national importance, reinforcing shared civic identity and pride. It will continue to serve both as a symbol of democracy and as a functioning seat of the executive branch. Therefore, the selected action does not result in unacceptable impacts or impairment, as the changes are consistent with the ongoing historical significance of the White House and its grounds.

Conclusion

As demonstrated here and supported by the analysis in the EA, the impacts from the modernization of the East Wing and the construction of a State Ballroom, do not prevent the National Park Service from fulfilling the park's purpose or result in impairment of park resources. Additionally, the selected action will not unreasonably interfere with park programs or activities, including tours and special events; with other appropriate uses; with the overall atmosphere of peace and tranquility; with the natural soundscape; or with NPS concessioner or contractor operations. Therefore, the selected action will not cause impairment of, or unacceptable impacts to, the park's resources or visitor experience.

# References

Department of the Interior
2025    U.S. Department of the Interior Handbook of National Environmental Policy Act
Implementing Procedures. 516 DM 1.

National Park Service (NPS)
1997    National Register of Historic Places: Nomination for L'Enfant Plan of the City of
Washington, DC

2000    Comprehensive Design Plan: The White House & President's Park, Washington, DC
United States Department of the Interior

2006    Management Policies. US Department of the Interior, Washington, DC

2014    Foundation Document. The White House and President's Park.
https://www.nps.gov/whho/learn/management/prpa-foundation-document.htm.
Accessed August 6, 2025.

2025    Revised Guidance for Non-Impairment Determinations and the National Environmental
Policy Act Process Memorandum. April 2025.

United States Congress
1961    Public Law 87-286: Concerning the White House and providing for the care and
preservation of its historic and artistic contents. Enabling Legislation. U.S. Government
Printing Office.

JA113

National Park Service
US Department of the Interior

The White House and President's Park



# White House
# East Wing Modernization and State Ballroom
# Environmental Assessment

Washington, DC

# August 2025

NPS-25012

# Table of Contents

1 – Purpose and Need.................................................................................................. 1

    Background ............................................................................................................. 1

    Purpose and Need.................................................................................................. 1

    Project Area and Issues......................................................................................... 2

2 – Alternatives ......................................................................................................... 4

    No Action Alternative............................................................................................ 4

    Proposed Action.................................................................................................... 4

3 – Affected Environment and Environmental Consequences.................................... 7

    Cultural Resources ............................................................................................... 7

    Visitor Access and Experience............................................................................ 14

References .............................................................................................................. 18

Appendix A – Impact Topics Considered But Not Carried Forward for Analysis ......... 22

Appendix B – Alternatives Considered but Dismissed............................................... 29

# Chapter 1 – Purpose and Need

## Background

The White House is the oldest public building in the District of Columbia and has been the home and office of every President of the United States except for George Washington. The White House, including its wings and grounds, serves as the residence of the First Family, offices for the President and staff, and an evolving museum. It sits within President's Park, which includes Lafayette Square, the First Division Monument, Sherman Park, and various sites in and around the Ellipse.

The White House itself has expanded since its original construction and has been subject to many major and minor renovations since its first cornerstone was laid in 1792. Although the White House has undergone expansions and many presidents have proposed large changes to the White House, its design remains a timeless representation of stability and resilience in our nation (Bushong 2005).

Beginning in 1805, various presidents have expanded the colonnade leading to the east of the White House. In 1902, the East Wing colonnade was reconstructed in the same location. During excavations, the contractors found and dug up the original East Wing's foundations (McDonald 2011). The East Wing, as we know it today, includes the colonnade leading to a two-story building that was added to the White House in 1942.

Congress established The White House as a unit of the National Park System in 1961, and it is managed by the National Park Service (NPS) through President's Park. The enabling legislation (Pub. L. No. 87-286, 75 Stat. 586 (1961)) states that the NPS will give primary attention to the preservation and interpretation of the museum character of the principal corridor on the ground floor and the principal public rooms on the first floor of the White House. The enabling legislation provides that NPS management of the park shall not conflict with the administration of the Executive Office of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family or his official purposes.

## Purpose and Need

The White House stands as one of the most stunning and historically significant buildings in the world. However, it faces a fundamental limitation: it cannot host large events without resorting to the installation of huge, unsightly tents positioned over 100 yards from the Executive Mansion and within view of visitors to President's Park. For 150 years, Presidents, administrations, and White House staff have needed a permanent indoor event space at the White House that can hold substantially more guests than currently allowed.

The continued use of temporary tents and outdoor set-ups for high-profile events has taken a toll on the cultural landscape and architectural integrity of the area. These installations pose threats to vital infrastructure and landscaping, while diminishing the overall visitor experience. During events, large stakes are driven into the ground, risking damage to underground utilities.

JA116

Meanwhile, temporary flooring damages the turf, leading to a need for expensive repairs, and the lack of sufficient restrooms adds to the growing urgency to establish a permanent event space and event support facilities. Visual distractions and the aged appearance of these temporary facilities further undermine the experience for visitors to the White House and President's Park (NPS 2000).

The Comprehensive Design Plan for the White House and President's Park (2000) identified the need for expanded event space to address growing visitor demand and provide a venue suitable for significant events. Successive administrations have recognized this need as an ongoing priority. To meet this need, the Executive Office of the President outlined three functional goals for any permanent event space: (1) immediate adjacency to the White House Executive Mansion, (2) a direct ceremonial procession from the East Room into the venue, and (3) enclosed second-story access from the Executive Mansion.

The purpose of the proposed action is to establish a permanent, secure event space within the White House grounds that provides increased capacity for official state functions, eliminates reliance on temporary tents, temporary support facilities, and associated infrastructure strains, and protects the historic integrity and cultural landscape of the White House and its grounds while maintaining a high-quality visitor experience, consistent with essential functional requirements of the Executive Office of the President.

The NPS has prepared this environmental assessment (EA) consistent with the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 et seq.), the Department of the Interior (DOI) NEPA regulations, 43 CFR 46, and the 2025 DOI Handbook of NEPA Implementing Procedures (516 DM 1 Handbook).[1,2]

## Project Area and Issues

The project area includes the East Colonnade, portions of the east side of the Executive Mansion where the colonnade meets the building, the East Garden, the East Wing of the White House, and space west and south of the East Wing extending down to the South Drive. The project area extends from Pennsylvania Avenue, running south along the East Executive Park (East Executive Avenue), and reaching Hamilton Place (Figure 1). Hereafter, when this document refers to the East Wing, it collectively includes the East Colonnade. Where necessary, the East Colonnade will be specifically called out.

---

[1] Certification related to Page Limits: The NPS certifies it has considered the factors mandated by NEPA; that this EA represents its good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects NPS's expert judgement; and that any considerations addressed briefly or left unaddressed were, in NPS's judgment, comparatively not of a substantive nature that meaningfully informed the consideration of environmental effects and the resulting decision on how to proceed.

[2] Certification related to Deadline: The NPS certifies that this EA represents a good-faith effort to fulfill NEPA's requirements within the congressional timeline; that such effort is substantially complete; that, in NPS's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in NPS's judgment, the analysis contained therein is adequate to inform and reasonably explain its decision regarding the proposed Federal action.

Impacts to Cultural Resources and Visitor Access and Experience are evaluated for each alternative. The following issues were considered but dismissed from detailed analysis (see Appendix A): Air Quality, Archeological Resources, Floodplains, Museum Collections, Noise and Noise-Compatible Land Use, Socioeconomics, Soils, Traffic and Pedestrian Access, Vegetation, Wildlife and Wildlife Habitat.



N ↑  MAP LEGEND

1  Executive Mansion
2  East Colonnade
3  East Wing
4  East Garden
5  South Lawn

Figure 1. The East Wing Modernization Project Area within The White House and President's Park.

JA118

# Chapter 2 – Alternatives

This section describes the no action alternative and the proposed action. The proposed action is informed by concept-level designs developed in collaboration with the Executive Office of the President's planning team and architects. A discussion of alternatives considered but dismissed is included in Appendix B.

## No Action Alternative

Under the no action alternative, there would be no physical changes to the White House or its grounds or the ongoing and continuing management of the site. Tents and other temporary facilities would continue to be erected on the South Lawn to host large White House events, such as State dinners.

## Proposed Action

The proposed action would establish a permanent, secure event space within the White House grounds. This would be accomplished by replacing the existing East Wing of the White House with a new building that would house the White House State Ballroom.

Deconstruction and Design

The existing East Wing and East Colonnade would be deconstructed. Prior to deconstruction, the NPS would remove all museum collections, artifacts, and paintings (collectively "museum objects") from the East Wing and some museum objects from the Executive Mansion. Museum objects from the East Wing may be relocated to other areas within the White House, which could result in temporary removal or modification of interior designs or museum objects in those spaces. If removed from the White House, all items would be stored in accordance with White House standards to ensure proper preservation and accountability.

The interiors and exteriors of the East Wing and East Colonnade have been evaluated to identify historic fabric with potential for salvage and possible reuse. Both buildings would be documented as outlined in the Documentation section below prior to removal of any features or finishes. Selected interior features would be documented, removed, and stored for potential reinstallation including wood paneling, light fixtures, movie theater elements, and interior columns. Selected exterior features, such as exterior columns, Seneca sandstone, the East Wing commemorative cornerstone and bronze plaque from the 1942 renovation, wrought iron fencing and gate, the Kennedy Garden arbor, two fanlight windows from the East Colonnade, and cobblestone paving, would be documented, removed, and stored for potential reinstallation. Some interior and exterior features would be reinstalled at and around the new building.

The new building would be approximately 90,000 square feet and would be connected to the Executive Mansion through the East Colonnade. The East Colonnade would be renovated to include an enclosed second story that would provide direct access from the East Room to the State Ballroom, while maintaining ground-floor access to and from the Executive Mansion.

JA119

Limited portions of the east façade of the Executive Mansion would be carefully removed to tie in both levels; stones removed for this work would be cataloged and reinstalled.

The exterior design of the new East Wing building would be compatible with the Executive Mansion through classical elements such as columns and pediments. Materials would include a white painted exterior, historically compatible windows and doors, and an architecturally compatible roof. Interior finishes would include stone slab flooring, decorative plaster moldings, and high-quality finishes for elevator cabs. Mechanical, electrical, and plumbing (MEP) upgrades would include custom chandeliers, fixture updates, and architectural grilles, along with advanced audio-visual (AV) system enhancements.

The second floor would contain the State Ballroom with capacity for over 1,000 guests, depending on final design configuration. The State Ballroom would allow flexible staging on the south or east sides and provide views to the west, south, and east. A flat tray ceiling with decorative chandeliers is proposed. The first floor would continue to serve as the visitor entrance to the building with monumental stairs to the ballroom and would house storage, mechanical equipment, and mission space. Ground-floor restrooms are proposed to support events on the South Lawn.

Construction and Staging

Under the proposed action, a temporary construction zone would be established near the East Wing until project completion (summer 2028). This zone would close Madison Place NW from H Street NW to E Street NW and portions of Pennsylvania Avenue NW, extending approximately 260 feet east and 350 feet west from the Madison Place NW centerline to non-construction or emergency vehicles. The construction area would extend south from the East Colonnade, with the South Drive as the western boundary and East Executive Drive as the eastern boundary. The construction zone would extend south to Hamilton Avenue. The construction would not impede visitation to other parts of President's Park.

A tower crane would be erected on site, with its final location determined upon completion of the final design documents. Other heavy construction equipment would be used, and contractors would employ ground protection to prevent turf and utility damage. Given the project's size and duration, turf replacement and ground remediation, such as decompaction of compacted topsoil, are expected to occur during project closeout, along with the repaving of affected roadway areas.

Landscaping

The proposed action would expand the footprint of the East Wing, resulting in adjustments to landscaping in the project area. To accommodate the larger building, a variety of ornamental trees and shrubs would be removed from the project site. The commemorative Southern Magnolias on the east front of the East Wing would be removed due to the proposed footprint of the building (north magnolia planted in 1947, south magnolia planted in 1942 by Franklin D. Roosevelt). The East Garden would be carefully removed during construction and reinstalled similar to its existing design. The arbor in the East Garden would be removed, restored, and reinstalled in the East Garden once exterior construction is complete.

JA120

The brick pavers along the garden paths would be carefully removed. The bricks would be stored and ready to be relaid as part of the garden reinstallation. The fountain, including its statue, a centerpiece of the garden, would also be carefully dismantled and preserved for future reinstallation. Meanwhile, the Laura Bush Silver Linden Tree would be fenced and protected with a rigid barrier to ensure its safety throughout the construction period.

<u>Documentation</u>

The NPS would continue to survey and record the current interior and exterior conditions of the East Wing, East Colonnade, and Jacqueline Kennedy Garden (East Garden) of the White House. The documentation would consist of two components:

1. Digital Survey: A 3-dimensional digital survey of the property using Light Detection and Ranging (LiDAR) laser scanning equipment would be done. Scanning would be conducted using Leica P50 and RTC360 terrestrial laser scanners. A Leica TS16i total station would be used to create a control network for the scanned data. A single three-dimensional model of the building and site would be completed.
2. High-Resolution Digital Photography: The NPS would capture high-resolution digital photographs of the building and site to include the primary interior and exterior spaces, significant features, and contextual views. Photographs would be executed using a Phase One medium-format digital system and a Canon R5 full-frame digital mirrorless system.

JA121

# Chapter 3 – Affected Environment and Environmental Consequences

This chapter is organized by issue. The current and expected future conditions of the resource, including reasonably foreseeable future actions and trends, are presented first, followed by an analysis of the environmental consequences of the alternatives on each resource.

## Cultural Resources

<u>Cultural Landscapes</u>

*Current and Expected Future Conditions of the Environment if No Action is Taken*

The White House and President's Park includes three distinct cultural landscapes that were identified as contributing features to the L'Enfant Plan of the City of Washington, DC, a historic district listed in the National Register of Historic Places (NPS 1997). These cultural landscapes are fundamental to the park and provide the setting for the "President's Park" as defined by Pierre L'Enfant in 1791. The period of significance of the historic district is 1790 to 1942 (NPS 1997; 2016).

- **Lafayette Park**. Lafayette Park, located north of the White House, is a 19th-century public park redesigned in the 1960s. H Street bounds the park to the north, Madison Place to the east, Pennsylvania Avenue to the south, and Jackson Place to the west. Two brick elliptical paths bisected by two brick parallel straight walkways inscribe the rectangular park. Elliptical fountains accent the east-west line of the park. Monuments to Revolutionary War heroes (Marquis Gilbert de Lafayette, Comte Jean de Rochambeau, Tadeusz Kosciuszko, and Baron Frederich Wilhelm von Steuben) anchor the corners, and an equestrian statue honoring President Andrew Jackson in the War of 1812 sits in the center of the park. Two 19th-century urns, known as the Navy Urns, flank the south-central entrance to Lafayette Park.

- **White House Grounds**. The White House Grounds cultural landscape consists of the gardens and grounds within the iron fence line of the White House that provide privacy, protection, and recreation for the first family, as well as the backdrop for official events. Thomas Jefferson originally designed the grounds and they have evolved through designs by Andrew Jackson Downing and Frederick Law Olmsted, Jr., as well as others. The north grounds consist of a semi-circular drive arching around a circular fountain centered on the house. Groves of trees, many commemorative, flank the drive to the east and west. The south grounds consist of a circular drive reached by a tangential road on the south with entrances at the east and west ends. A circular fountain, centered on the house, is located further south of the drive. Groves of trees and bushes, many commemorative, flank the east and west sides of the south lawn.

- **The Ellipse (President's Park South)**. The Ellipse area, or President's Park South, to the south of the White House grounds, is another important cultural landscape. President's Park South consists of the park area including the Ellipse, Sherman Park to the

JA122

northeast, and First Division to the northwest. An elliptical roadway serves as the centerpiece of the Ellipse with narrow curved roads, referred to as dog legs, in the northeast, southeast, and southwest corners. President's Park South is ringed with a series of monuments and memorials that include: the First Division Monument, the Zero Milestone, the General William T. Sherman Monument, the Boy Scout Commemorative Tribute, and the Second Division Memorial. The park is also significant for its views of and from the National Mall, the Washington Monument, and the Jefferson Memorial.

Views and vistas were among the most essential features of the first plan of Washington, DC, drawn by Pierre Charles L'Enfant in 1791. Situated on a high point within the city, the White House is a focal point on the principal north-south axis of L'Enfant's plan. Perhaps the most critical view associated with the site is the long vista linking the White House, Washington Monument, and Jefferson Memorial. The NPS has worked to maintain this historically significant corridor between these preeminent sites. The axial relationship is evident and remains one of the defining attributes for the entirety of Washington, DC's monumental core. Other significant vistas include views north from the First Division Monument to the Eisenhower Executive Office Building and south to E Street, the view from Sherman Park north to the Treasury Building, the view from Constitution Avenue north to the Second Division Memorial, and the view to and from the North Portico across Lafayette Park and up 16th Street. During special events, views of the White House and other features of President's Park are impacted by the installation of large white event tents on the south lawn of the White House. These installations include large stakes driven into the ground and temporary flooring, which impacts utilities and the turf at the White House. These tents detract from views of the White House and President's Park during the special events as well as a period of construction before and after the events for setup and take down of the tent structures (The White House – Office of the President 2025b).

The White House grounds are constantly changing with the seasons and to support essential executive functions, and vegetation is moved and removed frequently. Recent changes include major renovations to the Rose Garden in 2020 and 2025. The 2020 project improved accessibility and sustainability by widening walkways, reconfiguring flower beds, and upgrading drainage, while removing crabapple trees to open sightlines and reduce shading of the roses to encourage floral propagation. In 2025, the central grass panel was replaced with a diamond-patterned concrete paver patio to better support events in the space and existing rose bushes and ornamental planting beds were retained. That same year, the historic Jackson Magnolia, a long-defining feature of the South Lawn, was removed due to advanced decline. A 12-year-old sapling that is a direct descendant of the Jackson Magnolia was planted in its place (The White House- Office of the President 2025a). Also in 2025, the NPS relocated a commemorative tree from the Biden Administration and a few non-commemorative plants to other locations on the White House grounds.

*Environmental Consequences*

<u>Proposed Action</u>

JA123

Replacing the existing East Wing with a new building that is approximately 90,000 square feet and 55 feet tall would have permanent adverse impacts on the cultural landscape, particularly the White House Grounds cultural landscape. Its removal would alter the architectural symmetry and historical continuity of the White House. The increased footprint and the addition of a second story along the colonnade, compared to the existing East Wing, would increase the massing and scale of the eastern portion of the property, potentially deemphasizing the prominence of the West Wing and the Executive Mansion. This change could be seen as a departure from the traditional aesthetic values and architectural integrity that have been maintained over the years.

However, the introduction of a new building to house the State Ballroom would also bring certain improvements to the cultural landscape. The permanent event space would eliminate the need for temporary event tents, enhancing the overall appearance and functionality of the White House grounds, providing a more seamless and dignified setting for large gatherings. This change would also reduce the wear and tear on the lawn, utilities, and surrounding areas, preserving the landscape's integrity into the future. While the new ballroom would represent a shift in the White House's architectural narrative, it would offer practical benefits that align with the longstanding needs of the White House and essential executive functions.

The viewscape and axial relationships as identified in the L'Enfant Plan of the City of Washington, DC and the 1901 McMillan Plan would not be affected by the new building. The primary vista related to the White House extends north-south from the Ellipse to the Jefferson Memorial and the southern horizon (NPS, 2016). This view is maintained since the new building would be sited on the east side of the property and bordered by the U.S. Treasury Building, which is of nearly equal scale.

Impacts on landscaping within the cultural landscape would include both temporary and permanent effects. The temporary removal of the 1960 Holly Trees surrounding the East Garden would be a notable change, as these trees have long contributed to the garden's historical and aesthetic value. To mitigate this impact, the construction contractor would carefully uproot, preserve, and replant the trees, ensuring their continued role in the landscape. The Laura Bush Silver Linden Tree, planted by the former First Lady and of historical significance, would be protected with a rigid barrier during construction. Other non-commemorative shrubs, bushes, trees, and turf would be removed, altering the garden's appearance and ecosystem during construction, but allowing for new landscaping plans. Overall, while the project would alter the manicured environment of the cultural landscape during construction, preserving and reintroducing significant elements would help maintain the historical and aesthetic value of the White House and its grounds.

Several hardscape features on the landscape would also be modified. Features of the East Garden, like the brick pavers along the garden paths and pergola, would be carefully removed and stored for reinstallation following construction. The fountain, including its statue, a centerpiece of the garden, would be dismantled and preserved, ensuring that this feature can be reinstalled and would continue to contribute to the garden's aesthetic and historical value.

JA124

The period of significance for the L'Enfant Plan historic district is 1790-1942. Many of these features were installed after 1947 and, therefore, their removal or change would not impact the cultural landscape. In addition, specific planned landscapes such as public parks are generally considered contributing, but their individual component elements are not enumerated for each site (NPS, 1997).

Conclusion

Overall, the proposed modernization of the East Wing would introduce both adverse and beneficial effects on the White House Grounds cultural landscape. Permanent changes would include the reduction in architectural symmetry and alterations to the manicured environment and built features of the East Garden. During construction, the White House grounds, Lafayette Park, and the Ellipse would also be visually altered. However, nothing in the proposed action would permanently alter the critical view associated with the site, the long vista linking the White House, Washington Monument, and Jefferson Memorial. Impacts would be offset in part by mitigation measures, such as replanting historically significant trees, salvaging and reusing historic materials, and preserving or reinstalling garden features. The addition of a permanent ballroom would further reduce the need for temporary event infrastructure and lessen physical stress on the surrounding grounds. While the project would alter aspects of the cultural landscape that have developed over centuries, measures to preserve significant elements and adapt the grounds for continued use would help maintain continuity between historic values and contemporary functions. The cultural landscape's period of significance ending after 1947 reflects the understanding that continual changes would be needed by the Executive Office of the President, demonstrating that this project aligns with the long-standing practice of adapting the White House to meet evolving essential executive functions. There are no other reasonably foreseeable future actions that may affect cultural landscapes. For this reason, the proposed action would contribute all of the effects to this resource.

Historic Buildings

*Current and Expected Future Conditions of the Environment if No Action is Taken*

Today, the Executive Mansion encompasses approximately 55,000 square feet, not including the West and East Wings and colonnades. This historic main building is organized into three primary sections: the Ground Floor, the State Floor, and the Executive Residence floors. The iconic porticoes extend beyond the main structure, contributing to the building's grand and welcoming presence for visitors. On the northern façade, the building attains a height of 60 feet 4 inches, while the southern façade reaches an elevation of 70 feet. The interior consists of a sophisticated arrangement of 132 rooms, each steeped in historical significance, including 16 family and guest suites, three kitchens, and 35 bathrooms.

The East Wing has undergone many notable transformations since its original construction. President Thomas Jefferson was the first to expand the White House, adding colonnaded terraces to both the east and west sides, which not only enhanced the functionality of the building but also augmented its aesthetic appeal. It was during the renovations undertaken by President Theodore Roosevelt in 1902 that the East Wing assumed its more formal architectural style. This initial building served to welcome dignitaries and the public, featuring a long

cloakroom designed for the accommodation of guests' coats and hats during grand social gatherings.

During a substantial remodeling project in 1902, President Theodore Roosevelt enlisted the expertise of architect Charles McKim. McKim sought to instill a sense of Beaux-Arts order into the exterior and advocated for the removal of the greenhouses. He revitalized Jefferson's vision for a graceful flat-roof promenade and was able to construct a more harmonious architectural balance with the West Wing, thereby transforming it into a secondary entrance serving this historic residence (McDonald 2011).

In 1942, under the presidency of Franklin D. Roosevelt, the East Wing as it exists today was constructed. This addition incorporated an underground facility, currently referred to as the Presidential Emergency Operations Center, illustrating the complexities of governance during the turbulent period of World War II (White House n.d.).

Although the exterior of the Executive Mansion has largely retained its original design since its reconstruction following the War of 1812, the interior has experienced notable renovations, particularly between 1949 and 1952 during the administration of President Harry S. Truman. This extensive renovation prioritized the preservation of the historic floor plan while enhancing the interior's beauty and functionality.

On December 19, 1960, the White House was designated as a National Historic Landmark (NHL) under Criterion 1 (Significant Historical Events) for its critical role in the establishment of the nation's capital and its resilience during the British invasion in 1814. Significant documentation of the building has been completed over the years, including a Historic American Building Survey (HABS), Nos. DC 37A and DC 37B.

Currently, the East Wing provides office space for the First Lady and her staff, which includes the White House Social Secretary, Graphics and Calligraphy Office, and correspondence teams. In addition, visitors are welcomed at the ground floor entrance, which leads into the East Colonnade, a corridor connecting the East Wing to the Executive Mansion. The East Wing also features a movie theater for the First Family which also serves as a cloakroom for events. The East Wing encompasses approximately 60,000 square feet, forming an essential operational space for the First Lady and her team.

Each administration has left its imprint, shaping the building to reflect the evolving administrative needs, culture, and ideals of the nation (Table 1). The evolution of Jefferson's wings illustrates a continuous cycle of usage and adaptation, reflecting the dynamic nature of the White House itself. While innovation remains essential, the preservation of the historical significance of this landmark is equally paramount. This balance underscores the enduring legacy of the White House as an institution, one that embodies both a vibrant present and a promising future (McDonald 2011).

Table 1. Notable changes to the White House.

| Year | Notable Change |
|---|---|
| 1814-1815 | Rebuilding following the War of 1812 |
| 1824-1829 | Addition of the South and North Porticos |
| 1902 | Classical renovation of the White House interior and construction of the West and East Wings under President Theodore Roosevelt |
| 1909-1930 | Expansion of the West Wing, including the addition of the Oval Office and various renovations |
| 1942 | Second story of the East Wing constructed |
| 1948-1952 | Major structural renovation under President Harry S. Truman |
| 1961 | Redecoration by First Lady Jacqueline Kennedy |
| 1979-1980 | Exterior paint and stonework restored |
| 2019-2020 | Tennis Pavilion constructed to replace an existing facility |
| 2019-2023 | Replacement and upgrade of White House perimeter fence |
| 2020 | First Lady Melania Trump renovated the Rose Garden |
| 2024 | First Lady Jill Biden expanded the White House tour route and upgraded interpretive exhibits within the tour experience |
| 2025 | President Donald J. Trump renovated the Rose Garden |

*Environmental Consequences*

Proposed Action

The proposed action is the addition of an approximately 90,000-square-foot building to house the State Ballroom, which would require replacing the existing East Wing and adding a second story to the East Colonnade. This action would result in both adverse and beneficial effects on historic buildings and their character.

Deconstruction and replacement of the East Wing would result in the permanent alteration of a component that has been integral to White House operations since its construction in 1942. Both the exterior and interior spaces of the East Wing, including circulation corridors, office suites, and the theater, would be removed. This would disrupt the historical continuity of the White House grounds and alter the architectural integrity of the east side of the property. The new building's larger footprint and height would dominate the eastern portion of the site, creating a visual imbalance with the more modestly scaled West Wing and Executive Mansion. Adding a second story to the East Colonnade would further modify the setting, contrasting with the single-story design of the West Colonnade and changing the traditional spatial organization and sightlines of the grounds. Construction activities would also introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features.

While the proposed modifications would alter the design, setting, and feeling of the White House grounds, they are not anticipated to affect its continued designation as a National Historic Landmark. The designation is based on the White House's historical and cultural

JA127

significance, particularly its association with the presidency and role in American history. Core elements that contribute to its national significance would remain intact, although the project would represent a substantial change to one portion of the landmark.

Mitigation would include comprehensive documentation of the affected buildings. Existing HABS records would be supplemented with new documentation, including three-dimensional digital surveys using LiDAR scanning and high-resolution photography of exterior and interior spaces. This process would create a permanent record of the East Wing, East Colonnade, and related features prior to construction. Salvage and storage of some of the existing historic building materials would be reused in the new modernized East Wing, and to ensure their availability for future preservation or restoration projects. These measures would help preserve knowledge of the buildings' architectural and historical qualities for future generations, even as the project introduces functional and physical changes to the site.

The deconstruction of the East Wing and East Colonnade would likely impact other features of the building through the removal of historic materials, like Seneca sandstone.[3] The Seneca sandstone extant in the East Colonnade parapet walls would be salvaged and stored for future preservation projects, either at the White House or for other significant structures in Washington, DC. This effort would ensure this finite material remains available for restoration, helping maintain the architectural integrity of the White House and other historic buildings in the area.

Conclusion

In conclusion, the proposed action would alter the scale and architectural balance of the White House grounds through the replacement of the existing East Wing and modification of the East Colonnade. These changes would affect elements that have shaped the property's character since the early 20th century. Mitigation measures, including salvage of historic materials and comprehensive documentation, would preserve a record of the affected features and support future preservation needs. The addition of a permanent ballroom would also reduce reliance on temporary event infrastructure, limit wear on the grounds, and provide functional benefits for large gatherings. Taken together, the project would introduce both adverse and beneficial effects, but the White House and its grounds would continue to retain the core characteristics that convey its national significance, and thus its designation as a National Historic Landmark. Although there could be further changes to the building during this, or future, administrations, there are currently no reasonably foreseeable actions or projects that would affect the White House and its grounds. For this reason, the proposed action would contribute all of the effects to this resource.

---

[3] Seneca sandstone, known for its rich, reddish-brown color and durability, was quarried from the Seneca Creek area in Maryland and was a popular building material in Washington, DC, during the 19th century. Seneca Quarries provided building stone to Washington, DC from 1781 to 1901, and supplied distinctive red sandstone for some of the most significant structures and infrastructures in Washington, DC, including the East Wing of the White House. The quarries were closed in 1901, largely depleted. While the primary construction of the East Wing did not heavily rely on Seneca sandstone, it was used in various structural and decorative elements throughout the White House grounds.

## Visitor Access and Experience

*Current and Expected Future Conditions of the Environment if No Action is Taken*

President's Park

As noted above, the White House sits within President's Park, which also includes Lafayette Park, the Ellipse and its side panels, the First Division Monument Park, and Sherman Park. These locations, excluding the White House and its grounds, are open to the public without the need for a scheduled tour, however, temporary area closures do occur due to events and activities. U.S. Secret Service operations may also temporarily affect access to areas of the park to ensure necessary security and safety for the adjacent White House grounds, its occupants, and the public. These closures are frequent, given the high level of activity that occurs in and around the park.

Most visitors to President's Park view the White House from Lafayette Park or the north end of the Ellipse. Views of the White House from Lafayette Park include the northern façade of the East Wing. The East Wing is currently obscured from view by trees from the Ellipse, while the East Colonnade is partially visible. During special events, visitors can see large event tents on the south lawn of the White House. These tents detract from views of the White House and President's Park during special events as well as a period of construction before and after the events for setup and take down of the tent structures (The White House – Office of the President 2025b). Additionally, the setup and teardown for these events require a portion of President's Park to be temporarily closed to the public, resulting in impacts to visitor access.

Visitors to President's Park experience an urban environment with frequent noise from crowds, vehicles, construction, and overflights. Between 2014 and 2024, excluding 2020 and 2021 due to COVID-19 restrictions, President's Park welcomed an average of approximately 1.5 million[4] visitors annually (NPS 2025a).

The White House

A distinctive feature of the White House, as one of the few official residences of a head of state regularly open to the public, is its role in providing unique visitor opportunities. The White House hosts major public events such as the Garden Tours, the Easter Egg Roll, and the National Christmas Tree Lighting. President's Park offers open space for recreation, First Amendment expression, and community programming. The NPS provides visitor access, interpretation, and educational services throughout these areas (NPS 2014).

One purpose of the White House as a unit of the National Park System is to provide public access to the principal corridor on the ground floor and to the state rooms on the first floor (NPS 2000, NPS 2014). Public tours have been offered since the early 1800s. Availability has periodically been suspended or rerouted due to security concerns, renovations, wartime restrictions, budget limitations, pandemics, or significant presidential events.

---

[4] The years 2020 and 2021 were excluded from the calculation due to the impact of the COVID-19 pandemic, which drastically reduced visitation numbers.

Today, tours are coordinated by the White House Visitors Office, part of the Executive Office of the President, with day-of security screening and logistics overseen by the U.S. Secret Service. Members of the public request tours through their Member of Congress, which naturally limits the number of tour visitors. Once approved, visitors are notified of their scheduled tour date and time. Visitors enter the area through Sherman Park and start their tours in the East Wing. Interpretation within the tour is provided through interpretive exhibits and the tour itself is self-guided. The focus on maximizing tour capacity can limit the depth of visitor engagement. Security and event requirements often result in the closure of Sherman Park, the First Division Monument, and portions of President's Park South. These closures can affect circulation and reduce opportunities for interpretation.

While proposals to construct a permanent visitor screening facility have been made for more than two decades, this has not occurred. As a result, visitors pass through temporary screening tents before entering the East Wing. The current tour includes public rooms such as the Vermeil Room, Library, China Room, East Room, Blue Room, Red Room, Green Room, State Dining Room, and a view of the East Garden. U.S. Secret Service officers are stationed along the route and are knowledgeable about each room's history, art, furnishings, and current use. The White House tour route has evolved over presidencies, with new routes proposed and created in accordance with each administration's priorities and needs.

Tours are currently offered Tuesday through Thursday from 7:30 a.m. to 11:30 a.m., and on Friday and Saturday from 7:30 a.m. to 1:30 p.m. However, tours are subject to change or cancellation due to various special events and security reasons. Between 2014 and 2024, excluding 2020 and 2021 due to COVID-19 restrictions, the White House welcomed an average of approximately 488,200[5] visitors annually (NPS 2025b).

Multiple tourism sources identify the White House and President's Park as among Washington, DC's top attractions (Tripadvisor n.d., Washington.org n.d.a, U.S. News and World Report n.d.). The city recorded its highest-ever visitation in 2023 and 2024, a trend that is expected to continue. Visitor numbers are projected to peak in 2026, coinciding with the nation's 250th anniversary (Washington.org n.d.c). These visitation trends, coupled with the popularity of the White House and President's Park, indicate that visitation to the park and pressure for tours is likely to increase in the near future.

Construction activity around the White House and President's Park is expected to increase, coinciding with proposed East Wing work. Nearby, the National Mall is slated for renovations to landmarks such as the Lincoln Memorial, Constitution Gardens, Jefferson Memorial, and other event plazas (Washington.org n.d.b). In 2024, Washington, DC released its Downtown Action Plan, which covers areas east of the White House and President's Park and proposes new apartments, expanded pedestrian space, cultural hubs, and other construction projects (District of Columbia 2024). Lastly, as part of the President's Executive Order, *Making the District of*

---

[5] The years 2020 and 2021 were excluded from the calculation due to the impact of the COVID-19 pandemic, which drastically reduced visitation numbers.

*Columbia Safe and Beautiful*, (The White House 2025c) NPS and other federal agencies in the area will be taking actions such as removing graffiti, upgrading public benches, restoring buildings, cleaning public parks, and refurbishing fountains, among other actions. These actions, including construction projects, could result in short-term disruptions, lasting the length of construction, to visitor access and experience near President's Park through increased noise, changes in circulation patterns, and views. However, these projects are intended to improve the visitor experience in the long term.

*Environmental Consequences*

<u>Proposed Action</u>

Under the Proposed Action, construction activities would be ongoing from fall 2025 to summer 2028. During deconstruction and construction of the new building, heavy equipment, increased heavy truck traffic, and construction noise would temporarily detract from the aesthetics and setting of President's Park and the White House. For approximately three years, construction fencing, cranes, and staging areas would disrupt the site's visual integrity and historic character from certain viewpoints as described above in the cultural landscape section. Views from Lafayette Park would be most affected, while views of the main White House façade and North Portico would remain unobstructed. Views from the Ellipse to the White House may change, as construction activities and portions of construction fencing would be visible. Visitors are likely to see construction from this vantage point which would impact the visitor experience until construction concludes. Pedestrian access to sites in President's Park would remain largely unchanged both during and after construction (more detail provided in Appendix B, *Impact Topics Considered but Not Carried Forward for Analysis- Traffic and Pedestrian Access*).

The East Wing currently functions as the entry for White House tours. If deconstructed, visitors would no longer experience this space directly in its current state, which would represent a permanent change to the visitor experience. However, extensive documentation conducted prior to deconstruction, including HABS records, LiDAR scanning, and photography, would provide a detailed archival record of the East Wing, thereby reducing the intensity of effects on the visitor experience in this one location.

Construction would interrupt normal tour flow through the East Wing, necessitating rerouting (e.g., alternate entry point) or postponement. Historically, tours have been suspended or altered during renovations or heightened security conditions. At the time of this EA's preparation, new tour bookings have been paused while a collaborative group of White House, NPS, and U.S. Secret Service staff work to determine the best way to ensure public access to the White House as this project begins and for the duration of construction (DiMella 2025, Kurtz 2025). The President and First Lady have expressed commitment to continuing the tradition of public access to the White House (DiMella 2025, Kurtz 2025). Current plans anticipate that tours would continue to include the State Floor, comprising the Cross Hall, East Room, Green Room, Blue Room, Red Room, and State Dining Room. The Ground Floor State Rooms (Vermeil Room, Library, China Room, and Diplomatic Reception Room) would remain closed during construction. The NPS and the Executive Office of the President are also committed to continuing major public events at the White House. Based on these measures and the

JA131

Administration's stated commitment, any impacts on visitor access would be temporary, with the potential for enhanced public access to new spaces once construction is complete.

Upon completion, the modernized East Wing could incorporate accessible design, interpretive exhibits, enhanced tour features, and upgraded visitor amenities. Designed for a larger capacity than can currently be accommodated indoors, the State Ballroom would eliminate reliance on large temporary tents on the White House lawn, along with associated temporary flooring, generators, and portable restrooms, and would therefore avoid repeated staging, set-up, and tear-down that currently requires short-term closures of portions of President's Park and recurring turf repairs (The White House- Office of the President 2025b). Consolidating major events indoors would reduce the frequency and duration of lawn closures and lessen visual and noise intrusions during event preparation. These improvements would strengthen the White House's role as a national symbol and enhance the overall visitor experience.

Conclusion

Implementation of the proposed action would result in temporary but noticeable effects on visitor access and experience at President's Park and the White House during the approximately three-year construction period, due to the presence of heavy equipment, construction noise, and temporary visual obstructions. While views from certain locations, particularly Lafayette Square and portions of the Ellipse, would be altered, primary views of the White House façade, including the North and South Portico, would remain unaffected. Public access to the White House would be modified but maintained through adjusted tour routes, consistent with past practices during renovations, and supported by the Administration's stated commitment to preserving public access and hosting major events. These changes would be temporary, with no lasting restrictions on access once construction is completed. The design intent is for visitors to continue to enter through the ground floor of the modernized East Wing building for public White House tours and events. Upon completion, the project would provide a modernized East Wing and permanent Ballroom space designed to improve functionality, accessibility, and visitor amenities, while reducing the need for temporary event spaces. Collectively, these improvements would enhance the White House's ability to host large indoor events, reinforce its role as a national landmark, and contribute to an improved long-term visitor experience.

When combined with other reasonably foreseeable future actions described in the *Current and Expected Future Conditions of the Environment if No Action is Taken* section, visitors to and near the White House and President's Park are likely to experience greater short-term impacts while construction projects are underway. However, once construction is complete, both visitor access and experience will be largely beneficial, with the proposed action contributing most of the effects.

JA132

# References

Bushong, William
2005    Unbuilt White Houses of the 19th Century. White House Historical Association.

Department of the Interior
2025    U.S. Department of the Interior Handbook of National Environmental Policy Act
        Implementing Procedures. 516 DM 1.

District of Columbia
n.d.    Zone D-2, Official Zoning Map. https://maps.dcoz.dc.gov/zr16/#l=15&z=D-
        2&basemap=dcbasemap&mms=lots!square!pendingZones!pendingPuds!zoneDistrict!pu
        ds!campusPlans. Accessed August 18, 2025.

1977    Noise Control Act and Handbook.
        https://dob.dc.gov/sites/default/files/dc/sites/dob/Noise%20Regulation%20Handbook.
        pdf. Accessed August 18, 2025

2024    Downtown Action Plan. https://www.reimaginedowntowndc.com/

DiMella, A. J.
2025    First Lady Melania Trump to continue tradition of White House tours following pause.
        *Fox News*. https://www.foxnews.com/travel/first-lady-melania-trump-continue-
        tradition-white-house-tours-following-pause. Accessed August 12, 2025.

Federal Emergency Management Agency (FEMA)
2010    National Flood Insurance Program – Flood Insurance Rate Map Number 1100010018C
        Panel 18 of 100.

Kurtz, Judy
2025    White House pauses public tours amid Trump ballroom construction. The Hill.
        https://thehill.com/blogs/in-the-know/5442984-white-house-tours-paused. Accessed
        August 12, 2025.

McDonald, Travis
2011    The East and West Wings of the White House: History in Architecture and Building.
        White House History. White House Historical Association: 44-88.

Mennitt, D., Sherrill, K., and Fitstrup, K.
2014    A geospatial model of ambient sound pressure levels in the contiguous United States.
        *The Journal of the Acoustical Society of America*, 135 (5): 2746-2764.

Mennitt, D.

JA133

2015    Geospatial sounds Modeling: 2013-2015.
https://irma.nps.gov/DataStore/Reference/Profile/2217356

National Park Service (NPS)
1997    National Register of Historic Places: Nomination for L'Enfant Plan of the City of
Washington, DC

2000    Comprehensive Design Plan: The White House & President's Park, Washington, DC
United States Department of the Interior

2006    Management Policies. US Department of the Interior, Washington, DC

2014    Foundation Document. The White House and President's Park.
https://www.nps.gov/whho/learn/management/prpa-foundation-document.htm.
Accessed August 6, 2025.

2016    Cultural Landscape Inventory: President's Park South – The White House (President's
Park).

2025a   President's Park. Annual Park Recreation Visits.
https://www.nps.gov/subjects/socialscience/visitor-use-statistics-dashboard.htm.
Accessed August 11, 2025.

2025b   The White House. Annual Park Recreation Visits.
https://irma.nps.gov/Stats/SSRSReports/Park%20Specific%20Reports/Annual%20Park%
20Recreation%20Visitation%20(1904%20-%20Last%20Calendar%20Year)?Park=WHHO.
Accessed August 6, 2025.

2025c   Revised Guidance for Non-Impairment Determinations and the National Environmental
Policy Act Process Memorandum. April 2025.

The White House – Office of the President
n.d.    White House Tour: Overview.  https://www.whitehousehistory.org/white-house-tour.
Accessed August 11, 2025.

2025a   Press Release April 7, 2025: White House to Safely Replace Historic "Jackson Magnolia"
with Descendant Sapling.  https://www.whitehouse.gov/briefings-
statements/2025/04/white-house-to-safely-replace-historic-jackson-magnolia-with-
descendant-sapling/ . Accessed August 18, 2025.

2025b   Press Release July 31, 2025: The White House Announces White House Ballroom
Construction to Begin.  https://www.whitehouse.gov/briefings-
statements/2025/07/the-white-house-announces-white-house-ballroom-construction-
to-begin/ . Accessed August 6, 2025.

JA134

2025c   Making the District of Columbia Safe and Beautiful. Executive Order. March 28.
https://www.whitehouse.gov/presidential-actions/2025/03/making-the-district-of-columbia-safe-and-beautiful/

Tripadvisor
n.d.    Washington DC: Tours and Tickets.  https://www.tripadvisor.com/Attraction_Products-g28970-a_contentId.38896577922+714317699-Washington_DC_District_of_Columbia.html . Accessed August 12, 2025.

United States Congress
1961    Public Law 87-286: Concerning the White House and providing for the care and preservation of its historic and artistic contents. Enabling Legislation. U.S. Government Printing Office.

U.S. Department of Transportation
2017    Construction Noise Handbook. Federal Highway Administration. Updated August 24, 2017.
https://www.fhwa.dot.gov/environment/noise/construction_noise/handbook/handbook09.cfm. Accessed August 18, 2025.

U.S. Environmental Protection Agency (U.S. EPA)
1974    Information on levels of environmental noise requisite to protect public health and welfare with an adequate margin of safety. NPC Online Library, 550/9-74-004: 1-78.
https://www.nrc.gov/docs/ML1224/ML12241A393.pdf

2025a   8-Hour Ozone (2008) Maintenance Area (Redesignated from Nonattainment) Area/State/County Report. Data current as of July 31, 2025.
https://www3.epa.gov/airquality/greenbook/hmca.html.   Accessed August 20, 2025.

2025b   8-Hour Ozone (2015) Designated Area Area/State/County Report.  Data current as of July 31, 2025. https://www3.epa.gov/airquality/greenbook/jbca.html. Accessed August 20, 2025.

2025c   PM-2.5 (1997) Maintenance Area (Redesignated from Nonattainment) Area/State/County Report. Data current as of July 31, 2025.
https://www3.epa.gov/airquality/greenbook/qmca.html. Accessed August 20, 2025.

U.S. Fish and Wildlife Service (U.S. FWS)
2025    Endangered Species, District of Columbia County, District of Columbia. Information for Planning and Consultation.
https://ipac.ecosphere.fws.gov/location/C4KB7FZV4BB7ZKI25YEDINRB6I/resources.
Accessed August 26, 2025.

U.S. News and World Report

n.d.    41 Best Things to do in Washington, DC.
https://travel.usnews.com/Washington_DC/Things_To_Do/. Accessed August 12, 2025.

Washington.org

n.d.a    Attractions.  https://washington.org/find-dc-listings/attractions. Accessed August 12, 2025.

n.d.b    District Developments. Accessed August 14, 2025.
https://washington.org/press/journalist-newsletter/district-developments. Accessed August 14, 2025.

n.d.c    Washington, DC Visitor Statistics.  https://washington.org/research/washington-dc-visitor-research. Accessed August 13, 2025.

White House Archives

n.d.    The East Wing. Accessed August 11, 2025.  https://georgewbush-whitehouse.archives.gov/firstlady/text/east-wing.html. Accessed August 11, 2025.

# Appendix A – Impact Topics Considered But Not Carried Forward for Analysis

## Air Quality

The proposed action would result in the following short-term, construction-related emissions:

- Tailpipe emissions from construction equipment (e.g., dozer, backhoe) and trucks hauling construction materials to the site.
- Vehicle emissions from construction workers commuting to and from the site.
- Fugitive dust from soil excavation, site disturbance and deconstruction.

To protect air quality, the Clean Air Act (CAA) requires the Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) for six pollutants (called "criteria" air pollutants) which can be harmful to public health and the environment.[6] The primary NAAQs are established at levels considered protective of public health, including "sensitive" populations such as children, the elderly and people with heart and lung conditions. Areas where monitored air quality does not meet the NAAQS are designated as nonattainment and the appropriate air regulatory agency must develop an implementation plan to address air pollutants contributing to the NAAQS violations.

The Washington, DC, area (DC-MD-VA) is in moderate nonattainment for the current ozone standard (U.S. EPA 2025a, b),[7] and is a maintenance area for particulate matter less than 2.5 microns (U.S. EPA 2025c).[8] Section 176(c) of the Clean Air Act requires federal agencies to ensure that air emissions from federal actions located in nonattainment areas will not cause new violations of the NAAQS or increase the frequency or severity of existing NAAQS violations (called a "general conformity" determination). To assist federal agencies in making conformity determinations, the associated regulations provide "de minimis thresholds" which are emission thresholds (in tons per year) below which federal actions are assumed to conform, and a conformity determination is not required.[9]

---

[6] These include carbon monoxide (CO), lead, nitrogen dioxide ($NO_x$), ozone ($O_3$), particulate matter (less than 10 microns, referred to as $PM_{10}$ and less than 2.5 microns, referred to as $PM_{2.5}$) and sulfur dioxide ($SO_2$).

[7] The Washington, DC (DC-MD-VA) is area is classified as moderate nonattainment status for the 2015 eight-hour ozone standard and maintenance for the 2008 eight-hour ozone standard marginal designation. See EPA's Green Book at https://www3.epa.gov/airquality/greenbook/jbca.html (U.S. EPA 2025a) and https://www3.epa.gov/airquality/greenbook/hmca.html (U.S. EPA 2025b). Information current as of July 31, 2025.

[8] The Washington, DC (DC-MD-VA) is area is a maintenance area for the 1997 PM2.5 NAAQS. See EPA's Green Book at https://www3.epa.gov/airquality/greenbook/qmca.html (U.S. EPA 2025c). Information current as of July 31, 2025.

[9] See 40 CFR § 93.153(b)(1) and (b)(2) and EPA de minimis emission threshold rates information at https://www.epa.gov/general-conformity/de-minimis-emission-threshold-rates.

It is expected that the proposed action emissions would be well below the minimum pollutant thresholds established in the regulations for $PM_{2.5}$ and ozone[10] based on (1) the limited potential grading area, (2) the limited duration of construction equipment use, (3) the relatively small emissions generated by individual pieces of equipment, and (4) the limited numbers of equipment used in a project of this scope. In addition, it is expected that construction activities would conform with Washington, D.C. on-road and non-road diesel engine idling requirements, which would further reduce construction-related emissions.[11] Therefore, this impact topic was dismissed from detailed analysis.

## Archeological Resources

The construction of an approximately 90,000 square foot building in an area with a history of substantial ground disturbance poses a small risk of uncovering unknown archeological sites. Given the extensive past disturbances, any artifacts or features uncovered during excavation are likely to be out of context, meaning they may not be found in their original locations or conditions. This can complicate the potential interpretation and preservation of these materials, as their historical and cultural significance might be harder to ascertain. In addition, out-of-context archeological materials would be difficult to assess for their integrity and archaeological interest. The White House Curator's Office has trained staff on site who can identify signs of archeological materials and has established standard operating procedures in the event archeological remains are found. Therefore, because of the low likelihood of uncovering an unknown and undisturbed archeological resource, and the presence of trained staff and standard operating procedures for found items, this topic has been dismissed from detailed analysis.

## Floodplains

According to the Federal Emergency Management Agency (FEMA) Flood Insurance Rate Map 1100010018C, the project area is located within an area determined to be outside the 0.2 percent annual chance floodplain (FEMA 2010). Additionally, the project does not propose any new structures or uses within the floodplain. The actions proposed in this environmental assessment would not have any impact on flood storage capacity or downstream flood elevations, nor would they obstruct, restrict, or redirect flood flows. Therefore, impacts to floodplains were considered but dismissed from detailed analysis.

## Museum Collections

The NPS, in partnership with the White House Office of the Curator, manages the museum collections and archives for the White House. These collections include historic artifacts, American and European furnishings, fine art, and archival materials that expand with each

---

[10] Ozone is a secondary air pollutant, formed through atmospheric reactions of NOx and. For this reason, de minimis thresholds are established for NOx and VOC emissions. $PM_{2.5}$ is both a primary pollutant (e.g., emitted directly from a tailpipe), and a secondary pollutant formed through atmospheric reactions of particle-forming pollutants such as $SO_2$, $NO_x$, VOC and ammonia. For this reason, de minimis thresholds for $PM_{2.5}$ are established for primary $PM_{2.5}$ as well as $SO_2$, $NO_x$, VOC and ammonia.

[11] See DC municipal regulation 20-900.

administration. Exhibits at the NPS's White House Visitor Center make portions of the collection publicly accessible, linking visitors to the presidency and White House history.

As part of the proposed action, the NPS would remove all collections, artifacts, paintings, and other museum objects (collectively "museum objects") from the East Wing of the White House. Museum objects from the East Wing may be relocated to other areas within the White House, which would result in the temporary removal or modification of interior designs and museum objects in those spaces. All handling, relocation, and storage would follow established White House preservation standards, minimizing the potential for accidental damage.

The museum objects proposed for removal represent a small portion of the larger White House museum collection. Effects would be temporary, limited to the period of construction, and fully reversible. The NPS routinely relocates museum objects as part of White House operations, including building maintenance, renovations, and changes in administration. Such practices are authorized by the park's enabling legislation and institutionalized through longstanding practices between NPS and the White House Office of the Curator. Objects not on display are curated or stored within the White House or at the Executive Support Facility and may be returned to display at any time.

Because the proposed modernization of the White House East Wing primarily targets structural and functional improvements, the White House museum collections and archives would remain largely unaffected. The proposed action does not involve changes to the collections or how they are managed. For this reason, the White House would continue to function as a living museum, preserving museum collections for future generations. Impacts to museum collections were dismissed from detailed analysis.

## Noise and Noise-Compatible Land Use

Once complete, the project would not result in any material changes to the acoustic environment. Temporarily, construction noise would be present.

The NPS defines acoustic resources as physical sound sources, including both natural sounds (wind, water, wildlife, vegetation) and cultural and historic sounds (battle reenactments, tribal ceremonies, quiet reverence) (NPS 2006). The White House and President's Park are located in downtown Washington, DC, and experience noise common to most urban areas (e.g., traffic noise, construction noise, social gatherings). The existing median summer daytime sound pressure level is approximately 56 dBA (Mennitt et al. 2014; Mennitt 2015). This background sound pressure is high enough that group discussions, such as interpretive programs in President's Park, would not be fully audible to an audience around 5 meters apart (U.S. EPA 1974). Finally, 56 dBA is a median measure- meaning that the background noise in the area is higher than this 50% of the time.

The proposed action includes construction for approximately three years. For outdoor noise considerations, construction noise would be limited to the deconstruction and exterior builds (i.e., not noise in the interior of the building). Therefore, it would be more limited than the full

JA139

construction schedule, which includes interior buildouts. Further, the project proposes using standard construction equipment.

The U.S. Department of Transportation Construction Noise Handbook lists equipment and operation noise levels associated with common construction equipment (U.S. Department of Transportation 2017). Equipment such as backhoes, concrete mixer trucks, cranes, and excavators have actual measured Lmax values at 50 feet of around 80 dBA.

Like many cities, Washington, DC has noise regulations, promulgated through the District of Columbia Noise Control Act (1977), as amended. The area of the White House is listed as Zone D-2 (District of Columbia n.d.). The purposes of the D-2 zone are to accommodate high-density housing with a limited amount and type of commercial use on only the ground floor and to ensure the scale of new development is compatible with the scale of the historic areas in the vicinity of lower 16th Street, NW, 17th Street, NW near the White House, President's Park, and Judiciary Square. The Washington, DC, noise regulations have different considerations for daytime and nighttime noise, including construction noise. Specifically, daytime construction noise (7 am to 7 pm) is limited to a maximum level of 80 dB at 25 feet from the edge of the site, while construction at night is limited to the zone maximum, in this case 60 dB at 25 feet from the edge of the site.

Construction noise associated with the proposed action would elevate noise levels. However, noise attenuation from the construction site would likely fall below the maximum allowable noise regulations in Washington, DC. For example, a noise of 80 dB at 50 feet would attenuate to a level of 74 dB at 100 feet and 68 dB by 200 feet. Given the unique challenges of construction projects at the White House, the NPS and the Executive Office of the President would work closely to implement best management practices related to construction during the duration of the project.

Considering the elevated existing acoustic ambient noise of downtown Washington, DC, the temporary nature of the noise (i.e., construction noise), the attenuation of noise from off the construction site, and that construction noise is expected to be below local noise regulations, the NPS has dismissed noise as an impact topic from detailed analysis.

## Socioeconomics

The socioeconomic environment of the project area consists of local, regional, and national businesses, government agencies, residences, and tourist attractions. White House tours and some major events would likely continue during construction, although the extent and number of tours offered could change for a period of approximately three years. These tours represent a valued public opportunity to access the White House and experience its history, but they do not constitute a major economic driver for the region. Visitors to the White House typically combine tours with broader trips to Washington, DC, where numerous museums, monuments, and cultural institutions remain available year-round at no cost. A temporary change in tour capacity or events represents a limited inconvenience to some visitors but is not expected to meaningfully affect the regional economy, tourism sector, or local employment. Following

JA140

construction, tour capacity and events would be expected to return to current levels, with no lasting socioeconomic effects.

Construction of the modernized East Wing and State Ballroom would result in a short-term need for construction workers, but the number of workers would be minimal and most of them would already be employed, and there would be no effect on the population, income, or employment base of the surrounding community. The need for construction workers would provide minimal increases in employment opportunities and revenues for local businesses, but any increases would be below the level of detection due to the scale of the local economy. For these reasons, impacts related to socioeconomics were dismissed from detailed analysis.

## Soils

Construction of the modernized East Wing and State Ballroom would temporarily disturb soils within the project footprint over an estimated three-year period. The site has been heavily excavated and reworked during past construction episodes, and soils are already highly disturbed. As a result, impacts would be limited to short-term compaction, mixing, and handling of fill material during excavation and construction. No unique or undisturbed soil resources are present, and effects would end once construction is complete. For these reasons, impacts related to soils were dismissed from detailed analysis.

## Traffic and Pedestrian Access

Roads near the White House have greater security restrictions than most areas of Washington, DC. Pennsylvania Avenue NW, north of the White House, is closed to public vehicles between 17th Street NW and 15th Street NW but remains open to pedestrians. West Executive Avenue, East Executive Avenue, State Place, and Hamilton Place on the west and east sides of the White House are closed to public vehicles from Pennsylvania Avenue to E Street, with access limited to White House staff. Pedestrians can access Lafayette Square from Pennsylvania Avenue, Madison Place, Jackson Place and H St NW.

Under the proposed action, a temporary construction zone would be established near the East Wing until project completion (summer 2028). This zone would close Madison Place and portions of Pennsylvania Avenue, extending approximately 260 feet east and 350 feet west from the Madison Place centerline. Access would be limited to construction and emergency vehicles. Pedestrian access would remain along portions of both streets.

Because existing restrictions already prohibit public vehicle access on these road segments, the additional closures would not result in any change in vehicle circulation patterns. Primary pedestrian and authorized vehicle routes would remain available, and no measurable change in regional traffic operations or pedestrian connectivity is anticipated. Therefore, traffic and pedestrian access impacts were dismissed from detailed analysis.

## Vegetation

The project area is in a highly developed region and urbanized setting. Vegetation within the project area consists primarily of maintained lawn and landscape trees. All of the plant species

JA141

are common in the Washington, DC area. Vegetation within the White House grounds has historically been subject to frequent change and management, reflecting both evolving functional needs and aesthetic updates to the property. Examples include the redesign of the Rose Garden in 2020 and 2025, which altered lawn and planting configurations, the 2025 removal of the Jefferson Magnolia due to advanced decline, and 2025 relocation of a commemorative tree. Routine arboreal and horticultural activities, such as tree removals, pruning, and replacement of shrubs or turf, are common and ensure that the grounds remain safe, healthy, and visually consistent with their historic character. Following larger construction projects, notable species have often been replanted or otherwise reintroduced to preserve the cultural and historic values of the grounds.

Because the White House grounds have a long history of managed vegetation changes, and because replanting or replacement would occur after project completion, the effects of vegetation removal or alteration during construction would be small and temporary. No rare, threatened, or sensitive plant species are present, and no long-term ecological consequences would occur. For these reasons, impacts to vegetation were dismissed from detailed analysis.

## Wildlife and Wildlife Habitat

Construction activities associated with the proposed action could temporarily damage or remove vegetation and displace wildlife that use landscaped features for food, cover, or nesting. Wildlife present in the project area is typical of an urban environment and consists primarily of species adapted to human activity. Birds commonly observed include house sparrows, European starlings, common grackles, and rock pigeons, as well as edge-associated species such as gray catbirds, northern mockingbirds, eastern phoebes, blue jays, and northern cardinals. Canada geese and mallards are common along the nearby Potomac River, and small mammals such as eastern chipmunks, gray squirrels, and occasional Norway rats, and house mice may occur. These species rely on ornamental trees and shrubs for nesting and foraging, but habitat within the project area is limited and fragmented by surrounding roads and development. Any effects would be temporary and minor, limited to the approximately three-year construction period. Habitat altered during construction would be revegetated following project completion.

The NPS reviewed the U.S. Fish and Wildlife Service's Information for Planning and Consultation (IPaC) website to identify federally listed species that may occur within the project area. The northern long-eared bat, tri-colored bat, and monarch butterfly were identified as potentially present (U.S. FWS 2025). However, there are no known observations of these species or suitable habitat within the project area. Based on this information, the NPS determined that the project would have no effect on these species.

Following construction activities, there will be a permanent reduction of approximately 33,000 square feet, less than an acre, in available wildlife habitat. Disruption to migratory birds is not anticipated because birds would return as vegetation regenerates or is replanted. Given the common and urban-adapted nature of wildlife present, the limited scale of potential effects,

JA142

and the planned restoration of vegetation, impacts on wildlife would not be significant and were dismissed from detailed analysis.

JA143

# Appendix B – Alternatives Considered but Dismissed

**Alternative Design Concepts-** Multiple locations, layouts, and design concepts were considered, including options that preserved the entire East Wing with a new building that would include a state ballroom built south of the East Wing and attached to the East Wing through a walkway, locating the State Ballroom to the north façade of the East Wing, and concepts that matched the East Wing height without additional stories while retaining second-story access from the Executive Mansion. The park's enabling legislation (Pub. L. No. 87-286, 75 Stat. 586 (1961)) states that the NPS's management of the park may not conflict with the administration of the Executive offices of the President or the President's residential and official use of the buildings and grounds. As identified in the *Purpose and Need* statement in Chapter 1, there has been a longstanding need to construct a large event space at the White House to facilitate the hosting of large events, such as State Dinners. The Executive Office of the President identified executive functional goals for any event space: immediate adjacency to the Executive Mansion, a direct ceremonial procession from the East Room into the venue, and enclosed second-story access from the Executive Mansion. Alternatives that placed the venue farther from the Executive Mansion, interrupted the East Room procession, or removed second-story access would not meet these operational goals. Concepts that shifted the footprint outside the East Wing or reduced the project scale would limit capacity and create circulation and security conflicts that could disrupt executive functions. Additionally, design concepts set further from the Executive Mansion of the White House would require the continued use of tents for security and would subject guests to weather events like rain when moving to and from the event space. Because these alternative design concepts would not meet the purpose and need, they were dismissed from detailed analysis.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

## DECLARATION OF JOHN STANWICH, NATIONAL PARK SERVICE LIAISON TO THE WHITE HOUSE

I, John Stanwich declare as follows:

1. I am the National Park Service ("NPS") Liaison to the White House. I have been in this position for approximately 11 years. Prior to that time, I served as the Deputy NPS Liaison to the White House for approximately 5 years. I have been employed by NPS since 1992. In my current position, I report to the Deputy Regional Director of the NPS National Capital Region ("NCR").

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. As NPS Liaison to the White House, I supervise approximately 60 employees and oversee NPS daily operations at the White House and President's Park ("the Park") as well as at the White House Visitor Center and the Executive Support Facility. I function as and have the line authority of a park superintendent, but, due to the unique nature of the Park, I also have additional responsibilities of coordinating with other executive branch entities that have responsibilities in and around the Park. My role also includes

1

JA145

planning for and executing major national events such as Presidential Inaugurations, the National Christmas Tree Lighting, and the White House Easter Egg Roll.

4. The Park is an administrative unit within the National Park System comprised of the White House, Lafayette Park, Sherman Park, the First Division Monument, and the Ellipse. The Park is unique within the National Park System in that it serves as a private residence, the seat of the executive branch of the U.S. government, a military installation, a museum, and a public park.

5. In my role as NPS Liaison at the White House I regularly meet and coordinate with representatives of several federal entities with responsibilities in and around the Park including: the Office of Administration, Executive Office of the President; the Executive Residence at the White House ("Executive Residence"); the White House Curator's Office; the National Capital Region of the U.S. General Services Administration; the U.S. Secret Service; and the White House Military Office. I also perform on-site oversight of NPS activities in and around the Park and am present on site on a daily or near daily basis.

6. As the home of presidents, the White House must serve the needs of the presidential family, just as any American home serves its occupants. Additionally, the White House must serve the president as the location for official and ceremonial functions. In my role as NPS Liaison to the White House, I coordinate closely with the Executive Residence at the White House, within the Executive Office of the President to provide NPS support for day-to-day official activities at the White House, to ensure that NPS's maintenance and preservation activities on site do not interfere with planned official functions, and to support the White House tour program. The Executive Residence at the White House

2

JA146

provides for the use of the White House and its grounds as the official home of the President and his family, supports the official ceremonial functions of the President, and works with the NPS and other entities to promote the preservation and public appreciation of the White House and its contents.

7. The White House currently lacks a secure event space to host large events, such as State Dinners. To accommodate such events, large tents are typically erected on the South Lawn of the White House. In the past, these tents have caused substantial damage to NPS resources on the grounds, particularly the turf, which then must be repaired or remediated by NPS. The use of stakes to secure these tents also risks damaging irrigation systems and other NPS infrastructure elements on the ground.

8. The Executive Residence is managing the White House East Wing Modernization and State Ballroom Project ("the Project"), which requires extensive coordination with not only NPS, but also with other government entities with management responsibilities in and around the Park. Members of my staff and I have been closely coordinating with staff at the Executive Residence and supporting the Project since early spring 2025. I have personally attended, and continue to attend, coordination and planning meetings, and I personally observe activity on site in the performance of my official duties. I, or members of my staff, also attend weekly meetings with the general contractor engaged by the Executive Residence at the White House for the Project, Clark Construction, that provide regular updates on the Project's status, identify potential issues that arise in connection with the Project, and resolve those issues. Since the selection of Shalom Baranes Associates as the Project architect, representatives of Shalom Baranes Associates have also attended these meetings.

3

JA147

9.  On August 18, 2025, I signed a Categorical Exclusion Documentation Form to document compliance with the National Environmental Policy Act ("NEPA") for NPS activities on site in anticipation of the commencement of construction activities, including removal of museum objects from the White House and East Wing, limited relocation of trees and shrubs, and survey and historic documentation actions at the White House. A copy of this Form is attached to this Declaration as Exhibit A, and available online on the NPS's Planning, Environment & Public Comment ("PEPC") website at ParkPlanning - White House East Wing Modernization and State Ballroom Environmental Assessment.

10.  The Park's enabling legislation, Public Law 87-286, expressly addresses the management of artifacts and stipulates that furniture, fixtures, and decorative objects declared by the President to be of historic or artistic interest shall be considered inalienable and property of the White House. Pub. L. No. 87-286 (1961). Items not currently in use or on display are curated or stored at the NPS's Executive Support Facility and may be returned to the White House when required. NPS routinely transfers museum objects and other materials from the Executive Support Facility to the White House for use or display there and removes such objects from the White House for storage or curation at the Executive Support Facility.

11. The Executive Support Facility is an off-site facility that houses utilitarian property for use at the White House, as well as parts of the White House historical collection not in use and other artifacts.

12. In late August 2025 through September 2025, I and members of my staff coordinated closely with the White House Curator's Office to identify and remove museum objects, including paintings and historic furniture, from the East Wing, East Colonnade, and the

Ground Floor State Rooms of the White House to be stored or curated at the Executive Support Facility.

13. NPS's Heritage Documentation Programs completed Historic American Building Survey ("HABS") documentation of the East and East Colonnade in late August 2025, including 3D/LIDAR scanning and photo documentation. NPS's Heritage Documentation Programs, including HABS, document historic sites and structures across the United States through the creation of measured drawings, large-format photographs, and historical reports. NPS's Heritage Documentation Programs are prepared to provide ongoing photographic documentation during the construction process to document the Project for posterity.

14. The Executive Residence and the office of the White House Curator also performed similar documentation including photography and 3D scanning to create a digital twin of the East Wing and East Colonnade spaces for future preservation and interpretive purposes.

15. During summer 2025, my staff and I worked closely with Clark Construction to identify and plan to preserve historic building elements. Beginning in late-August 2025 through early-October 2025, Clark Construction performed historic preservation work salvaging historic materials within the East Wing and East Colonnade. Clark Construction removed and is storing the stone columns, doors, and other items that are planned to be reincorporated into the new facility. In addition to museum objects, NPS is also storing historic items removed from the East Wing and East Colonnade by Clark Construction, including the East Wing cornerstone and plaque, historic fencing, historic windows, light fixtures, and the IM Pei-designed pergola from the East Garden.

16.  I have been informed that abatement activities related to certain hazardous materials within the Project area were performed by Clark Construction during the months of September and October 2025. After Clark Construction completed the planned historic preservation work and abatement activities, structural demolition of the East Wing and East Colonnade commenced on October 20, 2025.

17. On November 6, 2025, members of NPS Cultural Resources Planning and Science directorate visited the East Colonnade to consult with Clark Construction and review plans regarding the removal of the portion of the East Colonnade immediately abutting the Executive Mansion. Substantial care and consideration was given to ensure that the removal of this last portion of the East Colonnade did not harm the Executive Mansion and that the vibrations from construction activity were monitored so that the deconstruction effort did not impact the artifacts and objects inside the Executive Mansion. Removal of this portion of the East Colonnade was completed on November 21, 2025.

18.  The White House tour program, which NPS supports in furtherance of its mission for the Park, was suspended on August 30, 2025 to accommodate on-site Project activities. The tour program resumed on December 2, 2025. Prior to the resumption of tour activities, a need was identified to install a temporary modular pavilion and walkway on the North Grounds of the White House to provide an entryway for guests and to house restroom and coat check facilities that will likely otherwise be unavailable until the Project is complete. On November 20, 2025, I signed a Categorical Exclusion Documentation Form to document compliance with NEPA for the installation of this temporary tour facility, a

copy of which is attached to this Declaration as Exhibit B, and available online on the Project's PEPC page.

19. As of December 5, 2025 above grade structural demolition of the East Wing and East Colonnade has been completed by Clark Construction. Below grade structural demolition has begun and is expected to be completed during December 2025. Below grade excavation activities throughout the site continue.

20. At present, I anticipate that Clark Construction will commence work on the footings and below-grade structural concrete in the East Colonnade area in January and in the East Wing area in February. Above grade structural work is not anticipated to begin until April 2026, at the earliest.

21.  The architectural design for the above grade elements is still in progress but has been coordinated in a manner to allow the below grade elements to be constructed as planned while the above grade design is finalized.

22. I am coordinating with the Executive Residence and staff at the NPS National Capital Region on submitting materials regarding the Project to the National Capital Planning Commission. I understand that the Executive Office of the President intends to engage with the U.S. Commission on Fine Arts at its discretion when the Commission has a quorum and that plans are underway to appoint new members to the U.S. Commission on Fine Arts.  The NPS will provide whatever support is needed to advance these efforts.

23. Due to the impacts of the Project, spaces that were previously included in tours of the White house are occupied by staff as office spaces, including the Vermeil Room, the China Room and the Library, and thus no longer included in tours. Until the Project is complete, Park visitors will not have the opportunity to enjoy and benefit from seeing

7

8

historic items in their historic context, such as the White House China Collection in the China Room. Additionally, the East Colonnade, which will be reconstructed as part of the Project, provided opportunities for Park visitors to view the South Lawn and its gardens. If progress on the Project were halted, this would prolong these impacts to the experiences of Park visitors.

24. I have also been informed that the below-grade waterproofing and structural concrete work that will be occurring over the next four months is critical to bringing the temporary construction state of the site into a more permanent condition, particularly in areas where the existing-to-remain elements have been temporarily exposed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 15, 2025.

Digitally signed by JOHN STANWICH
Date: 2025.12.15 15:33:48 -05'00'

John Stanwich

8

JA152

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

Plaintiff,

v.                                                      Case No. 1:25-cv-04316-RJL

NATIONAL PARK SERVICE, *et al.*,

Defendants.

## DECLARATION OF U.S. SECRET SERVICE
## DEPUTY DIRECTOR MATTHEW C. QUINN

I, Matthew C. Quinn declare as follows:

1. I am the Deputy Director of the United States Secret Service (Secret Service). Prior to my current appointment, I served as Deputy Assistant Director for the Office of Protective Operations and retired from the Secret Service after more than two decades of service. During that time, I held several leadership positions, including Special Agent in Charge of the Special Operations Division, Special Agent in Charge of the Office of Communication and Media Relations, Special Agent in Charge of Protective Operations, and Acting Special Agent in Charge of the Charlotte Field Office. I began my law enforcement career in 1998 at the Secret Service New York Field Office, conducting financial fraud investigations and serving as the primary liaison to the United Nations. I subsequently served as a supervisor in the Washington Field Office and as Assistant to the Special Agent in Charge at the James J. Rowley Training Center.

2. Following my retirement in 2021, I worked as a senior executive in the private sector, most recently as Senior Vice President at Fortem Technologies in Pleasant Grove, Utah,

1
JA153

where I was responsible for developing and applying airspace safety and security solutions for law enforcement, military, and commercial stakeholders. On May 19, 2025, I returned to the Secret Service, becoming the agency's 24th Deputy Director.

3. I am a graduate of Arizona State University and hold a master's degree from the National Defense University at the Dwight D. Eisenhower School for National Security and Resource Strategy. I am also a graduate of the Key Executive Leadership Program at American University in Washington, D.C. I am a certified and appointed member of the federal Senior Executive Service.

4. The U.S. Secret Service is charged with ensuring the safety of the nation's highest-ranking officials, including the President and Vice President. *See* 18 U.S.C. §§ 3056(a), 3056A. As part of that mission, the U.S. Secret Service also protects key locations where the nation's highest-ranking elected leaders live and work, as well as the foreign diplomatic missions located around Washington, D.C. Among these locations of national importance are the White House Complex and the Vice President's residence.

5. In my capacity as Deputy Director, I oversee the Secret Service's protective and investigative operations, managing seven operational directorates, including the directorates and offices responsible for managing the Secret Service's role in the East Wing construction project (the Project) on the White House grounds. My knowledge of the Project is based on my official duties, which include regular briefings, reports, and direct communications with the personnel overseeing and executing the Secret Service's role in the Project. As a result, I possess current knowledge regarding the status, scope, and operational security considerations surrounding the Project.

6. Due to the nature and location of the Project, the Project contractor is required to provide temporary security and safety measures around the project's construction site.

7. As part of its protective mission, the Secret Service coordinates with the contractor on these temporary measures to ensure the security and safety of the President, the First Family, and the White House complex.

8. While the contractor has completed most of these temporary security measures, improvements to the site are still needed before the Secret Service's safety and security requirements can be met. Accordingly, any pause in construction, even temporarily, would leave the contractor's obligation unfulfilled in this regard and consequently hamper the Secret Service's ability to meet its statutory obligations and protective mission.

9. In addition to the facts testified to above, the Secret Service is prepared to provide the Court with more details, including law enforcement sensitive and/or classified information, in an appropriate setting, such as classified declaration available for *in camera* review.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 15, 2025.

Matthew C. Quinn
Deputy Director
United States Secret Service

3
JA155

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br><br>                    Plaintiff,<br><br>        v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Case No. 25-4316 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM ORDER
December  17 , 2025 [Dkt. #2]

This matter comes before the Court on plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Dkt. #2]. For the reasons set forth below, I will **DENY** plaintiff's motion for a temporary restraining order and **DEFER** judgment on plaintiff's motion for a preliminary injunction until after the Court has held its hearing in January.

A temporary restraining order ("TRO") is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Its purpose is to "preserve the relative positions of the parties" pending a merits decision. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a TRO, the plaintiff must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the TRO

1

JA156

USCA Case #26-5134   Document #2172336   Filed: 05/07/2026   Page 163 of 525

were not granted, (3) that the TRO would not substantially injure other interested parties, and (4) that the public interest would be furthered by the TRO." *Am. Foreign Serv. Ass'n v. Trump*, 766 F. Supp. 3d 25, 28 (D.D.C. 2025) (cleaned up).

Here, plaintiff has not demonstrated "a clear and present need for equitable relief to prevent irreparable harm" before this Court can consider plaintiff's motion for a preliminary injunction. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation marks omitted). Plaintiff points to both the procedural harm of being denied participation in the review process for the proposed ballroom and the aesthetic (as well as historic and cultural) harm of an expansive ballroom overshadowing the White House. But bare procedural injury, standing alone, is insufficient to demonstrate irreparable harm. *See, e.g., Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 268–69 (D.D.C. 2020); *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). Further, the Government has committed to commencing the consultation processes with the National Capital Planning Commission ("NCPC") and the Commission of Fine Arts ("CFA") by the end of the month. The Court will hold the Government to its word.

As for plaintiff's claims of aesthetic harm, I find that plaintiff has not yet demonstrated that such harm is "certain, great, actual, imminent, and beyond remediation." *Fisheries*, 236 F. Supp. 3d at 337. While below-grade demolition and excavation at the East Wing are ongoing, the Government has represented that below-grade structural work—*i.e.*, "footings and below-grade structural concrete"—will not begin until January 2026 for the colonnade and February 2026 for the ballroom. Decl. of John Stanwich [Dkt.

#14-6] ¶¶ 19–20. And at yesterday's hearing, the Government represented that nothing about the ballroom has been finalized, including its size and scale. Based on those representations, there is no sufficiently imminent risk of irreparable aesthetic harm warranting a temporary restraining order halting construction over the next fourteen days. *See* Fed. R. Civ. P. 65(b)(2).

Indeed, because plaintiff has not made a sufficient showing of irreparable harm, I may deny "the motion for injunctive relief without considering the other factors." *Fisheries*, 236 F. Supp. 3d at 336. Accordingly, I reserve judgment as to plaintiff's likelihood of success on the merits and the balance of the equities. And I reserve judgment on whether plaintiff may be able to show irreparable harm at the preliminary injunction stage.

Finally, the Court takes seriously the Government's representations that its plans are not yet final, that it will commence consultations with the NCPC and CFA by the end of this month, and that no above-grade construction will take place before April 2026. If there *is* any below-grade construction that dictates the size or scale of the proposed ballroom *before* the Court can act on plaintiff's motion for a preliminary injunction, then the Government should be prepared to take it down depending on the Court's resolution of the merits of this case.

Accordingly, it is hereby

**ORDERED** that plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Dkt. #2] is **DENIED** in part (insofar as it seeks a temporary

JA158

restraining order) and **DEFERRED** in part (insofar as it seeks a preliminary injunction); and it is further

**ORDERED** that a hearing on plaintiff's motion for a preliminary injunction is set for January 15, 2026 at 3:30 PM in Courtroom 18 (In Person); and it is further

**ORDERED** that plaintiff shall file a supplemental brief in support of its motion for a preliminary injunction by December 29, 2025; defendants shall file a response by January 8, 2026; and plaintiff shall file a reply brief by January 12, 2026; and it is further

**ORDERED** that the parties shall address the following questions in their briefs, along with any other issues the parties wish to raise:

- Whether and to what extent, past Presidents have obtained congressional authorization and/or regulatory approval for construction and modifications to the White House structure and grounds.

- Whether the President has independent constitutional and/or statutory authority to construct a ballroom on White House grounds.

- Whether the entities directing the ballroom construction, including the Office of the Executive Residence, are "agencies" within the meaning of the Administrative Procedure Act.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

4

JA159

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * * *    )
NATIONAL TRUST FOR HISTORIC        )    Civil Action
PRESERVATION IN THE UNITED STATES, )    No. 25-04316
                                   )
             Plaintiff,            )
                                   )
   vs.                             )
                                   )
NATIONAL PARK SERVICE, et al.,     )    Washington, D.C.
                                   )    December 16, 2025
             Defendants.           )    3:40 p.m.
                                   )
* * * * * * * * * * * * * * * *    )


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:        THADDEUS A. HEUER, ESQ.
                          JACK S. SMITH, ESQ.
                          MATTHEW CASASSA, ESQ.
                          FOLEY HOAG, LLP
                          155 Seaport Boulevard
                          Boston, Massachusetts 02210

                          GREGORY B. CRAIG, ESQ.
                          FOLEY HOAG, LLP
                          1717 K Street, Northwest
                          Suite 1200
                          Washington, D.C. 20006

FOR THE DEFENDANTS:       ADAM R.F. GUSTAFSON, ESQ.
                          MARISSA A. PIROPATO, ESQ.
                          MICHELLE M. RAMUS, ESQ.
                          GREGORY M. CUMMING, ESQ.
                          MARK J. WIDERSCHEIN, ESQ.
                          DEPARTMENT OF JUSTICE
                          ENVIRONMENT AND NATURAL RESOURCES
                             DIVISION
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530


JA160

REPORTED BY:                LISA EDWARDS, RDR, CRR
                            Official Court Reporter
                            United States District Court for the
                              District of Columbia
                            333 Constitution Avenue, Northwest
                            Room 6706
                            Washington, D.C. 20001
                            (202) 354-3269

THE COURTROOM DEPUTY:  Your Honor, we are on the record in Civil Matter 25-4316, *National Trust for Historic Preservation in the United States versus National Park Services, et al.*

Beginning with Plaintiff's counsel, please approach the podium and identify yourself for the record.

MR. CRAIG:  Your Honor, my name is Gregory Craig. I'm a senior counsel at the law firm of Foley Hoag.

I'd like to introduce Tad Heuer, who will be arguing today, a partner at Foley Hoag; Jack Smith; and Matt Casassa.

THE COURT:  Welcome, everyone.

MR. CRAIG:  And with your permission, I'd also like to introduce the president of the National Trust For Historic Preservation who is here with us today, Carol Quillen, Q-U-I-L-L-E-N.

Would you stand?

Thank you, your Honor.

THE COURT:  Thank you.

MR. GUSTAFSON:  Good afternoon, your Honor.  Adam Gustafson for the federal Defendants.  I'm joined at counsel table by Marissa Piropato, Michelle Ramus, Greg Cumming and Mark Widerschein.

THE COURT:  Are they all from Main Justice?

MR. GUSTAFSON:  Yes, sir.

THE COURT:  And where are you from in Main Justice?

MR. GUSTAFSON:  The Environment and Natural Resources Division.

THE COURT:  Thank you, sir.

All right.  We're here for the hearing on the TRO. The moving party goes first.  They have 15 minutes.  And they can have a five-minute rebuttal later.  Okay?

MR. HEUER:  Thank you, your Honor.

Tad Heuer on behalf of the National Trust.

This is a simple motion about a fundamental principle, that even federal agencies --

THE COURT:  Simple?

MR. HEUER:  It is.

THE COURT:  That's a matter of opinion, my friend.

MR. HEUER:  Indeed.

But it's a simple motion --

THE COURT:  I guess I'll write the opinion.

MR. HEUER:  We believe it may be able to be briefed, your Honor.

Even federal agencies and even the president need to follow the law.

So Congress chartered the National Trust in 1949 to facilitate public participation in the preservation of sites, buildings and objects of national significance and

JA163

interest.  The Trust has done so for 76 years.  And the White House is perhaps the most nationally significant building in the country.

The Trust has used legislation, which is instrumental in creating the National Register of Historic Places.  It has used persuasion, saving hundreds of historic buildings by raising public awareness through the annual list of America's Eleven Most Endangered Places.

And on dozens of occasions, it has successfully used litigation against administrations of both parties to compel federal agencies to comply with the federal laws protecting historic resources.

The Trust is here today in defense of the White House and in furtherance of the institutional mission that Congress entrusted it with over 75 years ago.

So I have three points to make this afternoon. The first is to summarize the five laws that we believe the Defendants are ignoring, which explains why we are likely to succeed on the merits.

The second is to explain why the Trust will suffer irreparable injury without an immediate order to cease construction and why the equities in public interest are in our favor.

And third, to explain why the relief requested is narrow, tailored and proportionate with appropriate

JA164

accommodation for presidential safety and security.

First, the Trust is likely to succeed on the merits because even federal agencies and even the president have to follow the law.  And here, those laws are the following:  the National Capital Planning Act; the regulations of the Commission on Fine Arts; the National Environmental Policy Act, NEPA; the federal statute prohibiting the erection of buildings in D.C. parks without express congressional approval; and the U.S. Constitution's Property Clause.

The president has said that he and his administration don't need any approvals or permits for the ballroom project because as president he can, quote, "do anything I want to the White House."  In other words, the government doesn't have to follow the law.

That's simply wrong.  As the Parks Service's own website states, quote, "The White House is owned by the American people and stewarded by the National Trust -- or the National Park Service.  It is more than the president's residence.  It's a site for protest and national discourse on what it means to be American."

The fact that their opposition goes on for pages and pages about the need for a ballroom underscores that they are, with respect, missing the point.  The case is not about the need for a ballroom; it's about the need to follow

JA165

the law if you want one.

It is emphatically the province and the duty of the judicial department to say what the law is.

And here, the law is clear:  first, following the National Capital Planning Act.  Every federal agency contemplating construction in D.C. must consult the NCPC before preparing construction plans and must obtain NCPC approval for location, height, bulk, number of stories and size.

Presidents of both administrations, including this one in his first term, twice, have gone to the NCPC and routinely complied.

The project also undermines a separate section of the NCPC, the comprehensive plan provision of the Act, which discourages projects that, quote, "permanently alter symbolic views of the White House."

Revising the plan so it allows what it currently proscribes and allows this project would require public hearing and a consultation project.

THE COURT:  What year was the NCPC?

MR. HEUER:  Pardon?

THE COURT:  What year was the NCPC passed?

MR. HEUER:  1952.

THE COURT:  So the various projects that you list here that other presidents have initiated to change the

White House, did they all comply with the NCPC?

MR. HEUER:  They either complied with NCPC or the Commission on Fine Arts, and they all had congressional approval if they were using federal funds.

THE COURT:  I assume that they all were using federal funds.

MR. HEUER:  I believe the tennis pavilion, although opposing counsel will correct me, was done with private funds.  But even then, they went through NCPC.  That was in 2019.

THE COURT:  Which president did that?

MR. HEUER:  President Trump did.

THE COURT:  The tennis court approval?

MR. HEUER:  He did both the tennis court approval in 2019 and the fence approval in 2016.  Those were both during his first term.

THE COURT:  I see.

MR. HEUER:  So the government makes a few claims. One is that the plans are coming, so there's no need for an injunction.

Yet their affidavit submitted yesterday evening concedes that the first the NCPC heard from them was yesterday, the day they filed.  And it's clear the construction is ongoing now.

Their second claim is that the review is limited

to --

THE COURT: They said they were going to do it this month. There's only two weeks left in the month.

MR. HEUER: That's true. But if you look at the Stidham affidavit, it says, "The first I heard of this was yesterday," the 15th of December.

I agree. That's very different things. That's what --

THE COURT: Well, let me assure you of something: The Court will hold them to that.

MR. HEUER: Okay. We appreciate it.

THE COURT: They've got till the end of this month before we have our PI hearing, which will be in January. They have until then to get it done.

MR. HEUER: Well, we'd also notice -- note that again this is ongoing. That's why we're here on the temporary restraining order. We appreciate that. It's the temporary restraining order because the construction is ongoing.

And they claim that NCPC review is limited to vertical construction. Those words don't appear in the NCPC statute. That's a gloss.

We've cited a number of dictionary definitions that say that construction includes essential demolition and site preparation. This makes intuitive sense. The more

JA168

site you clear, the more concrete you pour, the more piles you drive, the more irrevocably you lock in the footprint, the size and the scope of what gets built above it, rendering subsequent public comment symbolic rather than substantive.

And the argument that construction hasn't started yet is even more difficult to take seriously.  There are massive construction cranes on the site.  There are pile drivers running around the clock.  There are materials being staged.

Even the White House's own website, as we cite in our brief, states the construction "kicked off," quote-unquote, in September.  This notion that you can construct first and provide plans later makes a mockery of that statute and the process that everyone else always has to follow.

Second --

THE COURT:  Couldn't -- depending upon the --

MR. HEUER:  Yes.

THE COURT:  -- size of the footprint that the construction below ground consists of, couldn't they always adjust the height of the building and the width of the building?

MR. HEUER:  We don't know.  That's one of the reasons you would want to have plans submitted to the

National Capital Planning Commission, so you could see and comment on it.  It's very possible that the pilings that you drive for a building of 90,000 square feet mean that you can't have a building in a certain place, a certain location.  It must be a certain size.  It must be a certain height.

We don't know that.  And that's the concern, that by completing underground construction you are creating a foundation on which they say:  We are locked into this location.  We're locked into this size.  We're locked into this shape.  Those are all things that are supposed to happen before you start constructing, not after.

As to the plain language of the Commission on Fine Arts regulations, those require that federal officers have a, quote, "duty to obtain CFA advice on the plans and the merits of the design of D.C. buildings before they are approved or action is taken and that the CFA receive public comment."

Now, the government's opposition claims this isn't true.  They seem to have not realized that --

THE COURT:  Slow down a little.

MR. HEUER:  Yes.

In addition --

THE COURT:  My reporter is trying to keep up with you.  And I'm trying to keep up with you as well.

MR. HEUER:  Indeed.

THE COURT:  So slow down.

MR. HEUER:  I shall.

The government's opposition doesn't appear to recognize that there is not only Section 2101 of those regulations, but if you turn the page there is a Section 2102, which says expressly that public comment is provided for under the CFA.

Now, rather than follow the law and submit plans to the CFA, the president fired all of its board members. The government again claimed yesterday that replacements are coming soon.  But construction is ongoing, and that's not soon enough.  That's why an injunction is needed.

Third, the plain language of NEPA requires the public publication of at least an environmental assessment, an EA, if not an environmental impact statement, an EIS, before either demolition or construction can commence.

Now, last night at 5:00 p.m. was the first time anyone saw the EA, since the government has hidden it from public view even though it was signed -- since August, when it was signed.

Had it been made public four months ago, like Section 4336 of NEPA requires, we would have sued to enjoin any demolition on the basis that it's woefully inadequate. The EA describes an entirely different project than the one

JA171

they are currently constructing.

Now, it's not just that the EA says that the East Wing is being, quote, "deconstructed" and, quote, "salvaged" or that the colonnade between the main building and the mansion is being, quote, "renovated" when we've all seen the pictures that show that's not true.

It's not just that it says the tower crane will be erected after final design documents.  But there aren't any final design documents, as we know, and the crane is there now, suggesting perhaps that those documents do exist.

The most egregiously arbitrary component is around the central purpose of an EA:  whether the proposed action is significant.

Defendants expressly agree.  On Page 4 of that EA, they quote:  Significance is determined solely in relation to the reasonably foreseeable adverse effects.  "Solely based on adverse effects."

It then goes on to state on the next page that the effect on the Olmsted landscape of the White House will, quote, "result in long-term adverse effects on the cultural landscape."  That's Page 5.

It will, quote, "disrupt the historical continuity of the White House grounds and create a visual imbalance with the more modestly scaled West Wing and executive mansion."

THE COURT:  Why don't you focus in the next five minutes you have left --

MR. HEUER:  Sure.

THE COURT:   -- on the irreparable harm argument.

MR. HEUER:  Of course.

In terms of irreparable harm, the Plaintiffs do have irreparable harm here because the construction is ongoing.  And their harm is that they are entitled under all of these statutes to be able to comment on all of these plans before that happens.  That's an information-forcing mechanism that Congress designed to make better projects.

These are things that they can do, that the Plaintiffs can -- that the Defendants can do as long as they follow the rules.

And here, they are injured by the fact that there is ongoing construction.  Every day you have more concrete, more footprint, more establishing what this structure is going to look like.  That means that the comment is going to be less and less valuable when it occurs.  It should all be occurring before anything goes into the ground.

Yet here, we have a situation where the government is saying:  Wait and find out, and then you can comment, but we might not be able to make any changes.

That's exactly what these statutes prohibit.  And what we --

THE COURT:  I think the -- isn't the work that's going to be conducted as represented by the government over the next few weeks, when the TRO would be in effect, all below the surface?

MR. HEUER:  That's what they assert, that it's going to be below the surface.

There's nothing in the NCPC statute that says it's below-ground construction in the same way it doesn't say it applies only to vertical construction.  It says "before construction plans."  And construction plans, as anyone who has a house knows, include the foundation.  If you build a house without a foundation, it's not a very good house.

THE COURT:  The purpose of the NCPC and the CFA, is it not, is principally to focus on what's above ground?

MR. HEUER:  We don't believe it is.  Maybe the CFA is.  They're talking about aesthetics.  But not the NCPC.  The NCPC says "before construction."

And the reason that you would want to have this plan before construction is so you know what it will look like when it does go above ground.  The more you lock it in, the more your comments afterwards are symbolic.  It will be a *fait accompli*.

We would also say that NEPA requires this before any construction occurs.  It's not just NCPC and it's not just CFA; it's NEPA.

JA174

And the one item I would further note -- and we can discuss it afterwards -- is this statute Section 8106. 8106 says that if you want to build a federal building in the District of Columbia, in a park, you need express congressional approval.

This is a building.  It is in President's Park. It does not have congressional approval.

We don't care which order these things go in.  But they all need to occur before you are constructing, not after.

We also would say that the balance of equities favor the Trust.  The Defendants have already caused irreversible damage to the White House and its grounds without complying with these review processes and approval processes.

And they're continuing this construction without complying with the laws and without this express approval I just mentioned from Congress.  They can't claim that they have a cognizable interest in protecting an illegitimate course of action.

I think we would also note briefly that we believe that this is both something for the president and for the agencies.  We fully concede the president is not an agency for purposes of the Administrative Procedures Act.  We have never claimed that.

JA175

We've set aside our claims separately, some for the agencies and another for the president.  But they get to the same place.  The agencies need to comply with all these rules because they are subject to the APA; and the rules say do this before you construct, not after.

And our argument about the president is simple: The Property Clause vests all power over federal lands with Congress.  It's an Article I power.  The president is asserting an Article II authority over the White House, which he simply does not have.

If he wants to act as to the White House, he needs to get congressional approval, not just because 8106 says so, but because Congress hasn't delegated him anything out of its Article I authority.

Finally, I would note that our preliminary relief here is narrow.  It already accommodates the temporary security interests that have been raised by the Defendant.  We would merely ask the Defendants to do what they should have done in the first place:  Request review and approval of the project from the appropriate authorities, including Congress; prepare and publish an adequate environmental impact statement; and give the public an opportunity to comment.

And I do want to make a note about national security.  Given the belated statement of the government

yesterday afternoon that the project includes a subterranean national security component, we do not object to modifying the requested relief in our proposed orders to exclude limited actions -- again, as we note, with the express written approval of this Court -- that are necessary for the sole purpose of ensuring safe physical conditions, which is what we originally had asked for, but also the safety of the president, of course, while the injunction is in effect.

However, we would continue to request an injunction over subterranean construction that would have that effect of predetermining the location, the height, the bulk, the number of stories, the size, all other features of ballroom construction that would occur before the required reviews are conducted and before required approvals have been obtained.

We would ask that the Court enter a temporary restraining order.  And we are here also because we have moved at the same time for a preliminary injunction -- we believe it's appropriate -- requiring the Defendants to cease work on the ballroom project until they follow the law.

THE COURT:  Thank you.

MR. HEUER:  Thank you, your Honor.

MR. GUSTAFSON:  Good afternoon.

This case involves --

JA177

THE COURT:  Say your name again.

MR. GUSTAFSON:  Adam Gustafson, your Honor, for the federal Defendants.

THE COURT:  Thank you.

MR. GUSTAFSON:  This case involves interesting questions about federal power and statutory interpretation. Fortunately, this Court does not have to address any of them in order to resolve the motion at hand.

Plaintiffs fail at the threshold because they cannot establish a ripe claim that this Court can redress.

Above-ground demolition concluded on December 5, a week before the complaint was filed in this case.  It cannot be undone.

As for future construction, there is no final plan for the ballroom.  Above-ground construction won't even begin until April at the earliest.  And Defendants have committed to voluntarily undergoing the NCPC and CFA consultation that Plaintiffs have been requesting.

Moreover, the national --

THE COURT:  Is your client going to submit the materials to NCPC and CFA by the end of the month, as they've said they would in their brief?

MR. GUSTAFSON:  Your Honor, they have already initiated outreach to the NCPC.

THE COURT:  That's an interesting choice of words.

JA178

Explain what you mean.  "Initiated outreach."  Did they pick up a phone and call somebody or did they hand somebody a document?

MR. GUSTAFSON:  There's a declaration that points out that the Executive Office of the President has made contact with an *ex officio* member of the National Capital Planning Commission and requested a meeting.  So that meeting is I understand in the process of being scheduled imminently.  But I don't have a date to report for that meeting yet.

But --

THE COURT:  But you've said it'll be done by the end of the month?

MR. GUSTAFSON:  That's correct, your Honor.

The Commission on Fine Arts does not have a quorum yet.  And so there's an intermediate step that has to happen.  Those members have to be appointed.  But the Defendants are committed to seeking consultation from the Commission on Fine Arts as well.

The National Park Services already complied with NEPA for both demolition and construction.

And the below-ground work that's occurring now has nothing to do with Plaintiff's asserted aesthetic injury, and that work must continue for national security reasons.

This Court can deny the injunction based on

JA179

Plaintiff's failure to establish irreparable harm. The procedural injuries that they've alleged standing alone do not constitute irreparable harm. There must be a concrete injury.

And given the speculative nature of the claims, there is none. Their asserted aesthetic injury is conjectural. The plans are not final and the consultation process hasn't yet commenced.

THE COURT: Is it possible or likely from your point of view that the concrete work that's being done below ground will dictate the height and the width of the building above ground?

MR. GUSTAFSON: Your Honor, I'm not an engineer. I couldn't speak to that with specificity, although I would point out that it's the Plaintiff's burden here to show an irreparable injury. There's nothing here to suggest that it would be impossible to change the size of the ultimate structure because concrete has been poured. Plaintiffs haven't suggested that there's anything irreversible about this process.

The architectural design remains in progress. And Plaintiffs can't know the result of the NCPC and CFA consultation before it's finished.

So for all of these reasons, Plaintiffs cannot show irreparable harm. And that can be the end of this

JA180

Court's consideration.

But Plaintiff's motion also fails because there is no agency action for this Court to enjoin.  President Trump's White House renovation is being planned, directed and executed by the Executive Office of the President using architects and contractors that he hired.

Plaintiffs would have this Court enjoin executive action by the chief executive relating to the executive residence for a core executive function, namely receiving ambassadors and other ministers.

THE COURT:  The president changed horses recently, didn't he?  He changed architects?

MR. GUSTAFSON:  That's correct, your Honor.  That demonstrates that this process is not complete, that it's ongoing, that any injury is speculative and that the exact --

THE COURT:  Are you aware of whether or not the new architect that he has picked has finalized his or her plans?

MR. GUSTAFSON:  The plans have not been finalized. That is clear from the declarations that we have submitted. The plans are not final.  And that -- and so the NCPC and CFA process will give an opportunity for those bodies to provide their views on the plans -- the tentative plans as they exist.

THE COURT:  So the size of the building is still an open question?

MR. GUSTAFSON:  Your Honor, there's nothing final about this building.  It would be premature to conclude that -- anything about what the final product is going to look like.

Because there is no final agency action and because the president himself has been directly involved in this, the separation of powers counsels against judicial supervision of such a project.

The state -- the statutes that Plaintiffs seek to enforce do not apply to the president.  They have just conceded that the president is not an agency.  That's critical to this question.  NEPA, the NCPC and CFA's organic statute are only enforceable through the APA.  That is their -- only enforceable against agencies.

But the president is not an agency and the president himself cannot be enjoined.

Your 2009 decision in *NRDC versus Department of State* is really helpful on this question.  That's the Keystone XL Pipeline case.  In that case, you held that the agency's participation in presidential action does not change the analysis.  It's still presidential action.

And this is a quote from that case on Page 110 of 657 F. Supp. 2d 105 at 110:  The president's exercise of

significant discretionary authority over agency decisions constitutes presidential action, which is shielded from judicial review under the APA out of concern for the separation of powers.

The agency action -- the agency's involvement in this matter has been in support of direct -- direction and planning from the Executive Office of the President.  There is no separate and distinct agency action in this case that would allow APA review.

But even if there were agency action here, it is doubtful that the procedural statutes Plaintiffs seek to enforce could govern an action at the president's residence. *Franklin v. Massachusetts* teaches that textual silence is not enough to subject the president -- and I would say by extension the president's mansion -- to the provisions of a procedural statute.

THE COURT:  Isn't it the Office of the Executive Residence that's spearheading and overseeing this project?

MR. GUSTAFSON:  That's correct; within the Executive Office of the President.

THE COURT:  Isn't that a federal agency?

MR. GUSTAFSON:  No, your Honor.  The executive residence is a component of the Executive Office of the President.  It is for all practical purposes the president. And the president himself is directing this action through

the Executive Office --

THE COURT:  Is this a new organization?  I don't remember hearing of that organization.

MR. GUSTAFSON:  The executive residence is a component of the executive -- of the Executive Office of the President.  I couldn't give you much more detail than that from here.  But I'm happy to provide more information.

THE COURT:  You don't know when it was founded?

MR. GUSTAFSON:  I don't know when it was first given that name, your Honor.  But as -- ever since Adams, presidents have been residing at the White House and their staff have been effecting their will, their executive will, in that role.

Even if Plaintiffs could overcome their justiciability problems and identify agency action, it would still fail to establish a likelihood of success.

As to Plaintiff's NEPA claims, the National Park Service has already conducted an environmental assessment.  And so there's nothing left for this Court to do, and certainly nothing that would justify a preliminary injunction.

*Seven County* teaches that when a court identifies a NEPA deficiency, it should not interfere with the agency's ultimate approval of a project at least absent reason to believe that the agency might disapprove of the project if

JA184

it had more information.

Plaintiffs have offered no reason to think that any different NEPA analysis than the National Park Service produced would result in a different ballroom.

Turning to the National Capital Planning Act, that Act applies to agencies again, not the president, and it requires consultation before preparing construction plans the agency originates.

And that statute has no application here.  There is no agency that has originated plans.  There are no plans that have been finalized.  And moreover, Defendants have committed to consult with the NCPC and the CFA.  Again, there's nothing left for this Court to do.

Turning to the last statute that Plaintiffs rely on, 40 USC 8106 -- it is the congressional approval statute -- that statute cannot support the weight that Plaintiffs place on it.  It was supplanted -- that 1912 statute was supplanted when Congress passed the National Capital Planning Act and provided an administrative process for consultation on building projects in the District.

THE COURT:  So did President Roosevelt, Teddy Roosevelt, when he created the West Wing, did he comply with that?

MR. GUSTAFSON:  If I'm remembering correctly, your Honor, the West Wing predated the National Capital Planning

JA185

Act.  But the East Wing was built by Franklin Delano Roosevelt.  And there's no evidence of compliance with the -- with this -- oh, I'm sorry, your Honor.  I take -- now I understand your question.  Pardon me.

Plaintiffs have provided no evidence and we're aware of no evidence that Congress has ever approved any White House construction projects.  Of course, Congress has sometimes appropriated money for such projects.  But in cases where there was no appropriation, we're not aware of any congressional approval.

For example --

THE COURT:  Well, what makes this one really unique -- I was under the impression that what makes this one unique is that the money to underwrite the cost of the construction here is coming from private companies.

MR. GUSTAFSON:  That's right, your Honor.

THE COURT:  It's not coming from Congress.

MR. GUSTAFSON:  That's right, your Honor. Congress has -- you know, this complies with the Appropriations Clause, of course, because Congress has allowed the National Park Service to have this gift authority.  Gifts that are received by the National Park Service become the funds of the government --

THE COURT:  Right.

MR. GUSTAFSON:  -- and then can be used for such

JA186

purpose.

But to get to your question, you know, the Truman Balcony, for example, was used -- used no congressional funds.  That was a White House-funded project.  We're aware of no evidence that Congress approved such a thing.

In any event, Congress has already approved presidential modification of the White House.  The evidence for that is 5 USC Section 105(d), which authorizes and appropriates money to the president for, quote, "alteration" and, quote, "improvement" of the executive residence.  Those funds may be expended in the president's discretion, notwithstanding the provision of any other law.

Clearly, Congress recognizes there's a separation-of-powers issue here and it recognizes that the president has control over the executive residence.

Unless your Honor has further questions, we respectfully request that the Court deny the motion.

THE COURT:  Very good.  Thank you.

Plaintiff can have five minutes.

MR. HEUER:  Thank you, your Honor.  A few points.

First, there seems to be a question about who is in charge here, which is concerning.

The NEPA review is conducted by the National Park Service.  Congress has given the control over the White House and President's Park to the Park Service.  Its attempt

JA187

to move the Park Service out of primacy and put it in this Executive Office of the President is rather constitutionally suspect, because there's nothing indicating that Congress put control of the White House in control of the Executive Office.

The executive branch cannot alter Congress's specific delegation of Article II -- of its Article I authority or the executive branch can't argue -- alter -- let me start again.

The executive branch can't alter Congress's specific delegation of Article II authority to another entity of the executive branch, and certainly not in an attempt to evade compliance with various statutes.

Congress thinks that the White House is in the control of the Park Service.  The Park Service is subject to NEPA and all these other statutes.

To the extent that they are now saying we have transferred it from the Park Service administratively within the executive branch to the Executive Office of the President potentially to evade these obligations, that's entirely improper.  And it is certainly something that should be enjoined.

But basically, it seems that everyone is trying to disclaim responsibility.  We want the work to stop and we want this Court to issue an injunction against whomever it

is who is directing the work.

The second point I would make is as to this 8106 argument. 8106 is a very express statute. And it says "express congressional approval." It's not an optional statute. It's not one that is a statute the president may or may not comply with. He must. Everyone must.

And the fact that they have said that it -- the later statute, it's not -- their statute -- they say they cite the NCP Act -- is from 1952. Ours is 2002. It was created in 1912, but recodified in 2002. It is the later statute. Congress really does mean it when it says what they have said in 8106.

And the only substantive statute they cite is 3105, 3 United States Code 105, which is Congress's annual appropriation for White House maintenance. That's not an express approval to build a 90,000-square-foot ballroom.

And the government doesn't say what the congressional appropriation was this year. They provide a link, but not the number. The number is $2.475 million. And it's designated for, quote, "repair and restoration." Not for demolition, not for construction.

And it's not a freestanding delegation of unlimited construction authority from Congress to the president.

There is no statute, and they can cite none; they

JA189

do cite none.  There's no case -- and they can cite none and they do cite none -- about the president's authority in this respect over the White House.  The only case they cite is *Kerry*, which is a case about passports.  There has to be some connection.

Third, I would note that they've said that there is no concrete injury here.

The concrete injury for any of these statutes, including NEPA or NCPC, is the ability to comment.  As a matter of fact, if you can't comment under NEPA, there is no right.  There's no purpose of it.  It's not a statute that requires you to do -- to reach a specific result.  It's a statute that requires comment.

And to say that it's just the below-ground construction, that's essentially segmentation, saying, Don't look at the below-ground construction because you don't need to talk about that even though it affects your above-ground construction.

We know we can't segment under NEPA.  But that's precisely what they're saying to do -- that they want to do.  They want no comment on the first half until you get to the second half.

NEPA talks about projects.  And they talk about projects because from their EA, we know that they're considering demolition and construction as a whole.

JA190

THE COURT: Well, if the architectural plans are still in flux, which apparently they still are, the work that's being done below ground can be used as a basis for the building above ground, which can be adjusted to -- in its height and its width. It would seem to me that there would be adjustments possible depending upon the size of the below-ground foundation.

MR. HEUER: We don't know that. And the notion that it's unripe because we haven't seen the plans that they haven't produced is somewhat rich, because the National Capital Planning Commission Act says you need to consult with them before construction plans are produced. Before, not after.

THE COURT: But --

MR. HEUER: It's not before construction; it's the plans. Those are the things that have to happen.

THE COURT: I think the point he was trying to make was that the architectural expertise that you needed to bring to the table to prove this point hasn't been brought to the Court's attention. So you don't have a statement by an architect who said that, depending upon the size of the foundation, the building can be adjusted, either larger or smaller.

MR. HEUER: We don't know if they have a foundation. But it's not just height, up or down. It's

width; it's size.  But they've already said in their NEPA EA that they've locked in the location.  Right?  They've said it has to be here and it has to be of this -- of some minimum size.

And they've said this proposed project will dwarf the more modestly sized executive residence.  That's their EA.  That's the Park Service talking.

I'm not sure I need to bring in an architect to say, Did they really mean it when they say it is going to overwhelm the executive mansion?  Because it's going to be right next to it.

Because the only things -- the only alternative we considered, the only NEPA alternative, was no build, and our options for what we needed, the things we had to have, were that it had to be immediately next to the executive mansion. It needed to have a ceremonial procession directly from the east room and it needed to have a second-story colonnade directly accessible from the executive mansion.

THE COURT:  What about the --

MR. HEUER:  And there's not very much else you can do.

THE COURT:  What about the fact that the plans are going to be brought to the attention in the next two weeks of NCPC?

MR. CRAIG:  "The next two weeks" is a common

JA192

refrain from this administration suggesting when they want to do things. It's always going to happen in the next two weeks.

If they submit those plans in the next two weeks, that's fine. But again, those plans need to be submitted before construction begins. And they are continuing to construct. Right?

This is a timing question. And timing and procedure matter. If they continue putting concrete in the ground, continue building, continue constructing, continue saying, Here's where the sewer pipes are going to have to go; here's where the electricity lines are going to have to go; here's where the gas lines are going to have to go, that will govern what you build above that foundation.

And that's why we are saying we need to know beforehand. Because they are likely to come and say: We're locked in. We've got to build it here. It's got to be this size; it's got to be this shape, because look at all the work that we've put in underground.

That's improper segmentation. We have a right to comment before those decisions are made, not after. And that's what NEPA requires. That's what the CFA requires. That's what the National Capital Planning Commission requires.

And on top of it, Congress has to affirmatively

JA193

say, "Yes, you can."  And Congress has not.

Those first three statutes are the ones that we are looking to enjoin on, because we need to be able to comment; but we are also observing that there is another statute sitting out there that requires them to do something that they insist they don't have an obligation to do.  And that's why we've asked this Court to say that indeed is an obligation upon the president and the agencies if they want to build this project.

THE COURT:  Thank you.

MR. HEUER:  Thank you, your Honor.

THE COURT:  In light of the briefing and the argument of the parties today, I'm inclined to deny the TRO motion, because the Plaintiff in my judgment has failed to show irreparable harm so great and certain that an order is warranted over the next 14 days.

The government has represented that below-grade demolition and excavation is currently ongoing and any below-ground structural construction like pouring concrete will not begin until January of 2026.  Further, above-grade construction will not start until April of 2026 at the earliest.

As such, a temporary restraining order halting construction over the next 14 days is not required to alleviate any irreparable harm to the Plaintiffs.

JA194

Moreover, bare procedural injury standing alone is insufficient to demonstrate irreparable harm.

Plaintiff may well have a right to participate in the construction process, but any procedural rights do not warrant the extraordinary remedy of a temporary restraining order at this stage.

I reserve judgment, however, on whether the Plaintiff may be able to show irreparable harm at the preliminary injunction stage.  And I reserve judgment as to the other factors, including the Plaintiff's likelihood of success on the merits.

I expect to issue a decision within the next day. I will also issue an order scheduling a preliminary injunction hearing for the second week of January.  My order will set forth a briefing schedule and a few questions that I'd like the parties to address in their papers.

Before we close, I want to put the government on fair notice that if there is any below-ground construction in the next few weeks that dictates the above-ground footprint the size of the ballroom, then the government should be prepared to take it down if it causes irreparable injury to the Plaintiffs.

Based on your representations today, however, I do not anticipate that to happen.  But if it does, the Court will address it.  I can assure you of that.

Case 1:25-cv-04316-RJL   Document 18   Filed 12/17/25   Page 37 of 38
USCA Case #26-5134   Document #2172336      Filed: 05/07/2026   Page 202 of 525

37

See you in January, counsel.

Happy holidays.

MR. CRAIG:  Thank you, your Honor.

(Proceedings concluded.)

**CERTIFICATE**

                    I, LISA EDWARDS, RDR, CRR, do hereby

certify that the foregoing constitutes a true and accurate

transcript of my stenographic notes, and is a full, true,

and complete transcript of the proceedings produced to the

best of my ability.


                        Dated this 17th day of December, 2025.


                /s/ Lisa Edwards, RDR, CRR
                Official Court Reporter
                United States District Court for the
                  District of Columbia
                333 Constitution Avenue, Northwest
                Washington, D.C. 20001
                (202) 354-3269

JA197

# Annex 1

The National Trust submits the below chart in response to the Court's question of "[w]hether and to what extent, past Presidents have obtained congressional authorization and/or regulatory approval for construction and modifications to the White House structure and grounds." ECF 17 at 4. The chart contains the projects of which the National Trust is aware that involved either the construction or the modification of the White House or structures on its grounds, dating back 235 years to the Residence Act of 1790. The chart does not include interior redecoration or minor interior renovations of the White House, exterior maintenance projects (like repainting), landscaping of the White House grounds, or other similar projects.

To the National Trust's knowledge, Congress authorized almost every project—and every *a* project—constructing or modifying the White House or structures on its grounds, either through (a) a project-specific authorization or (b) an authorization to the President to make certain minor repairs and alterations up to the limits of the funds Congress appropriated for those purposes, under which the project at issue was qualified both in its nature and its cost. The only exceptions of which the National Trust is aware are a pool and cabana built by President Gerald Ford in 1975, and a tennis pavilion built by President Trump between 2019 and 2020. To the Trust's knowledge, neither of those two projects, which were comparatively *de*, were subject to a legal challenge.

To the National Trust's knowledge, based on records reasonably available to it, it appears that every time regulatory review and approval of a project was required, review was sought and approval, where necessary, was received.

| Project | Approximate Duration | Nature of Project and Authorization |
|---------|---------------------|-------------------------------------|
| Initial Construction | 1792-1812 | Congress authorized and funded the initial construction of the White House by several statutes. First, the Residence Act of 1790 authorized three commissioners, appointed by the President, to |

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| | | "purchase or accept" land in what is now the District of Columbia, and provided that the commissioners "shall . . . provide suitable buildings for the accommodation . . . of the President." *ee* An Act for establishing the temporary and permanent seat of the Government of the United States, ch. 28, 1 Stat. 130, 130 (July 16, 1790). The selection of James Hoban, the White House's architect, was made through a design competition announced by these commissioners in 1792. *ee* Lina Mann, *ld  t e  te  e*, The White House Historical Association (Jan. 3, 2020), https://www.whitehousehistory.org/building-the-white-house (last accessed Dec. 29, 2025).<br><br>Construction of the White House continued through the 1790s. Subsequent legislation authorized the commissioners to borrow several hundred thousand dollars. *ee* An Act authorizing a Loan for the use of the City of Washington, in the District of Columbia, and for other purposes therein mentioned, ch. 21, 1 Stat. 461, 461 (May 6, 1796); An Act supplementary to an act intituled [sic] "An act authorizing a loan for the use of the City of Washington, in the District of Columbia; and for other purposes therein mentioned," ch. 30, 1 Stat. 551, 551 (Apr. 18, 1798). Legislation passed in 1812 discharged remaining claims related to the building's construction. *ee* An Act making an appropriation for the purpose of discharging all the outstanding claims for the construction and repair of the Capitol and the President's House; for the compensation of the late Surveyor of the Public Buildings, and for furniture for the different apartments of the Capitol, and for other purposes, ch. 121, 2 Stat. 775, 775 (July 5, 1812). |
| Repairs Following the War of 1812 | 1815-1820 | The White House suffered significant damage during the War of 1812. After the war, Congress authorized repairs through several appropriations. *ee* An Act making appropriations for repairing or rebuilding the public buildings within the city of Washington, ch. 41, 3 Stat. 205, 205 (Feb. 13, 1815) ("That the President of the United States cause to be repaired or rebuilt forthwith, the President's House, Capitol and public offices, on their present sites in the city of Washington, and that he be authorized to borrow, at an interest not exceeding six per centum per annum, from any bank or banks within the District of Columbia, or from any individual or individuals, a sum not exceeding five hundred thousand dollars, to be applied exclusively to that object."); An Act making appropriations to supply the deficiency in the appropriations heretofore made for the completion of the repairs of the north and south wings of the Capitol, for finishing the President's house, and the erection of two new executive offices, ch. 10, 3 Stat. 541, 541 (Feb. 10, 1820) ("For |

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| | | finishing the President's house, the sum of thirteen thousand one hundred and seventy-four dollars and sixty-six cents."). |
| | | The White House reconstruction was overseen by Congress.[1]  ee Report of the Commissioner of Public Buildings, H. Doc. 15-18, at 14-16 (Nov. 26, 1818) (detailing progress on repairs to White House). |
| Addition of South Portico | 1823-24 | The South Portico—the covered entrance to the White House facing the Ellipse—was added to the White House in or about 1824. Congress authorized the project by appropriating funds for it in 1823.  ee An Act making appropriations for the public buildings, ch. 62, 3 Stat. 784, 784 (Mar. 3, |

---

[1] The Court asked whether past presidents had obtained regulatory approval for past projects, in addition to congressional authorization.  ee ECF 17 at 4. For most of the country's history, the two regulatory bodies currently charged with oversight of projects at the White House—the Commission of Fine Arts ("CFA") and the National Capital Planning Commission ("NCPC")—did not exist. The CFA was established in 1910, and the NCPC was established in 1952.  ee An Act Establishing a Commission of Fine Arts, Pub. L. 61-181, 36 Stat. 371, 371 (May 17, 1910); An Act to amend the act of June 6, 1924, as amended, relating to the National Capital Park and Planning Commission, and for other purposes, Pub. L. 82-592, 66 Stat. 781, 782-83 (July 19, 1952) (creating the NCPC and charging it with functions similar to its present responsibilities).

Although predecessor entities of the NCPC date to 1924, the statutes establishing those entities did not grant general federal-project-review authority.  ee An Act Providing for a comprehensive development of the park and playground system of the National Capital, Pub. L. 68-202, 43 Stat. 463, 463-64 (June 6, 1924) (establishing National Capital Park Commission, principally to develop and acquire parkland); An Act Amending the Act entitled "An Act providing for a comprehensive development of the park and playground system of the National Capital," approved June 6, 1924, Pub. L. 69-158, 44 Stat. 374, 374-76 (Apr. 30, 1926) (amending the 1924 act to,  te al a, change the commission's name to the National Capital Park and Planning Commission, and charge it with planning authority for parkland and highways). As a result, many of the projects listed in this chart were not reviewed by the NCPC or the CFA simply because those projects predated the establishment of those commissions.

Before the establishment of the CFA and the NCPC, Congress generally oversaw projects directly through congressional committees or through a project commission established for that purpose. The National Trust has provided details about such committee or commission oversight, which functioned as a rough early analog of modern regulatory review, where the relevant records survive and are available to the Trust.

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| | | 1823) ("For finishing the south portico to the President's house, the sum of nineteen thousand dollars."). Work on the South Portico was overseen by a Committee of Public Buildings of the House of Representatives. *ee* Report on the Committee of Public Buildings, in relation to the operations on said buildings during the last year, and to their present state, H. Doc. 18-60 at 1 (Feb. 12, 1824) ("The Committee have also examined the work done on the South Portico of the President's House. All here has not been accomplished which was contemplated. Two flights of steps, to ascend from the surface level to the principal floor, with railing on the front of this floor, are still wanting. The reasons assigned for this deficiency, are: 'The frequent rains, which, rendering the road impassable for weeks together, between the quarries and the landing, rendered it impracticable to finish the work the last year.' To the Committee these reasons are satisfactory."). |
| Addition of North Portico | 1829-1830 | The North Portico—the covered entrance to the White House facing Lafayette Square—was added to the White House in or about 1829 and 1830. Congress authorized the project by appropriating $24,769.25 for it in 1829. *ee* An Act making appropriations for the public buildings, and for other purposes, ch. 51, 4 Stat. 362, 362 (Mar. 3, 1829) ("To complete the north front of the President's house, according to the original plan, by erecting a portico, twenty-four thousand seven hundred and sixty-nine dollars and twenty-five cents."). |
| Construction and Repair of Greenhouses and Conservatories | 1850s-1900s | During the nineteenth and into the early twentieth century, there were greenhouses and conservatories on the White House grounds. Congress authorized their construction and repair in various statutes. *ee e. .,* An Act to supply Deficiencies in the Appropriations for the Service of the Fiscal Year ending June thirty, eighteen hundred and sixty-six, and for other Purposes, ch. 297, 14 Stat. 324, 325 (July 28, 1866) ("For repair of one of the greenhouses at the President's [sic], five hundred dollars."); An Act making appropriations for sundry Civil Expenses of the Government for the Year ending June thirtieth, eighteen hundred and sixty-eight, and for other purposes, ch. 167, 14 Stat. 457, 463 (Mar. 2, 1867) ("To enable the commissioner of public buildings to put in thorough repair the conservatory recently injured by fire at the President's mansion, ten thousand dollars."); An Act making Appropriations for sundry civil Expenses of the Government for the Year ending June thirty, eighteen hundred and sixty-nine, and for other Purposes, ch. 177, 15 Stat. 110, 117 (July 20, 1868) ("For additional repairs of conservatory at the President's House, and for supplying the same with a suitable collection of plants to replace those |

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| | | destroyed by fire, five thousand dollars."); An act making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and seventy-six, and for other purposes, ch. 130, 18 Stat. 371, 392 (Mar. 3, 1875) ("For the Executive Mansion, as follows: . . . for care of, and necessary repairs to, the green-houses, five thousand dollars."); An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, nineteen hundred and four, and for other purposes, Pub. L. 57-157, 32 Stat. 1083, 1123 (Mar. 3, 1903) ("For repairs to and reerection of greenhouses, Executive Mansion, three thousand dollars."); An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, nineteen hundred and six, and for other purposes, Pub. L. 58-216, 33 Stat. 1156, 1192 (Mar. 3, 1905) ("For repairs to and reerection of greenhouses, Executive Mansion, three thousand dollars."). |
| Construction of the West and East Wings | 1902 | The West and East Wings were constructed in 1902. Congress authorized the construction by appropriating funds for the project.  *ee* An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, nineteen hundred and three, and for other purposes, Pub. L. 57-182, 32 Stat. 419, 460 (June 28, 1902) ("For a building to accommodate the offices of the President, to be located in the grounds of the Executive Mansion, and for each and every purpose connected therewith, including heating apparatus and light fixtures, furniture, and removal of green-houses, all to be done according to plans, the details of which shall be approved by the President, and completed in every respect within the sum hereby appropriated, sixty-five thousand one hundred and ninety-six dollars, to be expended by contract or otherwise in the discretion of, and under the direction of, the President, and to be immediately available; and said building shall be constructed with sufficient foundation and walls suitable for a durable, permanent building, and of sufficient strength for an additional story when needed."); *ee al    d.* ("For extraordinary repairs and refurnishing of the Executive Mansion and for each and every purpose connected therewith, including all necessary alterations and additions, cabinet work, decoration of rooms, covered ways and approaches, grading, paving, port cochere, gates and electric wiring and light fixtures for house and grounds, all to be done according to plans, the details of which shall be approved by the President and completed in every detail within the sum hereby appropriated, four hundred and seventy-five thousand four hundred and forty-five dollars, to be immediately available and to be expended by contract or otherwise in the discretion of, under the direction of, the President."). |

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| Expansion of the West Wing | 1909 | The West Wing was expanded in 1909, adding the Oval Office, among other things.  Congress authorized the expansion by appropriating funds for the project.  *ee* An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, nineteen hundred and ten, and for other purposes, Pub. L. 60-328, 35 Stat 945, 995 (Mar. 9, 1909) ("For additional accommodations to the building erected for the offices of the President, and for each and every purpose connected therewith, including heating apparatus and light fixtures, and furniture, all to be done according to plans, the details of which shall be approved by the President, and completed in every respect within the sum hereby appropriated, forty thousand dollars, to be expended by contract or otherwise, in the discretion and under the direction of the President, to be immediately available."). |
| Repair of Executive Residence's Attic and Roof | 1927 | The White House roof and attic were repaired and substantially renovated during the Coolidge administration. Congress authorized the project by appropriating $375,000 in 1926.  *ee* An Act Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1926, and prior fiscal years, to provide supplemental appropriations for the fiscal years ending June 30, 1926, and June 30, 1927, and for other purposes, Pub. L. 69-492, 44 Stat. 841, 844 (1926) ("For reconstructing the roof, attic, and ceilings of the second story of the Executive Mansion, including all necessary work in connection therewith, to be prosecuted, by contract or otherwise as the President may determine, under the supervision of the Director of Public Buildings and Public Parks of the National Capital, fiscal years 1927 and 1928, $375,000 . . . .").<br><br>The roof-repair project was presented to the CFA. Minutes from the CFA's April 14 and 15, 1927 meeting reflect that the CFA concluded that the project would "not alter the appearance of the White House." Minutes of April 14-15, 1927 Meeting, at 14-15, available at https://archive.org/details/cfaminutes14-15april1927/mode/1up.[2] |

---

[2] The CFA's meeting minutes from 1910 to 2002 are available online at the Internet Archive, and its minutes from 2002 forward are available on the CFA's website. *ee* CFA Minutes Available Online, Commission of Fine Arts (Nov. 15, 2017), https://www.cfa.gov/about-cfa/news/cfa-minutes-available-online (last accessed Dec. 29, 2025) (announcing that "[t]he minutes of the Commission of Fine Arts from 1910 through 2002 are now available online at the Internet Archive"); Minutes of the Commission of Fine Arts, Internet Archive, https://archive.org/details/uscommissionoffineartsminutes (last accessed Dec. 29, 2025) (1910-2002

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| West Wing Repairs After 1929 Fire | 1929-1930 | The West Wing sustained substantial damage in a fire in December 1929. The White House was repaired in the following months.  *ee* Joel D. Treese and Evan Phifer, *e t a e et e*, The White House Historical Association (Feb. 9, 2016), https://www.whitehousehistory.org/the-christmas-eve-west-wing-fire-of-1929 (last accessed Dec. 29, 2025). In March 1930, Congress made an appropriation to rectify certain "urgent deficiencies," which included $200,000 for repairs to the White House.  *ee* An Act Making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1930, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal years ending June 30, 1930, and June 30, 1931, and for other purposes, Pub. L. 71-78, 46 Stat. 90, 93 (Mar. 26, 1930) ("For an additional amount for the care, maintenance, repair, and alteration of the Executive Mansion and grounds, including the same objects specified under this head in the Independent Offices Appropriation Act for the fiscal year 1930, $200,000."). <br><br> The National Trust is not aware of available records reflecting that the CFA reviewed these repairs, and it is not evident that such repairs were of the sort that the CFA would have reviewed. |
| 1934 West Wing Renovations | 1934 | In 1934, the West Wing was renovated to add more office space, among other things. The renovations were predominantly below ground or within the original shell of the building, and included a slight expansion to the south. The renovations were carried out by the Public Works Administration ("PWA"), an agency created by the National Industrial Recovery Act of 1933, Pub. L. 73-67, 48 Stat. 195 (June 16, 1933) ("NIRA").  *ee* Caption List to Series 69-PWA, National Archives Catalog, at 138, available at https://catalog.archives.gov/id/461452185?objectPage=138 (listing among PWA projects in the District of Columbia that "[t]he roof of the White House Offices was literally raised to make additional room, and offices were also added around a sunken court"). The NIRA expressly provided the PWA, and the President, emergency powers to carry out public-works projects quickly and on a large scale.  *ee* NIRA §§ 1, 201(d), 48 Stat. at 195, 201 (declaring "national emergency" and establishing limited duration for the President's powers under NIRA, respectively). |

minutes); Record of CFA Actions, Commission of Fine Arts, https://www.cfa.gov/records-research/record-cfa-actions (last accessed Dec. 29, 2025) (minutes from 2002 to present).

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
|  |  | It appears the West Wing renovation project, having been authorized under the NIRA and carried out by the PWA, was funded by the NIRA or through financing mechanisms approved thereunder. The NIRA appropriated $3.3 billion and directed the PWA's administrator, "under the direction of the President," to "prepare a comprehensive program of public works," including "construction, repair, and improvement of . . . public buildings," excluding only projects under the jurisdiction of the Architect of the Capitol. NIRA §§ 202, 220, 48 Stat. at 201, 210. It also gave the President substantial flexibility in financing such projects. *ee* NIRA § 203(a), 48 Stat. at 202.<br><br>The CFA considered the 1934 renovations and ultimately arrived at a favorable view of the project. *ee* Minutes of April 23, 1934 Meeting, at 4-5, available at https://archive.org/details/cfaminutes23april1934/mode/2up ("The Commission considered the suggestion to enlarge the executive office building.[3] In their opinion it would be only a temporary proposition just as the executive office building, which was built west of the White House in the days of Theodore Roosevelt, was a temporary proposition. Also the Commission felt that no more space in the White House grounds should be taken up for building purposes. The Commission again strongly recommended that the State, War, and Navy Department Building [i.e., the EEOB] be remodeled as an executive office building."); Minutes of May 7, 1934 Meeting, at 1-5, available at https://archive.org/details/cfaminutes7may1934/mode/2up (considering sketches submitted by NPS in connection with the project and detailing meetings with NPS and President Roosevelt); *ee d.* Ex. A (making proposal for West Wing renovations in a letter to the President dated May 8, 1934). Several months later, the CFA "made a trip of inspection to the White House to see the construction work on the new executive offices." Minutes of October 19, 1934 Meeting, at 15-16, available at https://archive.org/details/cfaminutes9oct1934/mode/2up (recounting visit and positive impressions). |

---

[3] The CFA was referring here to the West Wing, not what is presently known as the Eisenhower Executive Office Building ("EEOB"). In 1934, the now-EEOB was known as the State, War, and Navy Department Building; it was built more than a decade before the administration of Theodore Roosevelt, whereas the West Wing was built during the Theodore Roosevelt administration. *ee* Eisenhower Executive Office Building, The White House, https://bidenwhitehouse.archives.gov/about-the-white-house/the-grounds/eisenhower-executive-office-building/ (last accessed Dec. 29, 2025) (detailing history of the EEOB).

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| Construction of Presidential Bunker and Expansion of East Wing | 1942 | During the Second World War, a presidential emergency operations bunker was built underneath the East Wing. In connection with that project, the East Wing was also expanded. Presumably due to the sensitive wartime defense and security aspects of the bunker project, contemporaneous appropriations and public statements about the project are less explicit than those concerning other projects in this chart. The National Trust's research suggests that the project was likely funded by a national-defense appropriations statute that provided approximately $3.4 million (approximately $83 million in present dollars) for public buildings in the District of Columbia, among other things. *ee* An Act making additional appropriations for the national defense for the fiscal year ending June 30, 1942, and for other purposes, Pub. L. 77-528, 56 Stat. 226, 236 (Apr. 28, 1942) ("For an additional amount for salaries and expenses, public buildings and grounds in the District of Columbia and adjacent area, fiscal year 1942, including the objects specified under this head in the Independent Offices Appropriation Act, 1942, $3,413,394 . . . ."). Several days after the passage of that statute, the Washington Post reported that a secretary to President Roosevelt had "disclosed yesterday" that "[a]n east wing is being added to the White House." *ee    te    e    ett    t e*    , Washington Post (May 1, 1942).<br><br>The project was presented to the CFA, and the CFA recommended it favorably. *ee* Minutes of January 8, 1942 Meeting at 1-2, available at https://archive.org/details/cfaminutes8jan1942/mode/1up ("Mr. Lorenzo S. Winslow, architect for the National Park Service, presented, as he said at the request of the President, a set of plans for alteration of the east end of the east terrace of the White House (facing the Treasury Department Building) so as to provide an office building at that location comparable to the executive office building on the west side of the White House."); *ee d.* Ex. A (favorably recommending project and "strongly recommend[ing]" the retention of "a thoroughly competent architect . . . to consult . . . on the details, both interior and exterior, in order that we may be assured that the character and spirit of the design will harmonize with the White House."); *ee al    d.* at 2 (noting that "a bomb shelter is being built" at the site). |
| Addition of Truman Balcony | 1947-1948 | The Truman Balcony—a balcony inserted within the existing South Portico, level with the second floor of the White House—was constructed by President Truman using funds appropriated by Congress to the Executive Office of the President. *ee* An Act Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1946, and for prior fiscal |

| Project | Approximate Duration | Nature of Project and Authorization |
|---------|----------------------|-------------------------------------|
| | | years, to provide supplemental appropriations for the fiscal year ending June 30, 1946, and for other purposes, Pub. L. 79-269, 59 Stat. 632, 634 (Dec. 28, 1945) ("Maintenance, Executive Mansion and grounds: For an additional amount, fiscal year 1946, for 'Maintenance, Executive Mansion and grounds', including the objects specified under this head in the Independent Offices Appropriation Act, 1946, $21,940. Addition to the Executive Mansion: For an addition to the Executive Mansion; for alterations, improvements, and furnishings, and for improvement of grounds, to be expended as the President may determine, notwithstanding the provisions of any other Act, to remain available until expended, $1,650,000."); An Act Making appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices, for the fiscal year ending June 30, 1947, and for other purposes, Pub. L. 79-334, 60 Stat. 60, 61 (Mar. 28, 1946) (clawing back $970,000 of the $1.65 million appropriated the year prior for an expansion and further appropriating, "[f]or the care, maintenance, repair and alteration, refurnishing, improvement, heating and lighting, including electric power and fixtures, of the Executive Mansion and the Executive Mansion grounds, and traveling expenses, to be expended as the President may determine, notwithstanding the provisions of any other Act, $184,000"); Joint Resolution Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1947, and for other purposes, Pub. L. 80-25, 61 Stat. 26, 28 (March 29, 1947) ("Executive Mansion and grounds: 'Care, maintenance, repair, and alteration', $18,250."); *ee al* William Seale, *e    e a d   e   de         a  .      a* , White House Historical Association, https://www.whitehousehistory.org/the-life-and-presidency-of-harry-s-truman (last accessed Dec. 29, 2025) (explaining that President Truman "took the $16,050.74 [the balcony] ultimately cost from the existing household budget"). <br><br> The Truman Balcony project was presented to the CFA, which did not view the project favorably. Minutes of August 28, 1947 Meeting, at 3-5, available at https://archive.org/details/cfaminutes28aug1947 (noting presentation of proposal for a balcony to the CFA, and the CFA's negative estimation of the project). |
| Structural Renovation | 1949-1952 | Major renovations of the White House were undertaken after it was discovered that the building was structurally unsound. Congress authorized the renovations by appropriating funds for the project on several occasions.  *ee* An Act Making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1949, and for other purposes, Pub. L. 81-119, 63 |

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| | | Stat 231, 235 (June 23, 1949) ("For all expenses necessary for and incident to the renovation, repair, and modernization (without change of present architectural appearance of the exterior of the mansion or the interior of its main floor) of the Executive Mansion, or for such other provision for remodeling or rebuilding the Executive Mansion or for construction of a separate residence for the President as may be determined upon by the Commission on Renovation of the Executive Mansion established pursuant to Public Law 40 (Eighty-first Congress), including the preparation of drawings and specifications, and the purchase of furniture, furnishings, and equipment, without regard to section 3709 of the Revised Statutes or the civil-service and classification laws, $2,000,000, to remain available until expended and, in addition contracts may be entered into in amounts not exceeding $3,400,000 . . . ."); An Act Making supplemental appropriations for the fiscal year ending June 30, 1952, and for other purposes, Pub. L. 82-253, 65 Stat. 736, 743 (Nov. 1, 1951) ("For an additional amount for 'Renovation and modernization. Executive Mansion', $261,000, to remain available until expended.")<br><br>Congress created a Commission on Renovation of the Executive Mansion, which oversaw the renovation project.  *ee* An Act To provide for a Commission on Renovation of the Executive Mansion, Pub. L. 81-40, 63 Stat. 45, 45-47 (April 14, 1949). While meeting minutes of the CFA from this period occasionally address the project, it appears that the project was principally supervised by the Commission on Renovation of the Executive Mansion.  *ee* March 16, 1949 Meeting Minutes, at 3, available at https://archive.org/details/cfaminutes16march1949/mode/1up (noting White House repairs); August 17, 1951 Meeting Minutes, at 3-5, available at https://archive.org/details/cfaminutes17aug1951/mode/1up (detailing meeting between CFA and Commission on Renovation of the Executive Mansion). |
| Outdoor Pool | 1975 | In 1975, President Ford installed a pool and poolside cabana to the south of the West Wing.  *ee* Lina Mann,   *l    t e   e  de t        t t e   t       te    e          l ,*  White House Historical Association (Feb. 21, 2023), https://www.whitehousehistory.org/a-pool-for-the-president (last accessed Dec. 29, 2025). The pool and the cabana cost approximately $67,000 and were funded by private donations, with a maximum donation of $1,000 from any one person.  *ee  d.* The National Trust is not aware of any legal challenge having been made to the construction of the pool and cabana. |

| Project | Approximate Duration | Nature of Project and Authorization |
|---------|---------------------|-----------------------------------|
|  |  | The cabana and pool deck were renovated in 2002 with funds appropriated by Congress.  *ee* An Act Making appropriations for the Treasury Department, the United States Postal Service, the Executive Office of the President, and certain Independent Agencies, for the fiscal year ending September 30, 2002, and for other purposes, Pub L. 107-67, 115 Stat. 514, 527 (Nov. 12, 2001) ("For the repair, alteration, and improvement of the Executive Residence at the White House, $8,625,000, to remain available until expended, of which $1,306,000 is for six projects for required maintenance, safety and health issues, and continued preventative maintenance"); *ee al* Report of Hearings before a Subcommittee of the Committee on Appropriations of the House of Representatives, 107th Congress, First Session, at 235-37 available at https://www.govinfo.gov/content/pkg/CHRG-107hhrg73567/pdf/CHRG-107hhrg73567.pdf (providing Executive Residence proposed appropriation language: "For the repair, alteration, and improvement of the Executive Residence at the White House, $1,306,000 is to remain available for 6 projects for required maintenance, safety and health issues, and continued preventative maintenance," and listing projects, which include "Cabana Roof Reconstruction and Pool Deck Renovation"); *ee al    la    e    at t e    te    e*, White House Historical Association, available at https://www.whitehousehistory.org/solar-energy-at-the-white-house (last accessed Dec. 29, 2025) (noting 2002 installation of solar panels on the roof of the cabana).<br><br>The pool was reviewed by the CFA in connection with the 1975 construction.  *ee* Minutes of May 21, 1975 Meeting, at [PDF] 1, 9-10, available at https://archive.org/details/cfaminutes21may1975/mode/1up ("The Chairman reported that he, the Secretary and Assistant Secretary had visited the White House a week earlier to see a scheme for a simple in-the-ground swimming pool with no cover, solar heat or dressing areas. . . .The Commission had no objection to this scheme, feeling that the simpler the pool area was, the better."); *ee al*   Minutes of October 15, 1975 Meeting, at [PDF] 10, available at https://archive.org/details/cfaminutes15oct1975/mode/2up (considering solar heating system for pool area and noting that it was "within the parameters of previous Commission approval"). The National Trust is not aware of the 2002 repair project having been reviewed by the CFA or by the NCPC, likely due to the repair nature of the project. |

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| Replacement of Perimeter Fence[4] | 2014-2021 | Due in large part to security concerns, the fence surrounding the White House and its grounds was replaced beginning in 2019, with project planning commencing several years prior. *ee  e  e all* National Park Service, *t  t  e  t da  e  te  e  e e*, available at https://www.nps.gov/whho/learn/news/ construction-begins-today-on-new-white-house-fence.htm (July 8, 2019) (last accessed Dec. 29, 2025). <br><br>Congress made several appropriations connected with the fence project.  *ee* An Act Making appropriations for the fiscal year ending September 30, 2017, and for other purposes, Pub. L. 115-31, 131 Stat. 135, 435 (May 5, 2017) (appropriating "an additional" $72,988,000 for "'Procurement, Construction, and Improvements' for necessary expenses for Presidential security"); Fiscal Year 2019 Congressional Justification, Department of Homeland Security – U.S. Secret Service, at [PDF] 154-55 available at https://www.dhs.gov/sites/default/files/publications/U.S.%20Secret%20Service.pdf (last accessed Dec. 29, 2025) (showing $50 million in obtained funding for fiscal year 2017 relating to the fence project); Consolidated Appropriations Act, 2016, Pub. L. 114-113, 129 Stat. 2242, 2503 (Dec. 18, 2015) ("That of the amounts made available under this heading for security improvements at the White House complex, $8,200,000 shall remain available until September 30, 2017"); Fiscal Year 2017 Congressional Justification, Department of Homeland Security – U.S. Secret Service, at [PDF] 5, available at https://www.dhs.gov/sites/default/files/publications/FY%202017%20Congressional%20Budget%2 |

---

[4] The grounds of the White House have been enclosed by a fence since the early 1800s. Congress has authorized modifications of the fence on various occasions.  *ee e. .*  An Act making appropriations for the public buildings, and for furnishing the Capitol and President's house, ch. 97, 3 Stat. 458, 458 (Apr. 20, 1818) ("For the wall north of the President's house, with gates and iron railing the width of the house, three thousand five hundred and eighteen dollars."); An Act making appropriations for the public buildings in Washington, and for other purposes, ch. 154, 4 Stat. 194, 194 (May 22, 1826) ("[F]or finishing the fences, and graduating and improving the grounds connected with the President's house, the sum of five thousand eight hundred and sixty-five dollars . . . ."); An Act in addition to the act entitled "An act making appropriations, in part, for the support of Government, for the year eighteen hundred and thirty-six, and for other purposes, ch. 353, 5 Stat. 112, 114 (July 4, 1836) ("For a dwarf wall and fence between the executive buildings and the President's house, one thousand one hundred and sixty-five dollars and fifty cents.").

| Project | Approximate Duration | Nature of Project and Authorization |
|---|---|---|
| | | 0Justification%20-%20Volume%203_1.pdf. (last accessed Dec. 29, 2025) (noting that Pub. L. 114-113 "provides . . . not less than $8,200,000, available for two years, for the Crown fence replacement"). <br><br> Plans for the fence project were submitted by NPS to the CFA and the NCPC for review, and the NCPC approved the project on February 2, 2017.  *ee* NCPC Project File 7776, available at https://www.ncpc.gov/review/project/7776/ (last accessed Dec. 29, 2025);  *ee e.  .*, Minutes of November 17, 2016 Meeting, available at https://cfa.gov/records-research/record-cfa-actions/2016/11/cfa-meeting/minutes (last accessed Dec. 29, 2025). |
| Construction of Tennis Pavilion | 2019-2020 | In 2019 and 2020, during the first Trump administration, a pavilion was constructed next to the White House tennis court. The White House has reported that the tennis pavilion was privately funded.  *ee* The White House,  *t ad     ela a                    e        let      t e  e        te         e  e        a  l*   (Dec. 7, 2020), https://trump whitehouse.archives.gov/briefings-statements/first-lady-melania-trump-announces-completion-new-white-house-tennis-pavilion/ (last accessed Dec. 29, 2025). The National Trust is not aware of any legal challenge having been made to the construction of the tennis pavilion. <br><br> Plans for the tennis pavilion were submitted by NPS to both the CFA and the NCPC for review, and the NCPC approved the project on July 11, 2019.  *ee* NCPC Project File 8077, NCPC, available at https://www.ncpc.gov/review/project/8077/ (last accessed Dec. 29, 2025); Minutes of May 16, 2019 Meeting, CFA, available at https://www.cfa.gov/records-research/record-cfa-actions/2019/05/cfa-meeting (last accessed Dec. 29, 2025) (concept plans); Consent Calendar for June 20, 2019 Meeting, CFA, available at https://www.cfa.gov/records-research/record-cfa-actions/appendices/consent-calendar/30344 (last accessed Dec. 29, 2025) (final plans). |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

      *Plaintiff,*

v.

      Civil Action No. 25-4316

NATIONAL PARK SERVICE, *et al.*

      *Defendants.*

## DECLARATION OF WILLIAM J. BATES

I, William J. Bates, declare as follows:

1.      The facts set forth in this declaration are based upon my personal and professional knowledge, and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.      My name is William J. Bates. I have been a registered architect in the Commonwealth of Pennsylvania since 1978. I have worked in the private sector for almost fifty years and have many years of experience working with government agencies and managing government construction projects. I served as the National President of the American Institute of Architects (AIA) in 2019. I am Adjunct Professor of Architecture at Carnegie Mellon University in Pittsburgh. For more details about my professional background, I have attached my resume as Exhibit A to this Declaration.

JA213

3.      I submit this Declaration in connection with the case of *National Trust for Historic Preservation in the United States v. National Park Service*.  I am aware of the administration's plans to build a new ballroom in the vicinity of the White House.  I understand that the administration has begun construction work in the vicinity of the White House, but has not finalized or publicized plans for the ballroom.

4.      The purpose of this Declaration is to share my expertise as to the need for—and the standard practice of preparing—plans for the design of a building before construction of the building's foundation commences.

5.      In my professional experience—which includes the design and construction oversight of civic buildings as well as privately owned projects—planning and design activities for the construction of buildings always precede the commencement of below-grade construction of a foundation.  This is so because the below-grade foundation system establishes the structural grid, load paths, and lateral-force resisting systems that dictate the size, spacing and location of columns, shear walls, structural cores, and load-bearing elements above-grade.  With respect to the proposed White House ballroom, once the foundation and related subsurface work are in place, the location, bulk, spans, bay sizes, and floor plate geometry (among other elements) of the building itself are fixed for all practical purposes.  Altering these conditions after the fact would require major demolition and redesign.

6.      The design of a foundation depends upon many factors—including soil bearing capacity, groundwater, settlement characteristics and seismic site classifications.  Foundation type and capacity determine the maximum permissible loads and column

2

JA214

locations.  These constraints in turn govern the allowable massing, height, occupancy loads and program details referenced above.  With respect to the proposed White House ballroom, to proceed with the construction of the foundation without having designed or obtained approvals for the entirety of the project—both below ground and above ground —risks constructing a foundation that is inadequate for the project that is ultimately approved.  Avoiding the risk of under-building in turn runs the risk of over-building a foundation that then requires down-sizing or revising the plan of the building.  Down-sizing is often expensive and difficult, and all else equal, an overbuilt foundation makes changing plans to a smaller building significantly more difficult.

7.    The layout of the foundation also fixes life safety elements of the project such as stair and elevator cores, fire-rated shafts and points of access and exit.  This is so because these elements must be anchored on and coordinated with foundation walls and pits. Travel distances for egress, exit separations, areas of refuge, and fire compartmentation are set by the subsurface work.  For the White House ballroom, any changes to exit routes, occupant load or emergency access points would be difficult to accommodate after the foundation is built because core access points and exit placements would already be fixed.

8.    It is standard architectural practice that subsurface utilities and infrastructure— stormwater detention or treatment, sanitary and water services, fire service mains, electric duct banks, fuel or water tanks, geothermal wells and foundation drainage—be approved and coordinated prior to excavation.  Post-foundation changes to the building may require

3

JA215

relocating these elements, which is not feasible once slab, pile caps and foundation walls are constructed.

9. The foundation establishes the building's structural and support points which govern the building's façade, window spacing, support of cantilevers, and the anchoring of balconies, canopies, or other projections. With respect to the proposed White House ballroom, review, consultation, and approval of the design may require changes to articulation, fenestration or projection limits in order to respect the setting of the Residence itself. With foundation and embed locations already fixed, adjustments to façade pattern, overhangs or projections—required to protect the setting of the White House itself—may not be achievable without extensive changes in the already-embedded foundation.

10. Numerous environmental requirements—stormwater management, tree protection, soils management and utility connections—affect where and how subsurface elements like foundations can be located. In a landscape that is historically significant—such as that of the President's Park—foundation and vault locations may need to be shifted to protect trees, existing historic resources such as the Executive Mansion itself, or accommodate other environmental constraints. Building the foundation prior to approval of the final design can lock the project into noncompliant configurations and restrict above-grade loading and layout options.

11. It is standard professional practice for the architect's and engineer's calculations for foundations to be predicated on defined design criteria, such as use, occupancy, structural loads and building geometry. Architects and engineers design buildings first—

4

JA216

according to these criteria—and, after completing the design, then plan for a foundation that supports that design. For the proposed White House ballroom, building the foundation before the design criteria have been reviewed and approved risks a mismatch between the already-built subsurface structure and the to-be-reviewed-and-approved superstructure. Finalizing and constructing a foundation before completing the building design inevitably will constrain if not eliminate the flexibility to modify elements of the building design such as program, massing, size, location, and layout.

12.     The location of a building's fire protection and related utilities requires an early decision that must be coordinated with the construction of foundation walls and penetrations. Fire service mains, backflow prevention systems, pump rooms, standpipe riser locations, and fire command center access are all considerations that impose requirements on the foundation. Building a foundation must take those requirements into account, but doing so before the building itself is designed may result in a foundation that is inconsistent with the building's ultimate design. Accommodating such design changes would require extensive re-working if not complete replacement of the foundation.

13.     Foundation and related subsurface work is not generic, and it is not easily modified. Such work is project-specific, and it determines what can be built above the surface. For the proposed White House ballroom to commence foundation work before review and consultation, and before obtaining required approvals, will predetermine key aspects of scale, size, location and shape of the above-grade structure. Commencing foundation work before submitting plans for review, commentary and approval will likely cause any such review, commentary or approval to be an empty exercise and preclude

meaningful approvals.   For a meaningful review and approval process to occur after foundation construction has already commenced might well require major demolition and redesign.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

William J. Bates

Executed this 26th day of December, 2025.

6

JA218

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

　　　　　Plaintiff,

　　v.

NATIONAL PARK SERVICE, *et al.*,

　　　　　Defendants.

Case No. 1:25-cv-04316-RJL

## DEFENDANTS' NOTICE OF SUBMITTING SUPPLEMENTAL *EX PARTE* DECLARATION *IN CAMERA*

　　　　　Defendants respectfully submit this Notice to inform the Court that they have submitted a supplemental *ex parte* declaration in support of their supplemental filing in opposition to Plaintiff's motion for a preliminary injunction.  Defendants rely on those grounds stated in their prior motion for leave to file a declaration *ex parte* for *in camera* review, Dkt. No. 13, which was granted by the Court the next day.  *See* Dec. 16, 2025 Minute Order.

　　　　　Plaintiff's counsel has advised they oppose the submission of a supplemental *ex parte* declaration.

　　　　　Respectfully submitted,

January 15, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

MARISSA A. PIROPATO
Deputy Chief

*/s/ Gregory M. Cumming*
GREGORY M. CUMMING

JA219

Senior Attorney
MICHELLE RAMUS
MARK WIDERSCHEIN
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
150 M Street, N.E.
Washington, DC 20002
Gregory.Cumming@usdoj.gov
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov
(202) 598-0414

*Counsel for Defendants*

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. I:25-cv-04316-RJL

## DECLARATION OF JOSHUA FISHER, DIRECTOR FOR WHITE HOUSE MANAGEMENT AND ADMINISTRATION

I, Joshua Fisher declare as follows:

1. I am an Assistant to the President, a Presidentially Commissioned Officer. In addition, I am the Director for White House Management and Administration ("M&A") and the Director of the Office of Administration ("OA").

2. I have personal knowledge of all the facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my position as Director of M&A, the President of the United States has delegated to me all authorities required to accomplish the mission of the White House and the White House Executive Residence. I am specifically responsible for certifying expenditures for the operation and maintenance of the Executive Residence at the White House ("EXR") on behalf of the President of the United States pursuant to 3 U.S.C. §§ 103 and 105(d). As the Director of OA, I am also the "head of the agency" for the Executive Office of the President ("EOP") solely for the purpose of carrying out the functions of a Chief Financial Officer as described in 31 U.S.C. § 902, which include, among other things,

JA221

overseeing all financial management activities relating to programs and operations of the EOP.

4. In addition, I am responsible for managing the East Wing Modernization Project ("the Project") on behalf of the President of the United States. In this role, I meet regularly with the President, federal officials within the EXR Chief Usher's Office, the United States Secret Service ("USSS"), the National Park Service ("NPS"), and other agencies, as well as contractors, architects, and engineers associated with the Project.

5. The Comprehensive Design Plan for the White House and President's Park (2000) identified the need for expanded event space to address growing visitor demand and provide a venue suitable for significant events. Successive administrations have recognized this need as an ongoing priority. To meet this need, EOP outlined three functional goals for any permanent event space: (1) immediate adjacency to the White House Executive Mansion; (2) a direct ceremonial procession from the East Room into the venue; and (3) enclosed second-story access from the Executive Mansion. Exhibit A, Comprehensive Design Plan for the White House and President's Park.

6. The President directed me to initiate a project to implement those and many other longstanding goals important to him and various other entities within the United States Government. Some of those additional goals included: (1) carrying out significant Secret Service upgrades to meet current protection requirements for the President and First Family; (2) creating a cohesive modern infrastructure for the White House to correct the network of fragmented, incompatible, and obsolete systems that remained after decades of incremental, uncoordinated projects that were never comprehensively integrated into a unified system; (3) reducing degradation of the Executive Mansion's historic structure

JA222

caused by hosting events larger and more frequently than it was structurally designed for; (4) enhancing the overall visitor experience of all guests to the White House and park grounds; (5) reducing costs and negative impacts to the White House grounds, including to the sod on the South Lawn, associated with the use of temporary structures to compensate for the lack of adequate event space; and (6) providing the First Lady and her staff with an office space that meets all modern life-safety requirements, such as ensuring there are two methods of egress from the building from each office space.

7.  Given EXR's mission to directly support the President's management of the Executive Mansion and its substantial expertise in (1) preservation and maintenance of the White House structure and its historical contents; and (2) providing for the use of the White House for official ceremonial purposes as well as the private home of the President, the President determined that he would manage the Project through EXR. With its unique position within the White House complex, EXR is also best-positioned to coordinate with other agencies (such as the USSS and NPS) that have equities affected by the Project.

8.  Accordingly, EXR is the entity responsible for developing contractual requirements, contracting for, and managing the Project at the direction of the President. To date, EXR is the signatory on all contracts associated with the Project.

9.  Prior to executing on the President's directives, I met with EXR, USSS, NPS, and other government agencies to evaluate all options for implementing the President's goal of establishing a modernized East Wing facility. Each of the stakeholders identified various issues within the Executive Mansion and the East Wing that had been discovered over their many years of service to the White House. We then used this information to contact and work with various contractors, architects, historians, and engineers to assess those

issues and the various options for resolving them as part of the Project. The issues identified by these agencies included the need to: (1) provide a safe and secure facility for the President and world leaders to meet while minimizing impacts to the public, including reducing road and park closures associated with the use of temporary tent structures; (2) address the aging and structurally unstable East Wing colonnade roof along with insufficient foundation and underpinning support to execute required structural upgrades; (3) address ongoing substructure water infiltration that has caused progressive deterioration and corrosion of structural components; (4) update roof systems on the East Wing that had exceeded their service life, causing chronic water intrusion, substructure leaks, and accelerated deterioration of structural and historic elements; (5) eliminate mold contamination that resulted from persistent moisture; (6) update obsolete electrical infrastructure that was undersized and non-compliant with current code, which increased fire risks and the likelihood of operational failure; (7) replace aging, inefficient, and unreliable steam and mechanical systems that support the Executive Mansion and continuous critical missions; (8) come into compliance with Americans with Disability Act requirements as well as other life-safety requirements; and (9) remove toxic substances spread throughout the structure, including asbestos and lead based paint.

10. After careful consideration of the President's goals identified in Paragraph 6 and the issues identified in Paragraph 9, EXR determined that, based on a cost analysis, demolition of the existing East Wing structure and reconstruction of a new East Wing provided the lowest total cost of ownership and the most effective long-term risk reduction.

11. EXR also carefully considered the views of the White House complex throughout the design process. A primary goal of the Project has been to maintain the visual primacy of the Executive Mansion and to ensure that the East Wing remains minimally visible from public spaces. Based on existing geographical features on the White House grounds, EXR does not expect public views of the East Wing to significantly change. In particular:

    A.  Views from the South fence of the White House lawn will not be significantly affected due to the "Jefferson mounds" – graded areas of the South lawn - and trees that frame the Executive Mansion and cover the West Wing and East Wing. It is possible that the uppermost point of the new south portico roof of the East Wing may be visible above the treetops.

    B.  Views from the North fence of the primary north façade of the East Wing will be largely obscured by trees. In the winter months, with the deciduous trees having lost their foliage, portions of the north façade will be visible through the trees.

    C.  The west views and principal north and south views from the White House will not be affected. The east views from the central White House Executive Mansion to the Treasury will be replaced by views of the western elevation of the new East Wing.

    D.  Several stands of trees are located between the Decatur House and the White House complex. Given the locations of these trees and the distance between the Decatur House and the White House, my understanding is that the East Wing will not alter existing views of the White House complex from the Decatur House.

12. Donated funds received by NPS pursuant to NPS's gift authority are being transferred to the White House Repair and Restoration Account pursuant to the Economy Act, 31

U.S.C. § 1535 to fund this Project and supplement the Executive Mansion's annual allowance appropriated pursuant to 3 U.S.C. § 105(d).

13. My understanding is that the final design for the Project is still under development, and is the subject of ongoing discussions between the President, the architect, and the relevant contractors.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 14, 2026.

Joshua Fisher

JA226

USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 233 of 525

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**DECLARATION OF HEATHER MARTIN REGARDING SUBMISSION OF THE
PROJECT TO THE NCPC AND CFA**

I, Heather Martin, declare as follows:

1. I am a Deputy Assistant to the President, a Presidentially Commissioned Officer. In addition, I serve as the Chief Financial Officer and Deputy Director of the Office of Administration, Executive Office of the President. I serve as a senior official supporting the East Wing Modernization Project ("the Project").

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

Submission to the NCPC

3. The National Capital Planning Commission ("NCPC") is a twelve-member commission. All twelve commission seats are currently filled. The NCPC is also supported by a staff of planners, architects, urban designers, and other professionals. *See* https://www.ncpc.gov/about/staff/ for a description of NCPC staff.

4. The NCPC does not have any promulgated regulations; instead, guidance for proceeding before the Commission is set out in the June 6, 2024 NCPC Submission Guidelines. However, my understanding is that the process as set forth in the guidelines is flexible.

5. On December 19, 2025, I conducted a pre-submission briefing with four members of NCPC staff and gave a presentation to inform them about the Project.

6. On December 22, 2025, EXR submitted an initial application for the Project to the NCPC.

7. On January 8, 2026, Josh Fisher, Director of White House Management and Administration, and Shalom Baranes, project architect, provided an informational presentation to the NCPC regarding the Project. Both took questions from Commissioners. *See* Ex. 1, Excerpts from NCPC Tr. (Jan. 8, 2026).[1]

8. I am currently scheduled to meet with NCPC staff on January 20, 2026, and January 27, 2026 to discuss EXR's final submission to the NCPC that EXR intends to file on January 30, 2026. These meeting will also include Commission of Fine Arts ("CFA") staff.

9. My understanding is that the NCPC will publicly release the final submission documents on February 12, 2026 and open an online portal for members of the public to register to speak at the NCPC public meeting scheduled for March 5, 2026.

10. On March 5, 2026, NCPC staff are scheduled to make their final presentation about the Project to the NCPC Commissioners.

11. My understanding is that the NCPC Commissioners will vote on the Project at the conclusion of the public comment period associated with the March 5, 2026 NCPC Public Meeting.

---

[1] A video of the meeting is available at https://www.youtube.com/watch?v=js5NoDBQFzY.

JA228

12. Development of the final design is continuing, and my understanding is the below-grade construction can accommodate potential modifications to the design of the above-grade structure. No above-grade construction on the Project will occur until April, at the earliest. EXR intends to secure approval from NCPC before above-grade construction commences.

Submission to the CFA

13. The CFA is comprised of seven commission members, all of whom are appointed by the President. There are currently four commission members. The CFA is staffed by full-time civil service employees that administer the operations of the CFA and the Old Georgetown Board. See https://www.cfa.gov/about-cfa/who-we-are for a description of the CFA staff positions.

14. On December 19, 2025, I conducted a briefing with four members of CFA staff and received informal feedback from CFA staff based on that presentation.

15. On January 20, 2026, and January 27, 2026, I am currently scheduled to meet with CFA staff to discuss EXR's submission to CFA. These meeting will also include NCPC staff.

16. On January 14, 2026, President Trump appointed four Members of the Commission of Fine Arts:

- Mary Anne Carter, of Tennessee, to be a Member of the Commission of Fine Arts for the term of four years, vice Billie Tsien, term expired.

- Roger Kimball, of Connecticut, to be a Member of the Commission of Fine Arts for the term of four years, vice Bruce Redman Becker.

- James Curtis McCrery II, of the District of Columbia, to be a Member of the Commission of Fine Arts for the term of four years, vice Peter Dibble Cook, term expired.

JA229

- Matthew Taylor, of the District of Columbia, to be a Member of the Commission of Fine Arts for the term of four years, vice Justin Garrett Moore, term expired.

17. I am working with CFA staff to schedule a public informational presentation with CFA Commission Members during the week of January 19th.

18. EXR is tentatively scheduled to present the Project to the CFA on February 19, 2026 and March 19, 2026. I intend to use my best efforts to work with CFA members and staff to complete the CFA review process at the March 19th meeting.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 15, 2026.

_Heather Martin_

Heather Martin

JA230

USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 237 of 525

EX. 1

NATIONAL CAPITAL PLANNING COMMISSION

+ + + + +

COMMISSION MEETING

+ + + + +

OPEN SESSION

+ + + + +

THURSDAY,
JANUARY 8, 2026

+ + + + +

The meeting convened in the Commission Hearing Room at 401 9th Street NW, Washington, D.C., and via videoconference, at 1:00 p.m., William Scharf, Chair, presiding.

NATIONAL CAPITAL PLANNING COMMISSION MEMBERS PRESENT:

WILLIAM SCHARF, Chair
        Presidential Appointee (At-Large)
STUART LEVENBACH, Vice Chair
        Mayoral Appointee
LINDA ARGO, Mayoral Appointee
MICHAEL BLAIR, Presidential Appointee
EVAN CASH, Office of the Chairman of the Council
        of the District of Columbia
ANITA COZART, Office of the Mayor of
        the District of Columbia
ARRINGTON DIXON, Mayoral Appointee
ED FORST, Administrator, General Services
        Administration
WILLIAM HENDERSON, U.S. Senate Committee on
        Homeland Security and Governmental Affairs
ELLIE McGOWAN, U.S. House of Representatives
        Committee on Oversight and Accountability
PHIL MENDELSON, Chairman, Council of the District
        of Columbia

90

made by Commissioner Dixon and seconded by Commissioner Schaefer.  Commissioner Cozart?

COMMISSIONER COZART:  Yes.

MS. HOTTEL-COX:  Commissioner Schaefer?

COMMISSIONER SCHAEFER:  Yes.

MS. HOTTEL-COX:  Commissioner Stidham?

COMMISSIONER STIDHAM:  Yes.

MS. HOTTEL-COX:  Commissioner Argo?

COMMISSIONER ARGO:  Yes.

MS. HOTTEL-COX:  Vice Chairman Levenbach?

VICE CHAIR LEVENBACH:  Yes.

MS. HOTTEL-COX:  Chairman Scharf?

CHAIR SCHARF:  Yes.

MS. HOTTEL-COX:  Commissioner Blair?

COMMISSIONER BLAIR:  Yes.

MS. HOTTEL-COX:  Administrator Forst?

COMMISSIONER FORST:  Yes.

MS. HOTTEL-COX:  Commissioner Dixon?

COMMISSIONER DIXON:  Yes.

MS. HOTTEL-COX:  Commissioner Cash?

COMMISSIONER CASH:  Yes.

MS. HOTTEL-COX:  Commissioner Henderson?

91

COMMISSIONER HENDERSON:  Yes.

MS. HOTTEL-COX:  Commissioner McGowan?

COMMISSIONER MCGOWAN:  Yes.

MS. HOTTEL-COX:  Thank you.  The motion carries unanimously.

CHAIR SCHARF:  Thank you very much, Madam Secretary.  We're now moving on to Agenda Item 7A, which is an informational presentation on the East Wing Modernization Project.

Quick logistical item.  My impression was that Commissioner Cash was going to be leaving us and that Commissioner Mendelson was going to be taking his place virtually.  Is he with us online right now?

MS. HOTTEL-COX:  Yes.

COMMISSIONER MENDELSON:  Yes, I am.

CHAIR SCHARF:  Okay, perfect.  Thank you, sir.  With that, do you want to proceed?

INFORMATION PRESENTATION

EAST WING MODERNIZATION PROJECT

MR. FLIS:  Hello.  Thank you.  Good afternoon, members of the Commission.  As was

92

mentioned, this is an informational presentation and overview of the proposed White House East Wing Modernization Project.

Before I turn it over to the applicant team I'm just going to provide you a brief background.  The purpose of the project is to establish a permanent secure event space within the White House grounds that provides increased capacity for official state functions.

I think everybody is familiar with the location of the White House, but here on the screen is a map view showing President's Park and the surrounding context.  The National Mall is located here at the bottom of the screen. Pennsylvania Avenue is located to the north of the White House.  And E Street is located to the south, just north of the Ellipse.  The project is proposed to be located between the Executive Mansion and the Treasury Building.

In addition to the Executive Residence, the vicinity of President's Park obviously also includes a number of significant buildings,

93

including the Eisenhower Executive Office Building, which is to the west, shown on the image on the left, and the main Treasury Building, which is located to the east.  Mixed used development frames the entire area, as it is located within the central core of Washington, D.C.

The project is located on federal land within the District of Columbia.  The National Capital Planning Act requires Commission approval for all federal buildings and open space around such buildings within the District.

As you know, NCPC has reviewed several other projects at the White House.  Most recently, the White House fence in 2016 and 2017, and the tennis pavilion in 2019.

In terms of the review of projects, NCPC uses guidance from the federal elements of the Comprehensive Plan for the National Capital, including policies related to urban design, parks, and open space, as well as visitor experience, among others.  As you're aware, the Commission takes a holistic approach when applying the Comprehensive

Plan policies in the context of each project's needs and objectives.

One of the primary areas of interest for the review of this project is how the public will see and experience the Modernization Project from the surrounding public spaces. Most notably, from Pennsylvania Avenue to the North, as shown here on this image, or from E Street to the south, as shown here. These are really the only publicly accessible streets in the vicinity, as others are located within a secure perimeter.

The public experience extends to several aspects of the proposed project, which will be helpful to understand as the design advances, including how the pedestrian level-views from the north and the south may or may not change from current conditions; how the connector or colonnade between the Executive Mansion and the new East Wing Modernization Project will be designed; how the landscape will be designed, restored, or improved; and how perimeter security and the associated infrastructure might be beautified for the public

and guests to the White House and grounds.

As the design proceeds for review, NCPC staff will work with the applicant to understand these components, as well as any other comments raised by the Commission today.

And so, with that, I am going to now turn it over to Josh Fisher with the White House, who will begin their presentation. Thank you.

CHAIR SCHARF: Thank you.

MR. FISHER: Good afternoon, Mr. Chairman and Commission staff. My name is Josh Fisher. I'm the Director of Management and Administration for the White House. We appreciate y'all allowing us the opportunity to discuss the East Wing Modernization Project and the reason we believe it to be so vitally important.

Every day, people from across the country and around the globe visit the White House and surrounding grounds. They look to it as a representation of the values that we, as Americans, stand for. It is our responsibility to ensure that the guests, those given the opportunity to come

inside the fence and those viewing from Lafayette Park or the Ellipse, experience the pride and the powerful symbol of American democracy, leadership, and history.

While we are only discussing the ballroom today, our efforts extend beyond the 18 acres so that every school group, family trip, marriage proposal, or birthday photo allow people to enjoy the beautiful pride of our nation's capital and the White House complex.

As you all know, U.S. presidents have been renovating, expanding, and modernizing the White House to meet the needs of the present day, including terraces built in the 1800s, the Truman Balcony in 1948, the original East Wing built in 1902 and rebuilt in 1942, as well as numerous other projects.

When President Trump decided to build a grand ballroom and modernize other aspects of the East Wing, we began researching. After careful study and consultation with engineers, architects, historians, and other experts, we determined that modifying or renovating the colonnade in the

existing East Wing was not feasible for many reasons. We found significant deficiencies and overall poor structural design and construction. The colonnade was structurally unstable, the roof systems had exceeded their service life, and the underpinnings were not sufficient to support the necessary upgrades.

In the East Wing, there was chronic water intrusion, accelerated deterioration, and mold contamination. The electrical infrastructure was obsolete, deemed undersized and noncompliant with current code. Facilities were also noncompliant with both ADA and Secret Service requirements.

Because of this and other factors, the cost analysis proved that demolition and reconstruction provided the lowest total cost ownership and most effective long-term strategy. As part of this overall process, we also took great steps to ensure that we preserved extraordinary history features, including parts of the original colonnade, the Kennedy Gardens, and the movie theater, amongst other items.

Case 1:25-cv-04316-RJL    Document 30-2    Filed 01/15/26    Page 9 of 17
USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 241 of 525

98–101

In choosing to carry out the East Wing Modernization Project, we are achieving life safety, ADA, environmental, and federal compliance. We are enhancing mission-critical functionality and eliminating systematic infrastructure failures. We are making necessary security enhancements and delivering resilient, adaptative infrastructure aligned with future mission needs.

Importantly, the addition of the modernized facility also significant reduces negative impacts on the truly historic Executive Mansion and South Lawn. The hosting of large events, the size of which were not contemplated when it was designed and reconstructed, drastically increases the rate of deterioration on the East Room and the State Dining Rooms, stressing the aging structural components of that specific building.

In addition to consequential structural and safety considerations, the East Wing Modernization Project will significantly improve the experience of the American people and foreign dignitaries when they visit the White House.

As I'm sure you're aware, historically, when visitors come to the White House for events, that tour begins at passing through temporary double-wide trailers to gain entry onto complex. State dinners or events with world leaders would take place in a tent on the South Lawn. These tents affected more than just the world leaders; their use destroyed large portions of the South Lawn, degrading its appearance for overall visitors and creating a reoccurring expense to replace and cultivate new grass.

Beyond the ballroom, we have plans for beautifying visitors' experience in the area, such as Lafayette Park, and creating a superior, more efficient visitor security screening center. In the coming weeks and month, both NPS and Secret Service will be submitting their plans on those two topics.

Inside the White Houses, spaces such as the ballroom, are just as important as the grounds outside. The ballroom is where leaders will gather, important decisions will be discussed, and

history will be made. It is a place that will bring people together for diplomacy, celebration, and unity. A beautiful, well-maintained, and historically-designed ballroom will show respect for these moments and emphasize the significance of collaboration and tradition in our government.

Now I will turn it over to Shalom, the architect on this project, to discuss the ballroom. As you guys know, Shalom is no stranger to this Commission. His work has been transformative across the D.C. region. So, we're excited to see what he can bring to the table.

MR. BARANES: So, good afternoon. And thank you for the opportunity to appear before the Commission. Today I'll provide a very high-level overview of the White House East Wing project. A more detailed and fully developed submission will be presented in one of your subsequent hearings.

And I'd like to begin here with a brief discussion of the evolution of the current design approach. I joined the project team approximately 60 days ago, in early November, following the

schematic design work that had been undertaken by McCrery Architects.

That earlier phase, which spanned most of 2025, involved a fairly comprehensive evaluation of programmatic needs and design alternatives, including multiple massing configurations, and, of course, a whole series of elevational studies.

Following the transition to my firm, we continue to evaluate various sizes and configurations for the project. Today, I'd like to report that the ultimate decision in late November was not to continue exploring options for increasing the size of the project; instead, the decision was made to advance one of the earlier schemes that had been developed prior to our joining the team.

That scheme is calibrated to respect key contextual relationships. The addition's cornice aligns and does not exceed with the cornice height of the White House. And the building mass is set back approximately ten-and-a-half feet from the White House's primary north facade on Pennsylvania

Case 1:25-cv-04316-RJL    Document 30-2    Filed 01/15/26    Page 10 of 17
USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 242 of 525

102–105

Avenue.  These measures, I think, are essential to maintaining the visual primacy of the White House.

The program includes a ballroom of approximately 22,000 square feet.  It's designed to accommodate approximately a thousand seated guests at a formal dinner.  The total area of the two aboveground visible East Wing floors, that's two floors, including the colonnade and the ballroom structure, is just slightly over 89,000 square feet.  Below the ballroom, and included in the 89,000 square feet, the project incorporates a series of functions, which I'll show you on the boards shortly here.

One could generously describe the current functioning of the White House support areas, such as loading, waste handling, general deliveries, food service, as being quite labyrinthian in character.  And I think that's a kind description.  These conditions reflect incremental adaptations over time, and they place ongoing operational stress on the historic structure.

The proposed East Wing Modernization seeks

to rationalize these functions in a manner that will relieve the stress by increase connectivity, operational efficiency, and by enhancing overall security.  The changes will allow the White House to be experienced and to age, I think, at a much more graceful way over time.

In advancing this proposal, we have aimed to land in a thoughtful middle ground by adapting, as I mentioned earlier, one of the earlier 2025 designs that meets the thousand-seat requirement for the ballroom.  And also, as I mentioned earlier, further consideration of enlarging the size was abandoned in late November.

Our primary focus has been on refining the exterior facades through the re-proportioning of windows, masonry detailing, revisiting the exterior terraces, and further developing the interior spaces, of course.

This scheme does require a two-story colonnade connecting the East Wing -- I'm sorry, connecting the East Room in the White House to the new ballroom.  We believe it's appropriate to

evaluate this condition within the context of the broader White House campus.

The White House is, therefore, considering the idea of a modest one-story addition to the West Wing colonnade, which would serve to restore a sense of symmetry around the original central pavilion.  It will be considered as part of a future overall planning framework which will be presented at a future hearing here.

So, with this context, I'll now just walk you through, briefly, some of the boards that we have here.  So, here, of course, you have Pennsylvania Avenue to the top here.  Thank you.

You have Pennsylvania Avenue here; it's at the upper part of the board.  So the White House complex.  And, of course, the colonnades with the (audio interference).  There will be two priority access points to the ballroom.  And we are talking about a large crowd here of a thousand people.  One of them will be through the White House, through the colonnade, to a foyer that will serve the ballroom.  And then the other one will be one level

down.

The grade drops as we come around this way.  And there will be an entrance through a portico here into a foyer with a grand stair that will take you up one level to the ballroom, and essentially meet where the other guests will be coming from the other direction.

The new structure here has a series of terraces on three sides of the building.  On the south side of the colonnade we have a terrace that's about 12-feet wide with a stair that leads down to the lawn panels.  And then that terrace continues around to the west side of the ballroom, along here.  And, actually, that's a very important life safety egress point for the whole project.

And that leads down to a stair here, which also lands at the lower level grade.  Halfway down that stair you can make a left and access a terrace, which is underneath this colonnade roof.  And that also has a stair leading down to the lawn.

We will show you much more detailed drawings next time with viewsheds, but, for today,

Case 1:25-cv-04316-RJL    Document 30-2    Filed 01/15/26    Page 11 of 17
USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 243 of 525

106–109

106

I'd just like to point out that there is a very dense cluster of trees here, which will remain, which really affects your view from the south, the public view from the south looking at this, just as there is a dense cluster of trees that protects the view of the West Wing.  And we also have the same condition on the north side, where we have a dense cluster of both evergreen and deciduous trees, which will really frame the view of the central pavilion of the White House.

These are very schematic drawings of the two primary levels.  On your right here is the ballroom level, which is the upper level.  And on the left is the level below the ballroom.

So, well, let's start at the upper level here.  So if you're entering the ballroom from the White House, the East Room is right here.  You'll come across the colonnade, adjacent to the stairs here, enter this foyer area, and then make your way into the ballroom, which has windows on three sides, facing east, west, and south.

If you're entering from the other side,

107

as many of the guests will be entering from the other side, you will come up a few stairs here through a portico, and that would give you access -- you'll be coming up here actually in a lower level -- that will give you access to this hall here, the foyer, and then up a grand stair which would land you right in the same area here.  And, again, giving you access to the ballroom.

On the lower level, the other uses that we have are this large space, which is devoted to food service.  That's basically a commercial kitchen.  And it will not only service the ballroom, but also service events inside the White House itself.

Opposite that, we have an office suite for the First Lady.  And then, on the lower level of the colonnade itself, we are rebuilding the movie theater that had been there.

These are north and south elevations of the White House complex.  We removed all three trees.  No landscaping at all is shown; just wanted you to see the building very clearly.  And I think

108

the most important thing here, perhaps, is what I mentioned earlier, which is the alignment of the cornice of the ballroom directly aligns with the cornice and the balustrade of the White House.  The heights will match exactly.

Here you see the upper level of the East Colonnade.  And I did mention the potential for a future addition, a one-story addition, to the West Wing.  And that would occur right here.  And you can see that the reason to think about that is so that we would reinstate the symmetry around the central pavilion of the White House.  We have not looked at that at all yet, but hope to do so in the future.

So, here is the view from the south. Again, you have the rear elevation of the White House itself.  We have the ballroom with the portico. The terrace at the half-level.  And then, of course, here the West Wing, two-part with a colonnade.

These are larger elevations so you can start to understand the character of the building. So, what we have at the top here is the east

109

elevation of the ballroom, which is directly across from the Treasury.  This portico sits pretty much directly across from a portico that abuts the Treasury.

The floor of the ballroom is at this upper level, right through here.  And the eight windows that you see here are basically centered on the ballroom.  On the opposite side we have the same condition, with the eight windows there centered on the ballroom.

This is the west elevation.  And on the lower level here you're seeing windows that face into -- they serve the First Lady's office suite.

We intend to develop all of this with a combination of stone and precast.  It will all be painted white to match the White House.  A very similar finish as you see on the White House.  And, of course, you know, the windows and all of the masonry details are things we are working on right now.

And then, finally, I just have one more board.  And this is just the north elevation, which

you saw a minute ago. But here we've added in the street trees, which are shown as a darker green. And then we've put in transparent outlines of the larger trees, which are behind the street trees inside the fence line. So the trees pretty much match the height of the proposed ballroom. So you'll start to get a sense, when I show you at your next hearing some photographs, the extent to which these will frame the view of the central pavilion.

So, that's all I have. And happy to open it up to questions if you like.

CHAIR SCHARF: Thank you very much for that presentation and for showing us this diagrams and images. I'll open it up to the Commission now for questions and clarifications.

COMMISSIONER MENDELSON: Mr. Chairman, I'll have some questions. This is Commissioner Mendelson.

CHAIR SCHARF: Please proceed, Commissioner.

COMMISSIONER MENDELSON: Oh, thank you. I hope you can all hear me. I do want to just first take a moment to thank my designee, Evan Cash, who comes to all the meetings. And I just want to thank him publicly. And I also want to thank those who gave the presentation.

I do have a number of questions. The first is, how is this proposal consistent with the Comprehensive Plan's urban design requirements, which include, I think it's B.1.4 in the Urban Design Element, visually reinforce the permanents of the Capitol Building, White House, and other nationally-significant resources by protecting the visual frame around them; and B.5.10, visually reinforce the special importance of the White House and its grounds by protecting the existing spatial relationship of the White House and the mass and scale of adjacent buildings?

So my question pertains to how this proposal is consistent with those comments of the Comprehensive Plan.

MR. BARANES: Thank you for those questions, Mr. Mendelson. We are being very, very careful, first of all, to maintain, I think, a fairly

sufficient distance from the central pavilion of the White House. And by proposing that the colonnades be developed in a matching way on both sides of the central pavilion of the White House, I think we will actually be in concurrence with the paragraph that you just cited.

COMMISSIONER MENDELSON: All right. That probably will come up again at future presentations.

Can the size, footprint, or location of the ballroom, the location of the ballroom on the site, be changed at this point?

MR. BARANES: I mean, certainly, anything is possible. It all depends on schedule and money. But this particular location has been studied pretty carefully by the previous architect, as well as myself. And it's been determined that this is the best location in terms of getting access to it from the East Room of the White House.

COMMISSIONER MENDELSON: But part of my question was the size or footprint. So, has construction work on the ballroom foundation already begun?

MR. BARANES: There's been excavation work, there is some foundation work, but that's really not the limiting issue in terms of whether things can be changed or not.

COMMISSIONER MENDELSON: Okay. So, as this gets further refined, the footprint could conceivably be reduced a little bit, the work on the foundation, so far as not that significant?

MR. BARANES: Well, as I said, the footprint has been studied fairly extensively already, and many different massing options were studied before we even came onboard. So, at this point, we've continued working with that, with the product of all those studies, and we are primarily refining the scheme.

COMMISSIONER MENDELSON: So, I appreciate that the cornice line will not be higher than the historic structure, but is it possible that the height of the ballroom, which of course determines the cornice line, that that could be reduced somewhat? Because it still seems to me that it's

overwhelming the existing building.

MR. BARANES: You know, it's interesting. I mean, it is the same height. I think you're familiar with the addition that we built to the Wilson Building that you're in?

COMMISSIONER MENDELSON: Yes.

MR. BARANES: So, you know, I mean, I bring it up because this size -- this question of size and relationship of an addition to an historic building comes up with almost every project I've ever worked on over the last 40 years. And we're essentially doing the same thing here we did at the Wilson Building.

We're building an addition. Although at the Wilson Building it really contrasts. It's a very modern addition; it contrasts very strongly to the neoclassical building. But, even there, we matched the height. You know, we did match the height of the existing building. And I think it works quite well. And we've done that on many, many other structures.

You know, we're just finishing up an addition to the Cannon Building where we increased the height by one story. That was reviewed pretty extensively. And, you know, you could look at it. I mean, I think that, too, works really well, you know, with the original historic structure, despite the additional height.

COMMISSIONER MENDELSON: But my sense of it is that there are two levels here. One is, I'm going to say the lower level, and then there is the ballroom level. And I can't remember what the height. What is the height for the ballroom level?

MR. BARANES: Well, if you measure it off the front driveway, where the portico is of the White House, we're approximately 51 feet above that elevation.

(Simultaneous speaking.)

COMMISSIONER MENDELSON: That's roughly the level of the ballroom?

(Simultaneously speaking.)

MR. BARANES: That's the roof of the ballroom. That's the height -- I mean, that's the height of the balustrade around our ballroom

structure. I'm sorry, is that what you're asking?

COMMISSIONER MENDELSON: No. I think I'm not asking it well. The ballroom is going to be like a 20-foot ceiling or 40-foot ceiling?

MR. BARANES: It's about 38 to 40. Yes.

COMMISSIONER MENDELSON: And could that be reduced?

MR. BARANES: It's possible. Not impossible.

COMMISSIONER MENDELSON: I had one other question, which I think is probably for Mr. Fisher and not you. And that is, why didn't the project come to us a whole instead of after the demolition?

MR. FISHER: Thank you for that question. Yeah, we've been -- we've begun work on this project. There are two phases to this project. I think that you've alluded to it with Shalom here. There are some things regarding this project that are, frankly, of Top Secret nature that we are currently working on. That does not preclude us from changing the above-grade structure, but that work needed to be considered when doing this

project, which was not part of the NCPC process.

CHAIR SCHARF: And let me note just for the record, if it's okay with you, Commissioner, it's long been the view of NCPC's Counsel's Office that the National Capital Planning Act does not give us authority to review demolition or site preparation work. So, while many projects do come before us at that stage, that's not a requirement of the National Capital Planning Act, and review of demolition is not something that we have the authority to do as a Commission.

COMMISSIONER MENDELSON: I appreciate that. And I've actually read that legal opinion. And I'm not arguing with it. It's just that I don't know the last time that a project has been presented before NCPC or Zoning Commission or any of the planning agencies where it wasn't presented as a whole: this is what we're going to do and we will proceed with the demolition as we move forward. As opposed to here, where the demolition occurred first.

I don't have any other --

118

CHAIR SCHARF:  The Air and Space Museum addition is one example of that, where they proceeded with demolition of the old addition, I believe, prior to presenting plans for the new addition to this Commission.  I think that's the nearest historical analogy.  I could be wrong.

COMMISSIONER MENDELSON:  I just want to conclude my -- I have a lot of respect for Shalom Baranes.  He's done a lot of great projects in the city over the decades and I just want to acknowledge that.  Thank you.

CHAIR SCHARF:  Thank you, Commissioner.  Do any other Commissioners have questions for the presentation team?  Yes, Commissioner Dixon.

COMMISSIONER DIXON:  One.  The stairway, that's going to be handicapped accessible also, I'm assuming?  You had mentioned stairways on the building, but they were -- they're going to be handicapped accessible, obviously?

MR. BARANES:  The primary handicapped access into the ballroom will be through the front

119

door of the White House.

COMMISSIONER DIXON:  Oh.  So the other entrances will not accommodate --

MR. BARANES:  The other stairways are there for egress purposes, for fire code purposes.  And they are stairways, so a wheelchair would have to really go in the other direction.

COMMISSIONER DIXON:  But I think that may be a concern, I would think.  I mean, we want handicapped people to be able to egress, too.

MR. BARANES:  Oh, absolutely.  No, no, believe me, we are looking very closely at all of the codes.

COMMISSIONER DIXON:  Secondly, there was -- there hasn't been any discussion of the new security process that we used to go through, that we have gone through, with the labyrinth of different corridors to get cleared to get into the White House.  How is that going to be addressed in this process?

MR. BARANES:  I'm sure they'd let you in at any time, but --

120

COMMISSIONER DIXON:  No, I doubt that.

(Laughter.)

COMMISSIONER DIXON:  I haven't been back for a while.

MR. FISHER:  Thank you for the question, sir.  We are currently looking at a new visitors entry facility that would be part of this project.  Again, as we look at this, it's not just the East Wing Modernization, it's not the ballroom; we are looking at a totality experience for the White House complex.

As I mentioned earlier, historically, when you come to the White House you go through double-wide trailers, tents, out in the cold.  We don't think that that's befitting of what the White House should be or could be, quite frankly.  So those plans are under review.  We're trying to put them together, make sure that we've got our i's dotted and our t's crossed before we bring before this Commission so that you guys can hopefully see and enjoy what we've produced.

COMMISSIONER DIXON:  Yeah, I think that

121

it's a sensitive area to even put it -- make it public, how this process may work.  But one of the detractions from the historical structures was the complicated clearance process and the hodgepodge, if you will.  So I'm assuming you will present to us how that will be handled in the future --

MR. FISHER:  Yes, sir.

COMMISSIONER DIXON:  -- so we can look at that?  Good.  And I do hope we do something with the handicapped issue.  Thank you.

CHAIR SCHARF:  Thank you.  Do any other Commissioners have questions for the project team?  Yes, Commissioner --

COMMISSIONER HENDERSON:  Clarification from something that was presented.  There was talk of adding, potentially, an additional level on the West Wing side of the building.  Is that to the West Wing structure itself or just to the walkway or what --

MR. BARANES:  It would be just to the colonnade.

COMMISSIONER HENDERSON:  Okay.

Case 1:25-cv-04316-RJL    Document 30-2    Filed 01/15/26    Page 15 of 17
USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 247 of 525

122–125

CHAIR SCHARF: Any other questions before we proceed to deliberations?

Hearing none, I'd like to thank, as always, our Staff and the presentation team here. Vice Chairman Levenbach, would you like to kick things off?

VICE CHAIR LEVENBACH: I think what strikes me about is this, you know, some people here, some of the Commissioners, have participated in White House events more than I have, but I'm struck at how much this expands the utility of the compound.

I mean, I think about the Hanukkah party I just went to you. You start the north end of Lafayette Park and you walk through one set of trailers and you walk through another set of trailers, and there's a coat check. And then when you get inside it's pretty crowded and there aren't that many people there. And this is going to just open up access to people at a much higher level.

I think that it's going to be enjoyed for generations to come, so I'm really excited to see how this project develops.

CHAIR SCHARF: Thank you, Vice Chairman Levenbach. Commissioner Blair?

COMMISSIONER BLAIR: I would just say I think that, you know, it looks like it's going to be very beautiful, but the utility, I think, for those of us that spend a lot of time there, is fairly obviously. Winston Churchill said to the House of Commons, when they were going to rebuild it, that we shape our buildings and they shape us thereafter.

The White House is a special place, but people come there to gather and to work. I would tell you that we've seen times where simply doing something like getting the Congress together to have a meal and break bread is not something that the current structure of the White House really accommodates in any way with the President of the United States. That's a problem.

When foreign dignitaries visit, you know, the President of the United States, of any party, is invited all over the world and goes and gets to see the best of whatever the country has to offer. And I think the President's view would be that he would -- he thinks the American people deserve that same opportunity to have grand gatherings for visitors to our country and show them what American has to offer.

So I think it has a obvious utility. I think it's very considered in its design. And I look forward to seeing the progress of the project, and appreciate your presentation and look forward to working with you.

CHAIR SCHARF: Thank you, Commissioner. Administrator Forst?

COMMISSIONER FORST: Thanks so much, Chairman. James read from my notes, so I --

(Laughter.)

COMMISSIONER FORST: Thanks.

CHAIR SCHARF: Thank you, Administrator Forst. Commissioner Dixon?

COMMISSIONER DIXON: I appreciate the presentation and look forward, as this moves forward, to more deliberation. Thank you, Mr. Chairman.

CHAIR SCHARF: Thank you, Commissioner.

Commissioner Mendelson?

COMMISSIONER MENDELSON: Yes. Sorry, I was muted. Let me say that I think that elevation we saw from Pennsylvania Avenue was not as disturbing to me as the elevation from the Ellipse. And as I said in my questions, I'm concerned about this addition overwhelming the original historic building.

I appreciate that the architect, Shalom Baranes, has really good taste with regard to dealing with historic structures, but I do think that -- it sounds to me like the height could be lowered without jeopardizing the footprint. I don't think that the footprint -- that is, 89,000 square feet -- should be the goal in and of itself. So maybe it can be and needs to be shrunk a little bit more. Again, looking at the elevations from the south, it's just so -- it's just so imbalanced.

The other observation I have is that it is disturbing to me that we are looking at an addition to this historic structure, but we're looking at what appears to be an overall plan in

126

a very segmented approach. So is there going to be some changes with the visitor center? Is there going to be some changes with Lafayette Park? Is there going to be some changes with the West Wing? But rather than looking at this as a whole, we're going to be looking at it piecemeal, and that's concerning as well.

CHAIR SCHARF: Thank you, Commissioner. Commissioner Henderson?

COMMISSIONER HENDERSON: I would just suggest, to those of us who don't work in that complex every day, that it would be probably be worthwhile and beneficial to our consideration to take some opportunities to go and see the site, see the facilities as they are, between now and future considerations.

CHAIR SCHARF: Thank you, Commissioner. Commissioner McGowan?

COMMISSIONER MCGOWAN: I don't have any additional comments or questions, but thank you all so much for the presentation. It was very informative.

127

CHAIR SCHARF: Thank you, Commissioner. Commissioner Cozart?

COMMISSIONER COZART: Yes. Thanks to the staff for their work on this and for the presentation. And I look forward to when it comes before the Commission again.

CHAIR SCHARF: Thank you, Commissioner. Commissioner Schaefer?

COMMISSIONER SCHAEFER: So, again, my thank you as well. This is -- it's exciting. It's a great job overall with the architectural features. And looking forward to see how this progresses, since I echo the same comments as has come before me, as well, because I think this is a great opportunity for us to continue to expand upon the importance of our entire nation. So, thank you.

CHAIR SCHARF: Thank you, Commissioner. Commissioner Stidham?

COMMISSIONER STIDHAM: Thank you. And thank you for the overview. It is really helpful to get a sense of the project.

And I should lead with that Secretary

128

Burgum, who I sit as a delegated position here, and the Department of the Interior, supports the East Wing Modernization without reservation. We appreciate the designs that were shown here today and we look forward to seeing more detail, especially when it comes to the landscaping and understanding how the temporary facilities will be -- how the uses that currently happen in this temporary facilities are taking shape in the new facility, to really understand how that replacement is taking place.

As well as understanding clearly, you know, it's important in those views, you know, anyone who is coming to visit who does not have the opportunity to be inside the fence to be able to understand and to view the White House. And so understanding those views will be really helpful when you come back, as well as the design choices you make and the materiality. So we look forward to much more detail and appreciate the overview.

CHAIR SCHARF: Thank you, Commissioner. Commissioner Argo?

129

COMMISSIONER ARGO: Yeah. I want to associate myself with my next door neighbor's comments. And seeing, you know, how seeing how this progresses. I have some concern about size and scale in a number of ways, but we can talk more about that, as I said, as the design and the work on this progresses. Thank you.

CHAIR SCHARF: Thank you, Commissioner. Speaking for myself, just a few things that I'd say. First of all, Commissioners, if you want to come over to lunch, you're welcome anytime. I'm happy to show you around.

More seriously, though, I think every project that comes before this Commission is ultimately determined, in large part -- or is shaped, in large part, by its function. And I think it's worth emphasizing a point that Commissioner Blair made, which is the vital nature of the function that I believe this project is intended to advance.

It's been a distinct honor for me to get to, frankly, travel around the world with the President and visit foreign countries and be hosted

by the leaders of foreign countries. And I think it's notable that when the President of the United States of American flies to the United Kingdom he's hosted at Windsor Castle. And when, next year, the King of the United Kingdom of Great Britain and North Ireland comes to the United States, more likely than not, he will be hosted in a tent on the South Lawn with porta-potties.

That, to me, is not a good look for the United States of America. And I think that, when you think about the long history of planning for a state ballroom on White House grounds, if you think about the number of times this project has been suggested historically, it speaks to that programmatic need. This isn't a new idea.

I've been interested to see that even in the press reports that have been -- or the press articles that have been very, I'd say, agitated about the way that this project has progressed, there has been a recognition by previous occupants of the White House from both parties, people who have worked in the White House from both parties,

that there is a real programmatic need for a building like this.

So I think what we're really talking about, then, is a lot of the issues that Shalom in particular was addressing in his presentation, which is, given the programmatic need, given this size that that programmatic need necessarily requires for this project, how do we ensure that this project accords with what we, as a Commission, care about? How do we ensure that the viewsheds, the way that the public will experience this building, won't detract from the way that the public experiences what I believe is one of the, really, two or three most important buildings in Washington, D.C., and in the region that we have jurisdiction over, which is the White House.

I'd be interested to see more detailed elevations, particular from the south, in light of Commissioner Mendelson's comments, what this would look like with the tree line, because I think that the elevation that we see there, just based on my knowledge of that the property looks like, that's

very stark and I don't think really represents how the public would experience this building.

I think it's important that this is framed between the White House and the Treasury Building, which is a building of significant massing. And I'd be interested to see an elevation that extends, essentially, further to the left, or further to the east, to encompass sort of the full viewing experience from Pennsylvania Avenue.

And, as many Commissioners have said, I just look forward to seeing more details in the weeks and months ahead. And I'd like to thank, as always, our staff for the collaboration, the work they're already put in on this issue. I think they can be a real resource to the project team, particularly as you start thinking about the visitor experience, visitor entrance, other aspects of the broader modernization of the White House complex. In particular, how the public interacts with it.

But, again, just speaking personally, I'm really excited to see how this project develops. And I'm excited to, hopefully, see more detailed

planning materials in the weeks and months ahead. So, thank you.

Are there any other Commissioners that have questions or comments before we adjourn for the day?

(No response.)

CHAIR SCHARF: In that case, unless there is anything else for us to address today, if there is no other business, that concludes the open session agenda for this meeting of the National Capital Planning Commission. Our next regular Commission meeting will be on Thursday, February 5th, at 1:00 p.m.

I believe the Commissioners are now going to exit the chambers. If you can please hold your seats while they do so, that would be a great help. And thank you all for being here today.

(Whereupon, the above-entitled matter went off the record at 3:10 p.m.)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

      Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

      Defendants.

Case No. 1:25-cv-04316-RJL

**SUPPLEMENTAL DECLARATION OF JESSICA BOWRON, COMPTROLLER OF
THE NATIONAL PARK SERVICE EXCERCISING THE DELEGATED
AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1.  I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025 delegation of that authority from the Acting Secretary of the Interior, and subsequent extensions of that authority by the Secretary of the Interior. I have been employed by NPS since 2007 and have served as NPS Comptroller since 2017.

2.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.  In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System nationwide, as well as all NPS programs, NPS directorates, and regional offices. The White House and President's Park ("the Park") is an administrative unit within the National Park System in the NPS National Capital Region ("NCR") comprised of the

White House, Lafayette Park, Sherman Park, the First Division Monument, and the Ellipse.

4. NPS's mission is to preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations.

5. Under the NPS Organic Act of 1916, NPS was authorized to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. This authority generally extends to historic preservation and construction activities at individual park units in furtherance of the purpose of the park unit at issue.

6. The NPS Organic Act also authorizes NPS to accept donations, including "patented land, rights-of-way over patented land or other land, buildings, or other property within a [National Park] System unit" and "money that may be donated for the purposes of the System." 54 U.S.C. § 101101.

7. In 1961, Congress enacted the Park's enabling legislation and directed that the President's Park enclosure, which includes the White House, its wings, the grounds within the White House fence and facilities located on those grounds, be administered pursuant to the NPS Organic Act, Pub. L. No. 87-286 (1961). Congress directed that in carrying out NPS's responsibilities, "primary attention shall be given to the reservation and interpretation of the museum character of the principal corridor on the ground floor

2

JA245

and principal public rooms on the first floor of the White House." *Id.* However, Congress further directed that "nothing done under [the Park's enabling legislation] shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." *Id.*

8. In my current position, I have been and continue to be regularly briefed by John Stanwich, the NPS Liaison to the White House, and members of the Park's staff regarding the East Wing Modernization project ("the Project"), the purpose of which is to establish a permanent, secure event space within the White House grounds that meets presidential priorities for capacity and dignified official functions and eliminates reliance on temporary tents and associated infrastructure strains.

9. The Project is intended to meet the functional goals and operational needs of the Executive Office of the President ("EOP"). NPS determined that the Project was consistent with the Park's enabling legislation.  Pub. L. 87-286. The Project will directly benefit the American people in a number of ways, including by: (1) expanding the White House's ability to host large indoor events; (2) reducing reliance on large tents that damage turf and infrastructure and necessitate costly repairs; (3) celebrating America's history through new interpretive opportunities; (4) maintaining public access to key interpretive areas and ensuring preservation of the museum character of the principal ground floor corridor and State Floor public rooms of the White House; and (5) creating a symbolic space for events of national importance, reinforcing shared civic identity and pride.

10. The Executive Residence at the White House ("EXR") has unique expertise in fulfilling the operational needs of the President and providing for the use of the White House for official ceremonial purposes as well as the President's home. EXR is also best positioned to coordinate with all agencies that have equities in the White House that may be affected by the Project. Accordingly, NPS determined that it was in the best interests of the United States for EXR to contract for and directly manage the Project.

11. EXR is therefore handling project management for the Project, meaning that it is in control of all aspects of the day-to-day execution of the Project, including its scope, schedule, budget, design, and completion. However, EXR is coordinating with NPS staff regarding the Project, in particular with respect to potential impacts on NPS operations at the White House.

12. Pursuant to NPS's donation acceptance authority, 54 U.S.C. § 101101, on November 13, 2025, the agency accepted a private donation for the Project.

13. Pursuant to the Economy Act, 31 U.S.C. § 1535, and for the reasons articulated in Paragraphs 9 and 10 above, on November 17, 2025, NPS entered into a reimbursable agreement with EXR under which the donated funds were transferred to EXR to fund the Project.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 15, 2026.

JESSICA BOWRON  Digitally signed by JESSICA BOWRON
Date: 2026.01.15 12:02:57 -05'00'

Jessica Bowron

4
JA247

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

     Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

    Defendants.

Case No. 1:25-cv-04316-RJL

### DECLARATION OF █████████████
### PROFESSIONAL ENGINEER

1. The facts set forth in this Declaration are based upon my professional knowledge, and, if called as a witness in this proceeding, I could and would testify competently thereto under oath.

2. I am a Professional Engineer and have been a licensed engineer since 1996. I am employed by ██████████████ which is an engineering firm that has been retained as a subconsultant by AECOM Services, LLC for the White House East Wing Modernization Project ("the Project"). For the Project, AECOM Services, LLC is responsible for the design and engineering, and ████████████ as their subconsultant, is responsible for structural engineering. I currently serve as a leader of the structural design team for the Project.

3. Throughout the course of my career, I have participated in, and overseen the design of, several large-scale commercial, institutional, and government projects in and around the Washington DC region.

4. As the leader of the structural design team for the Project, my duties consist of overseeing the structural design, which includes establishing appropriate building systems to support the architectural design proposed for this Project.

JA248

USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 255 of 525

5. Given the national security concerns with aspects of the below grade structure, , I am limited in what aspects of that structure I can discuss publicly. Below is a description of those aspects of the Project I am able to convey in an open forum. I am available to provide the Court further details in an *in camera* setting as requested.

6. Currently, the below grade structure includes conventional foundation systems and subterranean concrete floor framing, walls and columns.

7. The design for the Project is in progress and continues to be developed. For example, my Firm's activities include on-going collaboration with other design consultants and project stakeholders necessary to complete the design.

8. Based on my review of the relevant materials and knowledge of the Project, the below-grade elements of the Project have been designed to support an above-grade Ballroom roughly the size and scale of that which was proposed at the January 8, 2026, meeting of the National Capital Planning Commission.

9. However, the primary foundation system for the structure can accommodate potential design changes to the configuration of the above-grade structure.

10. Those design changes could include things such as modifying the location of windows, doors, and stairs, as well as modest changes in the overall above grade massing (height and width) of the structure.

11. In addition, while the foundation system is currently based on the approximate scale of the Ballroom design presented on January 8, the foundation layout does not necessarily determine the placement of certain life-safety elements (such as stairs). Instead, the placement of those elements can still be modified later in the design process even after portions of the below-grade foundation have been constructed.

12. Further, it is possible to move sub-surface utilities and infrastructure once the foundation is constructed. While that process might be costly or time-consuming, provisions are being

JA249

incorporated into the design to accommodate the need for potential future changes. This is because, given the unique needs of the White House complex, the Government will need long-term flexibility to adapt the Project to future presidential and operational needs. These same provisions also provide flexibility to make adjustments to utilities and infrastructure for the current design.

13. In the event that a future change to the above grade structure is necessary, certain elements such as transfer girders, sloped columns, and other means can be incorporated to accommodate modifications to the architectural design, including adjustments to the façade pattern, overhangs, projections, and reductions in massing.

14. In sum, I have reviewed the declaration submitted by William J. Bates in this litigation, Docket. No. 20-2, and disagree with his conclusion that work performed to-date on the Project "predetermine[]s key aspects" of the above grade structure. In particular, and as noted above, design changes to the Project remain possible, including modifications to the placement of windows and doors, changes to massing, location of life-safety elements, and placement of sub-surface utilities and infrastructure.

15. I reserve the right to amend this Declaration upon receipt and knowledge of new and/or additional information. The statements made herein are made in accordance with the reasonable industry standard of care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of January 2026.



USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 257 of 525

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

      Plaintiff,

      v.

NATIONAL PARK SERVICE, *et al.*,

      Defendants.

Case No. 1:25-cv-04316-RJL

## DECLARATION OF U.S. SECRET SERVICE
## DEPUTY DIRECTOR MATTHEW C. QUINN

I, Matthew C. Quinn declare as follows:

1. I am the Deputy Director of the United States Secret Service (Secret Service).

2. I previously submitted a declaration in this matter, filed on December 15, 2025 ("the Prior Declaration") (Dkt. No. 14-11). The Prior Declaration is incorporated herein by reference. Except as expressly stated below, to the best of my knowledge the statements contained in the Prior Declaration remain true and correct.

3. This declaration is submitted for the limited purpose of updating the Court regarding the status of security-related projects at the White House Complex.

4. Since the filing of the Prior Declaration, the East Wing Project contractor has made progress on certain elements of the security infrastructure and security projects referenced in the Prior Declaration. *Id.* ¶ 8.

5. While additional efforts are ongoing, crucial security projects remain incomplete. These outstanding security projects are expected to require additional weeks or months to complete.

6. Continued construction work is therefore necessary to maintain and update the security infrastructure of the project site and the White House Complex. For example, continued waterproofing and water management is necessary to maintain the integrity of security elements throughout the Complex as flooding poses risks to infrastructure, utilities, and other critical systems.

7. Until this remaining work is completed, Secret Service's ability to meet its statutory mission of protecting the President, the First Family, and the White House Complex continues to be hampered.

8. In addition, the current open construction site is, in and of itself, a coordinated and managed safety hazard and adds additional challenges to Secret Service operations. For example, the site requires the Secret Service to redirect resources to account for the disruption to existing security procedures caused by construction activities.

9. More broadly, the construction of a new East Wing is beneficial to the long-term security of the President (both current and future) and the White House Complex as a whole. The former East Wing was outdated in terms of security and support for Secret Service operations, and its modernization to today's technological standards will enable the Secret Service to more effectively achieve its protective mission.

10. As an additional example, due to size and infrastructure constraints with the previous East Wing building, tents were often set up on the South Grounds of the White House Complex to host larger events. This process limited screening space and types of security equipment, and the measures necessary to secure the outdoor area were numerous and costly, both in terms of expense and personnel resources. Additionally, these larger events relied on a temporary visitor screening trailer that, due to space and infrastructure

2

JA252

constraints, resulted in a lower throughput of guests and prevented the Secret Service from using the most advanced screening equipment available. Having permanent, updated, and secure structures for screening guests and hosting events will obviate the need to use outdoor tents and the temporary screening building for future events and will also increase the safety and security of all attendees at those events, including the President and foreign leaders and dignitaries.

11. As stated in the Prior Declaration, should the Court request it, the Secret Service is prepared to provide more details, including law enforcement sensitive and/or classified information, in an appropriate setting, such as a classified declaration available for *in camera* review.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 15, 2026.

Matthew C. Quinn
Deputy Director
United States Secret Service

3

JA253

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES**,

*Plaintiff*,

v.

**NATIONAL PARK SERVICE**, *et al.*

*Defendants*.

Civil Action No. 25-4316

## DECLARATION OF JONATHAN B. JARVIS

I, Jonathan B. Jarvis, declare as follows:

1.     The facts set forth in this declaration are based upon my personal and professional knowledge, and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.     I served with the National Park Service (the "Park Service" or "NPS") for 40 years, from 1976 to 2017. My decades of experience with the Park Service spanned a variety of roles, including park ranger, superintendent of multiple parks, and regional director. In 2009, I was nominated by President Barack Obama to serve as Director of the National Park Service. I held that role from my Senate confirmation in October 2009 until January 2017.

3.     During my time with the NPS, including my term as Director, I gained extensive experience in the preparation, public involvement, alternative evaluation and decision-making in the application of the National Environmental Policy Act ("NEPA") to NPS resources and projects.

4.     I submit this Declaration in connection with the case of *National Trust for Historic Preservation in the United States v. National Park Service*. I am aware of the administration's plans

JA254

to build a new ballroom in the vicinity of the White House (the "Ballroom Project"). I understand that the administration has begun construction but has not yet finalized or publicized plans for the proposed ballroom.

5.    The purpose of this Declaration is to respond to Defendants' representations and arguments in Defendants' Supplemental Response, to share my experience with past NPS projects in the White House and President's Park ("President's Park"), on the White House grounds, and in the Residence itself, and to express my expert opinion as to the need for—and the standard practice of preparing—environmental impact statements ("EIS") in connection with projects carried out by the NPS and by other entities or on lands and resources under the stewardship of the NPS.

6.    I have reviewed the environmental assessment prepared by NPS in August 2025 for the Ballroom Project, and I have read Defendants' arguments in their Supplemental Response relating to NEPA issues. Supplemental Response at pp. 22-28. Based upon my experience and expertise, it is my opinion that NEPA's environmental assessment is deficient for several reasons. For one, the size and scale of the Project is inconsistent with the Comprehensive Plan for the White House and President's Park adopted in 2000. The Comprehensive Plan may not be changed by the issuance of an environmental assessment; an EIS is needed. *See infra* ¶¶ 10-11, 30. For another, any one of the adverse impacts identified by the NPS in the environmental assessment and FONSI is sufficient to trigger the preparation of an EIS and the associated requirement to obtain public comment. *See infra* ¶ 25. Finally, the environmental assessment makes no mention of – and fails to address -- a serious adverse effect associated with the Ballroom Project, the need "to remove toxic substances spread throughout the [East Wing] including asbestos and lead-based paint." *See* Declaration of White House Director of Administration Joshua Fisher, at ¶ 9. The assessment's

failure to evaluate the impact on the Project of these hazardous materials renders NEPA compliance incomplete. *See infra* ¶ 29.

7.    I have reviewed NPS's description of the Ballroom Project as it appears in the environmental assessment and FONSI materials. Based upon my experience and expertise, it is my opinion that the demolition of the East Wing and the Ballroom Project represent the most significant modification and change in the structure of the White House—with an equally significant impact on its immediate surroundings—since the comprehensive interior renovations during the Truman Presidency. In my opinion, a project of such magnitude, scale and scope necessarily requires NPS to comply with the requirements of NEPA by preparing an Environmental Impact Statement.

8.    As already stated, I have taken note of the several adverse impacts that appear in the NPS environmental assessment of the East Wing demolition and Ballroom Project. Based on my experience and expertise, it is my opinion that the East Wing demolition and Ballroom Project as described in NPS's environmental assessment would cause such impairment to the resources and values under the stewardship of the National Park Service as to prohibit NPS from proceeding with the project without being "directly and specifically" authorized by Congress. *See infra* ¶¶ 19-20, 35.

9.    President's Park, established in 1933, includes the White House and its grounds, Lafayette Park and Ellipse. It is a unit of the National Park Service. The White House was designated a National Historic Landmark in 1960, the highest standard of recognition of historic property by the federal government, The East Wing, the associated gardens and the historic trees are contributing elements to that National Landmark. In 2000, NPS Director Robert Stanton signed the Record of Decision for the Comprehensive Design Plan for the White House and President's

Park. 65 Fed. Reg. 25,747. The Comprehensive Plan describes and details the existing setting, gardens, and architectural elements of the White House and President's Park, and lays out the procedures required for making changes in the Plan, including mandatory consultation with several federal agencies.

10. The Comprehensive Plan was itself subject to an Environmental Impact Statement and to several formal reviews, approval, and public comment processes:

> A *Draft Environmental Impact Statement* that presented the proposed plan, three alternatives, and a no-action alternative, and that analyzed the environmental consequences of implementing the alternatives, ***was available for public review and comment from December 2, 1998 to March 11, 1999***. Public forums on the document were held at the White House visitor center on February 27 and 28, 1999. ***A total of 100 comments were received—29 from governmental agencies, business, and organization; 2 from students at educational institutions; and 69 from individuals***. All substantive comments were addressed in the Final Environmental Impact Statement, which was released on December 13, 1999, for a 30-day no-action action. A "Record of Decision" approving the adoption of the proposed plan was signed by the director of the National Park Service on March 29, 2000. The plan was approved by the Commission of Fine Arts on April 19, 2000, and by the National Capital Planning Commission on May 4, 2000.

*The White House and President's Park, Comprehensive Design Plan*, National Park Service, 2000), https://parkplanning.nps.gov/document.cfm?documentID=40077. (Emphasis added).

11. While serving as National Park Service Director, I also served as the Chair of the Committee for the Preservation of the White House from 2009-2017. In this capacity, I was involved, with others, in changes to the interior and grounds of the White House. While several of these changes were relatively modest, including the installation of a vegetable garden, the most significant of these was a project to upgrade the White House perimeter security fence. The White House fence project was the subject of frequent discussion with members of Congress, received

specific appropriations from Congress, and was submitted to both the Commission on Fine Arts and the National Capital Planning Commission.

12.     In 2011, as NPS Director, I issued Director's Order 12, *Conservation Planning, Environmental Impact Analysis, And Decision-Making* (https://www.nps.gov/subjects/policy/upload/DO_12_10-5-2011.pdf). Director's Order 12, in conjunction with NPS Management Policies and Handbook, provides detailed guidance—and sets forth specific procedures and practices—for the application of NEPA to NPS projects and resources.

13.     The background to Director's Order 12 sets forth the context for the order in harmonizing NEPA with the 1916 National Park Service Organic Act:

> NEPA requires all Federal agencies ***to (1) prepare in-depth studies of the impacts of and alternatives to proposed "major Federal actions"; (2) use the information contained in such studies in deciding whether to proceed with the actions; and (3) diligently attempt to involve the interested and affected public before any decision affecting the environment is made***. The 1916 Service Organic Act (16 U.S.C. 1 et seq.) directs the National Park Service to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." (16 U.S.C 1) Read together, the provisions of NEPA and the National Park Service Organic Act are consonant and jointly commit the Service to make informed decisions that perpetuate the conservation and protection of park resources unimpaired for the benefit and enjoyment of future generations. Planning, environmental evaluation, and public involvement in management actions that may affect national park system resources are essential in carrying out the trust responsibilities of the National Park Service. Particularly in this era of heightened environmental concern, it is essential that NPS management decisions (1) be scientifically informed, and (2) insist on resource preservation as the highest of many worthy priorities.

*Id.* at 1-2. (emphasis added).

14. Director's Order 12 requires that *all* NPS NEPA reviews must include "[m]eaningful participation by the public and other stakeholders"; "[d]evelopment and critical evaluation of alternative courses of action"; and "[r]igorous application of scientific and technical information in the planning, evaluation and decision-making processes." *Id.* at 3. This Order applies to environmental assessments as well as EIS.

15. The August 2025 environmental assessment and FONSI prepared by the NPS for the demolition of the East Wing and construction of the White House Ballroom does not meet the standards of the National Park Service as stated in Director's Order 12.

16. Director's Order 12 also includes a "Prohibition on Impairment," which bars the NPS from "taking or authorizing any action that would impair park resources or values *unless specifically authorized by Congress*." *Id.* at 4. (emphasis added).

17. The "Prohibition on Impairment" in Director's Order 12 operationalizes a broadly applicable heightened threshold for NPS review of activities proposed to take place within NPS resources, including (but not limited to) activities that implicate NEPA. Congress mandated this heightened standard through what is colloquially known as the Redwood Amendment, a 1978 amendment to the NPS Organic Act. See Pub. L. 95–250, H.R. 3813, 92 Stat. 163 (recodified at 54 U.S.C. § 100101(b)(2)).

18. The Redwood Amendment, now codified at 54 U.S.C. § 100101(b)(2), is unambiguous: "The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, **except as directly and specifically provided by Congress**." (Emphasis added).

19.     The National Park Service posts all NEPA documents on the Planning, Environment and Public Comment website (chttps://parkplanning.nps.gov/publicHome.cfm) known as PEPC. These documents include all environmental assessments and environmental impact statements.

20.     Advance notification in the Federal Register of the intent to conduct a NEPA evaluation of a proposed project *before* any demolition, construction, or onsite project activity commences is essential to the process of meaningful public deliberation and participation in the review of park resources. Both before and during my tenure as Director, the longstanding historical practice at NPS was to publish and solicit public comment on all NEPA materials, including environmental assessments, *before* any demolition, construction, or onsite project activity commenced.

21.     During my time as Director, I oversaw, reviewed, was briefed on or approved of hundreds of projects for which the National Park Service prepared an environmental assessment or an EIS to comply with its NEPA obligations. The NPS PEPC website shows public availability of over 500 Environmental Assessments and over 80 Environmental Impact Statements prepared by the NPS during my tenure as Director from 2009 to 2017.

22.     As Director, I was not involved in all of these NEPA projects. I was, however, briefed on and provided direct engagement on the most highly controversial and high-profile environmental assessments and impact statements. Examples of Environmental Impact Statements include Winter Use (snowmobiles) in Yellowstone National Park, the Merced River Plan in Yosemite, Oyster farm removal in Point Reyes National Seashore, Overflights at Grand Canyon National Park, Off Highway vehicles at Glen Canyon NRA, Glen Canyon Dam operations and the flows of the Colorado River through the Grand Canyon, improvements to the Moose Wilson Road at Grand Teton National Park, reintroduction of wolves to Isle Royale National Park, restoration

7

JA260

of the Mariposa Grove of Giant Sequoias in Yosemite, and the construction of a bridge on the Tamiami Trail to allow passive waterflows into Everglades National Park.

23.    In my experience, projects frequently changed after the receipt of public comments. This was particularly true for projects of any significant public interest. During the entirety of my experience at NPS, including my tenure as Director, NPS carefully considered and responded to public comments, and it endeavored to address or mitigate environmental impacts raised by commenters, including such impacts to cultural or historic qualities of park resources. For instance, the Winter Use Plan for Yellowstone National Park received over 50,000 public comments that helped shape the final decision to balance appropriate public access with resource conservation.

24.    I recall a particular proposal, as a part of the new general management plan for Assateague National Seashore to relocate a parking lot and public beach access point, due to projected climate and sea-level-related erosion impacts to the then-existing site. In response to a series of NEPA reviews beginning in 2013, including multiple published environmental assessments, NPS received significant public opposition to the relocation of this parking lot. The agency first recommended the NEPA process by conducting a new environmental assessment with additional alternatives in 2015, before deciding not to pursue the project at that time in light of the public reaction. *See Assateague Island National Seashore (AINS) Parking Lot Relocation*, Adaptation Clearinghouse, https://www.adaptationclearinghouse.org/resources/assateague-island-national-seashore-ains-parking-lot-relocation.html (last updated Jan. 29, 2016). The NPS later adopted a different parking and beach access renovation plan. *See Beach Relocation and Habitat Restoration Projects,* U.S. Fish & Wildlife Service, https://www.fws.gov/refuge/chincoteague/beach-relocation-and-habitat-restoration-projects (last accessed Jan. 5, 2026) (describing a "multi-decade planning and engagement process" conducted

by NPS and the Fish and Wildlife Service to "carefully consider[] substantial public input and comments that informed the current strategy").

25.    I am unaware of any instance—other than NPS' environmental assessment of the Ballroom Project—of NPS preparing an environmental assessment without *contemporaneously* making that document available for public review before any action was taken. The failure to publish the Ballroom Project environmental assessment is contrary to decades of historical practice and guidance at NPS. It also violates the statutory mandate that such assessments be public documents. It is fundamentally inconsistent with the agency's statutory stewardship mission over the national parks.

26.    I understand that NPS was responsible for approving and managing the Ballroom Project when it prepared its environmental assessment in August 2025, but that the Office of the Executive Residence (EXR) took control of the Project at some point thereafter. That office is currently in charge of the Project. I am not aware of any other occasion where NPS prepared a NEPA review, but another agency subsequently asserted control over the project.

27.    EXR has little if any experience managing construction projects of any size, and, in my opinion, no experience at all managing a project the size and importance of the Ballroom Project. The National Park Service, on the other hand, has extensive experience in the design and construction of buildings throughout the entire National Park System. Teams of architects, engineers, and project managers work out of the NPS Denver Service Center, and the various regional offices to carry out construction projects on some of the most important and sensitive lands in the United States. Projects such as the repair of the Washington Monument after the 2011 earthquake, or the new exhibit space in the undercroft of the Lincoln Memorial are projects overseen and managed by the NPS. NPS is also involved in projects that are funded, in part, with

philanthropic donations. Although partially funded by private donations, such projects are still required to meet all the policies and standards of the National Park Service.

28.     Based on my extensive experience with NEPA reviews conducted by NPS, it is my opinion that President Trump's proposal for a new ballroom—including the demolition of the East Wing and subsequent construction—requires preparation of an EIS, public notification, public meetings and opportunity to comment, a range of alternatives, and a consideration of impacts to the natural and cultural resources of President's Park.

29.     The Declaration of Joshua Fisher, ¶ 9, indicates highly toxic substances, including asbestos and lead paint were present in the East Wing. The demolition of the East Wing would have disturbed these highly toxic substances, potentially impacting air quality, health of the workers and employees and visitors at the White House and site soils, requiring mitigation and remediation during and after deconstruction. There is no mention of either asbestos or lead paint in the NPS Environmental Assessment.

30.     The proposed ballroom size (90,000 square feet) and scale are incompatible with the 2000 Comprehensive Design Plan for the White House, which was the subject of an EIS and Record of Decision. The Comprehensive Design Plan for President's Park is equivalent to a General Management Plan prepared for a national park, and subject to an EIS and Record of Decision. Deviations from those plans and proposals evaluated in the park plan that significantly impact the park's primary resources require, by both policy and practice (see Director's Order 2, Park Planning), a new or revised EIS. In my opinion, demolishing the East Wing and replacing it with a larger structure would require a modification of the original EIS for the Comprehensive Plan. It is also my opinion that the NPS environmental assessment should have concluded that due

to the significant impacts to the primary resource of the park (the White House itself) that a full EIS would be necessary.

31.    The Ballroom Project environmental assessment and FONSI identified numerous adverse impacts, each of which alone (and certainly in combination) should have been deemed "significant" and should have triggered the preparation of an EIS. As laid out in the FONSI, these impacts include:

a.    The Ballroom Project's effect on the landscape "originally designed by Thomas Jefferson" "will result in long-term adverse effects on the cultural landscape." FONSI at 5.

b.    The deconstruction of the East Wing will "result[] in the permanent loss of a component that has been integral to White House operations since 1942." *Id.* at 6.

c.    The Ballroom will "disrupt the historical continuity of the White House grounds" and "creat[e] a visual imbalance with the more modestly scaled West Wing and Executive Mansion." *Id.*

d.    The Ballroom Project will "introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features." *Id.*

e.    The Ballroom Project "will result in a substantial change to one portion of the [National Historic Landmark]." *Id.*

f.    The Ballroom Project "will adversely affect the design, setting, and feeling of the White House and the grounds over the long-term." *Id.* at 6, 15.

g.    "The removal of the current East Wing will result in a permanent adverse impact for those who value the experience of this specific space." *Id.* at 7.

32.    The NPS environmental assessment of the Ballroom Project also makes clear that the Executive Office of the President imposed requirements that the NPS should have rejected, contested, or modified. The project requirements included "[1] immediate adjacency to the Executive Mansion, [2] a direct ceremonial procession from the East Room into the venue, and [3] enclosed second-story access from the Executive Mansion." Environmental Assessment at 29. The combined effect of these requirements is to foreclose meaningful alternatives. But considering

alternative ways of achieving a project's objective is a routine and required component of NEPA analysis at NPS. Defining a project with requirements so narrow as to foreclose consideration of any alternatives contravenes the Park Service's stewardship mission and non-impairment mandate. At a minimum, the EA should have considered (and not summarily "dismissed from detailed analysis") alternatives that evaluated a new ballroom at different scales, with at least some designs more consistent with the architectural size and scale of the existing east wing.

33.     The absence of express approval from Congress for the Ballroom Project violates the NPS non-impairment mandate set forth in the Redwood Amendment and operationalized by Director's Order 12. Applying Director's Order 12 to the Ballroom Project, demolishing a major historical structure such as the East Wing of the White House and replacing it with a massive and disproportionate ballroom would "impair park resources or values" and would not be permitted unless "specifically authorized by Congress." Director's Order 12 at 4.

34.     While the NPS Environmental Assessment does not mention funding for the construction of the new ballroom, the Defendants' Supplemental Response states that construction is being privately funded and routed through the Trust for the National Mall, which is in turn donating those funds to the National Park Service gift fund, 31 U.S.C. § 1321(a)(17).

35.     In 2016, as NPS Director, I issued Director's Order 21, *Donations and Philanthropic Partnerships* (https://www.nps.gov/subjects/policy/upload/DO_21_12-28-2016.pdf). Director's Order 21, in conjunction with NPS Management Policies and Handbook, provides detailed guidance—and sets forth specific procedures and practices—for engaging in philanthropic partnerships, reviewing and accepting donations, and maintaining the integrity and impartiality of the National Park Service.

36.      Construction projects in units of the National Park System, even when fully funded by private gift funds, must follow the same evaluation process as federally-funded construction projects. See Director's Order 21. This process requires submitting a privately-funded design to the NPS Development Advisory Board for its review and approval. This essential requirement prevents wealthy individuals from funding the construction of buildings or monuments to celebrate themselves on public property. It prevents the NPS from taking on – in perpetuity – the task of managing a poorly designed or incompatible facility within a unit of the NPS. To my knowledge, the White House ballroom design has not been subject to this review.

JA266

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Jonathan B. Jarvis

Executed this 20th day of January, 2026.

```
                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - x
NATIONAL TRUST FOR HISTORIC          CV No. 1:25-cv-04316-RJL
PRESERVATION IN THE UNITED STATES,


                     Plaintiff,
v.                                   Washington, D.C.
                                     Thursday, January 22, 2026
                                     3:30 p.m.
NATIONAL PARK SERVICE, et al.,


                     Defendants.
- - - - - - - - - - - - - - - - - - x
```

_____

        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
         HELD BEFORE THE HONORABLE RICHARD J. LEON
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiff:     Thaddeus A. Heuer, Esq.
                       Gregory B. Craig, Esq.
                       Jack C. Smith, Esq.
                       FOLEY HOAG, LLP
                       155 Seaport Boulevard
                       Boston, MA 02210
                       617-832-1187


For the Defendants:    Adam R.F. Gustafson, Esq.
                       Jacob M. Roth, Esq.
                       Brantley Mayers, Esq.
                       Eitan Sirkovich, Esq.
                       Marissa A. Piropato, Esq.
                       Gregory M. Cumming, Esq.
                       Michelle M. Ramus, Esq.
                       DOJ-Enrd
                       Environment and Natural Resources Division
                       950 Pennsylvania Avenue, NW
                       Washington, DC 20530
                       (202) 718-0703


Court Reporter:        Timothy R. Miller, RPR, CRR, NJ-CCR
                       Official Court Reporter
                       U.S. Courthouse, Room 6722
                       333 Constitution Avenue, NW
                       Washington, DC 20001
                       (202) 354-3111

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Your Honor, we are on the record in Civil Matter 25-4316, National Trust for Historic Preservation in the United States v. National Park Services, et al.

Beginning with plaintiff's counsel, please approach the podium and identify yourselves for the record.

MR. CRAIG:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. CRAIG:  My name is Gregory Craig from the Law Firm of Foley Hoag and we represent the plaintiff, the National Trust for Historic Preservation in the United States.  I'd like to introduce my partner Tad Heuer and my colleague Jack Smith.  Tad will be arguing for us today.

THE COURT:  Very good.  Thank you very much.

MR. CRAIG:  Thank you.

MR. GUSTAFSON:  Good afternoon, Your Honor.  Adam Gustafson on behalf of the federal defendants.  With me at counsel table are Brett Shumate -- I'm sorry, Brett Shumate is not here.

THE COURT:  Who are we starting with?

MR. GUSTAFSON:  With me at counsel table are Jacob Roth, who will be arguing the bulk of the case today.

THE COURT:  What do you mean "the bulk of the case"?

MR. GUSTAFSON:  I will be --

THE COURT:  I don't do multiple advocates.  You should have checked in advance.

MR. GUSTAFSON:  Oh, I'm sorry, Your Honor.

THE COURT:  I have one advocate per side.

MR. GUSTAFSON:  Understood, Your Honor.  We planned only to have a separate advocate for the NEPA argument.

THE COURT:  Don't need it.  Don't even need an argument on the NEPA issue.

MR. GUSTAFSON:  Thank you, Your Honor.

With me at counsel table are Jacob Roth --

THE COURT:  Which is which now?

MR. GUSTAFSON:  Jacob Roth will be arguing the case.

THE COURT:  You're going to argue it?  Okay.

Who's the next person now?

MR. GUSTAFSON:  Brantley Mayers.

THE COURT:  What's the name?

MR. MAYERS:  Brantley Mayers.

THE COURT:  Where are you from?

MR. MAYERS:  Department of Justice, Civil Division.

THE COURT:  Civil Division?

MR. MAYERS:  Yes, sir.

JA270

THE COURT:  Federal Programs Branch?

MR. MAYERS:  Counsel to the Assistant Attorney General.

THE COURT:  Counsel to the AAG?  Okay.

MR. GUSTAFSON:  Eitan Sirkovich.

MR. SIRKOVICH:  The Civil Division --

THE COURT:  Okay.

MR. GUSTAFSON:  Marissa Piropato.

MS. PIROPATO:  ENRD, DOJ.

THE COURT REPORTER:  I can't hear these people.

MR. GUSTAFSON:  Greg Cumming.

THE COURT:  Speak loudly.

MR. CUMMING:  Also from the Environmental Division, Your Honor.

MR. GUSTAFSON:  And Michelle Ramus.

MS. RAMUS:  Also from the Environmental --

THE COURT:  Very good.

Okay.  So obviously, we're here for a PI argument. I've read your papers.  They were well done.  I compliment both sides on the hard work and the good job you've done with your pleadings.

There are a lot of issues at play here, especially ones that are novel.  A lot of them.  And we have limited time.  Twenty minutes.  Twenty minutes.  Five-minute rebuttal.  That's it.  That's what you've got today.  I want

to make sure certain issues are addressed.  So I'm going to list them to you.  Make sure you cover these issues.  Okay?

First, the president's constitutional authority to construct the ballroom.  I appreciate that the Government chose not to focus on this issue in their brief.  That's your choice.  But if you're not arguing the president is acting pursuant to his constitutional authority, I want you to state clearly -- emphasis on the word "clearly" -- where the president gets the authority to demolish the East Wing and construct the ballroom.  Okay?  If you disagree, you know what you want to say on that issue.

Second, the funding mechanism.  The briefs talk about a gift authority through the National Park Service. I'd like the parties -- and especially the Government -- to explain what's going on in plain English, why this Rube Goldberg contraption gives the president authority to destruct and construct the ballroom with private funds.

Third, statutory authorization, 3 U.S. Code Section 105(d).  I want the parties to explain their interpretations of that statute, talk about whether and how it authorizes what the president is doing.

Fourth, and relatedly, what are the limits on your arguments?  Is there anything the president cannot do in the White House under 3 U.S. Code Section 105(d) and the private funding mechanism?  Where's the line between what is

JA272

permitted and what is not permitted?  I'm interested in hearing from both parties on what you think the dividing line is for Section 105(d).

Finally, I'd like each side to address irreparable harm and the balance of equities.

As I said a minute ago, the moving parties will have 20 minutes, plus 5 minutes for rebuttal.  Government will have 20 minutes.

You can go first.

MR. HEUER:  Thank you, Your Honor.  Tad Heuer on behalf of the National Trust for Historic Preservation.

I do want to start by addressing standing briefly, because the Government's mentioned --

THE COURT:  Don't spend any time on standing.

MR. HEUER:  Excellent, Your Honor.

THE COURT:  And don't worry about it.

MR. HEUER:  Then I do want to go through the Court's three questions which, I believe, is going to answer the questions you have just raised.

THE COURT:  There were four.

MR. HEUER:  Correct.  There were four questions?

THE COURT:  There were four.  Your notes aren't so good.

MR. HEUER:  I believe it was the --

THE COURT:  President's constitutional

JA273

authority --

MR. HEUER:  Oh, I understand, Your Honor.

THE COURT:  -- funding mechanism, the statutory authorization under 105(d), and limits on Government's arguments.

MR. HEUER:  Correct.  I was referencing the three questions that you posed in the TRO order which will address the four that you've just outlined now.

So -- and I do have a question for you on NEPA. Do you want to hear about NEPA or not?

THE COURT:  No.

MR. HEUER:  Okay.  And I will conclude on the Winter factors and irreparable harm.

I want to start just briefly with the Court's question, because I think it frames it well, the first question you asked in the TRO order, which was, does the Court -- does the president have congressional approval authority historically to construct something at the White House?  And our answer to that, as you know, is yes.  The annex details this in what we think is significant detail. For 230 years, the presidents have routinely obtained that congressional approval.

THE COURT:  The only two instances that I recall are the swimming pool for Gerald Ford and the tennis court for President Trump.

JA274

MR. HEUER:  I believe you are reading from my notes, Your Honor.  Indeed, those are the two.

THE COURT:  I don't want the press to get the wrong impression.  I'm not reading from your notes.

(Laughter.)

I have no idea what your notes look like.

(Laughter.)

MR. HEUER:  If you had let me continue, I would have said the only two exceptions are a pool and a cabana built by the Ford administration and a tennis changing room built by the first Trump administration.  Our position is that both of those are de minimis in size.  They are both for the president's personal use; they are not publicly visible; and, most importantly, they were not challenged for a lack of congressional authorization.  In contrast, a 90-thousand-square-foot ballroom is not de minimis; is not for personal use; is highly visible; and is being challenged.  Those exceptions do not prove a rule.

The answer to the second question you posed is no. The president has neither constitutional nor statutory authority to construct a ballroom, much less demolish the East Wing.

THE COURT:  The Government suggests 105 gives him that authority.

MR. HEUER:  They do.

JA275

USCA Case #26-5134   Document #2172336   Filed: 05/07/2026   Page 282 of 525

THE COURT:  You disagree, obviously.

MR. HEUER:  I do.  Could I speak briefly to constitutional and get that out of the way and then spend time on statutory?

THE COURT:  Sure.  You can do it briefly.  Go ahead.

MR. HEUER:  So on the constitutional question, you asked them if -- you asked what the Government's position was.  I believe they stated plainly on Page 12 of their supplemental brief they agree that the president does not have authority to construct the ballroom under the Constitution.  They state, quote, "nor is the president relying here on constitutional authority.  He is relying on a delegation of authority from Congress," end quote.  And to be clear, our understanding is that the Government is now conceding that if there is no statute that expressly authorizes the president to build a ballroom, they lose on the merits.

So let's go to that statutory authority.  I think we need to frame it just briefly for everyone's benefit that we're talking about 8106 as well as 105(d).  So --

THE COURT:  Well, 8106 is pretty straightforward.

MR. HEUER:  We believe so.  It has three elements.  You cannot construct a building or a structure -- they concede that this is a building or structure -- on any park

JA276

or public grounds of the Federal Government in the District -- it is clear that the White House is in President's Park and we are in the District -- without express authority of Congress.  Our position is that Congress has not provided express authority.

So in response, the statute that they volunteer is 3 U.S. Code 105(d), and that authorizes Congress's annual White House maintenance allowance.  Their claim, as we understand it, is that in enacting 105(d), which only authorizes appropriations for things like maintenance, repairs, alterations, refurnishing, heating, air conditioning, and by appropriating under that authorization statute only $2-and-a-half million this year, Congress was expressly approving demolition of the East Wing and construction of a 90-thousand-square-foot ballroom to be funded with $400 million of private funds funneled through the Park Service's gift statute.

That appears to be their position, because it's the only way they can get to anything remotely close to a congressional authorization.  And our response is this: Section 105(d) is not an express approval of Congress to build a 90-thousand-square-foot ballroom.  As we all know from Whitman, Congress does not hide elephants in mouseholes.  Like every other congressional appropriation, 105(d) is limited by what it is expressly appropriated for

JA277

Case 1:25-cv-04316-RJL   Document 38   Filed 01/26/26   Page 11 of 48
USCA Case #26-5134   Document #2172336   Filed: 05/07/2026   Page 284 of 525

11

and by the amount that was expressly appropriated.  And, crucially, under 105(d), it's even more narrow.  It says expressly "appropriated under this" statute -- "under this subsection."  That means 105(d).

Their position, going to your question about the gift statute -- and I will confess that we are as confused about how this works as they -- as you are -- their position is that you can use the Economy Act plus authorizations under the gift statute to make something a 105(d) congressional authorization simply by putting it in the same bank account that OMB has established for those repair funds.  We think that that is simply not the law.  Section 105(d) is a maintenance allowance.  It is not a freestanding delegation of unlimited congressional authority for construction to the president.  And that makes sense, because the president is a temporary tenant of the White House.  He isn't the landlord.

THE COURT:  He's the steward.

MR. HEUER:  "Steward" is a word that we would accept, as well.  He is a steward, but he is not the owner. We know that because the Property Clause vests authority in the United States's property in Congress.  And Section 8106 means what it says.  Ballroom construction requires an express congressional approval that 105(d) does not provide and which the defendants do not have.

JA278

Now, in their supplemental brief, the defendants have helpfully highlighted that there's actually a second congressional approval that they need but do not have, and that's the so-called Redwood Amendment to the National Park Service's organic statute, and it's called the Redwood Amendment because it was dealing with the redwoods out in California when it was passed in 1978, but it also has many other changes that were made to the statute. And that statute -- the amendment -- requires the Park Service to do two things: one -- among other things -- conserve historic objects and leave them, quote, "unimpaired for future generations"; and it forbids contrary action, quote, "except as directly and specifically provided by Congress," end quote.

So we have a Park Service that has an obligation to conserve and not impair assets within its control, and the White House is certainly one of those assets, and if it wants to do so, Congress has made it very clear: "You've got to come to us to ask for permission," a reservation of its rights, and the defendants admit that the ballroom is being funded through Park Service gift funds in some way. Our point is this. Where the Park Service is disbursing those discretionary funds -- and they are certainly discretionary, because the Park Service has no obligation -- ministerial obligation to hand them directly over to do

ballroom construction.  It's a gift statute.  It can use them in any national park it wishes.  When it has chosen to expend them here, it has made a discretionary determination as an agency in a way that plainly impairs the historic White House complex.  When it does so, it needs congressional approval under the Redwood Amendment.  It does not have it.

You asked whether there were any limitations to what the president can do under 105(d).  We think the answer is clear.  He can do exactly what 105(d) authorizes him to do and no more.  It's not just the express language of 105(d) which, as I note, talks about care, maintenance, repair, alterations, heating, air conditioning, refurnishing.  Those are things that he is doing with the $2.5 million he has been allotted.  It's even less than that, however, because we would note that the 105(d) is merely the authorization statute.  Every year, Congress has to appropriate within that statute.  They pick how much money and they can say what that money is being used for. And that's what they did last year in 2004 [sic].  And that language says that 2.475 million was appropriated for, quote, "required maintenance, resolution of health and safety issues, and continued preventive maintenance." Required maintenance, health and safety issues, and continued preventive maintenance.  None of those are a

JA280

ballroom.  They don't even talk about the other elements in 105(d).  Congress is very clear this amount of money is being given to the president to do what he wishes as long as it is consistent with the limitations they have placed on him.

THE COURT:  And by authorizing the funds, Congress retains the oversight capacity that it has --

MR. HEUER:  Of course it does.

THE COURT:  -- to make sure that it is being used consistent with its authorization.

MR. HEUER:  Of course it does.

THE COURT:  In this case here, we're using private funds.  There's no authorization oversight -- appropriations oversight.

MR. HEUER:  That is correct.  The only oversight is over the National Park Service's funds.  They've claimed the Park Service isn't involved.  There is an open question about how the Park Service, if it is not involved, is able to give those funds to EXR and why the Park Service does not itself have to comply with NEPA when it is making determinations -- a major federal action of using $200 million to $400 million for a purpose that is not otherwise authorized.  In and of itself -- I know you don't want to talk about NEPA -- but that itself is a major agency action that would require them to comply with NEPA separate and

JA281

apart from EXR.  It's Park Service agency funding that is being discretionarily used for a major federal project.  That is NEPA.

I want to talk briefly, if you'll indulge me, about the question about whether EXR is an agency because you asked it.  If you want me to move on, I can, but that was one of the questions in the TRO briefing, and we briefed it.  If you believe the papers are fine, we are happy to move on.

THE COURT:  I think the papers are fine.

MR. HEUER:  Okay.

On the question of irreparable harm, I want to be clear that procedural injuries like NEPA non-compliance are redressable irreparable harms.  So NEPA, as we know, is an information-forcing statute.  Its process is its purpose.  And this court in Brady as well as the Circuit in Oglala Sioux have held that a procedural violation of NEPA combined with an environmental or aesthetic injury -- which we've shown here -- establishes irreparable harm.  Otherwise, the government could act as it has here.  They would claim that review of NEPA actions are unripe until they are moot, and that's not the law.

We would note that the harms are --

THE COURT:  You say the D.C. Circuit has said that?

JA282

MR. HEUER:  In Oglala Sioux which is the case that we cite.  I have given the spelling to the stenographer because I understand it's, you know, not everyone's rolling off the tongue.

Nor are the harms speculative here.  Construction is ongoing.  The defendant's engineer, anonymous as though he may be, concedes that anything other than modest changes to the design at this point would be costly and time consuming.  Their own architect -- their new architect -- indicated to the NCPC just last week -- two weeks ago now -- that the location is set and has been for a while.  We know, when we're looking at NCPC and CFA, that they still have not submitted actual plans.  They have submitted pretty pictures, renderings of elevations.  They have done that for neither NCPC nor CFA.  The public has not had an opportunity to comment.  Indeed, the plan for NCPC, as we understand it, is that they will accept public comment on March 5th which is the same day they propose to have the NCPC vote.

THE COURT:  I don't think, in -- aboveground construction is scheduled to begin until May, I think.

MR. HEUER:  They wanted to build -- start aboveground construction on the colonnade, which connects to the ballroom, this month in January.  So they wanted -- belowground construction was on that in January.  Aboveground, not until April.  But, again, there's a

JA283

question here of what is ripeness and mootness.  The NCPC statute and the CFA require approval before you can do something.  They are approving the mass, the size, the bulk.  You've seen the affidavit -- or the declaration from our expert, the former president of the national association --

THE COURT:  Mr. Bates.

MR. HEUER:  -- American Institute of Architects, Mr. Bates.  You had asked last time, you know, for counsel not to play architect.  So we heard you and we got a real architect; someone who, I think, has rather unimpeachable credentials.  He has said that any time you are building a foundation, you are, by definition, in many ways -- particularly for a building of this size -- setting what happens aboveground.  Partly, I think, that's because of the laws not of this court but of gravity, but also it's because you are establishing many different conduits, underground utilities, fixing --

THE COURT:  Elevator shafts and --

MR. HEUER:  Exactly.  Those things.  Once you have said your location is set, as their architect has now informed the NCPC, means that you're not putting it somewhere else.  You're not putting it underground, for instance, as the White House comprehensive plan from 2000 created by the Park Service -- took them several years.  They consulted with dozens of experts, said:  You're right.

We do need additional space for meetings and the like at the White House.  Where should it go?  It should go underground.  And why should it go underground?  To avoid anything more than minor intrusions above the surface.  That went through an EIS.  Here, they have decided to simply ignore the comprehensive design plan that the Park Service established 25 years ago and said:  We just want to do something else.  Again, this goes to the fact that there is harm that is ongoing because they have decided to establish different parts of the construction unabated, because they're continuing to do it, that are foreclosing alternatives and constraining design options now.

THE COURT:  You've got a few minutes left on your --

MR. HEUER:  Indeed.

THE COURT:  -- 20 minutes.

MR. HEUER:  Finally, I think we would say that the defendants are not going to be harmed --

THE COURT:  Excuse me.

MR. HEUER:  Yes?

THE COURT:  I was about to say something.

MR. HEUER:  Oh, my apologies.

THE COURT:  It makes an easier job for the court reporter if you wait.

If you want to address irreparable harm, this

JA285

would be a good time to do it.

MR. HEUER:  Yes.

As we've just noted, you know, we think that these procedural issues are not merely procedural.  They are tied to injuries that do create them as irreparable harms.  They are not speculative because the ongoing construction means that they are ongoing.  They are establishing and narrowing those design options as we speak because every, you know, construction truck full of concrete that gets poured, the harder it comes and the more they are saying:  We can't change.  That's the irreparable harm.  It is not irreparable harm only when the building is already being built aboveground.  Irreparable harm is occurring now because they are narrowing the parameters of what they can build, even though they have not gone through NCPC, CFA, NEPA, and getting congressional approval to erect a building.

THE COURT:  If one of the issues that you're concerned about is the height of the East Wing, wouldn't it be possible architecturally to always go smaller as opposed to going larger?

MR. HEUER:  Again, having been instructed not to play architect, I'm not sure that I'm the best to answer that, but my understanding from Mr. Bates's affidavit is that that is not necessarily true; that once you've established certain widths, depths, heights, bringing the

JA286

building down, you've created structural elements at the periphery that will indicate how tall it can be.  Maybe you can take a little bit of height off.  I think we saw that at NCPC two weeks ago.  Their architect said:  Maybe I could do a little bit on height.  But he wasn't indicating that he could do a lot.  He was actually saying that the building is now going to be as tall as the Executive Mansion.  Before, our understanding was it was, you know, potentially slightly shorter.  It appears that it may be slightly taller than originally proposed.  But our understanding from the affidavit -- and I would refer to the affidavit -- is that simply making a building shorter is not necessarily something you're going to do with your foundation work.

I think the other thing I would note is this.  You can make a very short, squat building.  Architects refer to something called, you know, the golden ratio.  And the golden ratio is how you build, you know, buildings like those in ancient Greece.  They're what the White House is aesthetically modeled upon.  Once you start just saying, "I'm going to lop off 10 or 12 feet," without making changes to your width and your depth, you have created, you know, potentially an even more asymmetric building and an even more obviously inappropriate building than what is being proposed.  So that's why your width and your depth do have a direct relationship to your height.

Finally, I'd note that the defendants will not be harmed by a temporary pause that allows them to follow the law.  Their claim that they need to continue construction to avoid leaving what they call a, quote, "unsightly excavation site" is bold indeed.  Equity does not reward the party for creating the very problem it, then, invokes to avoid relief.  And the Trust is not asking the Court to enjoin construction of the bunker or to compromise presidential security.  That is not the aim.  As the Court knows, we were not even aware that that was a factor and a feature here until the defendants filed their opposition to the TRO in December.  The Trust is simply asking the Court, as in our proposed order, to enjoin construction of the ballroom until the defendants follow the law.

If the Court has no further questions, I will reserve for reply.

THE COURT:  Five minutes for rebuttal.

Mr. Roth?

MR. ROTH:  May it please the Court.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. ROTH:  Jacob Roth from the Civil Division.

THE COURT:  Welcome.

MR. ROTH:  I was planning to start with standing.  I would love to spend a couple minutes if -- I won't if Your

JA288

Honor doesn't want me to, but I --

THE COURT:  Not necessary.

MR. ROTH:  Okay.

THE COURT:  I'm comfortable with standing in this --

MR. ROTH:  Excuse me, Your Honor?

THE COURT:  I'm very comfortable with standing in this case.

MR. ROTH:  Okay.

THE COURT:  Sorry to disappoint you.

MR. ROTH:  Okay.  Yeah.  I mean, it -- I don't see it, but --

THE COURT:  You'll get your chance at the Court of Appeals.

MR. ROTH:  Okay.  I was going to address next the "cause of action" question of what is the cause of action under which they're proceeding.  I -- if Your Honor doesn't want to hear about that either, I can move on.

THE COURT:  You can take a minute on that one.

MR. ROTH:  Okay.  I'll take a minute on that.

I think the Trust does need a cause of action.  I don't think they have one here because they are, for the most part, purporting to proceed under the APA.  And that tees up the question that Your Honor asked in the TRO which is, is the entity that is running this project an agency

JA289

under the APA?  The entity that is running the project is the Executive Residence, EXR.  I don't think there's a factual dispute about that at this point.  And the D.C. Circuit has already decided in the Sweetland case that EXR is not an agency for purposes of FOIA which is broader than APA.  So necessarily also for purposes of the APA.  Now, the Trust argues that the role of EXR is different now than it was then, but the D.C. Circuit has been very clear that agency status doesn't toggle on and off based on the particular functions at issue.  Once you're in, you're in. If you're out, you're out.  And the D.C. Circuit has decided that EXR is out.  And so that leaves them without a cause of action under the APA.

I'd also just note it is not the case that this is somehow so beyond the scope of EXR's traditional role that it's, you know -- reflects some sort of attempt to circumvent.  The role of EXR is to manage the house and to oversee the ceremonial functions that go on there, and the purpose of this project is to improve and modernize the house and to make it possible to host these large ceremonial events that currently are being done in tents on the lawn. So this is right within the wheelhouse of EXR, and it also reflects the president's personal involvement in the project.  He cares about this, and so he wanted to keep it in-house with his own personal staff who are advising and

JA290

assisting.  That's EXR's job and that's why EXR is running this project.

I think that leaves them without a cause of action under the APA.  Some of the other defendants are agencies under the APA, but those other defendants are not -- they're not running the project.  And so there's no agency action there to set aside that would remedy the injuries that are alleged to the Trust.

Beyond the APA, plaintiffs only raise what they call "separation of powers" claims.  And I think Your Honor's opinion in Appalachian Voices from this summer explains why that doesn't work either.  As we'll get to and as Your Honor's questions alluded to, this ultimately comes down to a fight that we have -- a disagreement we have about the statutory authority that the president and the executive branch has.  And when you're disputing the scope of executive authority and whether the executive has gone beyond the scope of that statutory authority, it is not a constitutional claim.  That's what Dalton says.  That's what this Court explained in Appalachian Voices.  It's just a statutory claim.  To bring a statutory claim, you need a cause --

THE COURT:  He's conceded he doesn't have constitutional --

MR. ROTH:  We are not resting on constitutional

JA291

authority to undertake this project.  We're resting on statutory authority -- and we'll get to that because that's what Your Honor asked about -- under 105(d) and the Interior gift authority.

THE COURT:  You'd better cover 8106 in the process --

MR. ROTH:  I'm going to start with the --

THE COURT:  -- as well because that's --

MR. ROTH:  Yeah.

THE COURT:  -- kind of --

MR. ROTH:  Yeah.

THE COURT:  -- pretty straightforward.

MR. ROTH:  8106 is on the table, too.  8106, of course, is a statute.  And they claim we're violating the statute.  We say we're not.  I'll get to the merits of that, but for present purposes my point is just -- well, they're all statutory disputes.  If you want to bring a statutory dispute to a federal court to resolve, you need a cause of action to do that.  And that's not the technicality.  That speaks to whether Congress intended for courts to resolve these kinds of disputes.  And if they don't have a cause of action under the APA and there's no real constitutional claim -- they have not brought an ultra vires claim, and that's another non-statutory cause of action that's out there.  They have not pressed that.  That's not in their

JA292

complaint.  It's not in their amended complaint.  It's not in their briefs.  They haven't tried to satisfy the standards that apply to ultra vires claims which are high standards, as Your Honor knows.  And so I just don't see what they're proceeding under with respect to these statutory disputes.  And I'm -- and, again, I'm not going to address them on the merits, but I do think, before one gets to the merits of those statutory questions, we have to figure out what is the cause of action under which this plaintiff, even assuming standing, has a basis to proceed in federal court and ask the Court to step in and resolve the question.

All right.  Turning to the merits, then.  And I'm going to skip the consultation claims for now and get to the questions the Court asked.  And I think they're largely moot, given the -- that the process for those consultations has happened, as we represented at the last hearing that they would.  That process is underway.  All the details are spelled out in Heather Martin's declaration attached to our supplemental opposition.  So I think that's largely off the table.

I'll turn to 8106.  And I -- the Trust's argument is the president can't build any structures on the White House grounds without express approval from Congress.  I think that the history is a powerful refutation of that

JA293

claim, because the Trust has not identified a single structure that the president has erected since the enactment of the statute for which Congress provided express authority.  And there are at least four: the West Wing project in the '30s, the East Wing project in the '40s, the pool in the '70s, and the tennis pavilion more recently.  Those are all new structures, and there's no evidence of Congress specifically approving any of those structures.

THE COURT:  Well, they approved it through the appropriations process, did they not?

MR. ROTH:  Correct, Your Honor.  So there are appropriations for at least two of the four, and that's what the Trust points to.  They say:  Well, the West Wing project, you know, that was under this public works --

THE COURT:  And what comes with the appropriations authority?

MR. ROTH:  Well, I know --

THE COURT:  It's not a trick question.

MR. ROTH:  Yeah.  No.  Your Honor mentioned earlier that oversight comes with the appropriations --

THE COURT:  Exactly.

MR. ROTH:  -- authority.

THE COURT:  Oversight.

MR. ROTH:  Yeah.

THE COURT:  And in this case, there's been an

JA294

end-run around that congressional oversight --

MR. ROTH:  Well --

THE COURT:  -- has there not?

MR. ROTH:  I don't think so, Your Honor --

THE COURT:  Rube Goldberg contraption --

MR. ROTH:  I would push back on that for a couple of reasons.

THE COURT:  Go right ahead.

MR. ROTH:  So first, actually, the oversight under 105(d) is very limited because 105(d) specifically says -- well, I'll pull it; I have the text --

THE COURT:  I've got it here.

MR. ROTH:  -- that such sum shall be accounted for solely on the certificate of the president, and the role of the Comptroller General is very -- is narrow with respect to -- it's only for the -- solely for the purpose of verifying that all such expenditures related to expenses in --

THE COURT:  Slow down.  Slow down.  You've got the reporter here.

MR. ROTH:  Sorry.

The exact wording isn't necessarily critical.  My point is 105(d) actually reduces the ordinary oversight that applies which reflects that Congress traditionally has given the executive pretty broad discretion in determining how to

JA295

make alterations and improvements to the White House.  So my first point is, actually, the oversight is always a little bit lower in this space.  The second point is -- and I'll get to this when I talk about the gift authority -- but it's not true that the gift authority somehow gives up oversight.

THE COURT:  Hold on.

MR. ROTH:  Yeah.

THE COURT:  105 anticipates very small-sized projects, not a $400 million East Wing project.  There's a big difference between air conditioning -- refurnishing, air conditioning, heating, lighting, maintenance, repairs.  Those -- and it's a relatively small -- by Congress's standards -- relatively small sum of money involved.  Relatively small.  It's not $400 million worth of construction -- destruction and construction.

MR. ROTH:  Yes, Your Honor.  So the amount that was appropriated in the last round of appropriations pursuant to 105(d) was a relatively small number that would not on its own support the project that's going on, and that's why the president needs another source of appropriated funds in order to support the project.  And I'll get to that when I talk about the gift authority for --

THE COURT:  You're not suggesting that he asked and was rejected?

MR. ROTH:  Excuse me, Your Honor?

THE COURT:  You're not suggesting, are you, that he asked Congress for the authority and the appropriation and was rejected?

MR. ROTH:  No, no.

THE COURT:  You're not suggesting that?

MR. ROTH:  I'm not suggesting that, and I don't think he had to do that because Congress already provided for this.  Congress provided, yes, 105(d) and the money pursuant to that, but Congress also provided that the Secretary of the Interior has the power to accept gifts in order to promote the purposes of the National Park Service.

THE COURT:  There's no basis in the legislative history that suggests that that was being done by Congress in the anticipation of a $400 million East Wing project. There's none.  Zero.

MR. ROTH:  I -- Your Honor, I think that's probably because that authority predates the legislation that made the White House part of the National Park Service. So the National Park -- the White House was added as a unit of the National Park Service in 1961 in the statute that we cite.  As a result of that decision, the White House is now part of the National Park Service and the pre-existing authority that the Secretary of Interior had to accept donations for the purposes of the National Park Service is on the table.  And that's been true at least -- and clear, I

think, since the OLC opinion in 1977 that addressed this, and that OLC opinion goes through the statutes and says: Yes, you -- the president can do this because these authorities are out there for the Park Service, and the White House is part of the National Park Service.

THE COURT:  Are you suggesting that Congress is retaining its oversight capacity through the committees that oversee the Interior Department?

MR. ROTH:  Yes, Your Honor.  I don't see any reason why not.  And, in fact, I'll just say, there's already a bill in Congress to constrain the president to say the president should not be able to use the National Park Service funds for this East Wing project.  That bill was introduced in November in the Senate.  So there -- Congress has a way of expressing disapproval of the use of the funds, but Congress did provide a mechanism by which the president can access those appropriations.  And it is an appropriation.  The -- I apologize that it's two statutes and you have to read them together, but there's a statute that says the Secretary of Interior can accept the donations, and then there's another statute that says those funds are the -- are appropriated and can be disbursed for the purposes of the National Park Service.  And that's how the National -- and the purposes of the National Park Service are laid out in statute as well in 54 U.S.C. 100101,

and that's the authority that the Park Service uses to build all sorts of structures both in D.C. and beyond, you know, welcome centers for national parks and other things like that, and because Congress has designated the White House and President's Park as part of the National Park Service, Congress has thereby permitted that gift authority and appropriation authority to be used for that purpose, as well.  And, again, that's what OLC approved in 1977 where the -- in connection with the pool.  That's what the president used for the tennis pavilion back in 2018, 2019.  And that's been public for a while that that's the mechanism the president has used for the funding here.  And, again, Congress wants to say you can't use the money for that purpose.  There's a bill on the table that they can adopt.

THE COURT:  What about the other side of the coin?  If Congress wanted the president to do this, he has the majority in both the House and the Senate.  He could have very easily got the Speaker of the House and the majority in the Senate to come forward with a bill that would say:  Go forward and do a good job.

MR. ROTH:  So here's how I think about that, Your Honor.  I think that most of the time when the president goes to Congress and says, you know:  I want to do this project; I need some money, the reason he's going is to -- is because Congress has to appropriate that money and then

Congress appropriates the money and then he does the project. Here, the president didn't want $400 million of taxpayer money to be used for this. The president wanted it to be a donation. And Congress provided a mechanism for the president to be able to access donations for particular purposes, and this falls within those purposes. So the president didn't have to go to Congress and say: I need money. He had a way to get the money under existing law, and it's a way that saves the taxpayer $400 million.

THE COURT: And your best effort to demonstrate to this Court that the Congress intended this to be used for a purpose of this size and proportion on an icon that's a national institution is what? Is what?

MR. ROTH: Well, Your Honor, I think that I would point to the OLC opinion. Obviously, a pool is different.

THE COURT: The '77 --

MR. ROTH: Yeah.

THE COURT: The Gerald Ford swimming pool? You compare that to ripping down the East Wing and building a new East Wing? Come on.

MR. ROTH: I'm not comparing --

THE COURT: Be serious.

MR. ROTH: I'm not comparing the projects, Your Honor, but I am saying that I do think that made clear and public and Congress was aware that the president and the

JA300

executive branch have taken the position that the gift authority that has existed for a long time for the Secretary of Interior can be used to promote the purposes of the National Park Service, including President's Park, and if they wanted to restrict that, they could have restricted that, and they still can restrict that, but they haven't.

Let me go back to where I was.

Okay.  So I was -- what I was saying, Your Honor, was the four examples -- the West Wing, East Wing, pool, and tennis pavilion -- none of -- some of -- two of which have a general appropriation and two of which --

THE COURT:  The only two that were just not authorized funds, the swimming pool and the tennis pavilion.

MR. ROTH:  Yeah, but I just want to be --

THE COURT:  The only two.

MR. ROTH:  Yeah.  I just want to be clear, though, Your Honor.  The other two, they were general appropriations.  They were not specific to this.  So you know -- and they say this about the West Wing project in the '30s.  They say:  Oh, well, that was done under the -- this public works program that was a $3 billion general program to do public works.  It wasn't specific to the White House. It wasn't specific to the West Wing.  It wasn't the president went to Congress and said:  I want to build a West Wing.  Give me money.  It was an existing $3 billion

JA301

allotment for public works at large, and the president drew on that for the West Wing.  And the East Wing, presumably there was an appropriation.  They say:  Oh, well, national -- because of national security that wasn't very specific, they haven't really been able to track it down. But, again, definitely no specific authorization or earmark for that project either.  And then we have the later two for which the donation authority was used as a source of funding.

So there are all situations where there are different sources of funding that are being accessed.  All of those sources of funding are authorized by law, but none of the projects were specifically approved by Congress in any way.  And I think that undercuts their theory which, I think, is that Congress has to speak specifically to the project at issue and say:  Yes, we want you to do this. That's just not how it's worked for 250 years with, really, very few exceptions.  I mean, the only situation where Congress really took an active role in the specifics was under Truman when they created a commission that said:  We want the commission to make the decisions about the White House, which, I think, sort of, the exception that proves the rule, really, about Congress's role in these projects.

Now, I think one way to reconcile the history with the text of 8106 is to look at the "clear statement" rule

that the Supreme Court and the D.C. Circuit have applied in cases involving the president where they say:  If the statute is general, we're not going to read that to constrain the president if Congress hasn't spoken directly to the question of the presidency.  And I think that represents -- reflects an important presumption that exists to protect the separation of powers.  It's a guardrail so that the courts are not put in a position of creating or wading into interbranch disputes; right?  We're going to assume that Congress didn't mean to specifically constrain the president.  If it wants to, it can, and then we'll have to deal with it.  But absent that, why should we make that assumption, sort of, create an interbranch dispute that may not even exist?  And, again, we're, sort of, speculating here.  What does Congress think about this project?  We don't know because they haven't addressed it specifically, but they also haven't acted on the bill that would restrain the project.  So I think there's good reason to read the statute more narrowly so that it does not create an interbranch dispute that may not even exist.

THE COURT:  Well, where do you see in 105 the authority to the president to take down the East Wing and put up a new East Wing?  Where do you see that in the specific language of 105 which is very specific about what the funds are being used for?

JA303

MR. ROTH:  Yes, Your Honor.

THE COURT:  Where do you see it?

MR. ROTH:  So we think it's found in "alteration and improvement."  We think "alteration and improvement" are capacious enough terms to include improving, you know -- replacing --

THE COURT:  That's a pretty expansive interpretation of the language, if I may say so myself.

MR. ROTH:  It's -- well, we think it fits within the dictionary definition of those terms.  And we are -- look, I don't think there's any question the East Wing, as it existed before the demolition, needed improvement.  It had a lot of problems that had been documented for a long time.  It had to be improved.  Now, sometimes you can do an improvement without knocking down a building and sometimes you can't.  And in this instance, it was determined that the only way to improve it and the most efficient way to improve it was to take it down and rebuild it, and that's -- the, sort of, explanation for that is in the environmental assessment that was done that explains the analysis that went into that decision, but that was a decision that was made and we think it's covered by "alteration or improvement."

I don't think there's really an administrable line between, you know -- what if it was just the second story;

JA304

right?  We're going to take down the second story and rebuild that.  Does that count as an alteration or improvement?  But if you take it down to the studs, you know, then it's not.  What if it's interior versus exterior?  What if you leave the footprint but take everything down?  I mean, there's all sorts of questions that we could get into, but I think that these terms are broad enough.  And, again, these are the terms that have existed -- well, this statute existed since the -- I think, the '70s, but we look at the appropriations acts that the Trust cites in its annex, similar language going way back that covered all of the projects at the White House that all the presidents have undertaken since the beginning.  So this is traditional language that covers --

THE COURT:  You've got two more minutes.  Why don't you address the balance of equities and irreparable harm.

MR. ROTH:  Okay.  I'll address balance of equities and irreparable harm.

I didn't talk about standing.  And Your Honor said Your Honor's comfortable with standing.  That's fine.

THE COURT:  I'm trying to get you a little -- if you need more time.

MR. ROTH:  Sorry?

THE COURT:  I'm not talking standing.  You could

JA305

talk about other things.

MR. ROTH:  Yes, I appreciate it.  What I'm saying is some of the issues that relate to standing, they come back in the form of irreparable harm, because even if they're cognizable for purposes of Article III, that doesn't mean they're weighty interests; right?  So they say they're interests -- so the harm to the organization is, you know, they want to facilitate public comment.  Well, there's a public comment process that the NCPC is undertaking starting in just a couple of weeks.  They can participate in that.  They can facilitate public participation in that.  Their harm is they would have liked to have done it a few weeks earlier.  Okay.  That's one harm that we're weighing.  And the other harm is the aesthetic injury to Dr. Hoagland who periodically walks in the neighborhood and sees the building and is concerned that it will distract her from the Executive Mansion.  I think that's not a very weighty interest either.  I mean, I -- again, I think, under D.C. Circuit precedent, it's not a cognizable interest, but it's -- even if it's cognizable, it's a very weak, attenuated, speculative harm, and we point out it's actually not even visible -- barely visible from public spaces.  And they say that's irrelevant.  I don't know how that could be irrelevant when the harm is aesthetic and we're -- this is what we're weighing here.

JA306

So you have those two interests on the one side. And then on the other side, the question is, are we going to suspend construction in the middle when there's important work that has to be done in any universe; right? Waterproofing, security work, the excavation, all of that has to happen. You stop that in the middle and we're exposing the existing building to damage. We're creating security problems for the president, you know, the national security implications that are addressed in the classified declaration. And I don't think stopping the project is an equitable result of the balancing of those interests, you know? They say: Oh, well, you know, go ahead with the security work. It can't be divided out that way. And I don't think there's any administrable way to enforce that kind of rule. Unless they want the Court to be the project manager of the site, it's not practical.

Beyond that, I think, sure, there's always going to be room for debate over design choices, but I don't think there's any real question that this modernization advances the public interests in the White House and the East Wing that suffered from decades of neglect and insufficient updating and modernization leading to the point where we have security being done in trailers, we have large state dinners happening in tents on the lawn that have to be put up and taken down and destroy the grass and impair the view.

We have mold and water contamination.  We have security infrastructure that is outdated.  We have utilities that are unreliable.  And there is important work that people have been talking about doing for 25 years, if not more, and now it is getting done, and that is in the public interest in the long-term, not stopping construction in the middle and leaving this indefinite, sort of, limbo situation.  I don't see how that advances the public interest or, really, remedies the harms that they're concerned about.

Your Honor, did I address all the questions that Your Honor had at the outset?

THE COURT:  You did the best you could.

MR. ROTH:  I think there was a question about the limits, if there are any limits.  I do think there are limits.  The limits are both legal and political.  I mean, the legal limits, I think, are in 105(d).  We were talking about, what are the outer bounds of "alteration and improvement"?  I do think if the plan was to just bulldoze the entire White House and build something completely different in its place, I think there would be a better argument that that exceeds the scope of "alteration and improvement."

THE COURT:  I would hope so.

MR. ROTH:  Yeah.

I think the National Park Service donation

authority, that has to be used for -- to advance the purposes of the National Park Service. So if it was something personal or something that did not advance those purposes, the -- that could be a limit, although I would note that isn't -- like, also not one of the claims that has been raised in this case. There is no challenge in this case in the complaint, the amended complaint, or the briefs to the Interior Secretary's acceptance of the gift or transfer of the money. That's not one of their claims. And I mentioned already that the -- there's no ultra vires claim. So that's a limit.

And then, of course, there is -- there are political limits which is why nobody has touched the central Executive Mansion other than relatively minor alterations like the Truman Balcony. It's always been understood that is the core site. That is the site that Congress said in the 1961 statute is the important thing to preserve. The East Wing, the West Wing have been modified many times over the years by all presidents, but I think there would be enormous political constraints on doing anything to the central Executive Residence.

THE COURT: Thank you.

MR. ROTH: Thank you, Your Honor.

THE COURT: Mr. Heuer, five minutes.

MR. HEUER: I'll try to address three points, Your

Honor.

First, the question of authorization.  I would say two words: Rube Goldberg.  Congress didn't provide authority under 105(d).  And my brother said that the exact wording isn't critical.  Of course it's critical.  It's a statute.  You've got to comply with the statute.  And now, on the fly, they've shifted that it's not really 105(d); it's now the gift statute that authorized it.  This just goes to show how little they have thought through their funding mechanism seriously when faced with a challenge.

THE COURT:  What about the cause of action claim he makes?

MR. HEUER:  What about it?  Which --

THE COURT:  No cause of action.

MR. HEUER:  Well, there's a cause of action because the National Trust is looking at 10 -- at 8106 as simply not a -- Congress is the only one who can enforce it.  That's not the way that that works.  Congress has said no one can build something on a federal park land -- which the National Trust certainly has an interest in -- unless there is express congressional approval.  There's no reason that the National Trust doesn't have that within their zone of interest to bring it standing, but certainly is also a claim that they can make because it's a cause of action, as we would suggest, under the Constitution because the president

has no authority under 8106 to do any of this, and they have conceded that.  They're not relying on his congressional authority.  They've talked about congressional -- constitutional avoidance, but you can't have constitutional avoidance if you don't have any constitutional authority to do it.  The only people who have constitutional authority here to say he can is Congress.  It's not a grant of authority they've given him previously.  It's something they've reserved themselves and said if you want to do it, you've got to come back and ask for permission.

I think, on their question -- on their point about the 1934 and 1942 elements and the history, as we have noted in our brief, 1934 is a statute -- it's the NRI -- NIRA where Congress expressly directed the Public Works Administration, quote, "under the direction of the president to prepare a comprehensive program of public works, including construction, repair, and improvement of public buildings," and excluded, "only those buildings under the jurisdiction of the Architect of the Capitol."  That's the Supreme Court.  That's the Capitol Complex.  He is allowed under that -- it is fairly clear authority that Congress is saying:  Go forth and build, construct, and otherwise on any public building.  This is certainly a public building.

1942, we think it's clear that this is a couple of months after Pearl Harbor.  You probably don't want to let

the Axis know that you're building a bunker under the White House.  Defendants, as we note, surely have some appreciation for the importance of secrecy when it accompanies the building of bunkers.

And on the pool and the tennis -- the pool cabana and the tennis court, we would note that the fact that those were built without congressional authorization under 8106, as we note in our brief, no more proves the inapplicability of that statute than driving 60 in a 55 zone without getting a ticket proves the inapplicability of the speed limit.

I would also note that they don't mention, as we've pointed out, that when Congress wants to say that it is authorizing something under 8106, it's not dead letter. It knows how to do it.  It's done it as recently as 1993 with the bonsai gardens at the National Arboretum.  It has a statute that says:  You can build the bonsai collection housing and the limitation on construction contained in the act of August of 1912 -- which is this act, 40 U.S.C. 68, as it was previously before it was recodified -- shall not apply to the construction of such facilities.  If Congress knows how to invoke 8106 for bonsai facilities, it surely is not hiding 8106 authority in some other statute when it comes to the White House.

On the point about whether or not the authority of the Park Service to use the gift statute is relevant, we

would say it certainly isn't mostly -- or not only because of the arguments we made previously, but also because the foundation document of the Park Service from 2014 declares that the White House and its wings are fundamental elements of the White House and President's Park.  When my brother says that it's only really the Executive Mansion that anyone thinks is important, that's simply not true.  The Park Service has said repeatedly in documents for decades that it's the whole thing.  So it's not just about:  You can tear off the wings because those don't matter.  They do matter, and the Park Service has repeatedly said they do.

And, I think, my last point is when they note that it would be inequitable to allow them -- or to prevent them from continuing construction -- except, as we have noted, on the bunker and the other national security elements; we have no concerns about that -- when they say it would be inequitable not to allow them to proceed because it would create the problem of the project being half built, I think we would respectfully suggest that that's probably something they should have thought about before they tore it down to begin with.

Thank you, Your Honor.

THE COURT:  Thank you.

Well, as I said earlier, I appreciate the hard work and the high quality of the briefs that have been

submitted, and I want to compliment both sides in that.

It's a little busy around here's these days. I'll try to get you an opinion in the not-too-distant future, but I can't promise you. It won't be in the month of January. I can promise you that right now, especially with a snowstorm coming of mythic, epic proportions. But hopefully in February, I'll get you an opinion. I'm not kidding myself. I know it will be appealed. Whichever side wins, the other side will appeal. So this case is going to go to the D.C. Circuit, for certain, and, maybe, perhaps even to the Supreme Court. Who knows? But I know enough to know that going first is sometimes an advantage, sometimes a disadvantage. Hopefully, in this case, it will be an advantage for me.

We'll stand in recess.

THE DEPUTY CLERK: All rise.

(Proceedings concluded at 4:38 p.m.)

* * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 26th day of January 2026.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**

JA314

United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

         Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**DEFENDANTS' NOTICE OF SUBMITTING SECOND SUPPLEMENTAL *EX PARTE* DECLARATION *IN CAMERA***

Defendants respectfully submit this Notice to inform the Court that they have submitted a second supplemental *ex parte* declaration in support of their motion to stay any preliminary injunction pending appeal.

Dated: February 2, 2026               Respectfully submitted,

JA316

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY T. MAYERS
Counsel

/s/ *Eitan R. Sirkovich*
JOSEPH E. BORSON
Assistant Branch Director
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Eitan.R.Sirkovich@usdoj.gov
(202) 353-5525

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

MARISSA A. PIROPATO
Deputy Chief

GREGORY M. CUMMING
Senior Attorney
MICHELLE RAMUS
MARK WIDERSCHEIN
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Gregory.Cumming@usdoj.gov
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov
(202) 598-0414

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, <br> Plaintiff, <br><br> v. <br><br> NATIONAL PARK SERVICE, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Case No. 25-4316 (RJL) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION
February 26, 2026 [Dkt. #2]

The National Trust for Historic Preservation in the United States ("Plaintiff" or "the National Trust") challenges the President's authority to destruct and construct the East Wing of the White House without the prior approval of Congress and with private funds. Plaintiff bases its challenge on a ragtag group of theories under the Administrative Procedure Act ("APA") and the Constitution. The President, not surprisingly, disagrees, claiming that the White House is not covered by the APA and that his authority is statutory in nature, not constitutional.

Unfortunately for Plaintiff, its challenge fails because the White House office in question is not an "agency" under the APA and because Plaintiff did not bring the *ultra vires* claim necessary to challenge the President's statutory authority to complete his construction project with private funds and without congressional approval!

1

JA318

As such, unless and until Plaintiff amends its existing complaint to include the necessary *ultra vires* claim, the Court cannot address the merits of the novel and weighty issues raised by this statutory challenge, and Plaintiff's motion for a preliminary injunction must therefore be **DENIED**.

### FACTUAL AND PROCEDURAL BACKGROUND

**I.    The White House Ballroom Project**

The White House is the official residence of the President. Am. Compl. [Dkt. #19] ¶ 25. It is part of President's Park, which is a federal park administered by the National Park Service. *Id.* The White House is flanked by the East and West Wings. *Id.* ¶ 30. Before its demolition in October 2025, the East Wing housed the offices of the First Lady and contained a small theater. *Id.* ¶¶ 30–33, 64.

On July 31, 2025, the White House issued a press release announcing plans for a "White House State Ballroom." *Id.* ¶ 36; *see also* Ex. J to Mot. for TRO & Prelim. Inj. [Dkt. #2-14]. According to the press release, the ballroom would be "approximately 90,000 total square feet," "substantially separated from the main building of the White House," and located on the site of the "small, heavily changed, and reconstructed East Wing." Ex. J. The press release indicated that the President was "fully committed to working with the appropriate organizations to preserving [sic] the special history of the White House," and that the President had "held several meetings with members of the White House Staff, the National Park Service, the White House Military Office, and the United States Secret Service to discuss design features and planning." *Id.*

2

JA319

On October 20, 2025—without advance notice—President Trump posted on social media that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." Am. Compl. ¶ 51. On October 21, media outlets reported that heavy machinery was tearing down the East Wing. *Id.* ¶ 53. The entire East Wing was demolished over the next few days. *Id.* ¶ 64.

The site of the former East Wing is now "a bustling project site," with "heavy construction machinery" and a "construction crane" present. *Id.* ¶¶ 78, 81. Defendants have indicated that "work on the footings and below-grade structural concrete" will commence "in the East Wing area in February." Decl. of John Stanwich ("Stanwich Decl.") [Dkt. #14-6] ¶ 20. "Above grade structural work is not anticipated to begin until April 2026, at the earliest." *Id.*

## II.    The National Trust for Historic Preservation in the United States

The National Trust is a private, charitable, educational non-profit chartered by Congress. Am. Compl. ¶ 4. Its purpose "is to further the historic preservation policy of the United States and to promote the public's awareness of and ability to comment on any activity that might damage or destroy our nation's architectural heritage." *Id.* The National Trust "stewards twenty-seven historic sites" and "takes legal action to protect threatened sites where necessary." *Id.* ¶ 21. The National Trust "has thousands of members," who "use, enjoy, derive personal and professional benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C." *Id.* ¶ 22.

After the demolition of the East Wing, the National Trust contacted the National Park Service, the National Capital Planning Commission, and the Commission of Fine Arts

3

JA320

expressing concerns about the "massing and height of the proposed new construction." *Id.* ¶¶ 54–55. The National Trust wrote that the ballroom could "permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings." *Id.* ¶ 55. The National Trust "urge[d] the Administration and the National Park Service to pause demolition until plans for the proposed ballroom [go] through the legally required public review process." *Id.* ¶ 56. Curiously, the National Trust "received no response." *Id.* ¶ 57.

## III.   This Lawsuit

On December 12, 2025, the National Trust sued the National Park Service and its Acting Director, the Superintendent of the White House and President's Park, the Department of the Interior, the Secretary of the Interior, the General Services Administration, the Acting Administrator of the General Services Administration, and the President ("Defendants"). *See* Compl. [Dkt. #1]. The National Trust brought claims under the Administrative Procedure Act ("APA") and the Constitution, alleging that Defendants had failed to consult with the National Capital Planning Commission and the Commission of Fine Arts, comply with the National Environmental Policy Act ("NEPA"), and obtain congressional authorization for the ballroom. *See id.* ¶¶ 105–69. The National Trust moved for a temporary restraining order and preliminary injunction halting construction of the ballroom. Mot. for TRO & Prelim. Inj. [Dkt. #2].

On December 15, 2025, Defendants filed their opposition brief. *See* Mem. in Opp'n to Mot. for TRO & Prelim. Inj. ("Defs.' Opp'n") [Dkt. #15-1]. Defendants argued that the "President possesses statutory authority to modify the structure of his residence, and that

JA321

authority is supported by background principles of Executive power." *Id.* at 2. Defendants indicated that consultations with the National Capital Planning Commission and the Commission of Fine Arts would "soon be underway." *Id.* Defendants attached a previously-unpublished Environmental Assessment and Finding of No Significant Impact and argued that these documents satisfied their procedural obligations under NEPA. *See* Defs.' Opp'n at 20–21; Ex. 1A to Defs.' Opp'n [Dkt. #14-2]; Ex. 1B to Defs.' Opp'n [Dkt. #14-3]. And Defendants indicated that the ballroom construction was "now proceeding under the leadership of the Office of the Executive Residence." Defs.' Opp'n at 6.

On December 16, 2025, I held a hearing on the National Trust's motion for a temporary restraining order. *See* Dec. 16, 2025 Hr'g Tr. [Dkt. #18]. The following day, I denied the National Trust's motion for lack of "irreparable harm before this Court can consider plaintiff's motion for a preliminary injunction." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, __ F. Supp. 3d __, 2025 WL 3672837, at \*1 (D.D.C. Dec. 17, 2025) (internal quotation marks omitted). I deferred my decision on the National Trust's motion for a preliminary injunction and ordered the parties to submit supplemental briefs addressing the following questions: "[1] Whether and to what extent, past Presidents have obtained congressional authorization and/or regulatory approval for construction and modifications to the White House structure and grounds. [2] Whether the President has independent constitutional and/or statutory authority to construct a ballroom on White House grounds. [3] Whether the entities directing the ballroom construction, including the Office of the Executive Residence, are 'agencies' within the meaning of the Administrative Procedure Act." *Id.* at \*2.

On December 29, 2025, the National Trust filed an amended complaint, *see Am. Compl.*, and its supplemental brief in support of its motion for a preliminary injunction, *see* Suppl. Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Suppl. Br.") [Dkt. #20]. The National Trust added the Executive Office of the President, the White House Chief of Staff, the Office of the Executive Residence, and the White House Chief Usher as Defendants, and added a new claim alleging that placing responsibility for the ballroom with the Office of the Executive Residence violated the separation of powers. *See Am. Compl. ¶¶ 17–20, 188–96.*

On January 15, 2026, Defendants filed their supplemental brief. Defs.' Suppl. Resp. Br. in Opp'n to Pl.'s Mot. for a Prelim. Inj. ("Defs.' Suppl. Br.") [Dkt. #30]. In it, Defendants for the first time *disclaimed* the President's constitutional authority to build the ballroom and instead rested entirely on certain statutory authority! *Id.* at 12, 30. On January 20, the National Trust filed its reply brief ("Pl.'s Reply") [Dkt. #33], and on January 22, I held a hearing on the National Trust's motion for a preliminary injunction. *See* Jan. 22, 2026 Hr'g Tr. [Dkt. #38].

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

JA323

## ANALYSIS

### I.    Subject-Matter Jurisdiction

"[A] federal court generally may not rule on the merits of a case without first determining that it has" "subject-matter jurisdiction." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 93–102 (1998)). Before reaching the parties' substantive arguments about the APA and the Constitution, therefore, this Court must decide whether the National Trust has established a "substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). For the following reasons, I conclude that it has done so.

To establish standing to sue, a plaintiff must show (1) it has "suffered an injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury is "likely" to "be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). As an organization, the National Trust "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

The standing inquiry here begins and ends with associational standing.[1] "[A]n association has standing to bring suit on behalf of its members when: (a) its members would

---

[1] The National Trust also argues for organizational standing. *See* Mem. in Supp. of Mot. for TRO & Prelim. Inj. [Dkt. #2-1] at 36; Pl.'s Reply at 2–4; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). Because I conclude that the National Trust has adequately demonstrated associational standing, I need not address the parties' organizational standing arguments at this time.

7

JA324

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

To satisfy the first element, the National Trust must show that "at least one of its members" has suffered an "actual or imminent" "injury-in-fact" that is "fairly traceable to the challenged action" and "likely" to "be redressed by a favorable decision." *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

To do so, the National Trust relies on a declaration from Alison K. Hoagland, a Washington, D.C.-based professor of history and historic preservation and member of the National Trust. *See* Decl. of Alison K. Hoagland ("Hoagland Decl.") [Dkt. #2-3] ¶¶ 2–4. Hoagland has lived in Washington, D.C. for a total of over thirty years and currently lives two miles from the White House in Capitol Hill. *Id.* ¶ 9. She "travel[s] to the White House neighborhood frequently" and "regularly walk[s] through portions of President's Park, including Lafayette Square, in order to enjoy the historic buildings" and "the beauty of the L'Enfant Plan." *Id.* She also "regularly view[s] the White House from the south side, whether driving by on Constitution Avenue or walking on the Mall." *Id.* She has given "walking tours . . . on various aspects of Washington's historic architecture" and has "published scholarly articles on the topic." *Id.* ¶ 8. The White House is relevant to her

8

JA325

"research on more locally focused architecture" because the White House "drove development around it" and was "on the leading edge of all improvements" in Washington. *Id.* ¶ 11.

Hoagland intends to continue visiting President's Park roughly once a month. *Id.* ¶ 12. She asserts that construction of a ballroom of the form and scale proposed by the President would disrupt her enjoyment and use of President's Park and cause her to "suffer both professional and personal injuries, including to [her] aesthetic, cultural, and historical interests." *Id.* ¶ 13–14. The President's proposed ballroom would, in Hoagland's words, "overshadow[]" the White House and "diminish [its] primacy," thereby disrupting the message that "our president lives in a *house*." *Id.* ¶ 13.

Based on her claims of aesthetic injury, Hoagland could sue in her own right. It is well-settled that the "desire to use or observe" something, "even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63. Hoagland, who is a longtime D.C. resident and scholar of history and historic preservation, "use[s] the affected area" around the White House and is the type of person "for whom the aesthetic and recreational values of the area will be lessened by" the ballroom. *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). She alleges that Defendants' construction of "a ballroom of the proposed form and scale" would "cause permanent and irreparable harm to the White House and President's Park," thereby damaging her own "aesthetic, cultural, and historical interests" in the property. Hoagland Decl. ¶¶ 13–14.

JA326

Moreover, Hoagland asserts more than a "vague desire" to visit the affected space sometime in the future. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). She instead provides "specific facts and concrete plans," *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025), namely that she will continue to visit President's Park "about once a month" to enjoy the historic character of the setting and attend upcoming meetings in the neighboring Decatur House, *see* Hoagland Decl. ¶ 12. The construction of the planned ballroom would, as Hoagland alleges, diminish the "architectural statement" of the White House, thereby undermining her enjoyment and appreciation of the grounds. *Id.* ¶ 13. These are "here-and-now injuries" that will undoubtedly come to pass if construction proceeds as planned. *Ctr. for Biological Diversity*, 146 F.4th at 1157–58. Accordingly, Hoagland has demonstrated an "imminent" injury-in-fact. *Lujan*, 504 U.S. at 560.

Indeed, Hoagland's declaration goes much further than the declaration relied upon unsuccessfully by the plaintiff in *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), which Defendants cite in their supplemental brief. Hoagland is not a mere bystander who "incidentally views something unpleasant." *Id.* at 970. To the contrary, Hoagland expressly articulates her "particularized connection to the land." *Id.* She describes how she "derived aesthetic value" from the White House as it existed before the construction and explains that her "future uses," including research and aesthetic enjoyment, would be diminished by the President's proposed ballroom. *Id.* at 969. Further, in Hoagland's personal view, the White House is "one of the most historically significant buildings in the country" and "was designed to be a symbol of the new nation." Hoagland

10

JA327

Decl. ¶ 10. To say the least, this is a far cry from an "eyesore" on the side of a road. *Envt'l Def. Fund*, 2 F.4th at 969–70.

Our Circuit has routinely found Article III injury in similar circumstances. *See Sierra Club*, 827 F.3d at 66 (standing based on allegations of aesthetic and recreational harms from "greater tanker traffic" in waterway); *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180–81 (D.C. Cir. 2025) (standing where train traffic caused "increased disruption" to members' "homes and in nearby scenic areas"); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596–97 (D.C. Cir. 2015) (members who used waterways for recreational purposes would suffer harm to "aesthetic interests" by "additional leasing" in those waterways); *WildEarth*, 738 F.3d at 305–06 (members' "aesthetic interests in the land" and "specific plans to visit the area regularly for recreational purposes" sufficient for standing).[2]

Hoagland's alleged harms are also "fairly traceable to the challenged action" and likely to "be redressed by a favorable decision." *Sierra Club*, 827 F.3d at 65. Defendants do not address these elements. *See* Defs.' Suppl. Br. at 8–12. Indeed, there can be no dispute that Hoagland's alleged aesthetic harm stems directly from construction of a ballroom in the manner proposed by the President. And a decision from this Court halting

---

[2] Defendants quibble with the intensity and frequency of Hoagland's alleged aesthetic interests because she lives "2 miles from the White House," "several times further away than the [*Environmental Defense Fund*] plaintiff" lived from the metering station, and because Hoagland only intends to visit the White House area "once a month" instead of "several times a week." Defs.' Suppl. Br. at 10. Neither our Circuit nor the Supreme Court have parsed alleged aesthetic harms so finely for purposes of standing, and it would be incongruous for this Court to do so now. Defendants' objection that Hoagland's injury is not "sufficiently imminent" because "the East Wing plans are not finalized" is similarly meritless. *Id.* at 11. Construction is well underway, *see* Stanwich Decl. ¶ 20, and Defendants identify no authority for the proposition that an aesthetic injury must fully materialize before it may be cognizable.

11

JA328

that project for lack of statutory authority would redress Hoagland's alleged harm. In sum, Hoagland has standing to sue on her own.

Having established that one of its members has standing, the National Trust must also demonstrate that the interests it seeks to protect are "germane to the organization's purpose." *Ctr. for Sustainable Econ.*, 779 F.3d at 596 (quoting *Hunt*, 432 U.S. at 343). It has done so! The National Trust was established by Congress "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. § 312102(a). It exists to "protect[] America's historic sites through stewardship, advocacy, and direct assistance" and to "take[] legal action to protect threatened sites where necessary." Am. Compl. ¶ 21. As such, the National Trust has an "obvious interest" in challenging the construction of a massive new ballroom on White House grounds that could likely alter the aesthetic, cultural, and historical integrity of one of the most historic sites in the country. *Cf. Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013)) (concluding that an organization "dedicated to the protection and enjoyment of the environment" had an "obvious interest in challenging" the authorization of a pesticide).

Finally, as Defendants do not dispute, this lawsuit does not "require[] the participation of" Professor Hoagland. *Ctr. for Sustainable Econ.*, 779 F.3d at 596 (quoting *Hunt*, 432 U.S. at 343). Indeed, "neither the claim asserted . . . nor the relief requested . . . requires any [National Trust] member to participate as a named plaintiff in the lawsuit." *Ctr. for Biological Diversity*, 861 F.3d at 182.

12

JA329

Accordingly, the National Trust has established a substantial likelihood of Article III standing.

## II.    Availability of Judicial Review

Having concluded that the National Trust has standing, I may now consider whether judicial review is available for the National Trust's claims. Defendants advance two arguments to the contrary. First, Defendants argue that the Office of the Executive Residence ("EXR") is not an "agency," so there is no "agency action" to enjoin under the APA. Second, Defendants argue that the National Trust cannot bring freestanding constitutional claims because its claims in the final analysis are statutory in nature. Unfortunately for the National Trust, and based on the claims presently before the Court, I agree with Defendants on these two points and conclude that I lack authority to reach the merits of the National Trust's claims.

### A. Administrative Procedure Act Claims

To find a likelihood of success on the National Trust's APA claims, the National Trust must show that the relevant defendant is an "agency," such that there could be "final agency action" or "agency action unlawfully withheld." 5 U.S.C. §§ 704, 706(1). According to Defendants, EXR, which is part of the Executive Office of the President, is now "the entity managing the East Wing project." Defs.' Suppl. Br. at 13. I agree that EXR is likely not an "agency" under the APA.

Our Circuit held in *Sweetland v. Walters*, 60 F.3d 852 (D.C. Cir. 1995), that the "staff of the Executive Residence is not an agency as defined in" the Freedom of Information

JA330

Act. *Id.* at 855.[3] Whether an entity that has been determined to be a "non-agency" can subsequently become an agency by taking on agency responsibilities has not been resolved by our Circuit. *Compare Ryan v. Dep't of Just.*, 617 F.2d 781, 788 (D.C. Cir. 1980) ("Once a unit is found to be an agency, this determination will not vary according to its specific function in each individual case."), *with Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 n.5 (D.C. Cir. 1985) (suggesting that "[i]f the President adds duties to an entity which bring it outside the sole-function test, Congress would want the entity to be covered" by FOIA). But even if EXR could be considered an agency due to the change in its responsibilities, the current record does not support finding EXR an "agency." How so?

As a general matter, the Executive Office of the President is not an "agency" under the APA. *Am. Oversight v. Biden*, 2021 WL 4355576, at *6 (D.D.C. Sept. 24, 2021) (citing *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998)). But certain entities within the Executive Office of the President may be considered "agencies" if they "exercise[] 'substantial independent authority.'" *Competitive Enter. Inst. v. Podesta*, 643 F. Supp. 3d 121, 126–27 (D.D.C. 2022) (quoting *Armstrong v. Exec. Off. of President*, 90 F.3d 553, 557–58 (D.C. Cir. 1996)). Courts consider "how close operationally the group is to the President," "whether it has a self-contained structure," and "the nature of its delegat[ed] authority." *Id.* (alteration in original) (quoting *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009)).

---

[3] The Freedom of Information Act ("FOIA") "incorporates and expands on the APA's definition of agency," *Am. Oversight v. Biden*, 2021 WL 4355576, at *6 n.6 (D.D.C. Sept. 24, 2021), so if EXR is not an agency under FOIA then it is not an agency under the APA.

14

JA331

Here, the limited record suggests that EXR has an "intimate organizational and operating relationship" with the President himself. *Armstrong*, 90 F.3d at 560. Indeed, the President directed EXR to manage the ballroom construction, *see* Decl. of Joshua Fisher [Dkt. #30-1] ¶¶ 7–8, and the National Trust has alleged that the President "is planning and directing the construction of the Ballroom," Am. Compl. ¶ 16; *see also id.* ¶ 79 ("it was reported that President Trump had been 'holding frequent meetings about [the Ballroom's] design and materials'" and "personally select[ed] the project's contractors" (first alteration in original)). And while there are insufficient facts in the record to determine whether EXR has a "self-contained structure," *Competitive Enter. Inst.*, 643 F. Supp. 3d at 127, this factor alone is not dispositive, *see Armstrong*, 90 F.3d at 559 (National Security Council had a "firm structure, a staff, and a separate budget" but was not an agency (internal quotation marks omitted)). Finally, EXR's responsibilities— "handling project management" for the ballroom and "coordinating with NPS staff," Suppl. Decl. of Jessica Bowron [Dkt. #30-3] ¶ 11—are distinguishable from the "delegat[ed] authority" that has made certain entities agencies, *see Competitive Enter. Inst.*, 643 F. Supp. 3d at 127 (alteration in original); *see also Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993) (Council on Environmental Quality was an agency because it had authority to "coordinate federal environmental programs," "issue guidelines to federal agencies," and "promulgate regulations"); *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971) (Office of Science and Technology was an agency because it took on the "function of evaluating federal programs").

15

JA332

For these reasons, EXR is likely not an agency under the APA, and the National Trust therefore may not challenge EXR's actions under the APA. As a result, the National Trust's APA claims are unlikely to succeed on the merits.[4]

## B. Constitutional Claims

Next, the parties dispute whether the National Trust's constitutional claims are reviewable by this Court in equity—in other words, they dispute whether the National Trust has a "cause of action" to enjoin allegedly unconstitutional actions by Defendants. As the case now stands, under *Dalton v. Specter*, 511 U.S. 462 (1994) and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), I have concluded that the National Trust lacks a cause of action to assert its constitutional claims as presented. Therefore, I lack authority to reach the merits of its statutory arguments.

The National Trust's principal constitutional argument is that Defendants' construction of the ballroom usurps Congress's authority under the Property Clause. Am. Compl. ¶¶ 179–87. The National Trust also alleges that Defendants' reorganization of the executive branch violates Congress's Article I power to "establish[] . . . offices." *Id.* ¶¶ 188–96.

To obtain judicial review of their claims, the National Trust must have some basis "to invoke the power of the courts," often referred to as having a "cause of action." *See Davis v. Passman*, 442 U.S. 228, 239 (1979). For statutory claims, "private rights of action

---

[4] Even if EXR were an agency, the National Trust's APA claims face additional hurdles. Defendants have represented that consultations with the National Capital Planning Commission and Commission of Fine Arts are ongoing, so those claims will likely become moot. And the National Trust's remaining procedural claim must overcome the "substantial deference" afforded to agencies in NEPA cases. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025).

16

JA333

to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Though the National Trust invokes several statutes that it claims the President is violating—including 40 U.S.C. § 8106, which prohibits the construction of buildings on public grounds in the District of Columbia without congressional authorization, and 3 U.S.C. § 105(d)(1), which authorizes appropriation of funds for White House maintenance—the National Trust has not argued that any of these statutes grant it a right to sue to "judicially enforce" the statutes' requirements. *Davis*, 442 U.S. at 239.

Instead, the National Trust relies on a freestanding constitutional claim for injunctive relief. But courts permit this kind of claim only when the claim is, in fact, *constitutional*. To assess whether the National Trust may bring such a claim here, I must determine whether "the underlying claim is properly characterized as statutory or constitutional." *Glob. Health Council*, 153 F.4th at 14. If the claim is "properly characterized as statutory," then it may not be "refram[ed]" as constitutional "to avoid statutory limits on review." *Id.* (citing *Dalton*, 511 U.S. at 474).

Courts have recognized freestanding constitutional claims when the plaintiff "challenge[s] the constitutionality of the statute itself," such as by arguing that there is some structural constitutional defect. *Id.*; *see also, e.g., Collins v. Yellen*, 594 U.S. 220, 250 (2021) (reviewing separation-of-powers claim challenging statute's "for-cause restriction on the President's removal authority"); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2, 492 (2010) (reviewing separation-of-powers claim

17

JA334

challenging statute with "dual for-cause limitations on the removal of Board members"). The National Trust does *not* challenge the constitutionality of any of the statutes!

That forces the National Trust to confront the Supreme Court's decision in *Dalton*. *Dalton* held that a plaintiff's claim that the President "violated the terms of [a statute] by accepting procedurally flawed recommendations" could not be brought as a freestanding separation-of-powers constitutional claim. 511 U.S. at 474. The Supreme Court clearly explained that a "claim that the President exceeded his authority under [a statute] is not a constitutional claim, but a statutory one." *Id.* at 476–77. "Our cases do not support the proposition that every action by the President . . . in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.

Indeed, our Circuit recently applied *Dalton* to foreclose judicial review of a "freestanding constitutional claim" alleging that "the government violated the Constitution by infringing on the Congress's spending power through alleged violations of the 2024 Appropriations Act, the [Impoundment Control Act,] and the Anti-Deficiency Act." *Glob. Health Council*, 153 F.4th at 17, 21. The *Global Health* plaintiffs' "alleged statutory violations" were "the predicate acts for the constitutional claims because without an appropriations statute there could be no improper impoundment." *Id.* at 15. These "statutory claims c[ould not] be transformed into constitutional ones." *Id.* at 16.

Here, the National Trust's constitutional claims are more "properly characterized" as statutory! *Id.* at 14. The National Trust argues that the President "is wholly without constitutional authority to build or demolish anything on federal grounds" and that "[t]here is no statute that provides the President with the authority to demolish the White House or

construct a ballroom." Am. Compl. ¶¶ 181, 184. Defendants themselves have *disclaimed* any inherent constitutional authority and have instead argued that the President's authority to construct the ballroom comes from a series of statutes. *See* Defs.' Suppl. Br. at 12 ("Nor is the President relying here on constitutional authority[.]"), 28–35 (arguing that 3 U.S.C. § 105(d), 54 U.S.C. § 101101(2), 31 U.S.C. § 1321, and 31 U.S.C. § 1535 supply the President's authority). Whether those statutes give the President authority to build the ballroom is thus a statutory dispute! *See Glob. Health Council*, 153 F.4th at 14. The parties dispute the scope of 3 U.S.C. § 105(d), *see* Pl.'s Suppl. Br. at 12–15; Defs.' Suppl. Br. at 32–35, and whether 40 U.S.C. § 8106 may be read to constrain the President, *see* Defs.' Suppl. Br. at 28–32; Pl.'s Reply at 8–11. Unfortunately for the National Trust, the Court's equitable power to enjoin constitutional violations does not extend to this kind of statutory dispute! *See Dalton*, 511 U.S. at 476–77; *Glob. Health Council*, 153 F.4th at 13; *see also Trump v. Sierra Club*, 588 U.S. 930, 930 (2019) (staying injunction because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005").[5]

The National Trust's reliance on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), *see* Pl.'s Reply at 23, is misplaced. "In *Youngstown*, the Government disclaimed any statutory authority for the President's seizure of steel mills," so the "case necessarily turned on whether the Constitution authorized the President's actions." *Dalton*,

---

[5] The same goes for Plaintiff's unlawful reorganization claim. This claim is statutory because it is predicated on the statute "vesting [Congress's] authority over the management and regulation of the National Park System in the National Park Service." Am. Compl. ¶ 190 (citing 54 U.S.C. § 100101).

19

511 U.S. at 473. Here, the situation is the exact opposite—Defendants have disclaimed inherent constitutional authority to construct the ballroom. *See* Defs.' Suppl. Br. at 12, 30; *see also, e.g., League of United Latin Am. Citizens v. Exec. Off. of President*, __ F. Supp. 3d __, 2025 WL 3042704, at *25 (D.D.C. Oct. 31, 2025) (*Dalton* did not preclude implied equitable constitutional claims where the defendants "invok[ed] the Article II Vesting Clause, arguing that the President has inherent constitutional authority"), *appeal filed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025).

To be fair, the President's source of legal authority to construct the ballroom was *not* apparent before the National Trust brought its motion. *See, e.g.*, Am. Compl. ¶ 45 (alleging that "President Trump said that he had been told by two men that, as President, he could do anything he wanted to the White House" (cleaned up)). And to make things murkier, Defendants initially suggested that there *was* a dispute about the President's constitutional authority. *See* Defs.' Opp'n at 1 ("The Constitution makes the President of the United States the head of the Executive Branch and the sole organ of American foreign policy, and it requires the President to 'receive Ambassadors and other public Ministers.'"), 15 n.6 (discussing the Reception Clause). But Defendants' subsequent abandonment of any constitutional claims of authority places this case—as it now stands—squarely in *Dalton* territory. *See* Jan. 22, 2026 Hr'g Tr. at 24:25–25:2; *Dalton*, 511 U.S. at 474 n.6.

The National Trust argues that Defendants' "reading of *Dalton* would insulate a wide swath of genuinely constitutional claims from review simply because the executive has claimed some statutory authority for the challenged action." Pl.'s Reply at 23. Indeed, it strikes me as incongruous that Defendants' choice to make "expansive" statutory

20

JA337

arguments, *see* Jan. 22, 2026 Hr'g Tr. at 37:7, forecloses judicial review of those arguments in the context of constitutional claims!

But as several courts have recognized, where the question becomes one of the President's statutory authority to act, *ultra vires* review is the proper vehicle to bring such a challenge. *See Dalton*, 511 U.S. at 472 ( "If all executive actions in excess of statutory authority were *ipso facto* unconstitutional . . . , there would have been little need in [*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949)] for our specifying unconstitutional and ultra vires conduct as separate categories."); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) (reviewing claim that "presidential action— not one, it should be added, even contemplated by Congress—independently violates [another] statute" under *ultra vires* theory).[6]

The National Trust unfortunately did not bring an *ultra vires* claim, and the parties as a result have not briefed whether *ultra vires* review is available or whether Defendants' conduct rises to the level of acting *ultra vires*. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting the Court has "strictly limited nonstatutory ultra vires review to the painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)]" (internal quotation marks omitted)); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (describing "demanding" standard for successful *ultra vires*

---

[6] Recent cases challenging executive action have proceeded under *ultra vires* theories. *See, e.g., Illinois v. Trump*, 2025 WL 2886645, at *21 (N.D. Ill. Oct. 10, 2025) (granting temporary restraining order on *ultra vires* claim), *stay denied in part and granted in part by, Illinois v. Trump*, 155 F.4th 929, 933 (7th Cir. 2025), *stay denied by, Trump v. Illinois*, 146 S. Ct. 432, 434 (2025); *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369–70 (Ct. Int'l Trade) (granting summary judgment on *ultra vires* claim), *aff'd in part, vacated in part, remanded sub nom., V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom., Learning Res., Inc. v. Trump*, 2026 WL 477534 (U.S. Feb. 20, 2026).

21

claims). Thus, absent an amended complaint raising *ultra vires* claims, I cannot reach the merits of the National Trust's novel and weighty statutory arguments.

## CONCLUSION

The parties have jockeyed for the most legally advantageous position to either support, or oppose, the injunction that is the object of this suit.

Unfortunately, because both sides initially focused on the President's constitutional authority to destruct and construct the East Wing of the White House, Plaintiff didn't bring the necessary cause of action to test the statutory authority the President claims is the basis to do this construction project without the blessing of Congress and with private funds.

If Plaintiff is inclined to amend its complaint with the necessary *ultra vires* cause of action to test the President's statutory authority, the Court will expeditiously consider it and, if viable, address the merits of the novel and weighty issues presented.

Until then, however, I have no choice but to deny Plaintiff's motion for a preliminary injunction for lack of likelihood of success on the merits.

For all the reasons stated above, it is hereby **ORDERED** that the National Trust's Motion for a Preliminary Injunction [Dkt. #2] is **DENIED**.

An Order consistent with the above will issue with this Memorandum Opinion.

**SO ORDERED**.


_____
RICHARD J. LEON
United States District Judge


22

JA339

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC )
PRESERVATION IN THE UNITED )
STATES, )
      Plaintiff, )
                       ) Civil Case No. 25-4316 (RJL)
v. )
)
NATIONAL PARK SERVICE, *et al.*, )
)
      Defendants. )
)

### ᵗʰ ORDER
February 26 , 2026 [Dkt. #2, 35, 39, 41]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for Preliminary Injunction [Dkt. #2] is

**DENIED**; and it is further

**ORDERED** that defendants' Motion to Strike Declaration [Dkt. #35] is **DENIED**;

and it is further

**ORDERED** that defendants' Motion to Stay Any Preliminary Injunction Pending

Appeal [Dkt. #39], and plaintiff's Motion to Strike Defendants' Motion for Stay Pending

Appeal [Dkt. #41] are both **DENIED** as moot.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

1

JA340

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**,
600 14th Street N.W., Washington, D.C. 20005,

*Plaintiff*,

v.

**NATIONAL PARK SERVICE**,
1849 C Street, N.W., Washington, D.C. 20240;

**JESSICA BOWRON, in her official capacity as ACTING DIRECTOR, NATIONAL PARK SERVICE**,
1849 C Street, N.W., Washington, D.C. 20240;

**JOHN STANWICH, in his official capacity as SUPERINTENDENT, THE WHITE HOUSE AND PRESIDENT'S PARK**,
1849 C Street, N.W., Washington, D.C. 20240;

**DEPARTMENT OF THE INTERIOR**,
1849 C Street, N.W., Washington, D.C. 20240;

**DOUGLAS BURGUM, in his official capacity as SECRETARY OF THE INTERIOR**,
1849 C Street, N.W., Washington, D.C. 20240;

**GENERAL SERVICES ADMINISTRATION**,
1800 F Street, N.W., Washington, D.C. 20405;

**MICHAEL J. RIGAS, in his official capacity as ACTING ADMINISTRATOR, GENERAL SERVICES ADMINISTRATION,**
1800 F Street, N.W., Washington, D.C. 20405;

**DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES**,
1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500;

**EXECUTIVE OFFICE OF THE PRESIDENT**,
1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500;

**SUSIE WILES, in her official capacity as WHITE HOUSE CHIEF OF STAFF**, 1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500;

Civil Action No. 25-4316

JA341

**OFFICE OF THE EXECUTIVE RESIDENCE**, 1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500; and

**ROBERT B. DOWNING, in his official capacity as WHITE HOUSE CHIEF USHER**, 1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500,

*Defendants*.

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.       With its modest neoclassical design, the White House has served as a symbol of the United States for over two hundred years. In late October 2025, at the direction of President Donald J. Trump, the defendants in this action (together, "Defendants") demolished the East Wing of the White House in order to build a 90,000-square-foot ballroom ("Ballroom") on its site ("Ballroom Project"). They did so without seeking approval from Congress; without requesting review and approval from the federal commissions charged with oversight of development in the nation's capital; without conducting the required environmental studies; and without allowing the public any opportunity for input. Within days, the East Wing and its colonnade—a version of which was first built on the site during the presidency of Thomas Jefferson—were completely destroyed.

2.       The Defendants did not stop with the demolition of the East Wing. Recent reporting describes the former location of the East Wing as a bustling construction site, with dozens of workers driving piles, stockpiling materials, and amassing heavy machinery. In early December 2025, a towering construction crane was erected on the White House grounds, and President Trump recounted that work on the Ballroom Project was audible all night. Yet the Defendants *still* have not sought review of the Ballroom Project or obtained the necessary approvals. And the American public, to whom the White House belongs, *still* has had no chance to provide its input.

3.       No president is legally allowed to tear down portions of the White House without any review whatsoever—not President Trump, not President Biden, and not anyone else. And no president is legally allowed to construct a ballroom on public property without giving the public the opportunity to weigh in. President Trump's efforts to do so should be immediately halted, and work on the Ballroom Project should be paused until the Defendants complete the required

1

JA343

reviews—reviews that should have taken place *before* the Defendants demolished the East Wing, and *before* they began construction of the Ballroom—and secure the necessary approvals.

4.      Plaintiff, the National Trust for Historic Preservation in the United States ("National Trust"), is a private charitable, educational non-profit corporation chartered by Congress in 1949.  *See* Pub. L. 81-408, 63 Stat. 927 (Oct. 26, 1949). The purpose of the National Trust is to further the historic preservation policy of the United States and to promote the public's awareness of and ability to comment on any activity that might damage or destroy our nation's architectural heritage. *See* 54 U.S.C. § 312102. The Trust is obligated by its charter "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." *Id.* § 312102(a). In furtherance of those goals, the Trust has brought historic preservation suits across—and against—numerous Presidential administrations.

5.      Upon learning of the Defendants' sudden, unilateral, and unlawful decision to destroy the East Wing of the White House, the National Trust immediately wrote to the National Park Service, the National Capital Planning Commission ("NCPC"), and the Commission of Fine Arts ("CFA") on October 21, 2025, urging the cessation of demolition and initiation of the review procedures for the plans for the Ballroom Project. The National Trust received no response. The National Trust brings this action to compel the Defendants to comply with procedural requirements that inform the public and protect the public's opportunity to comment on the Ballroom Project.

6.      The Defendants were required to submit their plans to the NCPC, the CFA, and Congress for review before they began work on the demolition of the East Wing and the construction of the Ballroom. *See* 40 U.S.C. §§ 8106 ("A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."), 8722(b) ("[A] federal . . . agency, before preparing

2

JA344

construction plans the agency originates for proposed developments and projects . . . shall advise and consult with the [NCPC] as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital."), 8722(d) ("[T]he location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of the [NCPC]."); 45 C.F.R. § 2101.2(b) ("Officers and departments of the federal government responsible for finally approving or acting upon proposed projects [for certain development within the District of Columbia] are required first to submit plans or designs for such projects to the [CFA] for its advice and comments."). And they were required to secure the approval of the NCPC and Congress. *See* 40 U.S.C. §§ 8106; 8722(d). Yet it appears that site preparation and preliminary construction of the proposed new Ballroom is proceeding without any review by either commission or by Congress, and without the necessary approvals.

7.      By evading this required review, the Defendants are depriving the public of its right to be informed and its opportunity to comment on the Defendants' proposed plans for the Ballroom Project. This public involvement, while important in all preservation matters, is particularly critical here, where the structure at issue is perhaps the most recognizable and historically significant building in the country.

8.      The National Trust therefore brings this action for declaratory and injunctive relief. Specifically, the National Trust requests that this Court declare that the Defendants' commencement of, and continued work on, the Ballroom Project violates numerous federal statutes, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; certain statutes requiring review of the project by the NCPC and the CFA, and approval by the NCPC, *see* 40 U.S.C. §§ 8721-8722, 9102; *see also* 45 C.F.R. §§ 2101.1-2101.2; a statute requiring

3

JA345

construction of the Ballroom to be expressly authorized by Congress, *see* 40 U.S.C. § 8106; and the National Environmental Policy Act ("NEPA"), *see* 42 U.S.C. § 4332(2)(C). The National Trust further requests that the Defendants be enjoined from continuing work on the Ballroom Project until the necessary federal commissions have reviewed and approved the project's plans; adequate environmental review has been conducted; and Congress has authorized the Ballroom's construction.

## PARTIES

9.      Defendant National Park Service is a federal agency within the Department of the Interior that is charged with the management of most of the country's national parks, including the national park known as "The White House and President's Park" (hereinafter "President's Park") in Washington, D.C., within which the White House is located. The National Park Service is headquartered in Washington, D.C.

10.      Defendant Jessica Bowron was appointed Acting Director of the National Park Service in or about January 2025. Defendant Bowron is the highest-ranking official of the National Park Service. As such, she is responsible for overseeing the National Park Service's management of the country's national parks, including President's Park in Washington, D.C. Acting Director Bowron is also responsible for ensuring that the National Park Service complies with all laws in its operations. Acting Director Bowron is sued in her official capacity.

11.      Defendant John Stanwich is Superintendent of President's Park. In that capacity, Superintendent Stanwich is responsible for overseeing the management of President's Park in Washington, D.C. Superintendent Stanwich is sued in his official capacity.

12.      Defendant Department of the Interior is an executive department charged with the management and conservation of most federal lands, including President's Park in Washington, D.C. The Department of the Interior is headquartered in Washington, D.C.

4

JA346

13.     Defendant Douglas Burgum is the Secretary of the Interior. As head of the Department of the Interior, he is responsible for the Department's management and conservation of federal lands, including President's Park in Washington, D.C. Secretary Burgum is also responsible for ensuring that the Department of the Interior complies with all laws in its operations. Secretary Burgum is sued in his official capacity.

14.     Defendant General Services Administration ("GSA") is an independent agency that assists in the management of federal property. Among other things, GSA manages and supports federal construction projects. GSA is headquartered in Washington, D.C.

15.     Defendant Michael J. Rigas is the Acting Administrator of GSA. As Acting Administrator, he is responsible for overseeing and directing GSA's operations. Acting Administrator Rigas is also responsible for ensuring that GSA complies with all laws in its operations. Acting Administrator Rigas is sued in his official capacity.

16.     Defendant Donald J. Trump is the President of the United States. President Trump planned and directed the demolition of the East Wing and is planning and directing the construction of the Ballroom on its site. President Trump is sued in his official capacity.

17.     Defendant the Executive Office of the President is an executive branch entity that houses various executive offices, including the Office of Management and Budget, the Council of Economic Advisors, and the Office of the Executive Residence. The Executive Office of the President is located in Washington, D.C.

18.     Defendant Susie Wiles is the White House Chief of Staff.  In that capacity she is, among other things, the head of the Executive Office of the President. Chief of Staff Wiles is responsible for ensuring that the Executive Office of the President complies with all laws in its operations. Chief of Staff Wiles is sued in her official capacity.

JA347

19.     Defendant the Office of the Executive Residence is an office within the Executive Office of the President. The Office of the Executive Residence has historically been charged with the management of the executive residence, including upkeep and housekeeping functions. The Office of the Executive Residence is located in Washington, D.C.

20.     Defendant Robert Downing is the White House Chief Usher. In that capacity he is, among other things, the head of the Office of the Executive Residence. Chief Usher Downing is responsible for ensuring that the Office of the Executive Residence complies with all laws in its operations. Chief Usher Downing is sued in his official capacity.

21.     Plaintiff, the National Trust for Historic Preservation in the United States, is a private charitable, educational, non-profit corporation headquartered in Washington, D.C. The National Trust protects America's historic sites through stewardship, advocacy, and direct assistance. It stewards twenty-seven historic sites, all of which are open to the public. The National Trust owns the historic Stephen Decatur House on Lafayette Square, which is managed by the White House Historical Association pursuant to co-stewardship agreements. The Trust helps neighbors, partners, and individuals across the country protect threatened historic sites in their own communities. And it takes legal action to protect threatened sites where necessary. For example, the National Trust has filed suit numerous times over the years to stop highway projects that would have destroyed historic neighborhoods and communities. *See, e.g., Coalition Against a Raised Expressway v. Dole,* 835 F.2d 803 (11th Cir. 1988); *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d 700 (11th Cir. 1985); *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 770 F.2d 423 (5th Cir. 1985); *City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106 (C.D. Cal. 1999).

22.     The National Trust has thousands of members across the country. Members of the National Trust use, enjoy, derive personal and professional benefit from, and have a substantial

6

JA348

interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park. For example, one Trust member—a professor emerita at a university where she taught history and historic preservation, and a member of the boards of various historic-preservation organizations—resides in Washington, D.C., and frequently visits the White House neighborhood in order to enjoy the historic buildings and the beauty of the city's design, in which the White House prominently features. The interests of this Trust member, and those of other members, have been impaired by the destruction of the East Wing of the White House by the Defendants, and will be impaired further by the construction on the East Wing's former site of a ballroom substantially similar to that which the Defendants propose to build. If given the legally required opportunity, the National Trust would provide comments expressing its and its members concerns regarding the Ballroom Project, the substance of which is described further herein.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action presents federal questions under the Constitution and the laws of the United States. An actual, justiciable controversy now exists between the National Trust and the Defendants, and relief may be granted under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

24.     Venue is proper in this district because the parties reside in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(c), (e).

7

JA349

**FACTUAL BACKGROUND**

**The White House**

25.    The White House is the official residence of the President of the United States. It is located in President's Park, a federal park administered by the National Park Service in Washington, D.C. President's Park encompasses the White House and its grounds, the Ellipse, Lafayette Square, the Eisenhower Executive Office Building, and the Treasury Building.

26.    Conceived by the capital's initial planner, Pierre Charles L'Enfant, as a grand presidential palace, the White House owes its modest yet iconic profile to James Hoban, an Irish-born architect whose winning submission to an architectural competition served as the plans for the new building. Hoban's surviving sketches depict a structure, on the scale of what would then have been a large country house, that substantially resembles the Executive Residence today.



*Figure 1 – Plan drawn by James Hoban circa his 1793-1794 designs for the White House. The White House Historical Association.*

27.    Construction of the White House according to Hoban's plans began in the 1790s and, in 1800, near the end of his presidency, President John Adams moved into the still unfinished building. In 1801, President Adams was succeeded in the presidency—and in the White House— by Thomas Jefferson. Every president since has resided in the White House while in office.

8

JA350

28.    President Jefferson, a talented self-trained architect, took an active interest in the White House, remodeling the residence's interiors, adding fencing, and developing its grounds. Perhaps his most significant improvement, however, was the construction of colonnades extending east and west from the White House, initial plans for which the President sketched himself. These colonnades were likely inspired by Renaissance villas with which President Jefferson was familiar, and were similar to structures that he had previously built at Monticello, his personal residence in Virginia.



*Figure 2 – "Elevation of the South front of the President's house, copied from the design as proposed to be altered in 1817," Benjamin Henry Latrobe. The colonnades are depicted on the left and the right of the main structure. Library of Congress.*

29.    President Jefferson's colonnades, along with much of the rest of the White House, suffered substantial damage during the War of 1812. After the war, the White House—including its colonnades—was rebuilt under the supervision of Hoban, with input from then-former President Jefferson. The White House returned to use by 1818, and reconstruction of the east and west colonnades continued through the remainder of the decade.

### The East and West Wings of the White House

30.    In 1902, the East and West Wings were added at the ends of new east and west colonnades. The West Wing was constructed as an executive office building; today, it houses the

9

Oval Office, the Cabinet Room, and office space for the President and executive staff. Initially, the East Wing served as a receiving area for visitors and guests attending functions at the White House.

31.     The East Wing was expanded in 1942 to increase its footprint, add a second story, and construct a bunker underneath the building. The bunker provided the President and staff with a secure meeting place in the event of an emergency during the war, and continued to serve that purpose in the decades thereafter.

32.     The principal function of the modern East Wing, however, has been to house the offices of the First Lady. By the 1930s, First Lady Eleanor Roosevelt was using the East Wing for official functions and news conferences. Subsequent presidential spouses kept their own staff and offices in the East Wing. This arrangement, by then commonplace, was formalized in the latter part of the century by the White House Personnel Authorization Act of 1978, Pub. L. 95-570, § 105(e), 92 Stat. 2445, 2446 (Nov. 2, 1978), which made available to the First Lady funds for an office and staff.

33.     In addition to offices for the First Lady and her staff, the East Wing contained a small theater. Constructed during the 1942 renovations, the theater was used by many presidents, their families, and guests for more than eighty years to show movies and watch major sporting events.

 

*Figure 3 (left) – "President George W. Bush Speaks to the Attendees of the Screening of 'United 93' in the White House Family Theater." National Archives Catalog / George W. Bush Library.*

10

JA352

*Figure 4 (right) – President Bill Clinton, family, staffers, and guests watching the Super Bowl in 1993. Clinton Library.*

34.     Located on the grounds outside of the East Wing was a garden, constructed shortly after the East Wing itself. Dating to 1903, but dedicated to former First Lady Jacqueline Kennedy in 1965, the Jacqueline Kennedy Garden balanced the Rose Garden on the west side of the White House. The Jacqueline Kennedy Garden, depicted below, featured a defined central lawn bordered by a brick walk and various botanical specimens. A pergola designed by the architect I.M. Pei was located at its west end. Like the Rose Garden, the Jacqueline Kennedy Garden was used to host events and receptions. Along with the East Wing, the Kennedy Garden was demolished in its entirety by the Defendants.



*Figure 5 – Jacqueline Kennedy Garden (2023). National Park Service / Kelsey Graczyk.*

35.     Around the East Wing and the Jacqueline Kennedy Garden were several commemorative trees, including a silver linden planted by former First Lady Laura Bush and two magnolias planted in the middle of the twentieth century and dedicated to the memory of President Warren Harding and President Franklin D. Roosevelt, respectively. On information and belief, one or more of these trees were removed or destroyed by the Defendants.

11

JA353

**The Defendants Announce Plans for the Ballroom**

36.    On July 31, 2025, the White House issued a press release (the "July 2025 Press Release") announcing plans to build a "White House State Ballroom" on the White House grounds. The purpose of the Ballroom, as announced by the July 2025 Press Release, was to host "substantially more guests" at the White House than could presently be accommodated indoors. The press release stated that the Ballroom would be "approximately 90,000 total square feet of ornately designed and carefully crafted space, with a seated capacity of 650 people – a significant increase from the 200-person seated capacity in the East Room of the White House."

37.    According to the July 2025 Press Release, the Ballroom "will be substantially separated from the main building of the White House, but at the same time, it's [sic] theme and architectural heritage will be almost identical." The press release stated that "[t]he site of the new ballroom will be where the small, heavily changed, and reconstructed East Wing currently sits."

38.    The July 2025 Press Release announced that "[t]he project will begin in September 2025" and was "expected to be completed long before the end of President Trump's term" in January 2029. The press release stated that McCrery Architects would serve as the lead architect on the project; that the construction team would be headed by Clark Construction; and that the engineering team would be led by AECOM.

39.    Included at the bottom of the July 2025 Press Release was a series of six images. Five of the images appeared to depict a structure on the east side of the White House, roughly on the site where its East Wing then stood. The structure shown in the images was substantially larger than the East and West Wings, and out of proportion to the Executive Residence to which it appeared to be attached. The sixth image depicted what was presumably the interior of that structure—a large room with oversized windows and gold trim on the ceiling.

12

JA354

 

*Figure 7 (left) – Rendering of the exterior of the planned Ballroom. July 2025 Press Release.*
*Figure 8 (right) – Rendering of the interior of the planned Ballroom. July 2025 Press Release.*

40.    The July 2025 Press Release did not specify whether the Defendants intended to replace the East Wing with the planned Ballroom, or instead incorporate some or all of the East Wing into the larger structure.

41.    However, on or about July 31, 2025, President Trump stated that the proposed Ballroom "won't interfere with the current building. . . . It'll be near it, but not touching it, and pays total respect to the existing building, which I'm the biggest fan of."

42.    The Defendants also gave no indication that they planned to ignore or to attempt to circumvent the statutorily required review processes for the Ballroom Project. For example, the White House Chief of Staff, Susie Wiles, was quoted in the July 2025 Press Release as saying that "[t]he President and the Trump White House [we]re fully committed to working with the appropriate organizations to preserving [sic] the special history of the White House" while building the Ballroom.

43.    The July 2025 Press Release also stated that, "[i]n recent weeks, President Trump ha[d] held several meetings with members of the White House Staff, the National Park Service, the White House Military Office, and the United States Secret Service to discuss design features and planning"—meetings which, in the normal course, would be followed by the legally required

13

JA355

submission of design plans for the Ballroom Project to the federal commissions responsible for oversight of the construction of public buildings in the District of Columbia.

44.     However, during the months following the July 2025 Press Release, none of the agencies responsible for the Ballroom Project submitted plans or proposals for the Ballroom Project to the NCPC or the CFA, or sought Congressional approval for the project.

45.     Rather, the Defendants and their associates began to suggest that they intended to proceed without the required reviews. In September 2025, William Scharf, a lawyer and aide for the President who had also been serving as chairman of the NCPC since his appointment two months prior, stated that, in his opinion, what the NCPC "deal[t] with [wa]s essentially construction, vertical build"—not demolition. And at a dinner for donors on or about October 15, 2025, President Trump said that he had been told by two men that, as President, he could "do anything [he] want[ed]" to the White House.

46.     During this time, the planned size of the Ballroom, already out of proportion to the rest of the White House, appeared to increase substantially. On September 13, 2025, President Trump stated in an interview with NBC News that he was "making [the Ballroom] a little bigger." Under the President's new plan, the Ballroom would accommodate 900 people—more than a 30 percent increase from the 650-person capacity announced in the July 2025 Press Release. The size of the proposed new Ballroom increased further in October 2025, as the President, while speaking to a group of donors, stated that it would now be capable of accommodating nearly 1,000 people.

47.     During this same period, several architectural groups sought to persuade the Defendants to engage in the required reviews before beginning work on the Ballroom Project. In an August 5, 2025 letter, the American Institute of Architects ("AIA") urged defendant Stanwich, in his capacity as Executive Secretary for the Committee for the Preservation of the White House—

14

JA356

an advisory committee responsible for matters concerning the preservation of the building—"to allocate the time necessary for a rigorous process" and "ensur[e that] decisions" concerning the White House were "made with the utmost care and consideration." The White House, the AIA's letter noted, was "not a private building," and "[a]ny modifications to [the White House]—especially modifications of th[e] magnitude [of the Ballroom]—should reflect the importance, scale, and symbolic weight of the White House itself." To that end, the AIA urged a review process that "r[o]se to the significance of the building and the proposed alterations," including, among other things, a transparent and publicly accountable historic-preservation review.

48.    Similarly, in an October 16, 2025 statement, the Heritage Conservation Committee for the Society of Architectural Historians ("SAH") "expresse[d] great concern over the proposed ballroom addition to the White House." Although "recogniz[ing] that the White House [wa]s a building with evolving needs," the SAH noted that "the proposed ballroom w[ould] be the first major change to [the White House's] exterior appearance in the last 83 years," "since the East Wing in its current form was built in 1942." "[S]uch a significant change to a historic building of this import," the SAH urged, "should follow a rigorous and deliberate design and review process." The SAH requested that a comprehensive preservation review be undertaken; that the impacts of the Ballroom Project on the White House grounds be evaluated; and that the broader national impacts on historic preservation be considered.

49.    It is not unusual for even minor structures proposed to be built on the White House grounds to be subject to extensive review. For example, in 2016, defendant the National Park Service submitted concept plans to the NCPC for the installation of a new perimeter fence around the White House. The National Park Service's proposal included three options for the fence's finials and the design of its base, and two variations of the size and spacing of its pickets. The

15

JA357

NCPC's executive director prepared a lengthy evaluation of the National Park Service's proposal, with detailed analysis and comments regarding how the various picket styles cohered with the design of the White House, the potential for the new fence to obstruct the public's view of the building, and other matters. Notably, this evaluation, although favorable, was not an approval of the National Park Service's project—for that, the National Park Service had to submit preliminary and then final project plans for further review by the NCPC.

50.    Further, in 2019, during President Trump's first term, the National Park Service submitted multiple sets of plans to the NCPC in connection with its proposed replacement of a small building on the White House grounds housing a restroom and storage space with a new tennis pavilion. The NCPC approved the National Park Service's final construction plans. A report prepared by the executive director in connection with the proposal concluded, after thorough consideration, that the pavilion would "improve the existing restroom facility, provide a connection between the Children's Garden and the tennis court, and w[ould] not impact any historic resources or prominent vistas," and recommended its approval.

## The Defendants Demolish the East Wing

51.    Despite not having sought review of the plans for the Ballroom Project—a much more significant project than either the new fence or the tennis pavilion—and despite the public's concerns, the Defendants forged ahead. On October 20, 2025, President Trump posted a statement to social media announcing that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." President Trump stated that "the East Wing"— which he characterized as "[c]ompletely separate from the White House itself"—was "being fully modernized as part of this process, and will be more beautiful than ever when it is complete!"

16

JA358

52.    During a press conference in the East Room of the White House that same day—while destruction of the East Wing was actually underway—President Trump confirmed that the demolition of the East Wing was happening "right behind us" and "might [be] hear[d] periodically."

53.    On October 21, 2025, various media outlets reported on the demolition of the East Wing. Images published by the New York Times showed heavy machinery tearing down the East Wing's façade.



*Figure 9 – Demolition of the East Wing of the White House. Alex Kent / The New York Times.*

54.    Later that day, the National Trust submitted a letter to Commissioner Scharf, in his capacity as the chairman of the NCPC; the chair of the CFA; and defendant Bowron, in her capacity as Acting Director of the National Park Service.

55.    In the letter, the National Trust explained that its congressional charter obligated it to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." The National Trust expressed its "deep[] concern[] that the massing and height of the proposed new construction w[ould] overwhelm the White House itself . . . and m[ight] also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings." The National Trust's letter further explained that

17

JA359

"[t]he federally recognized Secretary of the Interior's Standards for Rehabilitation offer[ed] clear guidance for construction projects affecting historic properties," specifically "provid[ing] that new additions should not destroy the historic fabric of the property and that the new work should be compatible with existing massing, size, scale, and architectural features."

56.     The National Trust "respectfully urge[d] the Administration and the National Park Service to pause demolition until plans for the proposed ballroom [went] through the legally required public review process, including consultation and review by the [NCPC] and the [CFA], and to invite comment from the public." These processes, the Trust explained, "provide[d] a crucial opportunity for transparency and broad engagement—values that ha[d] guided preservation of the White House under every administration going back to the public competition in 1792 that produced the building's original design."

57.     The National Trust received no response to its letter.

58.     Despite the Trust's concerns, and those of the public, the Defendants did not pause demolition of the East Wing or engage, however belatedly, in the legally required review process. Rather, that same day, the White House issued a press release asserting that "unhinged leftists and their Fake News allies" were "manufactur[ing] outrage" and "clutching their pearls" over President Trump's "visionary addition of a grand, privately funded ballroom to the White House."

59.     The next day, October 22, 2025, President Trump showed renderings of the Ballroom to members of the press and other persons gathered in the White House during a meeting with NATO Secretary General Mark Rutte. A three-dimensional model on a table in front of President Trump displayed the Ballroom on the site of the East Wing.

18

JA360



*Figure 10 – Three-dimensional rendering of the Executive Residence and of the planned Ballroom displayed by President Trump in the Oval Office.*

60.     President Trump stated that the East Wing was "a very small building" that was "never thought of as being much." "Over the years, many presidents have made changes," President Trump claimed, while showing renderings of the Ballroom. "This," he continued, referring to the ongoing razing of the East Wing, "obviously would be the biggest change."

61.     President Trump did not explain why it had been determined that the East Wing would have to be razed to accommodate the Ballroom except to say that, "[i]n order to do it properly, we had to take down the existing structure." Nor did President Trump divulge when it had been decided that the East Wing would be razed; who had been consulted; or why the statutorily required processes had not been followed.

62.     The updated renderings of the Ballroom displayed by President Trump showed marked differences from the images in the July 2025 Press Release, including the number of large exterior windows, the number of columns in the proposed northeast portico, and the design of the staircase leading from the Ballroom to the South Lawn. Other aspects of the October renderings suggested a haphazard design process—the exterior trim of two windows appeared to collide, for instance, and a set of stairs led to no apparent landing.

19

63.    On or about the same day, October 22, 2025, a White House official confirmed to the press that the "entirety" of the East Wing would be "modernized and rebuilt." The same official acknowledged that "[t]he scope and size of the ballroom project ha[d] always been subject to vary as the process develop[ed]."

64.    Within days, the Defendants had demolished the entirety of the East Wing. An aerial photograph taken on October 23, 2025, reflected the demolition of the East Wing and the east colonnade.



*Figure 11 – Aerial photograph of President's Park and the surrounding area on October 23, 2025. The site of the former East Wing is to the right of the remainder of the White House. ABC News / Katie Harbath.*

65.    A satellite photograph likewise depicted cleared space where the East Wing previously stood.



20

*Figure 12 (left) – Satellite photograph of the White House and grounds taken on September 26, 2025. Planet Labs PBC.*

*Figure 13 (right) – Satellite photograph of the White House and grounds taken on October 23, 2025. Planet Labs PBC.*

66.    And photographs taken from near the White House showed the demolition of nearly the entire East Wing and east colonnade.



*Figure 14 – Photograph of debris at the East Wing taken on October 23, 2025.  Jacquelyn Martin / AP.*

67.    Debris from the demolished East Wing was dumped at a nearby public park. Photographs of the dumping of the debris were published by media organizations. On information and belief, the dumping of debris at the park was done by or at the direction of one or more of the Defendants or their agents.

68.    In a press conference held on October 23, 2025, Press Secretary Karoline Leavitt, when asked by a reporter why the public had not been informed of the decision to demolish the East Wing, stated that, "[w]ith any construction project, changes come" and claimed that the press and public had been "ke[pt] . . . apprised" by having been shown renderings of the Ballroom.

69.    Press Secretary Leavitt explained that "the President heard counsel from the architects and the construction companies who said that in order for the East Wing to be modern and beautiful for many, many years to come, for it to be a truly strong and stable structure, this

21

JA363

phase one that we're now in"—presumably a reference to the demolition of the East Wing—"was necessary." Press Secretary Leavitt did not explain why the Defendants had not also sought counsel from the federal commissions charged with reviewing such projects.

70.    When asked by another reporter if the President could "tear down anything he wants" at the White House "without oversight," Secretary Leavitt stated her opinion that approval was needed only for vertical construction, not demolition, echoing statements previously made by Commissioner Scharf and President Trump.

71.    The Defendants provided no information about the results of any environmental review or the safety precautions that were undertaken in connection with the demolition of the East Wing and the disposal of the debris. Rather—and despite NPS having undertaken an environmental assessment of the project in August 2025—they failed to publish the assessment until after the work was already underway and after the National Trust commenced this action, despite being required by statute to publish it, *see* 42 U.S.C. § 4336(b)(2). Because NPS's environmental assessment concluded that the project would have no significant impact, NPS did not prepare an environmental impact statement.

**The Defendants Begin to Construct the Ballroom Without Submitting Plans for Review**

72.    Although more than two months have passed since the demolition of the East Wing, on information and belief, the Defendants have not submitted any plans for the Ballroom Project to the NCPC, the CFA, or Congress for review and approval as of the filing of this complaint.

73.    The CFA has not met since all its members were dismissed by President Trump on or about October 28, 2025. As of the filing of this amended complaint, the CFA has no sitting members and is not scheduled to meet again until January 2026.

22

JA364

74.    As for the NCPC, although Chair Scharf stated at the NCPC's December 4, 2025 meeting that he had "been told by colleagues at the White House . . . that the ballroom plans will be submitted to NCPC this month, in December," he acknowledged that he had been "screened from planning itself over there." Plans for the Ballroom Project were not reviewed at the December 4, 2025 meeting, and the Ballroom Project was not on the list of projects anticipated for review over the next six months issued by the NCPC prior to that meeting. The NCPC is not scheduled to meet again until January 2026.

75.    Although on December 19, 2025 the NCPC placed an "information presentation" about the Ballroom Project on the NCPC's agenda for its January 8, 2026 meeting, on information and belief, the Defendants have not submitted any plans. As of the filing of this amended complaint, the Ballroom Project's project file on the NCPC website consisted of only a single document: a set of FAQs prepared by the NCPC. *See* Project Information, 8733 East Wing Modernization Project, NCPC, https://www.ncpc.gov/review/project/8733/ (last accessed Dec. 29, 2025).

76.    The Defendants have never publicly acknowledged their obligation to secure Congress's express authorization for the Ballroom Project, and on information and belief have not sought such authorization or submitted any project plans to Congress.

77.    Despite having failed to obtain (or even request) review and approval of their plans for the Ballroom Project, the Defendants have begun construction at the site of the East Wing. The White House's website announces that "construction commence[d]" in "September 2025" and invites the reader "to check back here for completed phases of renovation." None of the White House's listed stages of the Ballroom Project include review or approval by the NCPC, CFA, or Congress.

23

JA365



78. Recent public reporting describes the location of the former East Wing as "a bustling project site . . . almost entirely fenced off from public view" and "contain[ing] dozens of workers and materials ready to be installed, including reinforced concrete pipes and an array of cranes, drills, pile drivers and other heavy machinery."

79. In late November 2025, it was reported that President Trump had been "holding frequent meetings about [the Ballroom's] design and materials"; clashing with James McCrery, then the project's lead architect, over the President's desire to keep increasing the size of the Ballroom; personally selecting the project's contractors and handling details of their contracts, including amounts of payment; and telling people working on the project that they did not need to follow permitting, zoning, or code requirements because the structure was on White House grounds.

80. On December 4, 2025, it was reported that President Trump had chosen a new architect, Shalom Baranes, to replace McCrery.

24

81.    In late November and early December 2025, heavy construction machinery and construction materials, including concrete pipes, pile drivers, and drills, were installed at the former site of the East Wing. A construction crane anchored to a concrete paddock now towers above the fences surrounding the site. President Trump told his cabinet that the pile drivers operate "all night," and that he had rebuffed requests from the First Lady to cease the pounding, stating: "Sorry, darling, that's progress."

**The Executive Office of the President and the Office of the Executive Residence Takes Control of the Ballroom Project**

82.    In filings made in connection with their opposition to the National Trust's motion for a temporary restraining order and preliminary injunction, and at a hearing held on that motion on December 16, 2025, the Defendants stated that the Ballroom Project was "now proceeding under the leadership of the Office of the Executive Residence" and the Executive Office of the President. ECF 15-1 at 6; *see also* ECF 14-1 ¶ 13, 14-6 ¶ 8; Dec. 16, 2025 Hrg. Tr. 24:5-9 (Executive Office of the President), 18-20 (Office of the Executive Residence).

83.    The Defendants did not explain when the Office of the Executive Residence and the Executive Office of the President had taken control of the Ballroom Project from the National Park Service (which conducted the environmental reviews and is charged with management of projects in national parks), or what authority purported to justify the change in control. Nevertheless, the Defendants implied that because the Office of the Executive Residence and the Executive Office of the President were managing the Ballroom Project, judicial review of the Project would be substantially limited, if not outright prohibited. *See* Dec. 16, 2025 Hrg. Tr. 24:5-9.

25

JA367

## STATUTORY AND REGULATORY BACKGROUND

### The National Capital Planning Act

84.     Enacted in 1952, the National Capital Planning Act established the NCPC "as the central planning agency for . . . the appropriate and orderly development and redevelopment of the National Capital and the conservation of the important natural and historical features thereof." National Capital Planning Act of 1952, Pub. L. No. 82-592, § 2(a), 66 Stat. 781, 782 (July 19, 1952) (codified as amended at 40 U.S.C. § 8711(a) ("The [NCPC] is the central federal planning agency for the Federal Government in the National Capital, created to preserve the important historical and natural features of the National Capital . . . .")).

85.     The NCPC consists of twelve members. *See* 40 U.S.C. § 8711(b). Seven—the Secretary of the Interior, the Secretary of Defense, the General Services Administrator, the Mayor of the District of Columbia, the chair of the Council of the District of Columbia, the chair of the Committee on Governmental Affairs of the Senate, and the chair of the Committee on Government Reform of the House of Representatives—are *ex officio* and ordinarily appoint alternates in connection with NCPC business. *See id.* The other five members of the NCPC are "citizens with experience in city or regional planning" appointed by either the President or the Mayor of the District of Columbia. *Id.*

86.     The NCPC is charged by statute with "preparing, adopting, and amending a comprehensive plan for the federal activities" in the District of Columbia and its federal environs, and with "making related recommendations to the appropriate developmental agencies." *Id.* § 8711(e)(1); *see id.* § 8721. The comprehensive plan (the "Comprehensive Plan"), which must by law be made available to the public, *see id.* § 8721(g), is published on the NCPC's website, *see* Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10,

26

JA368

2025). The most recent version of the Comprehensive Plan, issued in 2024, contains hundreds of pages of detailed guidance for construction and development in and around the District of Columbia. *See* Comprehensive Plan for the National Capital: Federal Elements, available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025).

87.    One of the principal elements of the Comprehensive Plan is the historic preservation of the capital district. *See id.* at 1. The Comprehensive Plan explains that "[t]he federal government's goal is to preserve, protect, and rehabilitate historic properties in the National Capital Region and promote design and development that is respectful of . . . the symbolic character of the capital's setting." *Id.* at 266. It identifies "[t]he protection and management of historic properties" as "critical elements to successful historic preservation planning." *Id.* at 272. To that end, the Comprehensive Plan instructs the federal government to "[s]ustain exemplary standards of historic property stewardship." *Id.* at 273; *see also id.* at 271 (stating that federal agencies should "be careful stewards of the historic properties under their care or affected by their decisions"). The federal government is obligated to "[r]ecognize the role historic properties . . . have in defining the national capital and its image" and to "[p]lan carefully for appropriate uses and compatible design in and near the monumental core to protect and preserve the nation's key historic properties." *Id.* at 276.

88.    Before "any revision" to the Comprehensive Plan "is adopted," the NCPC must present the revision "to the appropriate federal or District of Columbia authorities for comment and recommendations." 40 U.S.C. § 8721(e)(1). The NCPC and the Mayor of the District of Columbia must "jointly . . . establish procedures for appropriate meaningful continuing consultation throughout the planning process for the National Capital." *Id.* § 8721(h)(1). The

JA369

NCPC "may provide periodic opportunity for review and comments by nongovernmental agencies or groups through public hearings, meetings, or conferences, exhibitions, and publication of its plans," and may, "in consultation with" the Council of the District of Columbia, "encourage the formation of citizen advisory councils." *Id.* § 8721(e)(2).

89.    The Comprehensive Plan's requirements reflect Congress's desire, as expressed in federal statutes governing the NCPC and its operations, for carefully managed development of the capital district, "proceed[ing] along the lines of good order [and] good taste, and with due regard to the public interests involved." *Id.* § 8104(a). Construction in the capital district has broadly adhered to the Comprehensive Plan and these congressional goals, and the district's present state of development stands as evidence of their enduring value.

90.    In addition to promulgating and maintaining the Comprehensive Plan, the NCPC is charged with reviewing agencies' "development programs" for the District of Columbia and its federal environs; "advis[ing] as to [their] consistency with the [C]omprehensive [P]lan"; and ultimately approving, or disapproving, of various elements of proposed development projects. *Id.* §§ 8711(e)(2), 8722(d). Federal buildings proposed to be built in the District of Columbia must receive the NCPC's approval. *Id.* § 8722(d).

91.    An agency intending to engage in development in the District of Columbia must "advise and consult" with the NCPC "before preparing construction plans the agency originates for proposed developments and projects," and must thereafter continue to advise and consult with the NCPC as it "prepares [its] plans and programs in preliminary and successive stages." *Id.* § 8722(b)(1).

92.    "After receiving the [federal agency's] plans," the NCPC is tasked with "promptly . . . mak[ing] a preliminary report and recommendations to the agency." *Id.* The agency then has

JA370

the opportunity, if it disagrees with the NCPC's preliminary report and recommendations, to advise the NCPC of the reasons for its disagreement. *Id.* Thereafter, the NCPC must make a final report and ruling on the project. *Id.*; *see id.* § 8722(d).

93.    The NCPC considers proposed projects in open, public sessions. On its website, the NCPC states that it "welcomes public comment" both prior to and during these sessions. How to Comment, NCPC, https://www.ncpc.gov/participate/guidelines/#written (last visited Dec. 10, 2025). The NCPC's website allows members of the public to submit written comments on "projects, plans, or initiatives where NCPC has a lead or shared responsibility." *See* Public Comment Opportunities, NCPC, https://www.ncpc.gov/participate/notices/ (last visited Dec. 10, 2025). It offers a description of pending projects and information about the type of input the NCPC is seeking, *see id.*, and gives "Commenting Tips" to help members of the public craft their submissions, *see* How to Comment, NCPC, https://www.ncpc.gov/participate/guidelines/#written (last visited Dec. 10, 2025).

94.    The NCPC's website also allows members of the public to register to speak at NCPC meetings. *See id.* Under the heading "Commission Meeting 101," the website offers guidance on various aspects of speaking at NCPC meetings, from how and when to submit testimony in advance of the meeting to where in the NCPC's meeting room the podium at which the public should address the NCPC can be found. *See id.*

95.    The NCPC's advise-and-consult process is mandatory for agency programs that would "affect the plan and development" of the District of Columbia or its federal environs, *see* 40 U.S.C. § 8722(b)(1), with exceptions made only for buildings within the Capitol grounds and structures erected by the Department of Defense on military installations during wartime, *see id.* § 8722(b)(2)(A). Further, "[i]n order to ensure the orderly development" of the capital district and

its federal environs, "the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around [such] buildings" must be "approv[ed]" by the NCPC. *Id.* § 8722(d).

### The Commission of Fine Arts

96.     The CFA is an independent federal agency established by Congress in 1910 to advise on matters of fine art within the District of Columbia. *See* An Act Establishing a Commission of Fine Arts, Pub. L. 61-181, 36 Stat. 371 (May 17, 1910) (codified as amended at 40 U.S.C. §§ 9101-9104). Like the NCPC, the CFA plays an important role in shaping the District of Columbia and the historic buildings it contains.

97.     The CFA is composed of "seven well-qualified judges of the fine arts" appointed by the President for four-year terms, 40 U.S.C. § 9101(a), who are assisted in their duties by a secretary and by "staff as authorized by the [CFA]," 45 C.F.R. § 2101.10; *see* 40 U.S.C. § 9103. As of the filing of this amended complaint, all seven seats on the CFA are vacant, President Trump having dismissed each of the six then-sitting members on or about October 28, 2025.

98.     Federal agencies intending to undertake development or construction projects in the capital district must seek the advice of the CFA on matters concerning fine arts. *See* 40 U.S.C. § 9102(a); 45 C.F.R. § 2101.1(a)(1). "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the designs" "before final approval" of the plans or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1); *see also id.* § 2102.10(a) (requiring submission to the CFA "when concept plans for the project are ready but before detailed plans and specifications or working drawings are prepared").

99.     The agency's submission to the CFA should state, among other things, "the nature, location, and justification of the project" regarding which the CFA's advice is sought, "including

30

JA372

any relevant historical information *about the building or other structure to be altered or razed*" (emphasis supplied), as well as, to the extent relevant, "area studies, site plans, building and landscape schematics, renderings, models, depictions or samples of exterior materials and components, and photographs of existing conditions to be affected by the project." 45 C.F.R. § 2102.10(b)(1). The information submitted must "be sufficiently complete, detailed, and accurate as will enable the [CFA] to judge the ultimate character, siting, height, bulk, and appearance of the project, in its entirety, including the grounds within the scope of the project, its setting and environs, and its effect upon existing conditions and upon historical and prevailing architectural values." *Id.* § 2102.10(b)(2).

100.    After receiving an agency's proposal, the CFA will "comment[] and advise[] on the plans and on the merits of the designs" of the proposed "public building[]." *Id.* § 2101.1(a)(1). The CFA is generally required to "conduct its deliberations and reach its conclusions" in open meetings, *id.* § 2102.1, and must keep "detailed record[s]" of these meetings and of its decision-making, *see id.* § 2102.5.

101.    Notice of the CFA's meetings must be published in the Federal Register. *See id.* § 2102.3. "Interested persons are permitted to attend meetings of the [CFA], to file statements with the [CFA] at or before a meeting, and to appear before the [CFA] when it is in meeting" to present their views on "the matter or issues then before the [CFA]." *Id.* § 2102.4.

102.    The only buildings excepted from the advise-and-consult requirement are the Capitol Building and the Library of Congress buildings, *see* 40 U.S.C. § 9102(c); in all other cases, seeking the CFA's advice is mandatory. Further, even if the agency's project is to proceed in multiple stages, "information about the eventual plans should accompany" the agency's initial

31

JA373

submission, regardless of whether the first stage only seeks "approval for razing or removal of a building or other structure." 45 C.F.R. § 2102.10(c).

## The National Environmental Policy Act

103.    NEPA, codified as amended at 42 U.S.C. § 4321 *et seq.*, has long been described as the "basic national charter for protection of the environment." *Los Angeles v. Nat'l Highway Traffic Safety Admin.,* 912 F.2d 478, 491 (D.C. Cir. 1990) (quoting 40 C.F.R. § 1500.1(a)). The statute, which is intended "to inform agency decisionmaking," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025), requires federal agencies to take a "hard look" at the environmental consequences of their proposals before approving or taking action on them, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  It also requires agencies to make their environmental analyses available to the public. *See* 42 U.S.C. §§ 4332(2)(C), 4336(b)(2).

104.    NEPA is "a purely procedural statute." *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 235 (D.C. Cir. 2025).  As such, it does not "force . . . agenc[ies] to change the course of action [they] propose[]"; instead, it obligates them to make "fully-informed and well-considered" decisions. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (first quoting *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008); and then quoting *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799-800 (D.C. Cir. 2022)). In order to carry out that obligation, agencies must "have available, and . . . carefully consider, detailed information concerning significant environmental impacts" of their proposed actions, and share such information with "the larger audience that may play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

105.    In furtherance of those aims, NEPA requires federal agencies to prepare a "detailed statement" for any "major Federal action[]" that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major" federal actions are those that the responsible agency "determines [to be] subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

106.    If a proposed major federal action does not have "a reasonably foreseeable significant effect" on the quality of the human environment, or if the significance of its effects are unknown, the agency must prepare an "environmental assessment." *Id.* § 4336(b)(2); *see also* 43 C.F.R. § 46.210. In form, the agency's environmental assessment must be "a concise public document" that "set[s] forth the basis of" the agency's findings. 42 U.S.C. § 4336(b)(2). In substance, the environmental assessment must reach one of two conclusions: either that the proposed action has "no significant impact" or "that an environmental impact statement is necessary." *Id.* The agency may issue a finding of no significant impact only if a contemplated action has no reasonably foreseeable significant effects on the quality of the human environment, *see id.* §§ 4332(2)(C), 4336(b)(2); in all other cases, the agency must prepare an environmental impact statement ("EIS").

107.    The agency's EIS must take the form of a "detailed written statement," *id.* § 4336e(6), that describes the "reasonably foreseeable environmental effects of the proposed agency action," including "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented," *id.* § 4332(2)(C)(i), (ii).

108.    Effects of a proposed agency action "are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (alteration in

33

JA375

original) (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)). They need not be direct or immediate effects of the agency's action to qualify as "reasonably foreseeable." *See id.*

109.    The agency's EIS must also propose "a reasonable range of alternatives to the proposed agency action," including a no-action alternative. 42 U.S.C. § 4332(2)(C)(iii); *see* 43 C.F.R. § 46.30. This alternatives analysis, long referred to as "the heart of the environmental impact statement," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (quoting 40 C.F.R. § 1502.14), requires the agency to "look hard" at its options to "bring about the ends of the federal action" proposed, *id.* at 195-96. The agency must "consider[] the relevant factors" and "define goals for its action that fall somewhere within the range of reasonable choices." *Id.* In so doing, the agency may not define "the objectives of its action in terms so unreasonably narrow that only one alternative would accomplish the goals of its action." *Sierra Club v. FERC*, 145 F.4th 74, 88 (D.C. Cir. 2025) (quoting *Citizens Against Burlington*, 938 F.2d at 196) (citation modified).

110.    Throughout its analysis, the agency must consider the proposed project as a whole—from the demolition through to the completion of construction, taking into account all reasonably foreseeable effects. An agency impermissibly "segments" its NEPA review when it divides "connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "The justification for the rule against segmentation is obvious: it 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (alteration in original) (quoting *NRDC v.*

34

JA376

*Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)). The rule also prevents agencies from evading NEPA review with respect to one or more portions of a larger and ostensibly separate project for which the agency has prepared, or will prepare, an EIS.

## Administrative Procedure Act

111.    The APA affords federal judicial review of agency action. *See* 5 U.S.C. §§ 701-706. It provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).

## CLAIMS FOR RELIEF

### Count I – Violation of Administrative Procedure Act (Failure to Advise and Consult with the NCPC and to Obtain NCPC Approval, 40 U.S.C. §§ 8721, 8722)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing)**

112.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

113.    Federal agencies that "originate[ plans] for proposed developments and projects" that "affect the plan and development of the National Capital" must "advise and consult" with the NCPC with respect to those plans. 40 U.S.C. § 8722(b)(1). Specifically, such federal agencies must "advise and consult" with the NCPC "before preparing construction plans" and "as the agency prepares plans and programs in preliminary and successive stages." *Id.*

114.    Separately, the federal agency must also secure the NCPC's approval of various aspects of the proposed project, namely its "location, height, bulk, number of stories, and size . . . and the provision for open space in and around" the proposed development. *Id.* § 8722(d).

35

JA377

115. The Defendants are federal agencies, heads or senior officials thereof, and an executive department having authority over a defendant agency.

116. The Defendants' Ballroom Project is a "proposed development[]" or "project." *Id.* § 8722(b)(1).

117. The Ballroom is a major building proposed to be located in the monumental core of the District of Columbia, and as such "affect[s] the plan and development of the National Capital." *Id.*

118. By demolishing the East Wing, and with their ongoing construction activities continuing to the present day, the Defendants have commenced work on the Ballroom Project, and have done so without having first submitted project plans to the NCPC. Consequently, they have neither advised or consulted with the NCPC, nor have they secured the NCPC's approval of the Ballroom Project. *Id.* § 8722(b)(1), (d).

119. If the Defendants had submitted project plans to the NCPC, the National Trust would have submitted comments on those plans. The National Trust's comments would have informed the NCPC of its concerns with the Ballroom Project, which include but are not limited to the Ballroom's size, which threatens to overwhelm the White House itself, and the Ballroom's permanent disruption of the carefully balanced classical design of the White House, with its central Executive Residence and two smaller, and lower, East and West Wings.

120. The National Trust's comments would have also explained that the Trust stands ready to assist the White House, the National Park Service, and relevant review agencies in exploring design alternatives and modifications that would accomplish the objectives of the administration while preserving the historic integrity and symbolism of the White House.

36

JA378

121.    The Defendants' Ballroom Project also alters the NCPC's Comprehensive Plan for the capital district. *See id.* § 8721.

122.    The Comprehensive Plan explains that the capital district's "iconic cityscape is distinguished through the close relationship between its form and the functional and visual symbols of national civic life." Comprehensive Plan for the National Capital: Federal Elements, 50 available at Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last accessed Dec. 10, 2025). This "symbolic identity," the Comprehensive Plan states, "expresses itself in a number of ways," including a visual hierarchy "that emphasizes symbols and structures, particularly the . . . White House" and several other major buildings and monuments. *Id.*

123.    The Comprehensive Plan cautions against "infrastructure solutions" that would "permanently alter[]" "symbolic views of . . . the White House." *Id.* at 18. And it instructs that "the preeminence of the . . . White House" and other significant structures should be "[v]isually reinforce[d]" "by protecting the visual frame around them." *Id.* at 55. The effect of these admonitions is to elevate to a "guiding urban design principle[]" the "[p]reserv[ation of] the physical preeminence and visual hierarchy of the most significant civic structures within the city, including the White House." *Id.* at 38 (capitalization removed).

124.    Simply put, demolishing the East Wing and erecting the Ballroom on its site is not just a "project[]" or a "proposed development[]"—it is also a "revision" of basic principles underpinning the Comprehensive Plan. 40 U.S.C. §§ 8721-8722.

125.    The NCPC's responsibilities therefore do not end with its review of the plans for the Ballroom Project. Rather, the NCPC must present the "revision" to the Comprehensive Plan that the Ballroom Project has effected "to the appropriate federal or District of Columbia authorities for comment and recommendations." *Id.* § 8721(e)(1). The NCPC must also, "jointly"

JA379

with the Mayor, "establish procedures for appropriate meaningful continuing consultation" regarding the revision to the Comprehensive Plan. *Id.* § 8721(h)(1).

126.    The National Trust would participate in this consultation process, and would provide comments similar to those detailed above.

127.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the NCPC violates 40 U.S.C. § 8722, and that any further work on the Ballroom Project without both plans having been submitted to the NCPC, and the NCPC's approval of those plans having been secured, is unlawful, in violation of 40 U.S.C. §§ 8721 and 8722.

128.    The National Trust is further entitled to an injunction against the performance of any further work on the Ballroom Project until the Defendants have submitted plans for the project to the NCPC; the National Trust has had the opportunity to comment on those plans; the revision to the Comprehensive Plan caused by the Defendants' proposal has undergone the review process required by 40 U.S.C. § 8721; and both the proposed project plans and the revision to the Comprehensive Plan have been approved by the NCPC and any other relevant authorities.

### Count II – Violation of Administrative Procedure Act
### (Improper Segmentation of NCPC Review)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing)**

129.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

130.    Defendant President Trump and Press Secretary Leavitt have suggested or stated that the NCPC's review is not necessary for demolition of the East Wing, or for demolition of other portions of the White House.

131.    Insofar as the Defendants failed to submit plans for the Ballroom Project to the NCPC for review prior to the demolition of the East Wing because they believe that such review is not required for demolition, but only for vertical construction, the Defendants are wrong.

132.    The NCPC is the zoning authority for federal public buildings in the District of Columbia. *See* 40 U.S.C. § 8722(d). "[T]he location, height, bulk, number of stories, and size of federal public buildings," as well as "the provision for open space in and around federal public buildings" are therefore subject to the NCPC's approval, "[i]n order to ensure the orderly development" of the capital district. *Id.*

133.    To that end, the NCPC requires the submission of "construction plans" for its review. *Id.* § 8722(b). Where, as here, construction of a new building is proposed to take place on the site that an old building already occupies, "construction plans" for the new building necessarily include demolition of the old building. *Id.*

134.    Insofar as the Defendants rely on the opinion of Commissioner Scharf, or on other legal opinions previously produced by the NCPC, that adopt the position that "construction" for the purposes of the NCPC's review encompasses only vertical build, and not demolition, such opinions are entitled to no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

135.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the NCPC before demolishing the East Wing violates 40 U.S.C. § 8722, and an injunction against any further demolition at or around the site of the East Wing until the Defendants have submitted plans for the project to the NCPC; the National Trust has had the opportunity to comment on those plans; the revision to the Comprehensive Plan caused by the Defendants' proposal has undergone the review process required by 40 U.S.C. § 8721; and both

JA381

the proposed project plans and the revision to the Comprehensive Plan have been approved by the NCPC and any other relevant authorities.

### Count III – Violation of Administrative Procedure Act
### (Failure to Request Advice from Commission of Fine Arts, 40 U.S.C. § 9102)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing)**

136.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

137.    Federal agencies intending to undertake development or construction projects in the capital district, including demolition in furtherance thereof, must seek the advice of the CFA on matters concerning fine arts. *See* 40 U.S.C. § 9102. "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," the agency must seek the CFA's advice "on the plans and on the merits of the designs" "before" the plans are "final[ly] approv[ed]" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1).  This expressly includes providing CFA with "any relevant historical information about the building or other structure to be altered or razed," 45 C.F.R. § 2102.10(b)(1).

138.    The Ballroom affects the appearance of the city and is a "public building[] to be erected in the District of Columbia by the federal government." *Id.* As such, it is a structure for which the CFA's review is required under 40 U.S.C. § 9102.

139.    By demolishing the East Wing, and with their ongoing construction activities continuing to the present day, the Defendants have commenced work on the Ballroom Project, and have done so without having first submitted project plans to the CFA or otherwise advising and consulting with the CFA in connection with the project

140.    If the Defendants had submitted plans for the Ballroom Project to the CFA, the National Trust would have provided comments on those plans. The National Trust's comments

40

JA382

would have informed the CFA of its concerns with the Ballroom Project, including the demolition of the East Wing, and the excessive massing and height of the proposed new building.

141.    The National Trust is entitled to a declaration that the Defendants' failure to submit plans for the Ballroom Project to the CFA violates 40 U.S.C. § 9102 and 45 C.F.R. § 2101.1 and that the performance of any further work on the Ballroom Project without having advised and consulted with the CFA, including by submitting plans for the project to the CFA, is unlawful. The National Trust is further entitled to an injunction against the performance of any further work on the Ballroom Project until the Defendants have submitted plans for the Ballroom Project to the CFA, and the National Trust has had the opportunity to provide comments on those plans.

### Count IV – Violation of Administrative Procedure Act
### (Inadequate Environmental Assessment, 42 U.S.C. § 4336)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing)**

142.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

143.    The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." 42 U.S.C. § 4336e(10)(A).

144.    As a major federal action, the Ballroom Project requires that the Defendants prepare an environmental assessment. Notwithstanding that the environmental assessment is required to be a "concise *public* document," *id.* § 4336(b)(2) (emphasis added), the environmental assessment conducted by the Defendants in August 2025 was not made public until December 15, 2025, when the Defendants attached it to their opposition to the National Trust's motion for a temporary restraining order.

41

JA383

145.    That environmental assessment was accompanied by a finding of no significant impact ("FONSI").

146.    NEPA requires the preparation and publication of an environmental assessment or EIS *before* commencing a project, but the environmental assessment and FONSI were not made public until *after* work commenced on the Ballroom Project, in violation of § 4336(b)(2) (requiring an environmental assessment, which must be a "concise public document," for any "proposed" agency action without significant effects); *see also Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 532 (D.C. Cir. 2018) (holding that use of "proposed" action means the agency's "hard look" and disclosure must come "before taking that action").

147.    The Defendants' determination that the Ballroom Project would have no significant impact on the quality of the human environment was arbitrary and capricious. The East Wing was an integral component of perhaps the most famous National Historic Landmark in the entire United States. It was a building with exceptional national historical and cultural significance dating back to 1902.

148.    When the East Wing was demolished, it was over 120 years old, and many buildings of similar age contain environmental hazards—including asbestos and lead paint—that must be properly handled. Debris from the East Wing has been dumped at a public park, with no apparent plan or regard for its potential hazards.

149.    The Ballroom itself is proposed to be a 90,000 square foot building in a dense urban area that the Defendants expressly concede will, if constructed, have significant aesthetic and other adverse effects on its historic surroundings.

150.    Under any of these circumstances individually, and certainly under all of them collectively, a finding of no significant impact cannot be supported and is arbitrary and capricious.

42

JA384

151.   NEPA mandates that if an environmental assessment identifies any "reasonably foreseeable significant effect on the quality of the human environment," then a FONSI is inappropriate, and the agency must prepare an EIS. 42 U.S.C. § 4336(b)(1).

152.   In the EA and FONSI released on December 15, Defendants National Park Service and Bowron identified  many such impacts, including:

a.   The Ballroom Project's effect on the landscape "originally designed by Thomas Jefferson" "will result in long-term adverse effects on the cultural landscape." ECF 14-2 (FONSI) at 5.

b.   The deconstruction of the East Wing will "result[] in the permanent loss of a component that has been integral to the White House operations since 1942." *Id.* at 6.

c.   The Ballroom will "disrupt the historical continuity of the White House Grounds" and "create a visual imbalance with the more modestly scaled West Wing and Executive Mansion." *Id.*

d.   The Ballroom Project will "introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features." *Id.*

e.   The Ballroom Project "will result in a substantial change to one portion of the [National Historic Landmark]." *Id.*

f.   The Ballroom Project will "adversely affect the design, setting, and feeling of the White House and the grounds over the long-term." *Id.* at 6, 15.

43

JA385

g.  "Removal of the current East Wing will result in a permanent adverse impact for those who value the experience of this specific space." *Id.* at 7.

153.  Despite identifying all of these effects, the Defendants determined there would be no significant impact and thus failed to prepare an EIS.

154.  In doing so, the Defendants improperly minimized recognized impacts, or impermissibly balanced them against perceived beneficial impacts.

155.  The Ballroom Project also implicates an additional significant impact that the National Park Service failed to acknowledge in the environmental assessment: the fact that the project will also damage the Executive Mansion itself. The Ballroom Project contemplates "a direct ceremonial procession from the East Room in to the [ballroom] venue" and "enclosed second-story access from the Executive Mansion." ECF 14-3 at 2; *see also id.* at 4 ("The East Colonnade would be renovated to include an enclosed second story that would provide direct access from the East Room to the State Ballroom, while maintaining ground-floor access to and from the Executive Mansion."). These aspects of the Project will require major construction involving the east wall of the Executive Mansion itself, not just the colonnade or the former East Wing. *See id.* at 5 (noting that "portions of the east façade of the Executive Mansion" would need to be removed to accommodate this procession). The environmental assessment and FONSI are arbitrary and capricious because they fail to acknowledge this significant impact to the central White House structure, apart from the impacts to later-added features. This impact would by itself trigger the need to prepare an EIS.

156.  Beyond the significant impacts that the Defendants failed to address by preparing an EIS, the environmental assessment is further arbitrary and capricious because it describes a different project from the Ballroom Project actually underway, in several fundamental respects.

44

JA386

157.    The FONSI states that the East Colonnade will merely be "renovated" to add a second story. ECF 14-2 at 2 (FONSI). The East Colonnade was not renovated: it was demolished. The environmental assessment similarly misdescribes the project (and is internally inconsistent with the FONSI), asserting in several places that *both* the East Wing and East Colonnade will be "deconstructed." ECF 14-3 (EA) at 4. "Renovation" is not synonymous with "deconstruction," nor is "deconstruction" synonymous with "demolition." According to the U.S. Department of Housing and Urban Development, "[i]n contrast to demolition where buildings are knocked down and materials are either landfilled or recycled, deconstruction involves carefully taking apart portions of buildings or removing their contents with the primary goal of reuse in mind." U.S. Department of Housing & Urban Development, A GUIDE TO DECONSTRUCTION (2000), *available at* https://www.huduser.gov/publications/pdf/decon.pdf (last visited Dec. 29, 2025). While the FONSI proposes "renovation," and the EA proposes "deconstruction," the government now concedes that what actually occurred was "demolition," Hrg. Tr. 19:11, 20:21, with the materials dumped in one or more D.C. public parks, *see supra* ¶ 63.

158.    The FONSI also specifies that "[a] tower crane will be erected on site, with its final location determined *upon completion* of the final design documents." ECF 14-2 at 3 (emphasis added). The government continues to insist that there are no final design documents, yet the tower crane was erected weeks ago at the beginning of December. ECF 15-1 at 2, 9, 12, 18. The EA and FONSI therefore rely on inaccurate factual premises regarding the construction planning process.

159.    The environmental assessment is also arbitrary and capricious because it was prepared for the purpose of ratifying a predetermined conclusion.

160.    NEPA requires the agency to conduct an alternatives analysis. *See* 42 U.S.C. § 4332(2)(C)(iii).

45

JA387

161.    The National Park Service acknowledged the exercise of considering alternatives, ECF 14-3 at 4, 29, but failed to consider any meaningful alternatives.

162.    The environmental assessment describes three criteria for the project that foreclosed the consideration of virtually all alternatives for the Ballroom Project. According to the National Park Service, it was instructed by the Defendant Executive Office of the President that any alternatives to the Ballroom Project needed to satisfy each of: "[1] immediate adjacency to the Executive Mansion, [2] a direct ceremonial procession from the East Room into the venue, and [3] enclosed second-story access from the Executive Mansion." ECF 14-3 at 29. No rationale was provided for any of these hyper-specific requirements, the effect of which is to foreclose any alternative locations, heights, or structural forms that the National Park Service otherwise would have considered. *See id.* (listing alternative forms eliminated by these requirements, including "a State Ballroom built south of the East Wing and attached to the East Wing through a walkway").

163.    Reverse-engineering agency analysis with pretextual inputs, in order to reach a predetermined outcome, is arbitrary and capricious agency behavior.

164.    The National Trust is entitled to a declaration that the environmental assessment performed by the Defendants is inadequate, and is entitled to an injunction against the performance of any further work in connection with the Ballroom Project until the Defendants have completed and published an appropriate environmental review that complies with the requirements of NEPA.

### Count V – Violation of Administrative Procedure Act
### (Failure to Prepare an Environmental Impact Statement, 42 U.S.C. § 4336)

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing)**

165.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

46

JA388

166.   The Ballroom Project, carried out by multiple federal agencies under the active, personal oversight of the President, is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." *Id.* § 4336e(10)(A).

167.   As a major federal action, the Ballroom Project required the Defendants to prepare at least an environmental assessment. *See id.* §§ 4332(2)(C), 4336(b).

168.   As alleged above, the Defendants' environmental assessment was improperly conducted, and their finding of no significant impact was not supported. To the contrary, the environmental assessment itself identified numerous significant impacts, each of which alone would have sufficed to trigger the requirement to prepare an EIS.

169.   The Defendants were therefore required to prepare an EIS in connection with the Ballroom Project, but have failed to prepare and publish such an EIS.

170.   The National Trust is entitled to a declaration that the Defendants must prepare and publish an EIS in connection with the Ballroom Project, and is entitled to an injunction against the performance of any further work in connection with the Ballroom Project until the Defendants have completed and published an appropriate EIS that complies with the requirements of NEPA

**Count VI**

171.   [*Count VI omitted.*]

**Count VII – Violation of Administrative Procedure Act (40 U.S.C. § 8106)**

**(Against Defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing)**

172.   The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

173.   Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

47

JA389

174.    President's Park comprises the White House and its grounds, and is the planned site of the Ballroom.

175.    President's Park is owned by the Federal Government, managed by the National Park Service, and located in the District of Columbia. It is within the statutory meaning of a "reservation, park, or public grounds." *Id.*

176.    The Defendants intend to "erect[]" the Ballroom—a "building or structure"—on the grounds of President's Park. *Id.* That work has already begun: recent reporting has revealed that the site of the East Wing is a bustling project site filled with dozens of workers and materials pertaining to construction, not demolition.

177.    Congress has not authorized, expressly or otherwise, the construction of the Ballroom in President's Park. *See id.*

178.    The National Trust is entitled to a declaration that construction of the Ballroom violates 40 U.S.C. § 8106, and an injunction prohibiting the Defendants from performing further work on the Ballroom Project or proceeding with the erection of any building or structure similar to the Ballroom in President's Park without having first obtained express authorization to do so from Congress.

### Count VIII – Violation of the Separation of Powers
### (Property Clause, U.S. Const. Art. IV, § 3, cl. 2)

**(Against Defendants President Donald J. Trump, Executive Office of the President, Wiles, Office of the Executive Residence, and Downing)**

179.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

180.    The Constitution divides the powers of the federal government between and among its three branches. The Property Clause vests in Congress the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

181. Congress's power over federal property is exclusive. Nothing in the Constitution gives the President overlapping authority to dispose of federal property. As a result, only Congress may authorize the demolition or construction of federal buildings. The President, acting unilaterally, is wholly without constitutional authority to build or demolish anything on federal grounds.

182. President's Park and the White House, located therein, are "Property belonging to the United States." *Id.*

183. President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the Executive Residence, and Chief Usher Downing, have demolished the East Wing and are building the Ballroom.

184. There is no statute that provides the President with the authority to demolish the White House or construct a ballroom on the White House grounds. And the President has pointed to no statute giving him such authority. Any justification for these defendants' actions must therefore rest in the President's inherent constitutional authority. But, as noted, the President has no constitutional authority to dispose of federal property—that authority rests exclusively with Congress. *See id.*

185. By nevertheless demolishing the White House and beginning to construct the Ballroom, President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the Executive Residence, and Chief Usher Downing have unconstitutionally invaded Congress's prerogative to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *Id.*

JA391

186.    President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the Executive Residence, and Chief Usher Downing have thereby violated the separation of powers and the Property Clause. *See id.*

187.    The National Trust is entitled to a declaration that the actions and omissions of President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the Executive Residence, and Chief Usher Downing violate the separation of powers and the Property Clause. The National Trust is further entitled to an injunction against President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the Executive Residence, and Chief Usher Downing, and/or all those operating or acting at their direction or in concert with them prohibiting further work on the Ballroom Project.

**<u>Count IX – Violation of the Separation of Powers</u>**
**<u>(Unlawful Reorganization of the Executive Branch)</u>**

**(Against Defendants President Donald J. Trump, Executive Office of the President, Wiles, Office of the Executive Residence, and Downing)**

188.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

189.    Article I of the Constitution gives Congress power to "establish[] . . . offices, [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Congress "has plenary power over the salary, duties, and even existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010) (emphasis added).

190.    Congress has exercised that constitutional power by vesting certain of its authority over the management and regulation of the National Park System in the National Park Service, within the Department of the Interior. *See* 54 U.S.C. §§ 100101 *et seq.*; *see also* Pub. L. 87-286 (1961) (placing President's Park within the control of NPS).

50

JA392

191. President's Park is a national park within the National Park System, *see* ECF 2-18; ECF 14-1 ¶ 3.

192. Specifically, Congress has charged the National Park Service with "promot[ing] and regulat[ing] the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." *Id.* § 100101(b)(1). Congress has reaffirmed this decision in in a detailed set of provisions codified throughout Title 54, a comprehensive system of park management, administered by the National Park Service. *See* Enactment of Title 54 – National Park Service and Related Programs, Pub. L. 113-287; 128 Stat. 3094 (Dec. 19, 2014).

193. Although "[t]he President may create, reorganize, or abolish an office that *he* established," the Constitution does not authorize him to reorganize offices and agencies established by Congress, or transfer to one office obligations that Congress by statute has vested in another. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (emphasis added).

194. By seizing control of the Ballroom Project from the National Park Service and placing it within the Office of the Executive Residence and the Executive Office of the President, defendants President Trump, the Executive Office of the President, Chief of Staff Wiles, Office of the Executive Residence, and Chief Usher Downing have attempted to unconstitutionally reorganize the Executive Branch.

195. By arrogating to themselves Congress's constitutional power to establish executive offices and to determine their functions and jurisdiction, defendants President Trump, the Executive Office of the President, Chief of Staff Wiles, Office of the Executive Residence, and Chief Usher Downing have violated the separation of powers.

196. The National Trust is entitled to a declaration that the actions and omissions of President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the

JA393

Executive Residence, and Chief Usher Downing violate the separation of powers. The National Trust is further entitled to an injunction against President Trump, the Executive Office of the President, Chief of Staff Wiles, the Office of the Executive Residence, and Chief Usher Downing, and/or all those operating or acting at their direction or in concert with them, prohibiting them from directing, controlling, or otherwise carrying out or administering any work on the Ballroom Project without first obtaining affirmative congressional authorization.

<u>Count X – Ultra Vires</u><br><u>(3 U.S.C. § 105(d))</u>

<strong>(Against All Defendants)</strong>

197.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

198.    Title 3, U.S.C. § 105(d) provides, in relevant part: "There are authorized to be appropriated each fiscal year to the President such sums as may be necessary for— (1) the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House . . . Sums appropriated *under this subsection* for expenses described in paragraphs (1), (3), and (5) may be expended as the President may determine, notwithstanding the provisions of any other law" (emphasis supplied).

199.    The Ballroom Project, as carried out by the Defendants, is *ultra vires* of any authority they may have under § 105(d).

200.    Insofar as the Ballroom Project is directed by the Office of the Executive Residence, and insofar as the Office of the Executive Residence is not an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Ballroom Project.

201.    No statutory review scheme forecloses all other forms of judicial review.

52

JA394

202.    The National Trust is entitled to a declaration that the actions and omissions of the Defendants are *ultra vires* of any statutory authority they may possess. The National Trust is further entitled to an injunction against the Defendants, and/or all those operating or acting at their direction or in concert with them prohibiting further work on the Ballroom Project.

### Count XI – Ultra Vires
### (40 U.S.C. § 8106)

**(Against All Defendants)**

203.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

204.    Title 40, U.S.C. § 8106 provides: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

205.    The Ballroom Project, as carried out by the Defendants, is *ultra vires* of any authority they may have under 40 U.S.C. § 8106.

206.    Insofar as the Ballroom Project is directed by the Office of the Executive Residence, and insofar as the Office of the Executive Residence is not an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Ballroom Project.

207.    No statutory review scheme forecloses all other forms of judicial review.

208.    The National Trust is entitled to a declaration that the actions and omissions of the Defendants are *ultra vires* of any statutory authority they may possess. The National Trust is further entitled to an injunction against the Defendants, and/or all those operating or acting at their direction or in concert with them prohibiting further work on the Ballroom Project.

### Count XII – Ultra Vires
### (54 U.S.C. § 100101(b)(2))

**(Against All Defendants)**

209.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

53

JA395

210.    Title 54, U.S.C. § 100101(b)(2) provides: "Congress reaffirms, declares, and directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."

211.    Subsection (a) of § 100101 provides: "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

212.    The Ballroom Project, as carried out by the Defendants, is *ultra vires* of any authority they may have under 54 U.S.C. § 100101(b)(2).

213.    The Ballroom Project, as proposed to be funded by the Defendants through 51 U.S.C. § 101101(2), 31 U.S.C. § 1321(a)(17) & (b)(1), or 31 U.S.C. § 1535, is *ultra vires* of any authority they may have under 54 U.S.C. § 100101(b)(2).

214.    Insofar as the Ballroom Project is directed by the Office of the Executive Residence, and insofar as the Office of the Executive Residence is not an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Ballroom Project.

215.    No statutory review scheme forecloses all other forms of judicial review.

JA396

216.    The National Trust is entitled to a declaration that the actions and omissions of the Defendants are *ultra vires* of any statutory authority they may possess. The National Trust is further entitled to an injunction against the Defendants, and/or all those operating or acting at their direction or in concert with them prohibiting further work on the Ballroom Project.

### Count XIII – Ultra Vires
### (54 U.S.C. §§ 100301-100302 & 75 Stat. 586)

**(Against All Defendants)**

217.    The National Trust incorporates by reference the allegations in paragraphs 1 to 111.

218.    Title 54, U.S.C. § 100301 provides: "There is in the Department of the Interior a service called the National Park Service."

219.    Title 54, U.S.C. § 100302 provides, in relevant part: "(a) Director.— (1) Appointment.— The Service shall be under the charge of a director who shall be appointed by the President, by and with the advice and consent of the Senate. (2) Qualifications.— The Director shall have substantial experience and demonstrated competence in land management and natural or cultural resource conservation. (3) Authority.— Under the direction of the Secretary, the Director shall have the supervision, management, and control of System units. In the supervision, management, and control of System units contiguous to national forests the Secretary of Agriculture may cooperate with the Service to such extent as may be requested by the Secretary."

220.    Public Law No. 87-286 (75 Stat. 586) (1961) places control of the White House and President's Park with the National Park Service, providing in relevant part: "That all of that portion of reservation numbered 1 in the city of Washington, District of Columbia, which is within the President's park enclosure, comprising eighteen and seven one-hundredths acres, shall continue to be known as the White House and shall be administered pursuant to the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-3), and Acts supplementary thereto and amendatory thereof." The Act

55

JA397

of August 24, 1916, 39 Stat. 535, is the National Park Service Organic Act, now codified at Title 54, U.S.C. § 100101 *et seq.*

221.    The Defendants' placing of control of the Ballroom Project with the Office of the Executive Residence is *ultra vires* of any authority that they may have under 54 U.S.C. §§ 100301-100302 or 75 Stat. 586.

222.    Insofar as the Ballroom Project is directed by the Office of the Executive Residence, and insofar as the Office of the Executive Residence is not an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Ballroom Project.

223.    No statutory review scheme forecloses all other forms of judicial review.

224.    The National Trust is entitled to a declaration that the actions and omissions of the Defendants are *ultra vires* of any statutory authority they may possess. The National Trust is further entitled to an injunction against the Defendants, and/or all those operating or acting at their direction or in concert with them prohibiting further work on the Ballroom Project.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the National Trust for Historic Preservation in the United States, respectfully requests that this Court grant the following relief:

i.    Declare that the demolition of the East Wing by defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing violated the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; and 40 U.S.C. §§ 8722 and 9102;

56

JA398

ii.      Declare that the continued work on the Ballroom Project by defendants National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, Office of the Executive Residence, and Downing violates the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; and 40 U.S.C. §§ 8106, 8722, and 9102;

iii.     Enjoin defendants the National Park Service, Bowron, Stanwich, Department of the Interior, Burgum, General Services Administration, Rigas, the Office of the Executive Residence, and Downing, and anyone acting at their direction or in concert therewith, from performing any additional work on the Ballroom Project until an EIS has been prepared and published; the NCPC and the CFA have reviewed the plans for the Ballroom Project; the NCPC has approved the plans for the Ballroom Project; Congress has expressly authorized the Ballroom's construction; and the public has had time and opportunity to comment;

iv.     Declare that defendants President Trump, the Executive Office of the President, Wiles, the Office of the Executive Residence, and Downing have violated the separation of powers by purporting to exercise constitutional powers vested exclusively in Congress by the Property Clause, U.S. Const. Art. IV, § 3, cl. 2, and by arrogating Congress's power to establish executive offices and fix their duties and jurisdiction, and enjoin those defendants, and anyone acting at their direction or in concert with them, from directing, controlling, or otherwise carrying out or administering any work on the Ballroom Project without first obtaining affirmative congressional authorization;

57

JA399

v.   Declare that all the Defendants have acted *ultra vires* of any authority they might possess under 3 U.S.C. § 105(d); 40 U.S.C. § 8106; 54 U.S.C. § 100101(b)(2); 54 U.S.C. §§ 100301-100302; or 75 Stat. 586 in connection with the Ballroom Project, and enjoin those Defendants, and anyone acting at their direction or in concert with them, from directing, controlling, or otherwise carrying out or administering any work on the Ballroom Project.

vi.   Award the National Trust reasonable fees, costs, and expenses, including attorneys' fees; and

vii.   Grant any such other relief that the Court deems just and proper.

Respectfully submitted,

_____
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200

Thaddeus A. Heuer (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Jack C. Smith (1725229)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000

58

JA400

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

      Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

      Defendants.

Case No. 1:25-cv-04316-RJL

**SUPPLEMENTAL DECLARATION OF TAMMY STIDHAM, ASSOCIATE REGIONAL DIRECTOR, LANDS AND PLANNING, NATIONAL PARK SERVICE, NATIONAL CAPITAL REGION**

I, Tammy Stidham declare as follows:

1. I am the Associate Regional Director for Lands and Planning for the National Park Service ("NPS") National Capital Region. I have been in this position for approximately two years. Prior to that time, I served as the Deputy Associate Regional Director for Lands and Planning at the NPS National Capital Region. All together, I have been employed by the NPS for over thirty-six years.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my position as Associate Regional Director, and my previous position as Deputy Regional Director, I have worked to plan and implement a substantial portfolio of NPS projects across the region involving many different types of buildings and structures, including comfort stations, offices, maintenance and operational facilities, law enforcement facilities, stables, visitor-use and recreational facilities, utility and

1
JA401

infrastructure-related structures, large buildings, and nationally significant memorials. My experience includes seeking and obtaining the approval of the National Capital Planning Commission (NCPC) for NPS projects in the National Capital Region and obtaining review by the Commission on Fine Arts (CFA) for NPS projects in the National Capital Region.

4. Additionally, in my current position I represent the Secretary of the Interior as an ex officio member of the NCPC. As such, I fully participate in the business of NCPC including making motions and voting on Commission actions.

5. Due to my position, I am generally familiar with the buildings, structures and other facilities on NPS managed lands in the District of Columbia, including their history and condition. I am also generally familiar with NPS history and authorities.

6. Under the NPS Organic Act of 1916, the NPS is required to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. This authority extends to historic preservation and construction activities at individual park units in furtherance of the purpose of the park unit at issue.

7. The National Park System has evolved over time and now includes more than 400 parks across the country, covering more than 85 million acres. Systemwide, NPS infrastructure includes more than 75,000 assets, such as historic buildings, visitor centers, comfort stations, NPS administrative and maintenance facilities, trails, roads, bridges, and utility

systems. There are over 5,500 miles of paved roads, 17,000 miles of trails, and 25,000 buildings managed by the NPS. This unique infrastructure has evolved over time in response to the NPS mission. Maintaining that infrastructure is a key NPS responsibility

8. In general, the NPS plans and approves projects to construct, rehabilitate, and maintain the wide variety of buildings, structures, and other NPS facilities that support park operations, resource protection, visitor use, public safety, resource interpretation, or park administration. The NPS has long performed this role on parklands in the District of Columbia.

9. NPS Administrative units in D.C. include Rock Creek Park, the White House and President's Park, the National Mall and Memorial Parks, National Capital Parks – East and parts of the Chesapeake and Ohio Canal National Historical Park and the George Washington Memorial Parkway. These administrative units manage individual park units in D.C. such as the Lincoln Memorial, Ford's Theatre, and the National Mall.

10. The NPS has substantial park infrastructure in D.C., including recreational facilities, such as the NPS's three public golf courses, administrative and maintenance facilities, visitor centers, comfort stations, historic structures, and interpretive waysides and kiosks, as well as other types of facilities in furtherance of the NPS's mission.

11. The NPS may carry out construction, rehabilitation or maintenance projects itself using appropriated funds through the NPS's annual construction appropriation, if funds are available. The National Capital Region headquarters and the recently constructed U.S. Park Police substation, discussed below, were constructed using appropriated funds.

12. The NPS also uses its donation acceptance authority, 54 U.S.C. § 101101, to carry out projects on parkland, including the construction of facilities. Such projects may involve

JA403

the donation of funds to NPS for the NPS to complete the construction. Examples of privately supported construction or rehabilitation projects on NPS-managed lands in D.C. include the repairs to the Washington Monument after the D.C. earthquake, the Washington Monument elevator modernization, the Lincoln Memorial roof restoration, the Lincoln Memorial undercroft project, and the Thomas Jefferson Memorial museum/accessibility improvements. In some instances, these privately raised funds were provided through authorized philanthropic partners such as the National Park Foundation or the Trust for the National Mall and used in combination with appropriated funds.

13. Alternatively, the NPS uses its donation acceptance authority to accept donations of completed projects. In such cases, the NPS authorizes a donor to construct a project on NPS-managed land to NPS's specifications, and the completed project is then donated to the NPS. The U.S. Park Police Stables and Tennis Stadium, both discussed below, were constructed by donors and donated to the NPS.

14. My office is located in the National Capital Region headquarters campus on Hains Point, in East Potomac Park, managed by the NPS as part of the National Mall and Memorial Parks. The NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and additional administrative facilities at this site between 1963 and 1969 as part of the Mission 66 program ("National Capital Region Campus").

15. In 2016, the NPS proposed renovation of the existing National Capital Region Campus to consolidate NPS administrative offices, including park and regional headquarters, and the construction of a new 13,000 square foot facility for the U.S. Park Police substation to move the existing facilities out of the floodplain. The construction of the substation was submitted to NCPC and CFA for review and approval.

16. Below is an image of the campus as it existed in 2016 when the proposed substation construction was submitted to NCPC for approval.



17. Below is a photograph of the newly constructed substation.



18. The tennis stadium in Rock Creek Park is another example of a large facility constructed under NPS's authority on parkland in D.C. The tennis stadium, large enough to seat 7,500, was constructed in the late 1980s by Washington Area Tennis Patrons Foundation and donated to the NPS after construction was completed.

19. An image of the outside of the tennis stadium, which is the home of the annual DC Open tournament, is below:



20. The recent U.S. Park Police Stables project on the National Mall is another example of an NPS construction project in D.C. The stables were originally constructed in 1975 as a temporary structure, adjacent to a maintenance yard and water treatment plant for the Lincoln Memorial reflecting pool, to house park police horses. The project was submitted to NCPC and CFA for review and approval.

21. In 2023, the NPS opened a 13,542 square foot U.S. Park Police facility that includes public paddocks, educational areas, stable space, training and medical paddocks, administrative areas, support, and employee parking. This project was constructed as a donation from the Trust for the National Mall.

22. Below is an image depicting the newly constructed U.S. Park Police facility:



6

JA407

I declare under penalty of perjury that the foregoing is true and correct. Executed on

March 12, 2026.



TAMMY STIDHAM    Digitally signed by TAMMY STIDHAM
Date: 2026.03.12 11:32:22 -04'00'

Tammy Stidham

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br><br>    Plaintiff,<br><br>    v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>    Defendants. | Case No. 1:25-cv-04316-RJL |

**SUPPLEMENTAL DECLARATION OF HEATHER MARTIN**

I, Heather Martin, declare as follows:

1.  I am a Deputy Assistant to the President, a Presidentially Commissioned Officer.  In addition, I serve as the Chief Financial Officer and Deputy Director of the Office of Administration, Executive Office of the President. I serve as a senior official supporting the East Wing Modernization Project ("the Project").

2.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.  I submit this declaration to supplement the testimony in my earlier January 15, 2026 declaration submitted in this matter, Dkt. No. 30-2.

4.  Since the filing of my prior declaration, the following factual developments have occurred which bear on this litigation:

5.  First, EXR removed the triangular pediment above the south portico of the ballroom in response to comments from the Commission of Fine Arts (CFA) and the National Capital Planning Commission (NCPC). In prior designs, the pediment's peak had been

1

JA408

approximately nine feet higher than the pediment on the north elevation of the White House. Its removal and replacement with a balustrade aligned with the existing White House balustrade allows the ballroom roofline to match that of the White House.

6.  Second, the CFA approved the Project on February 19, 2026 at its public meeting.  The CFA's approval letter can be found at www.cfa.gov/records-research/project-search/cfa-19-feb-26-1.

    - "Expressing enthusiastic support for the project," the CFA approved the submission for a new addition to the White House to accommodate a ballroom and other official uses.  [See CFA Approval letter - cfa.gov/records-research/project-search/cfa-19-feb-26-1]

7.  Third, the Project was discussed at a public NCPC meeting on March 5, 2026.  The staff presented the Project and recommended that the Commission approve "the preliminary and final site and building plans for the East Wing Modernization Project located on the grounds of the White House." https://www.ncpc.gov/docs/actions/2026March/8733_East_Wing_Modernization_Project_Staff_Report_Mar2026.pdf. Notably, the NCPC staff recommendation report found that, "per the viewshed study provided in the submission, the existing landscape will substantially screen views of the project from the surrounding public spaces" and "the main views of the Executive Mansion . . . will largely be maintained." The architect and landscape architect for the Project gave a presentation, followed by 30 public comments about the Project, including a public comment from the President and CEO of the Trust.  In addition, 36,300 written public comments were submitted.  While EXR does not believe it must obtain approval of NCPC to proceed with the Project, the NCPC is scheduled to vote on the Project during its next public meeting on April 2, 2026.

JA409

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 12, 2026.

HEATHER MARTIN
Digitally signed by HEATHER MARTIN
Date: 2026.03.12 11:18:25 -04'00'

Heather Martin

JA410

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

          Plaintiff,

     v.                                    Case No. 1:25-cv-04316-RJL

NATIONAL PARK SERVICE, *et al.*,

          Defendants.

**SECOND SUPPLEMENTAL DECLARATION OF JESSICA BOWRON,
COMPTROLLER OF
THE NATIONAL PARK SERVICE EXERCISING THE DELEGATED
AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1.  I am the Comptroller for the National Park Service ("NPS") and am exercising the
    delegated authority of the Director of the NPS pursuant to a January 20, 2025, delegation
    of that authority from the Acting Secretary of the Interior, and subsequent extensions of
    that authority by the Secretary of the Interior. I have been employed by NPS since 2007
    and have served as NPS Comptroller since 2017.

2.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I
    could and would testify competently thereto.

3.  In my current position as Comptroller, Exercising the Delegated Authority of the Director
    of the NPS, I oversee the management and operation of all units within the National Park
    System nationwide, as well as all NPS programs, directorates, and regional offices. The
    White House and President's Park (the Park) is an administrative unit within the National
    Park System in the NPS National Capital Region ("NCR").

4.  The Economy Act, currently codified at 31 U.S.C. § 1535, is a longstanding authority under which agencies may order goods or services from other federal agencies or major organizational units within the same agency. It promotes efficiency by allowing interagency acquisitions when it is in the government's best interest, funds are available, and the service cannot be provided as conveniently or cheaply by the private sector.

5.  The Government Accountability Office ("GAO") is a nonpartisan, independent agency within the legislative branch. The GAO publishes a treatise titled "Principles of Federal Appropriations Law," which is referred to as "the Red Book." The third volume of this treatise, available online at https://www.gao.gov/assets/2019-11/203470.pdf, provides detailed information and guidance to federal agencies regarding Economy Act transactions. Agencies regularly consult this document regarding appropriations issues, including Economy Act transactions, as well as the Office of Management and Budget's ("OMB") Circular No. A-11 "Preparation, Submission and Execution of the Budget," which also discusses Economy Act transactions. OMB's Circular No. A-11 is publicly available at https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf.

6.  The Red Book explains that "the subject of an Economy Act transaction must be something the ordering agency is authorized to do and the performing agency is in a position to provide. Also, there must be direct benefit to the paying agency. Apart from these general prescriptions, the Economy Act makes no attempt to define the kinds of work, services, or materials that can be ordered. This is in apparent recognition of the great diversity of tasks and functions one encounters in the federal universe, and the fact that these tasks and functions are subject to change over time." Red Book, Third Edition, Volume III at page 12-64.

7. The Red Book provides examples of transactions in which the Economy Act "has been used," or at least "recognized as available [authority] for," including an agreement between the Department of Veterans Affairs and the Department of the Navy under which the "Navy would execute and superintend a contract for the construction of the Corregidor-Bataan Memorial." Red Book, Third Edition, Volume III at page 12-67.

8. To establish an Economy Act agreement with another federal agency for the other agency to provide goods and services, the NPS initiates an order in the Department of Treasury's system that documents key data elements, including identifying 31 U.S.C. § 1535 as the statutory authority for the transaction. A fully executed order constitutes an obligation of funding under 31 U.S.C. § 1501(a)(1). This obligation is similar to obligations recorded for contracting actions with a non-federal vendor. The Economy Act authorizes advance payments to the seller as well as reimbursement for costs already incurred by the seller pursuant to the agreement.

9. The NPS often relies on federal partners that provide valuable support and assistance to the NPS to accomplish projects that the NPS has the statutory authority to perform, but lacks the capacity or expertise to accomplish on its own. The NPS often uses Economy Act agreements to accomplish such projects.

10. For instance, the NPS often relies on the Federal Highway Administration (FHWA) to provide design, assisted acquisitions, and construction management services to execute large road projects on NPS lands. The NPS holds statutory authority under its Organic Act to conduct those projects. But without the assistance of FHWA subject matter experts, the NPS would lack the capacity and expertise to execute the volume of complex road projects needed to maintain National Park System roads. FHWA uses its expertise to

develop the acquisitions strategy and quality assurance requirements, conduct source evaluation, award and administer the design-build contract, and inspect and accept the construction contractor's work.

11. As one example, in 2021, the NPS entered into a $184 million Economy Act agreement with FHWA to reconstruct 7.5 miles of the George Washington Memorial Parkway between Spout Run and the I-495/Capital Beltway, reconfigure the existing roadway geometry at the Route 123 interchange, and rehabilitate the Central Intelligence Agency interchange. This important project is nearing substantial completion.

12. Another example of an NPS Economy Act agreement is an agreement with the U.S. Army Corps of Engineers to replace a seawall on the west shoreline of Sandy Hook at Gateway National Recreation Area. This seawall provides protection for NPS assets— including the adjacent multiple use path, sewer line, sewage lift station, Hartshorne Drive and historic officer row houses—but it has exceeded its service life and is in a state of failure. Although this project falls within the NPS's statutory authority, the Army Corps' subject matter experts have superior knowledge to provide the design, contracting and project management services needed to successfully execute this $14 million project. Partnering with the Army Corps increases the NPS capacity to protect NPS assets and execute projects that require specialized knowledge and experience.

13. At the White House and President's Park, the NPS has entered into multiple Economy Act agreements with other federal agencies with responsibilities at the park, including the Executive Residence at the White House ("EXR") and the U.S. Secret Service ("Secret Service"). The NPS currently has an Economy Act agreement in place with the Secret

4

JA414

Service to reimburse the NPS for costs to maintain security booths and to support security closures of park areas.

14. Starting in 2015, the NPS entered into a series of Economy Act agreements with the Secret Service to execute a project to replace the existing perimeter fence that encompasses the White House grounds with a more protective perimeter barrier. In this instance, the NPS was the servicing agency rather than the ordering agency. The NPS Denver Service Center provided project management and contracting support for design efforts and the construction phase of this project. This means that the NPS acted as the design and construction agent for this project and engaged contractors to complete the project, in consultation with the Secret Service and at the request of the Secret Service. More than $80 million was transferred to the NPS by the Secret Service to fulfill this role and construct and install the fence. The project was substantially completed in 2024.

15. As explained in my previous declaration dated January 15, 2026, EXR has unique expertise in fulfilling the operational needs of the President and providing for the use of the White House for official ceremonial purposes as well as the President's home. EXR is also best positioned to coordinate with all agencies that have equities that may be affected by the East Wing Project.

16. Accordingly, the NPS determined that it was in the best interests of the United States for EXR to contract for and directly manage the Project. consistent with the Economy Act and the park's enabling legislation, Pub. L. No. 87-286, which provides that NPS management of the park shall not "conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes,"

5

17. In general, the NPS demonstrates compliance with its Organic Act for individual projects by preparing a nonimpairment determination—a document that demonstrates in writing that "in the professional judgement of the NPS decision-maker" the selected action "will not result in impairment to park resources or values." NPS's "Guidance for Non-Impairment Determinations and the NPS NEPA Process" is publicly available at https://www.nps.gov/subjects/nepa/upload/Guidance-for-Non-Impairment-Determinations-andthe-NEPA-Process-Apr-2025_508.pdf.

18. The NPS's 2006 Management Policies provide guidance to the NPS regarding the management of the National Park System. The Management Policies are publicly available at https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf. In Section 1.4.2 of the NPS Management Policies the NPS explains that it interprets "impairment" under the Organic Act of 1916 and "derogation" under the Redwood Amendment to be a single standard, as follows:

> Congress intended the language of the Redwood amendment to the General Authorities Act to reiterate the provisions of the Organic Act, not create a substantively different management standard. The House committee report described the Redwood amendment as a "declaration by Congress" that the promotion and regulation of the national park system is to be consistent with the Organic Act. The Senate committee report stated that under the Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system." So, although the Organic Act and the General Authorities Act, as amended by the Redwood amendment, use different wording ("unimpaired" and "derogation") to describe what the National Park Service must avoid, they define a single standard for the management of the national park system— not two different standards. For simplicity, Management Policies uses "impairment" (or a variation thereof), not both statutory phrases, to refer to that single standard.

Management Policies at 10.

19. Before entering the Economy Act transaction with EXR, the NPS complied with its Organic Act, including the Redwood Amendment, by determining that the East Wing Project would "not cause impairment of, or unacceptable impacts to, the park's resources or visitor experience" and the changes to the park from the Project would be "consistent with the ongoing historical significance of the White House and its grounds." The NPS further concluded that the impacts from the Project would "not prevent the [NPS] from fulfilling the park's purpose." The NPS documented these determinations in its Non-Impairment Determination, attached as Appendix A to the NPS's Finding of No Significant Impact (FONSI), which was attached to my initial declaration in this case in December 2025.

20. In the FONSI itself, the NPS determined that the East Wing Project "aligns with the long-standing functional goals of the Executive Office of the President, meets the current operational needs of the Executive Office of the President, and is consistent with the White House's historical evolution and the park's enabling legislation." FONSI at 10.

21. EXR is therefore handling project management for the Project, meaning that it is in control of all aspects of the day-to-day execution of the Project, including its scope, schedule, budget, design, and completion. However, EXR is coordinating with NPS staff regarding the Project, in particular with respect to potential impacts on NPS operations at the White House.

22. As explained in my January 15, 2026 declaration, the NPS accepted a private donation for the project on November 13, 2025, pursuant to its donation acceptance authority for projects that are authorized by the NPS Organic Act, 54 U.S.C. §§ 100101, 101101.

7

JA417

Case 1:25-cv-04316-RJL    Document 55-2    Filed 03/23/26    Page 8 of 8
USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 424 of 525

8

23. Pursuant to the Economy Act, and for the reasons articulated above and in my previous declarations, on November 17, 2025, the NPS entered into a reimbursable agreement with EXR under which the donated funds were transferred to EXR to fund the Project.

24. On February 4, 2026, the NPS accepted a second private donation for the project, again pursuant to its donation acceptance authority, 54 U.S.C. § 101101.

25. On February 9, 2026, pursuant to the Economy Act, and for the reasons articulated above and in my previous declarations, the NPS modified the reimbursable agreement with EXR to add funding. These additional donated funds were then transferred to EXR to fund the Project.


I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2026.

JESSICA BOWRON

Digitally signed by JESSICA BOWRON
Date: 2026.03.23 17:44:10 -04'00'

Jessica Bowron

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

   Plaintiff,

  v.

NATIONAL PARK SERVICE, *et al.*,

   Defendants.

Case No. 1:25-cv-04316-RJL

## SECOND SUPPLEMENTAL DECLARATION OF HEATHER MARTIN

I, Heather Martin, declare as follows:

1. I am a Deputy Assistant to the President, a Presidentially Commissioned Officer. In addition, I serve as the Chief Financial Officer and Deputy Director of the Office of Administration, Executive Office of the President ("EOP"). I serve as a senior official supporting the East Wing Modernization Project ("the Project").

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. I submit this declaration to supplement the testimony in my earlier declarations submitted in this matter, Dkts. No. 30-2 and 52-2.

4. The Economy Act, currently codified at 31 U.S.C. § 1535, is a longstanding authority under which agencies may order goods or services from other federal agencies or major organizational units within the same agency. It promotes efficiency by allowing interagency acquisitions when it is in the government's best interest, funds are available, and the service cannot be provided as conveniently or cheaply by the private sector.

1

JA419

5.  The Government Accountability Office ("GAO") is a nonpartisan, independent agency within the legislative branch. The GAO publishes a treatise titled "Principles of Federal Appropriations Law," which is referred to as "the Red Book." The third volume of this treatise, available online at https://www.gao.gov/assets/2019-11/203470.pdf, provides detailed information and guidance to federal agencies regarding Economy Act transactions. Agencies regularly consult this document regarding appropriations issues, including Economy Act transactions, as well as the Office of Management and Budget's ("OMB") Circular No. A-11 "Preparation, Submission and Execution of the Budget," which also discusses Economy Act transactions. OMB's Circular No. A-11 is publicly available at https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf.

6.  The Red Book explains that "the subject of an Economy Act transaction must be something the ordering agency is authorized to do and the performing agency is in a position to provide. Also, there must be direct benefit to the paying agency. Apart from these general prescriptions, the Economy Act makes no attempt to define the kinds of work, services, or materials that can be ordered. This is in apparent recognition of the great diversity of tasks and functions one encounters in the federal universe, and the fact that these tasks and functions are subject to change over time." Red Book, Third Edition, Volume III at page 12-64. It is my understanding that funds transferred under the Economy Act are "available for the purposes for which the appropriation from which transferred are available, and also subject to the same limitations fixed in the appropriations from which the funds are transferred." 18 Comp. Gen. 489, 490-91 (1938).

7.  The Red Book also provides examples of transactions in which the Economy Act "has been used," or at least "recognized as available [authority] for," including an agreement

JA420

between the Department of Veterans Affairs and the Department of the Navy under which the "Navy would execute and superintend a contract for the construction of the Corregidor-Bataan Memorial." Red Book, Third Edition, Volume III at page 12-67.

8. EOP regularly enters into agreements under the Economy Act, 31 U.S.C. § 1535. The Economy Act is commonly used at EOP when an agency determines that it does not have the appropriate resources to execute an action of work, services or materials that EOP, as a servicing entity, is in the position to provide more conveniently. Once a formal agreement between the agency and EOP is executed, EOP assumes responsibility for carrying out the acquisition, activities, and necessary support for the goods and/or services that are being sought by the requesting agency. This includes developing requirements in coordination with the requesting agency, conducting market research as needed, and securing qualified vendors through appropriate competitive procedures. EOP also issues solicitations and awards contracts to companies capable of delivering required goods and services.

9. Over the past decade, components of EOP have entered into approximately 2500 Economy Act agreements, which is an average of 21 agreements per month or an average of 250 per year.

10. The Office of the Executive Residence ("EXR") has often served as the servicing entity for construction projects at the White House. In these instances, EXR has received funding from other government agencies to manage permanent improvements to the Executive Residence at the White House. EXR is uniquely suited to carry out such projects given its close relationship with the President and its substantial expertise in providing for (1) the preservation and maintenance of the White House structure and its

JA421

historical contents, and (2) the use of the White House for official ceremonial purposes as well as the private home of the President.

11. Past Economy Act agreements with EXR concern, for instance, installation of security windows on behalf of the U.S. Secret Service, improvements to the North Portico paving on behalf of the National Park Service ("NPS"), a 1.5-million-dollar renovation of the White House press room on behalf of NPS, and rehabilitation of the fire alarm systems on behalf of NPS.

12. Other examples include personnel details—in which EOP staff will temporarily work for another agency to provide specific expertise—and temporary construction for events taking place across the country that involve an EOP principal. Like other examples, EOP components act as the servicing agency and receive reimbursement for their services from the ordering agency.

13. As the above examples make clear, use of the Economy Act has long been standard operating procedure at EOP. The Economy Act agreement concerning the Project, in which EXR acts as the servicing agency for NPS, is consistent with this precedent.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2026.

HEATHER MARTIN

Digitally signed by HEATHER MARTIN
Date: 2026.03.23 16:15:08 -04'00'

Heather Martin

4

JA422

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - x
NATIONAL TRUST FOR HISTORIC          CV No. 1:25-cv-04316-RJL
PRESERVATION IN THE UNITED STATES,


                    Plaintiff,
v.                                   Washington, D.C.
                                     Tuesday, March 17, 2026
                                     3:30 p.m.
NATIONAL PARK SERVICE, et al.,


                    Defendants.
- - - - - - - - - - - - - - - - - - x
```

_____

### TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
### HELD BEFORE THE HONORABLE RICHARD J. LEON
### UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiff:     Thaddeus A. Heuer, Esq.
                       Gregory B. Craig, Esq.
                       Jack C. Smith, Esq.
                       FOLEY HOAG, LLP
                       155 Seaport Boulevard
                       Boston, MA 02210
                       617-832-1187


For the Defendants:    Jacob M. Roth, Esq.
                       Brantley Mayers, Esq.
                       Eitan Sirkovich, Esq.
                       Marissa A. Piropato, Esq.
                       Peter M. Torstensen, Esq.
                       DOJ-Enrd
                       Environment and Natural Resources Division
                       950 Pennsylvania Avenue, NW
                       Washington, DC 20530
                       (202) 718-0703


Court Reporter:        Timothy R. Miller, RPR, CRR, NJ-CCR
                       Official Court Reporter
                       U.S. Courthouse, Room 6722
                       333 Constitution Avenue, NW
                       Washington, DC 20001
                       (202) 354-3111



Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

JA423

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Your Honor, we are on the record in Civil Matter 25-4316, National Trust for Historic Preservation in the United States v. National Park Service, et al.

Beginning with plaintiff's counsel, please approach the podium and identify yourself for the record.

MR. CRAIG:  Good afternoon, Your Honor.  My name is Gregory Craig.  I'm senior counsel at Foley Hoag, and we're here on behalf of the National Trust for Historic Preservation in the United States.  And I'd like to introduce Tad Heuer who will be arguing for the Trust today.

THE COURT:  Welcome back.

MR. CRAIG:  Thank you.  It's nice to be back.

MR. ROTH:  Good afternoon, Your Honor.  Jacob Roth on behalf of defendants, and I'm joined by Brantley Mayers, Eitan Sirkovich, Pete Torstensen, and Marissa Piropato.

THE COURT:  Where are they from?

MR. ROTH:  So this side, (indicating) is from the Civil Division, front office and Federal Programs Branch; and this side, (indicating) is from the Environment and Natural Resources Division.

THE COURT:  Okay.  Welcome back.

MR. ROTH:  Thank you, Your Honor.

THE COURT:  All right.  Well, we're here for the

JA424

second installment of this preliminary injunction battle extraordinaire. I had thought before today -- well, before the last couple days, I should say -- that this was just a question of where's the president's authority come from, and that's why the ultra vires action, but now it appears that the Government is changing direction. They're not backing off that position that the president has the authority, but now they're saying that National Park Service is the one that was acting on authority. So I want to hear some argument from both sides -- especially the Government's side -- on NPS's role in this, especially since the footnote in the earlier brief says that they had no role in it.

Sir, you can have 15 minutes.

MR. HEUER: Thank you, Your Honor.

I do want to address that point and two others. The first is the one that we thought we were here on which is that ultra vires review is available and applicable. And the second is that neither 105(d) nor the National Park Service's Organic Act come anywhere close to providing the express congressional approval for the ballroom which renders the project ultra vires of the statutes that mandate such approval, which are 8106 and Redwood. And, third, I will discuss that the Government's opposition has, in our view, voluntarily reopened the APA claims again the Park Service that they have spent the last three months trying to

JA425

foreclose.

THE COURT:  Well, if this is an NPS show and then -- there's no question NPS is covered by the APA.

MR. HEUER:  Correct.

THE COURT:  No question.

MR. HEUER:  Correct.

THE COURT:  Zero.  So I won't even entertain argument that it doesn't.  It does come under the --

MR. HEUER:  We would wholeheartedly agree.

THE COURT:  Yeah.

MR. HEUER:  On the first point about ultra vires review, it is available here.  The Government claims that ultra vires is always a Hail Mary.  It is not.  The Circuit has called ultra vires review a critical backstop when no other mechanism exists to enforce a clear statutory limit.  As we've noted, it is demanding but certainly not insurmountable.  There must be no other avenue for relief available.  Here, the Court's order makes plain there is not.  Congress must not have foreclosed relief.  It has not.  And the plaintiff must show that the Government has patently misconstrued the statute, disregarded a specific and unambiguous statutory directive, or violated some specific command.  That's the Changji Esquel case.

And both the Circuit in Postal Supervisors and the Supreme Court just last month in Learning Resources have

JA426

sustained such challenges to executive action. And in our view, this case presents exactly the kind of clear and mandatory prohibition that supports ultra vires relief. There is simply nothing vague about the words "shall not." 8106 says "a building or structure shall not be erected on any federal park in the District without express authority of Congress." So does the Redwood Amendment. "Federal activities shall not be exercised in derogation of the values and purposes for which the Park Service units have been established except as directly and specifically provided by Congress." The ultra vires question is whether the defendants have clearly violated a specific and unambiguous statutory directive. Here, that they obtain express congressional approval for their actions. In our view, this is not even a close call. 8106 and Redwood forbid such actions without express congressional approval.

THE COURT: Indeed, where does NPS, under its Organic Act, get the authority to --

MR. HEUER: I would be pleased to discuss that point, Your Honor. Under the Organic Act -- which we believe is their alternative backup here because 8105, in our view, clearly doesn't provide them the authority they need -- it is a maintenance statute provision. It is not a grant of congressional approval to license --

THE COURT: They claim this is an alteration.

JA427

MR. HEUER:  They do claim it is an alteration, and they have made that argument for the last three sets of briefings and we continue to have the same answer.  The words "alteration" and "improvement" are in a statute that Congress authorized repair, care, maintenance, refurnishing, heating, lighting, air conditioning.  It is a maintenance statute.  And we know this because the appropriation that Congress made this year in the 2024 act to allow how much money, they gave $2-and-a-half million for even more specific elements.  That was for required maintenance, health and safety issues, and preventive maintenance.  The word "maintenance" is everywhere in this statute and its appropriation.  This is a maintenance allowance.  It's not a construction license.

So moving to the question about, then, NPS Organic Act, this is their second backup, presumably because it appears that 105 is a dead end.  We would say that the general grant of authority under the Organic Act, which is to promote and regulate the use of national parks, is certainly not a project-specific congressional authorization to erect a ballroom under 8106.  But the Redwood Amendment reinforces that the defendants need express congressional approval that they simply do not have.  Any federal entity under the Redwood Amendment that is engaged in the management or the administration of a National Park System

unit shall not exercise that authority in derogation of the values and purposes for which the system units have been established except as directly and specifically provided by Congress. And the Redwood Amendment's legislative history, which we cite to in our brief, makes this very clear. In 1968, Congress designated Redwood National Park in California. It then found that over the intervening 10 years, the Park Service had done nothing to stop the adverse impacts of erosion and logging on that park. Congress wanted to put a stop to that. So in 1978, they commanded that any federal action that impaired a national park required congressional approval. The Redwood Amendment is a strong congressional remedy to protect vulnerable cultural and environmental park resources from the indifference or the harmful actions of the executive branch, and we know that such harm will occur here because the defendants' own environmental assessment acknowledges it. It says that there will be permanent adverse effects to the cultural landscape. There will be a permanent loss of the East Wing. That is impairment. It is authorized only if directly and specifically provided by Congress, and it has not been. I think we would say generally as to both 105(d) and the Organic Act, the defendants' problem is not an absence of a clear statutory instruction. It's their insistence on doing something that the statute clearly forbids. That is the

JA429

8

core of an ultra vires action.

Now, I would note that they also, having had both of these positions put in front of the Court, go to a third argument which is that 8106 simply doesn't apply to them. I think their problem remains twofold. The first is the plain text of the statute. It contains no carveout for the Park Service, the president, or for any federal entity. If Congress can exempt bonsai facilities at the Arboretum under 8106, it surely knows how to exempt the White House, and it has not.

Second -- it's important to be very clear on this point, because we've had hundreds of pages of briefing at this point -- the defendants admit they lack constitutional authority. Congress has plenary authority over federal property from the Property Clause. So they still need to demonstrate that they have delegated authority from Congress to build the ballroom whether 1 -- 8106 exists or not. They still haven't provided that authority.

We would note that, again, in response to the Government's contention that they have repeated that Gerald Ford's pool and a tennis changing room may have been built at the White House without congressional authorization so the ballroom gets a pass as well should have the same response as this Court gave in January, which was be serious. A ballroom is not a pergola. And, regardless, as

JA430

the Supreme Court held in the Lexecon case, which we've cited, even if it had been a longstanding practice not to adhere to a particular statutory command, that does not relieve the Court of its obligation to, quote, give effect to the statute's plain command now.

I'd like to turn to the APA NPS question.  As you've seen in our brief, our position is that the Government's, again, shifting legal position has resulted in the voluntary revival of an APA claim against the National Park Service that they had spent the first two sets of briefing saying did not exist.  So you'll recall back in December and in January, the Government told this Court that the Park Service had no meaningful role in the project so APA review was unavailable, and the Court reasonably took them at their word.

THE COURT:  I quote from their brief, Footnote 7: "While NPS is an APA agency, it is indisputably not directing the East Wing project," closed quote.

MR. HEUER:  I would add to that two quotes.  That was the second quote I was going to give you of three.  The first was the project was, quote, "proceeding under the leadership of EXR"; and the next was, quote, "NPS had, and has, no role in directing the project."  This was not a passing statement.  They have said this three times and more.

JA431

THE COURT:  Maybe Mr. Roth is an alchemist.

MR. HEUER:  It is possible.

Now, of course, NPS is suddenly everywhere in their brief.  And when I say everywhere, I mean everywhere, starting on Page 2.  Their brief claims the project is doubly authorized by 105(d) and by the NPS Organic Act.  They claim that the NPS NEPA process and its non-impairment determination are touted as evidence of their consistency with the Organic Act, and they argue that EXR is now merely acting as a contractor of the Park Service.

Now, none of this helps them in their need for express congressional authorization under either 8106 or Redwood.  As we've just discussed, the Organic Act doesn't provide that express congressional authority, much less the express impairment authorization that you need under Redwood.  But as is probably obvious, EXR has no authority to do anything under the NPS Organic Act.  They're two different entities.  So if the Organic Act applies, then the Park Service must be in charge, the very claim the Government has tried for months to evade.  And in our view, the Government has two options here.  If it continues to assert that the Organic Act is the statutory foundation of the ballroom project, then an injunction should enter because the Park Service has violated the APA by continuing to construct the ballroom in violation of 8106, in violation

JA432

of the commission review statutes, in violation of NEPA, and in violation of the Redwood Amendment.  If it disclaims this newfound supposed express congressional authority under the Organic Act, an injunction should also enter, because no statutory authority exists under the only alternative, 105(d), and they have already disclaimed any constitutional authority.  What they can't do here is have it both ways. They can't claim the Organic Act provides express congressional approval for the ballroom but that NPS is also not in charge.

Briefly, Your Honor, on the remaining Winter factors, there is clearly irreparable harm.  Once above-grade construction proceeds, those adverse aesthetic impacts and the adverse cultural impacts will be locked in.

THE COURT:  That's not supposed to proceed until April; right?

MR. HEUER:  Not until April, but we are now -- St. Patrick's Day.

THE COURT:  Two weeks away.

MR. HEUER:  We are two weeks away.  The imminence is now imminent.  And the defendants concede that.  They have said:  It's in process.  We have been constructing for months, and we are now ready to go above-grade.

And I would note that the Semonite decision that they cite -- and we do as well -- is a cautionary tail here.

In that case, the court declined to issue a preliminary injunction because only foundation work was proceeding and the defendants there claimed that the towers could be removed later.  By the time the National Trust won on the merits in that case, the towers had been built and the Court found the consequences of removal too great to order their removal.  I think, quite simply, our position is the Trust is entitled to more than a Pyrrhic victory here for the same reasons.

The balance of the equities also favors the Trust, as does the public interest.  The defendants continue to insist that there is a national security issue that precludes them from stopping anything.  I need to reiterate the National Trust has never sought to halt work imperative to national security.  We have said that in every brief we have filed, and there have now been many.  The Trust has also repeatedly urged the Court to design any injunction to ensure the president's safety.  We have no interest in making the president unsafe.  Our interest is in preventing a ballroom that is not authorized by law.  And the Court is more than capable of permitting safety-critical work here while pausing a ballroom that has no national security purpose.

THE COURT:  Do you want to take the last couple minutes you have to address -- well, maybe, you don't want

JA434

to -- address the standing issue, which they trudge up again for the third or fourth time.

MR. HEUER: I am happy to address the standing issue, Your Honor.

THE COURT: They're looking for an escape hatch, it seems.

MR. HEUER: I would not disagree. I would say that nothing material has changed from this Court's order on standing other than that the defendants released new renderings last week, one of which is in our reply brief on Page 20, which shows that the ballroom will indeed overwhelm everything that surrounds it and will indeed be visible to everyone from everywhere.

I would also say their persistent assertion that Dr. Hoagland needs some kind of special access to the White House allowing her to view it before she has standing is highly puzzling. She doesn't need special access to assert harm. The White House is not a forbidden palace. It's a public building open to the public. You can walk around it. You can walk in it. This notion that Dr. Hoagland, for all the reasons that the Court articulated, is comfortably within the realm of associational standing is one that we simply don't take seriously, and we would agree that they appear to be looking for a way not to reach the merits but to get out on procedural niceties and to say that there's a

standing issue.  That simply doesn't lie here.

I think my last point would be this on the merits -- on the irreparable harm.  The defendants' response, as you have seen, is that their, quote, gaping hole at the East Wing site means that construction can't be paused.  They seem to have forgotten the proverbial first law of holes, which is when you find yourself in one, stop digging.  They have known for months that they lack congressional approval yet insist on continuing to dig, literally and figuratively.  They now assert that the larger their hole gets, the more imperative it is that they be allowed to keep digging.  Self-inflicted harm is not a basis for evading equitable relief.

In sum, the Court [sic] is entitled to relief on its ultra vires claims.  As we have said before, the president is the steward of the White House.  Congress is its owner.  When he wishes to undertake a project of this size, the law requires him to go to Congress and obtain express approval.  Because he refuses, this Court should enter the preliminary injunction.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Roth?

MR. ROTH:  Thank you, Your Honor.

And I want to assure the Court, I'll -- I'm going

to address the NPS issue and role when I get to that point in the argument, but I'm absolutely --

THE COURT: Well, good, and I understand because, frankly, the whole idea here was to deal with the ultra vires issue. That was what I was hoping that I would get briefs addressing, if not exclusively, principally. Instead, I find we've moved off on a whole new direction that you've come up with with regard to NPS, National Park Service. So I expect you to start with ultra vires --

MR. ROTH: Yes.

THE COURT: -- especially as it relates to the two statutes that are squarely before the Court, 8106 and 105 --

MR. ROTH: Yeah.

THE COURT: -- and whatever time you've got left we'll deal with your new theory involving NPS.

MR. ROTH: Yeah. Absolutely, Your Honor. As we'll get to, I don't think it's a new theory, but I'll get to it when I get to it.

THE COURT: Well, what would you -- would you call it your alternative approach? What's your principal approach?

MR. ROTH: Here's where I'd start, Your Honor. The White House has a unique dual role because it is both the president's home and office and the national park, and the consequence of that dual role is that there are two sets

of statutes that speak to grounds and who and what can be done on them.  We have the president's source of authority under Section 105(d), and we have the National Park Service authority under the National Park Service --

THE COURT:  Who's directing this project?  Up until this most recent brief, I was under the distinct impression that EXR was directing this project.

MR. ROTH:  Absolutely correct.

THE COURT:  Now, I'm under the impression that you're saying NPS is directing this project.

MR. ROTH:  No.

THE COURT:  You can't have it both ways.

MR. ROTH:  I agree, Your Honor.  We're not trying to have it both ways.

THE COURT:  So who is it?

MR. ROTH:  EXR is directing the project 100 percent.  We have said that from the beginning, and that is true.  The role of NPS -- which we've also made clear from the beginning -- is, on the funding side, the donations are being made pursuant to NPS --

THE COURT:  Well --

MR. ROTH:  -- donation authority --

THE COURT:  -- that's the Rube Goldberg contraption.

MR. ROTH:  Well, let me -- I think we've tried to

lay it out in -- more clearly in this set of briefs for Your Honor, because I understood the questions Your Honor had at the last hearing, but as I'll get to, NPS did play a role that we have identified since December which is it explained in a determination of no significant impact that the project was consistent with the NPS Organic Act and that it was accepting donations, which it can do for projects that fall within the scope of the NPS Organic Act, and that under the Economy Act, it had contracted with EXR to run the project, and that is why EXR is directing the project, and that is what we've said from the beginning.  EXR is directing the project, but in part it is using authority and funds that NPS has provided through the Economy Act transaction, and we've said that from the beginning and plaintiffs have never challenged the Economy Act transaction.  That would have been a perfectly normal APA claim if they had raised it. They never challenged that step which we identified from the very beginning.  And I'm -- when I get to there, I'll walk through the items in the record that show that, but I just want to start by explaining this has always been dual source of funding and dual source of authority, even though EXR is the one running the project day to day.

I'm not going to spend as much time on 105(d) because we spoke about it at some length last time, but what I'll just say is that I do think the Trust's inability to

draw a clear line between what's in and what's out under 105(d) makes it very hard to support an ultra vires claim based on that statute.  Ultra vires is a high standard.  It requires a clear, obvious violation of the statute, what Your Honor, in Hunter v. FERC, called a brazen defiance of the statute.  We had a dispute with them, I understand, about the scope of "alter" and "improve," and they point to canons and we point to dictionaries and we go back and forth about it, but that is the type of ordinary statutory dispute that doesn't rise to the level of an ultra vires claim under the D.C. Circuit's precedents.

THE COURT:  I don't think the D.C. Circuit's ever had a case like this.

MR. ROTH:  That may be.

THE COURT:  I don't think it --

MR. ROTH:  It's novel.

THE COURT:  Frankly, I don't think it's even close, frankly.  And, of course, this case will ultimately be there anyway.  No matter who wins, it's going there.

MR. ROTH:  I assume that's true, Your Honor.

THE COURT:  But to call a $400 million project with 90,000 square feet an alteration, that takes some brazen interpretation of the laws of vocabulary.

MR. ROTH:  Well, again, Your Honor, we -- I'm not going to cover ground that we addressed last time.  I do

JA440

think that the ordinary dictionary definitions of "alter" and "improve" cover a new wing.  And I -- what I would ask the other side is, you know, will their position be different if, instead of demolishing the East Wing, it had been a large extension of a ballroom, or what if it had been built on top of the existing structure as a new story?  Would they say that is an alteration or an improvement?  Maybe that's on the other side of the line.  They can't draw that line, because they're not really identifying a clear statutory test.  They're, sort of, just saying:  Well, this is too big.  It can't possibly be what was meant.

I think, for ultra vires review, we need something more than that.  We need something, the D.C. Circuit has said, that rises to the level of almost a jurisdictional error, a Hail Mary that almost never succeeds.  I don't think they've met that with respect to 105(d).

But I do want to spend more of the time --

THE COURT:  Well, that's a matter of opinion, and it's going to be mine in the first instance.

MR. ROTH:  Absolutely agree on that, Your Honor.

I do want to spend more of my time this morning -- this afternoon on the NPS side, because we didn't spend as much time on it last time.  But I do want to -- I'll start by addressing this idea that it's a change.  Okay?  It's not correct.  And here's a few ways you can see that's not

correct. Number one, their opening brief addressed it. Pages 14 to 16 of their opening brief addressed the NPS Organic Act and said: We don't have authority under the NPS Organic Act.

So I don't know how they can turn around and say this is some new surprise assertion that they never saw coming when they address it and preemptively try to rebut it in their opening brief. Okay? That's Pages 14 to 16. The reason it wasn't a surprise to them is because we've identified it going back to December. In our December filings at the TRO stage, we attached the National Park Service finding of no significant impact -- it's ECF 14-2 -- which is a 17-page analysis that the National Park Service did as to whether this project was consistent with the NPS Organic Act and was consistent with the Redwood Amendment, and they determined that it was. We provided a declaration from the Comptroller of the National Park Service, ECF 14-1.

THE COURT: You have the Organic Act there? Show me the language in the Organic Act that gives the authority to demolish the East Wing and rebuild it. Show me the language, NPS's Organic Act.

MR. ROTH: Here it is. Your Honor, the NPS Organic Act is 54 U.S.C. 100101 and it provides for the Secretary, through the Director of the National Park Service, to promote and regulate the use of the National

JA442

Park System by means and measures that conform to the fundamental purpose of the system units.

THE COURT:  That's a quote.

MR. ROTH:  That's a quote.  That is the authority that the National Park Service has used for a century to do construction in national parks across the country.  And we said that in the declaration from NPS, again, back in December at ECF 14-1 where -- Paragraph 5, the Organic Act of 1916.  This authority generally extends to construction activities at individual park units in furtherance of the purpose of the park unit at issue, and then explained how that also provided NPS the authority to accept donations in -- to advance that project, and that they had made the determination -- this is in Paragraph 9 -- that this project was consistent with the fundamental purpose of the system unit that would not result in impairment of park resources and, therefore, was permissible under that statute, and then said that EXR is handling the day-to-day actual work and directing the project, but those determinations about consistency with the statute and the funding mechanism that goes along with it were provided back in December, and in the January filings we said the same thing, and we have a second declaration from the Comptroller of the National Park Service.  It's at ECF 30-3.  It explains all of this again and says that NPS entered into an agreement with EXR under

JA443

the Economy Act under which the funds were being provided to EXR to handle the project day to day, which is what's happening, but that the authority --

THE COURT:  The funds from the private sourcing.

MR. ROTH:  Correct, Your Honor.  Correct.

And they go together.  So the authority to accept donations is 54 U.S.C. 101101.  You can only accept donations for projects that are consistent with the NPS Organic Act which is 100101.  So NPS had to make the determination:  This is consistent with the Organic Act; therefore, we can accept donations for it, but we don't want to do the work.  EXR is best positioned to do the work.  So we have an agreement with EXR under the Economy Act which is the tool that agencies use to -- when they need -- some other entity in the Federal Government is best positioned to carry out a project, they use the Economy Act to provide them with the funding and that second entity actually does the work, but they're using the authority that applies to the first entity.

THE COURT:  Where has an arrangement like that ever before been done?

MR. ROTH:  Been what, Your Honor?

THE COURT:  Where has an arrangement of that nature ever before been done?  Well, let me ask.  Is this the first time ever?

MR. ROTH: No, no. Absolutely not, Your Honor. Economy Act is used all the time for projects within the Federal Government. We cite a case --

THE COURT: I'm talking about an arrangement between NPS and the White House to construct anything at the White House ever.

MR. ROTH: I don't know, Your Honor, if it's been done in that context before, but as a general matter, the Economy Act is available for exactly that purpose, is to allow an entity that is better positioned to do a particular piece of work to do it using funding and authority of another agency. And, again, we said that this was what -- how it was happening consistently December and January, and they never challenged that determination. If they had wanted to challenge the Economy Act transaction, sure, they could have said NPS, you know, is acting arbitrarily and capriciously or contrary to law through this arrangement. I don't know what the merits of that argument would be because I think it's perfectly lawful, but they could have brought that APA claim. They never brought that APA claim. They instead said: No, we want an injunction against EXR to stop the construction.

Well, they can't do that under the APA, as the Court correctly acknowledged.

THE COURT: Well, bear in mind that when this

litigation first got going, the impression everybody had, including this Court, was that the Government's position was that the president had constitutional authority to do what he's doing; then we get the first round of briefs and the Government backs off that and disclaims constitutional authority and claims it's statutory authority, in essence. So things have been -- this has been a case where there have been shifting theories and shifting dynamics -- and I regret to say --

MR. ROTH:  I understand, Your Honor.

THE COURT:  -- from the beginning.

MR. ROTH:  I understand, Your Honor, but what I would say is the case moved very quickly at the beginning, TRO and then PI, and initially we were dealing with a whole host of other claims, as well.  I mean, if the Court recalls, the lead claim initially was NEPA and:  You didn't consult with the Commission on Fine Arts; and:  You didn't get approval from the National Capitol Planning Commission.

And the ultra vires statutory authority aspect of this really only came to be developed because the Court had questions about it and then we briefed it.  And I think, in that briefing, from the very beginning, we made clear, yes, 105(d) gives the president authority, but we always said 105(d) didn't supply all the funding we needed because there's only 2-and-a-half million in that account from the

JA446

congressional appropriation. We needed the second source of funding which is the NPS funding, and the way we get that NPS funding is through the NPS Organic Act. That's the only way we can access that funding, is if the project is consistent and falls within the scope of the NPS Organic Act. And, again, that is the authority that the Park Service uses for all of its construction in all national parks around the country, including in D.C., and it has for decades and decades, and we pointed this out, and I don't think they argue with that. Again, their argument on the -- their merits argument on the National Park Service Organic Act, as I understand it, is one thing. They say: This project doesn't fall within the scope because it's in derogation of the values and purposes of the park.

That's their argument. Well, NPS wrote a 17-page memo analyzing that and said the opposite, and they never engage with it. They just want the Court to declare: I don't, you know -- we don't think that this project furthers the purposes of the park.

Well, that's not how review of these agency determinations is supposed to operate. The agency did that analysis. It's -- it involves a wide array of considerations of the purposes of the park and how this is going to impact them. This is something NPS does all the time when it's considering any project in a national park.

JA447

They do this analysis.  They evaluate the impairment.

THE COURT:  This isn't just any national park.

MR. ROTH:  Correct.

THE COURT:  This is a special place.  This is an iconic symbol of this nation that people -- the Congress has concluded, of course, too -- think of as something that they have an ownership interest in.  Indeed, the president does not have an ownership interest.  He's a steward of the institution for the future presidents that live in that Executive Mansion.  This is not just any park, and there's no track record of anything like this ever being done before.  And wouldn't it have been a heck of a lot easier by any standard to have just gone to Congress to get the authority to do it and then worried about the funding part later?

MR. ROTH:  I understand, Your Honor, but what I would say is --

THE COURT:  I think the answer is "yes" to that question, by the way.

MR. ROTH:  Yes.  Yes, Your Honor.  The -- but what I would say is the Congress did determine to designate the White House as a national park, and in doing so in 1961 it said this will be subject to operation under the NPS Organic Act, and the consequence of that is that at least in the first instance for projects within that scope, the agency

JA448

determines whether the project is consistent with the statute. The agency made that determination. We gave it to them in December. And they have not actually challenged that, again, 17-page analysis in the record --

THE COURT: Well, I'm going to give Mr. Heuer five minutes to address that.

MR. ROTH: Okay.

THE COURT: You've used your 15 minutes. I'll give you a few more minutes since you've gotten sidetracked with my questions.

MR. ROTH: I appreciate it, Your Honor. And I'll use that on 8106, if I can.

THE COURT: Please, because --

MR. ROTH: Okay.

THE COURT: -- I'm struggling to see how -- first of all, I'm struggling to see how you see this as an alteration. That's the 05 --

MR. ROTH: That's 105.

THE COURT: -- 105.

MR. ROTH: Yeah.

THE COURT: But 106 is a specific directive that would seem to --

MR. ROTH: Yeah. So --

THE COURT: -- it would seem to be --

MR. ROTH: So let me talk about 8106, because I

JA449

think there's -- really, there's two ways to read it, and the way they're reading it does not work. Okay? There -- here are the two ways to read it. One is that if an agency has authority -- general authority to build in an area, 8106 is satisfied. That's the congressional authorization. The other way -- which is their way -- is, no, no, Congress has to speak specifically to the particular building that is being erected.

THE COURT: Normally, they do that when they appropriate money for that purpose.

MR. ROTH: So --

THE COURT: This is an end-run on the money appropriation process.

MR. ROTH: So I don't think -- respectfully, I don't think that's correct, Your Honor, with respect to the National Park Service projects, and we gave a number of examples in the most recent brief and declaration from the Park Service of all the construction that has happened in national parks in D.C. without Congress specifically speaking to a particular structure --

THE COURT: Building a headquarters for the U.S. Park Police is not the same as building a $400 million project, including the East Wing of the White House. Come on. You just cannot -- you can't equate those.

MR. ROTH: Your Honor, I don't think --

THE COURT:  It doesn't make sense.

MR. ROTH:  I don't think I have to equate them, but my point is we have a statute and we need a consistent interpretation of the statute, and the right way to read the statute is that 8106 does not restrict NPS from building on national parks.  If it did, then almost every building built in D.C. national parks over the last 100 years would have been illegal.  Nobody has ever thought it meant that.  And we've found this near contemporaneous understanding from Major Ulysses Grant from the '20s who was talking to Congress about this and they said:  How did you have the power to build this fieldhouse in Anacostia Park, despite the statute?

And he said:  Oh, we asked for that statute. That's there to protect us from third parties coming in and encroaching on the parks.

It has -- it was never construed to restrict the park authorities from building on the parks.  And, again, they can't explain the history, because regardless of what differences may exist between this project and, you know, the 7,500-person tennis stadium in Rock Creek Park -- and I'm not saying they're the same, but legally either Congress needs to approve both or it doesn't have to approve either, and their reading is just untenable because they are suggesting -- the implication of their reading is that all

of these buildings have always been illegal and Major Grant didn't understand the statute back in the '20s even though his office is the one that asked for it.

And they also have no answer to Section 451 which is this other provision that we discovered in researching this -- the history here, which is -- which was enacted originally at the same time as 8106 but was specific to national parks, and Congress repealed that in 1996.  If either of these -- if one of these is applicable, it's the one applicable to national parks, and Congress chose to get rid of that statute.  Now, that does explain their bonsai example because that's the one example they've found where Congress has actually spoken to a particular structure and said:  Yes, you can do it, notwithstanding 8106.

That was the Department of Agriculture and it wasn't on a national park.  So that makes sense.  It's consistent with the history, but otherwise their reading of -- their reading of the statute just does not comport with the history, and particularly in an ultra vires context, that just can't be enough to get them where they need to go.

THE COURT:  You can have one minute.

MR. ROTH:  Okay.  Well, I'm going to skip zone of interests and I'm going to say that on the balance of harms, I do think this is the rare case where even if the Court

concludes that the Trust does have a likelihood of success on the merits, that should not translate into an injunction against the project because the equitable balancing is so lopsided in favor of the construction continuing and against the aesthetic interests on the other side, and that's for the security reasons that we've identified in the classified declarations and just for practical reasons. It does not benefit the Trust; it does not benefit the public to have this excavation site dormant indefinitely. That doesn't help anyone. So if the Court does conclude that the plaintiff is likely to succeed on the merits, I think the most that should be ordered is a declaratory relief that would, then, allow Congress to take whatever steps it deems necessary and appropriate to deal with it rather than shut down the entire construction in the middle.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Roth.

Mr. Heuer, you can have five minutes.

MR. HEUER: Thank you, Your Honor.

Several points. First, on the question of where is the line in 105(d), the Government continues to persist in arguing that it could theoretically authorize demolishing and rebuilding an entire wing of the White House. At our last hearing, I believe you called that a pretty expansive interpretation and pressed them for some limiting

JA453

principles.  The Government responded that bulldozing the White House and building something completely different might cross that line.  Apart from the fact that that is exactly what happened here, that is not a limiting principle.  It is a concession that the Government's reading of 105(d) is one of limitless authority.

Their alternative assertion which was that 105(d)'s notwithstanding clause saves this -- that seems to be what they're going -- is no better.  We've explained this three times.  It applies to sums appropriated under this subsection.  That means 105(d).  That's the $2-and-a-half million that Congress appropriated for maintenance.  The government cannot move hundreds of millions of dollars of private money into the 105(d) maintenance account, summarily declare those funds congressionally authorized, and use them for ballroom construction, even if 105(d) funds could be used for ballroom construction which, because of its plain language, they cannot be.  That is the Rube Goldberg machine run amok.

On the question of whether or not we have -- they have properly talked about the Park Service Organic Act in their original briefing, I would remind the Court that the way that TROs work is that the plaintiffs file first and then the defendants file later.  Why we should be mind readers as to what they might plead after we have pleaded is

JA454

beyond me, but I would point out that we agreed that NPS was the entity in charge. That's why they're the lead defendant. We were, then, told that they're not in charge. Now, we're told they are in charge. What we do is we dutifully plead in anyone that they claim is in charge of the project we want to stop. It's not our fault that they keep changing positions. And if you look at those declarations from the acting director that he referenced, the only contract they discuss is the handover of Park Service funds to EXR so EXR can run the project under 105(d), and they did that because they were attempting to say that the Park Service was not in control. Now, they are claiming the exact opposite.

And as to this question of whether we have waived the Economy Act question under 10- -- under 1535, I would point you to Paragraph 213 of our amended complaint where we say that the ballroom project, as proposed to be funded by the defendants through 101101(2), 31 U.S.C. 1231 [sic], or 31 U.S.C. 1535, the Economy Act, is ultra vires of any authority they may have under the Redwood Amendment. We've pleaded what they've said we haven't. This is consistent from this Government.

As to -- the third question I want to talk about briefly is the question on 105 -- or sorry, on the -- 8106 as to these other improvements that they have discovered.

JA455

So as we noted in our brief, our preliminary research is that some of these other projects actually were authorized by congressional appropriation, but as I noted in my original -- or my initial discussion, even if they were not, that doesn't help the ballroom, given the plain text of 8106. That's Lexecon. Even if it's been the longstanding practice not to adhere to the command, the Court has an obligation to give effect to its plain command now. Put slightly differently, it is no answer that you cannot be ticketed for speeding on the grounds that you do so all the time but haven't been caught until now. The only project before this Court is the ballroom, and it unambiguously violates 8106.

As to this question about the Government's discovery of supposed legislative history with Major Ulysses S. Grant, III, that is a single statement made in an unrelated hearing in 1926, I believe -- so 14 years after the passage of this act -- by someone who was not, and had never been, a legislator. Justice Scalia has warned us that subsequent legislative history is not to be taken seriously. Something that is not legislative history at all certainly cannot be taken seriously. I think our question here for the Court is if -- based on what we've heard today, if the Court enjoins the Park Service, will construction stop? It's not clear to us that it will. So we would argue that

an injunction has to enter as to both the Park Service and to EXR and to anyone else who they may come up with who we would -- pleaded in who may have control over this and attempts to keep it going.

I will close with this. It is abundantly clear that the Government has no cognizable or consistent theory about who's in charge of this project. First, it was NPS; then it was EXR; then it was NPS; this afternoon, it's EXR. They have no cognizable or consistent theory of their case. First, it was the Constitution; then it was 105(d); now, it's the NPS Organic Act. They have constructed an elaborate Rube Goldberg funding mechanism that is no more plausible after three rounds of briefing than it was at the outset, and after taking this Court on a months-long merry-go-round ride just to end up right back where we've started, they now claim the project is too far along to be stopped. We ask this Court to say that enough is enough and grant the requested preliminary injunction.

Thank you, Your Honor.

THE COURT: Thank you, sir.

Well, I'll do my level best to get you an opinion by the end of the month. You haven't made it easier on me, but the briefs are very well written. My compliments to both sides. And the arguments, although at times testy, were both well done and I appreciate that. We don't get

JA457

that every day in the federal courtroom.

So with that, we'll stand adjourned.

THE DEPUTY CLERK:  All rise.

THE COURT:  Oh, Erin go bragh.

(Laughter.)

THE DEPUTY CLERK:  This Honorable Court stands adjourned.

(Proceedings concluded at 4:19 p.m.)

* * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 24th day of March 2026.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**
**United States Courthouse**
**Room 6722**
**333 Constitution Avenue, NW**
**Washington, DC 20001**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

## DEFENDANTS' NOTICE OF SUBMITTING THIRD SUPPLEMENTAL *EX PARTE* DECLARATION *IN CAMERA*

To ensure that the Court has a current record when deciding the Second Motion for a Preliminary Injunction, Defendants respectfully submit this Notice to inform the Court that they have lodged an updated classified declaration that, along with its attachments, reflects the present status of the East Wing project.

1

JA459

Dated: March 30, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

MARISSA A. PIROPATO
Deputy Chief

/s/ *Brantley T. Mayers*
BRANTLEY T. MAYERS
(FL Bar. No. 1039996)
Counsel
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Brantley.T.Mayers@usdoj.gov
(202) 890-9874

MICHELLE RAMUS
MARK WIDERSCHEIN
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov
(202) 598-0414

JOSEPH E. BORSON
Assistant Branch Director
EITAN R. SIRKOVICH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

     Plaintiff,

   v.

NATIONAL PARK SERVICE, *et al.*,

     Defendants.

</td><td>

)<br>
)<br>
)<br>
)<br>
)<br>
)  Civil Case No. 25-4316 (RJL)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)

</td></tr>
</table>

MEMORANDUM OPINION
March **31**, 2026 [Dkt. #51]

The President of the United States is the steward of the White House for future generations of First Families. He is not, however, the owner! President Trump ("the President") claims that Congress has given him authority in existing statutes to construct his East Wing ballroom project and to do it with private funds. The plaintiff, the National Trust for Historic Preservation in the United States ("National Trust"), claims the President has no such authority under existing statutes and that a preliminary injunction is necessary to avoid irreparable harm. I have concluded that the National Trust is likely to succeed on the merits because no statute comes close to giving the President the authority he claims to have. As such, I must therefore **GRANT** the National Trust's Motion for a Preliminary Injunction, and the ballroom construction project must stop until Congress authorizes its completion.

1

JA461

## BACKGROUND

### I.    The White House

Shortly after the founding, Congress passed the Residence Act of 1790, which authorized three commissioners to "provide suitable buildings for the accommodation of . . . the President." *See* An Act for Establishing the Temporary and Permanent Seat of the Government of the United States, ch. 28, 1 Stat. 130 (1790).[1] The three commissioners, empowered by Congress and appointed by the President, selected James Hoban as the architect of the President's residence through a design competition. *See* Pl.'s Suppl. Br., Annex 1 ("Annex") [Dkt. #20-1] at 2. Congress funded construction of the White House through several statutes. *See id.* In 1800, President John Adams moved into the still-unfinished White House, and every President has resided in the White House since then. Second Am. Compl. [Dkt. #50] ¶ 27.

Congress has continued to authorize and fund construction and maintenance at the White House up until the present day. *See generally* Annex. For example, Congress authorized repairs to the White House after it suffered extensive damage during the War of 1812, *see* Annex at 2–3; Act of Feb. 13, 1815, ch. 41, 3 Stat. 205; Act of Feb. 10, 1820, ch. 10, 3 Stat. 541, and received regular updates on progress, *see* H. R. Doc. No. 15-8, at 14–

---

[1] Relevant filings are abbreviated as follows: Pl.'s Mem. in Supp. of Mot. for TRO & Prelim. Inj. ("Pl.'s TRO Br.") [Dkt. #2-1]; Defs.' Mem. in Opp'n to Mot. for TRO & Prelim. Inj. ("Defs.' TRO Opp'n") [Dkt. #15-1]; Pls.' Suppl. Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Suppl. Br.") [Dkt. #20]; Defs.' Suppl. Resp. Br. in Opp'n to Pl.'s Mot. for a Prelim. Inj. ("Defs.' Suppl. Br.") [Dkt. #30]; Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply Br.") [Dkt. #33]; Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Renewed PI Br.") [Dkt. #51-1]; Defs.' Mem. in Opp'n to Pl.'s Second Mot. for Prelim. Inj. ("Defs.' Renewed Opp'n") [Dkt. #52]; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. ("Pl.'s Renewed Reply Br.") [Dkt. #54].

16 (1818). Congress appropriated funds for construction of the South Portico in 1823, the North Portico in 1829, and the East and West Wings in 1902. *See* An Act Making Appropriations for the Public Buildings, ch. 62, 3 Stat. 784 (1823); An Act Making Appropriations for the Public Buildings, and for Other Purposes, ch. 51, 4 Stat. 362 (1829); Act of June 28, 1902, ch. 1301, 32 Stat. 419, 460.

In the late 1940s, after the discovery of major structural issues, Congress appropriated funds for "the renovation, repair, and modernization" of the White House but prohibited any "change of [the] present architectural appearance of the exterior of the mansion or the interior of its main floor." Act of June 23, 1949, ch. 236, 63 Stat. 231, 235; *see also* Annex at 10–11. More recently, Congress funded the replacement of the White House perimeter fence in 2019 through a series of appropriations. *See* Annex at 13–14; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 435; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2503.

Today, the White House remains the official residence of the President. Second Am. Compl. ¶ 25. It sits in President's Park, a federal park administered by the National Park Service in Washington, D.C. *Id.*

## II.   The East Wing Ballroom Project

On July 31, 2025, the White House issued a press release announcing plans to build a "State Ballroom" on White House grounds. Second Am. Compl. ¶ 36; *see also* Mot. for TRO & Prelim. Inj., Ex. J [Dkt. #2-14]. The press release stated the ballroom would be constructed at the site of the "small, heavily changed, and reconstructed East Wing" and would encompass "approximately 90,000 total square feet." Ex. J. The press release also

3

JA463

stated that "President Trump, and other patriot donors, have generously committed to donating the funds to build" the ballroom. *Id.*; *see also* Mot. for TRO & Prelim. Inj., Ex. X ("Ex. X") [Dkt. #2-28] (ballroom will have "zero cost to the American Taxpayer!").

On October 20, 2025—without advance notice or apparent approval—President Trump announced on social media that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." Second Am. Compl. ¶ 51. On October 21, 2025, media outlets confirmed that heavy machinery was demolishing the East Wing. *Id.* ¶ 53. The next day, President Trump showed new renderings of the proposed ballroom to the press, noting that "many presidents have made changes" at the White House but "[t]his . . . obviously would be the biggest change." *Id.* ¶¶ 59–60. By October 23, 2025, the East Wing had been demolished in its entirety. *Id.* ¶ 64.

After the demolition of the East Wing, the National Trust—a nonprofit with "thousands of members" who "have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C."—contacted various federal entities to express concerns. Mem. Op. [Dkt. #47] at 3–4; *see also* Second Am. Compl. ¶ 22. The National Trust warned that the "massing and height of the proposed new construction would overwhelm the White House itself and might also permanently disrupt the carefully balanced classical design of the White House." Second Am. Compl. ¶ 55 (cleaned up).

Receiving no response, the National Trust brought this lawsuit in December 2025. *See* Compl. [Dkt. #1]. Since then, there has been significant progress on construction of the ballroom. The site of the former East Wing is a "bustling project site" with "heavy construction machinery," "pile drivers," and a "construction crane." Second Am. Compl.

4

JA464

¶¶ 78, 81. Demolition work has been largely completed, and work on "footings and below-grade structural concrete" began in February 2026. Decl. of John Stanwich ("Stanwich Decl.") [Dkt. #14-6] ¶ 20. "Above[-]grade structural work" is "anticipated to begin" in April 2026. *Id.* Indeed, President Trump has stated that ballroom construction is "ahead of schedule." Pl.'s Renewed PI Br. at 23 (quoting Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 10, 2026, at 1:41 PM ET), https://truthsocial.com/@realDonaldTrump /posts/116047799547098230).

According to the parties' filings, the ballroom plans are in the final stages of the design approval process. The Commission of Fine Arts approved designs on February 27, 2026. *See* T. Luebke to J. Fisher, CFA 19/FEB/26-1, https://perma.cc/CV2F-VE6M (cited in Suppl. Decl. of Heather Martin ("Martin Suppl. Decl.") [Dkt. #52-2] ¶ 6). The National Capital Planning Commission has reviewed detailed "final" plans for the ballroom and is scheduled to vote on the design on April 2, 2026. *See* Martin Suppl. Decl. ¶ 7. The plans presented to these entities show a planned size of 89,000 square feet and a seated capacity of 1,000 guests. Exec. Director's Recommendation, Nat'l Cap. Planning Comm'n (Mar. 5, 2026), https://perma.cc/4LFC-YDEJ (cited in Martin Suppl. Decl. ¶ 7). The ballroom is now projected to cost around $400 million, and the President has represented that private donations will foot the bill. *See* Jan. 22, 2026 Hr'g Tr. [Dkt. #38] at 33:2–3; Ex. X.

## III.   Procedural History

I recounted the procedural history of this case in my previous opinions, which I incorporate by reference here. *See* Mem. Order [Dkt. #17] at 2; *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, __ F. Supp. 3d __, 2025 WL 3672837 (D.D.C. Dec. 17, 2025); Mem.

5

JA465

Op. [Dkt. #47]; *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, __ F. Supp. 3d __, 2026 WL 533420 (D.D.C. Feb. 26, 2026).  To summarize, I previously denied the National Trust's motion for a temporary restraining order for lack of irreparable harm before the Court could decide the motion for a preliminary injunction.  *See* Mem. Order.  On February 26, 2026, I denied the National Trust's request for a preliminary injunction.  *See* Mem. Op.  While I concluded that the National Trust had shown a "substantial likelihood" of Article III standing, *see id.* at 7–12, I found that the National Trust's motion suffered from two fatal flaws.  As to its Administrative Procedure Act ("APA") claims, I concluded that "the Office of the Executive Residence . . . is not an 'agency,' so there is no 'agency action' to enjoin under the APA."  *Id.* at 13.  As to the National Trust's constitutional claims, I concluded that those claims were foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994) because they were "statutory in nature."  Mem. Op. at 13, 16–22.

On February 27, 2026, the National Trust sought leave to file a second amended complaint, *see* Mot. for Leave to File Second Am. Compl. [Dkt. #49], which I granted, *see* Minute Order (Mar. 1, 2026).  The National Trust's second amended complaint adds four new *ultra vires* claims challenging the Defendants' statutory authority to construct a ballroom on White House grounds and to do it with private funds.  Second Am. Compl. ¶¶ 197–224.[2]  On March 5, the National Trust filed a renewed motion for a preliminary injunction based on its *ultra vires* claims.  *See* Second. Mot. for Prelim. Inj. [Dkt. #51].

---

[2] Defendants named in the Second Amended Complaint include: the National Park Service; Jessica Bowron, in her official capacity as Acting Director of the National Park Service; John Stanwich, in his official capacity as Superintendent of the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration;

JA466

Defendants filed their opposition on March 12, *see* Defs.' Renewed Opp'n, and the National Trust filed its reply on March 16, *see* Pl.'s Renewed PI Reply Br. I held a hearing on March 17, 2026. The National Trust's motion is now ripe for decision.

## IV.    Statutory Background

The National Trust's claims require consideration of three main statutes.

*3 U.S.C. § 105(d).* Section 105, titled "Assistance and Services for the President," provides for the employment of staff members to assist the President and authorizes appropriations for expenses related to White House administration. Most relevant here, § 105(d) provides: "There are authorized to be appropriated each fiscal year to the President such sums as may be necessary for[] (1) the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d). The statute continues: "Sums appropriated under this subsection for expenses described in paragraph[] (1) . . . may be expended as the President may determine, notwithstanding the provisions of any other law." *Id.* This statute was enacted in 1948, *see* Act of June 25, 1948, ch. 644, §§ 109, 110, 62 Stat. 672, 679, and Congress added the language about "care, maintenance, repair . . ." in 1978, *see* Act of Nov. 2, 1978, Pub. L. No. 95-570, § 105, 92 Stat. 2445, 2446.

---

Michael J. Rigas, in his official capacity as Acting Administrator of the General Services Administration; Donald J. Trump, in his official capacity as President of the United States; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher. They are referred to collectively in this opinion as "Defendants."

7

JA467

*40 U.S.C. § 8106.* This statute provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. This provision was originally enacted in 1912, *see* Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 444 (codified at 40 U.S.C. § 68 (1912)), and was recodified in 2002, *see* Act of Aug. 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062, 1206.

*54 U.S.C. § 100101.* The National Park Service ("NPS") Organic Act provides that the Secretary of the Interior, acting through the director of the NPS,

> shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a). Congress later reaffirmed these purposes through a 1978 amendment known as the "Redwood Amendment." *See* Act of Mar. 27, 1978, Pub. L. No. 95-250, sec. 101(b), 92 Stat. 163, 166 (codified at 54 U.S.C. § 100101(b)(2)). The Redwood Amendment provides that the "management" and "administration" of NPS units "shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b)(2).

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555

JA468

U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

**ANALYSIS**

### I.  Likelihood of Success on the Merits

This case, in essence, is about whether the President has the authority to build a ballroom on White House grounds with private funds without seeking authorization from Congress. The National Trust asserts that Defendants' actions are *ultra vires* of statutory authority and violate the APA. But why do Defendants even need statutory authority in the first place? The Constitution shows why.

The Property Clause vests Congress with complete authority over public lands. *See* U.S. Const. Art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). "Congress exercises the powers both of a proprietor and of a legislature over the public domain," *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976), and those powers are "without limitations," *id.* at 539 (quoting *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940)). This "broad" grant of authority "extend[s] to . . . personal and real property rightfully belonging to the United States." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 331 (1936) (quoting Joseph Story, Commentaries on the Constitution of the United States §§ 1325, 1326 (1833)).

9

JA469

The Appropriations Clause "provides that money may be 'drawn from the Treasury' only 'in Consequence of Appropriations made by Law.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024) (quoting U.S. Const. Art. I, § 9, cl. 7). "Since the earliest days of our Republic, Congress's 'power over the purse' has been its 'most complete and effectual weapon' to ensure that the other branches do not exceed or abuse their authority." *Id.* at 447–48 (Alito, J., dissenting) (quoting The Federalist No. 58, at 359 (Clinton Rossiter ed., 1961) (James Madison)).

The District Clause gives Congress legislative authority over the District of Columbia. *See* U.S. Const. Art. I, § 8, cl. 17. The Constitution "confer[red]" this power on Congress "in broad terms." *Nat'l Mut. Ins. Co. of Dist. of Col. v. Tidewater Transfer Co.*, 337 U.S. 582, 589 (1949).

Together, the Property Clause, the Appropriations Clause, and the District Clause establish Congress's primacy over federal property, spending, and the District of Columbia. Indeed, Defendants have declined to argue that they have any inherent constitutional authority to build the ballroom. *See* Defs.' Suppl. Br. at 12, 30. So the President must identify some law that allows him to demolish the East Wing and construct his planned ballroom with private funds. For the following reasons, I conclude that the National Trust is likely to succeed on the merits on its *ultra vires* claims because no law comes close to giving the President this authority.[3]

---

[3] Defendants argue that successive preliminary injunction motions are improper. *See* Defs.' Renewed Opp'n at 5–6. But there is no per se bar. And here, "change[s] in circumstances" counsel in favor of considering the motion. *U.S. Sec. & Exch. Comm'n v. Young*, 121 F.4th 70, 78 (10th Cir. 2024); *see also Gill v. Monroe Cnty. Dep't of Soc. Servs.*, 873 F.2d 647, 648–49 (2d Cir. 1989). It was only *after* the National Trust

10

JA470

### A.    *Ultra Vires*

The National Trust argues that Defendants' construction of the ballroom is *ultra vires*. "Literally translated, the Latin phrase 'ultra vires' means 'beyond the powers (of),' and as a legal term, the phrase means 'unauthorized' or 'beyond the scope of power allowed or granted by law.'" *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) (cleaned up) (quoting Black's Law Dictionary 1755 (10th ed. 2014)).

To succeed on a nonstatutory *ultra vires* claim, the plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.* ("*FedEx*"), 39 F.4th 756, 763 (D.C. Cir. 2022) (internal quotation marks omitted). Defendants have not disputed the first two factors, so the principal question before the Court is whether the President has "'stepped so plainly beyond the bounds of [his statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" *Id.* at 764 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Unfortunately, he has!

*Ultra vires* review is a high bar—the Supreme Court has described it as "a Hail Mary pass." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation

---

amended its complaint that "Defendants for the first time disclaimed the President's constitutional authority to build the ballroom." Mem. Op. at 6 (emphasis omitted). Defendants' late-breaking abandonment of any constitutional arguments, as well as Defendants' factual representations about the Office of the Executive Residence, were crucial to my decision to deny the National Trust's first motion. *See id.* at 13. I find these circumstances "[]sufficient reason why the grounds were not urged in the earlier application." 43A C.J.S. *Injunctions* § 365.

JA471

marks omitted). But it is not insurmountable. Our Circuit has held that the U.S. Postal Service's failure to maintain statutorily-mandated pay differentials was *ultra vires*, *see Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972–74 (D.C. Cir. 2022), and that an executive order barring government contractors from permanently replacing lawfully striking employees was *ultra vires* under the National Labor Relations Act, *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996). Most recently, the Court of International Trade's decision invalidating the Trump Administration's tariffs on *ultra vires* review was affirmed on the merits by the Supreme Court. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369–70 (Ct. Int'l Trade), *aff'd in part, vacated in part, remanded sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

Here, the National Trust is likely to succeed in its argument that Defendants have "stepped . . . plainly beyond the bounds of" their statutory authority. *FedEx*, 39 F.4th at 763. Indeed, neither 3 U.S.C. § 105, nor the NPS Organic Act, authorize the President to build a ballroom on White House grounds. Moreover, his actions run up against an explicit statutory prohibition in 40 U.S.C. § 8106. In fact, Defendants' reading of the statutes *assumes* that Congress has granted nearly unlimited power to the President to construct anything, anywhere on federal land in the District of Columbia, regardless of the source of funds. This clearly is not how Congress and former Presidents have managed the White House for centuries, and this Court will not be the first to hold that Congress has ceded its powers in such a significant fashion!

12

JA472

1.    **3 U.S.C. § 105**

Defendants principally rely on 3 U.S.C. § 105(d)(1) as their authority to construct the ballroom. *See* Defs.' TRO Opp'n at 16–17; Defs.' Suppl. Br. at 18, 32–35; Defs.' Renewed Opp'n at 10–13. As I read it, 3 U.S.C. § 105(d)(1) is a statute authorizing the President to conduct ordinary maintenance and repair of the White House, up to the limits of the congressionally appropriated amount. Interpreting 3 U.S.C. § 105(d)(1) to grant virtually unlimited authority to the President to demolish and build at will on White House grounds is a "patent[] misconstruction of the Act." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *FedEx*, 39 F.4th at 764). How so?

Let's start with the kind of statute 3 U.S.C. § 105 is: an authorization for appropriations. Section 105 says "[t]here are authorized to be appropriated each fiscal year to the President such sums as may be necessary for" specific purposes. 3 U.S.C. § 105(d). "The expression 'authorized to be appropriated' clearly indicates that no appropriation is made or intended to be made, but the bill when enacted becomes the authority of law for an expected appropriation in the future[.]" GAO, The Red Book 2-54 to 2-55 (4th ed. 2016) (quoting 27 Comp. Dec. 923 (1921) (ellipses omitted)). An "authorization act" is "a directive to Congress itself, which Congress is free to follow or alter . . . in the subsequent appropriation act." *Id.* at 2-56 (citing B-323433 (Comp. Gen. Aug. 14, 2012)); *see also, e.g., Maine Cmty. Health Options v. United States*, 590 U.S. 296, 307–10 (2020) (relying on GAO Red Book to interpret federal appropriations law). Since § 105(d) is an authorization act, it must be read in conjunction with the relevant appropriations statute,

JA473

which is the Further Consolidated Appropriations Act, 2024. *See* Pub. L. No. 118-47, 138 Stat. 460, 532 (2024).

So what do these statutes authorize the President to do? Section 105(d)(1) authorizes the use of appropriated funds for "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1). The corresponding 2024 appropriations act provides "[f]or the repair, alteration, and improvement of the Executive Residence at the White House" at a fixed sum— $2,475,000—which is appropriated specifically "for required maintenance, resolution of safety and health issues, and continued preventative maintenance." 138 Stat. at 532.

Section 105(d)(1) plainly authorizes the President to conduct ordinary maintenance and upkeep of the White House, and nothing more! Reading the text as an "[o]rdinary reader[] of English" would, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 68 (D.C. Cir. 2023), the list of authorized actions—which includes words like "care, maintenance, repair" and "air-conditioning, heating, and lighting"—bring to mind things like replacing the lightbulbs, fixing broken furniture, and changing the wallpaper, not wholesale demolition of entire buildings and construction of new ones.

Defendants point to "alteration" and "improvement," arguing that these terms are "capacious" and permit the President to "modify" the White House and "make [it] better," including by constructing entirely new buildings like the ballroom. Defs.' Renewed Opp'n at 10. A brazen interpretation, indeed! Those two words cannot bear that weight, for a few reasons.

14

JA474

*First*, the meanings of "alteration" and "improvement" are "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Here, the "neighboring words," *id.*, including "refurnishing," "heating," and "maintenance," all strongly suggest *minor* "alteration[s]" and "improvement[s]," 3 U.S.C. § 105(d), not wholesale demolition and reconstruction. *See also, e.g., Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026) (reading "regulate" in the context of its "neighboring words" to conclude that "Congress did not intend for 'regulate' to include the revenue-raising power" (first quoting *Williams*, 553 U.S. at 294)); *Yates v. United States*, 574 U.S. 528, 544 (2015) (reading "tangible object" to refer "specifically to the subset of tangible objects involving records and documents"). Reading "alteration" and "improvement" narrowly also comports with the "cardinal principle" that courts should "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted).

*Second*, reading § 105(d)(1) to grant limited authority to the President to maintain the White House is consistent with the principle that Congress "does not . . . hide elephants in mouseholes"—meaning that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). As our Circuit has explained, "the *American Trucking* rule rests on a . . . modest intuition about how we use language." *Heating, Air Conditioning & Refrigeration*, 71 F.4th at 67. "Ordinary readers of English," *id.*, would not expect Congress to grant the President unchecked construction authority over the White House

15

through two disparate words in a statute about replacing furniture. *Cf. Biden v. Nebraska*, 600 U.S. 477, 513 (2023) (Barrett, J., concurring) ("[C]ontext is . . . relevant to interpreting the scope of a delegation.").[4]

Defendants argue that canons of construction have no place in *ultra vires* review. Defs.' Renewed Opp'n at 11. Please! The Supreme Court itself has made it clear that courts have a *duty* to locate the "single, best meaning" of the statute, no matter the cause of action. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). *Ultra vires* review does not suspend commonsense interpretive canons, nor does it grant the government flexibility to adopt an "utterly unreasonable" reading of a statute that is "contrary to the [statute's] plain language." *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 977–80 (applying canon of construction to reject agency's reading of statute in *ultra vires* case). Even in *ultra vires* cases, courts retain their duty to apply "commonsense" canons of construction grounded in the way ordinary people read English. *Williams*, 553 U.S. at 294.

*Third*, Defendants' interpretation of § 105(d)(1) lacks any discernible limits. Courts, however, generally do not read statutes to give the "broadest imaginable definitions of its component words," divorced from "linguistic and statutory context." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (alterations incorporated)). Under Defendants' reading, virtually any change to the White House could be framed as an "alteration" or "improvement." Indeed, some might even view tearing down the White House and building a modern skyscraper in its place as

---

[4] The "*American Trucking* rule" is different from the major questions doctrine, which the National Trust has not argued applies here. *See Heating, Air Conditioning & Refrigeration*, 71 F.4th at 67.

16

JA476

an "improvement." As Defendants have argued it, so long as the White House grounds are "developed" or "occupied by buildings and structures," Defs.' Renewed Opp'n at 10, the President has complete authority to engage in whatever construction activity he sees fit.[5] How grand!

*Fourth*, Defendants' interpretation of § 105(d) loses sight of its "statutory context." *Sackett v. EPA*, 598 U.S. 651, 675 (2023). Section 105(d)(1) is an authorization of appropriations. While it gives the President discretion to spend funds "as [he] may determine, notwithstanding the provisions of any other law," that discretion applies *only* to "[s]ums appropriated under" § 105(d)(1). 3 U.S.C. § 105(d). Section 105(d) simply does not speak to the President's authority to spend funds *not* appropriated under the statute. Defendants must concede that the President is not spending "[s]ums appropriated under" § 105(d)(1) because $2.475 million does not come close to supplying the approximately $400 million required to construct the ballroom. *See* Defs.' Suppl. Br. at 34. So both the plain language of the statute and the annual amount that Congress has appropriated to the President pursuant to § 105(d)(1) limit the President's authority.[6]

To make up the gaping chasm between the § 105(d)(1) appropriations ($2.475 million) and the projected cost of the ballroom ($400 million), Defendants have identified

---

[5] Defendants suggested at oral argument that "bulldoz[ing] the entire White House and build[ing] something completely different in its place" would "exceed[] the scope of 'alteration and improvement.'" Jan. 22, 2026 Hr'g Tr. 41:18–22. But if demolishing one wing of the White House and building a new structure is permissible, it is difficult to understand how demolishing the rest of the complex would cross the line. Both could conceivably "bring [the White House] into a more profitable or desirable state." Defs.' Renewed Opp'n at 10 (quoting Improve, Oxford English Dictionary, 2d ed. 1989).

[6] The precise and limited language of the 2024 appropriation—for "required maintenance, resolution of safety and health issues, and continued preventive maintenance"—further supports a limited reading of § 105(d)(1). 138 Stat. at 532.

17

JA477

a convoluted funding scheme that they argue permits the President to fund the ballroom using private donations. Defendants' argument goes like this: Congress has authorized the Secretary of the Interior to accept donations "for the purposes" of the National Park System. 54 U.S.C. § 101101(2). National Park Service donations may be "appropriated to be disbursed" as trust funds. 31 U.S.C. § 1321(a)(17), (b)(1). The Economy Act permits the Secretary of the Interior to transfer funds to the White House account because NPS has "contract[ed]" with the Office of the Executive Residence ("EXR") for the ballroom project. 31 U.S.C. § 1535(a); *see* Suppl. Decl. of Jessica Bowron [Dkt. #30-3] ¶¶ 12–13. So, according to Defendants, this aptly described Rube Goldberg contraption authorizes the President to use private donations to the Secretary of the Interior for the purposes of 3 U.S.C. § 105(d)(1).

While its legality is not squarely at issue here, this funding mechanism is, to say the least, a far cry from affirmative congressional *authorization.* Defendants cannot evade the limitations of § 105(d)(1) and the 2024 appropriations act through a series of unrelated statutes that say nothing about the President, the White House, or the construction of a ballroom.

*Finally*, "[s]tatutory history points in the same direction" as my reading of § 105(d)(1). *Sackett*, 598 U.S. at 673. Plaintiff's historical annex lays out a nearly unbroken history of congressional authorization for construction and major renovations at the White House. *See generally* Annex. Not only did Congress authorize specific changes through legislation, *see id.*, but in some instances Congress exercised its oversight authority over specific projects, *see, e.g.*, H. R. Doc. No. 18-60, at 1 (1824) (examining the "work

18

JA478

done on the South Portico of the President's House"); An Act To Provide for a Commission on Renovation of the Executive Mansion, ch. 51, 63 Stat. 45 (1949). In other cases, Congress authorized appropriations of funds for the "building to accommodate the offices of the President" and left the "details" to be "approved by the President." *See* Act of June 28, 1902, ch. 1301, 32 Stat. 419, 460 (authorizing construction of the original East and West Wings). There is zero evidence that when Congress enacted the relevant language in § 105(d)(1) in 1978, Congress intended a sea-change in the way that it authorizes and funds construction at the White House.[7]

In sum, Defendants ask this Court to ignore the full text of the statute in favor of two words plucked free from all statutory context. Because Defendants' reading of the statute is clearly contrary to its plain meaning, their reliance on § 105(d)(1) is likely *ultra vires*.

### 2.    40 U.S.C. § 8106

Because Congress holds the keys to the Nation's property, the President must have *some* statutory basis to build the ballroom. Section 105(d)(1) doesn't work, so the Court

---

[7] One clue that Congress did not intend to give the President vast construction authority in § 105(d)(1) is Congress's use of similar language in a different statute. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). In 1966—a little over a decade before the relevant version of § 105(d)(1) was enacted—Congress passed a law providing that "the Administrator of General Services is hereby authorized to plan, design, and construct an official residence for the Vice President of the United States in the District of Columbia." Pub. L. No. 89-386, § 1, 80 Stat. 106, 106 (1966). In a separate subsection, Congress authorized the Administrator to provide "for the care, maintenance, repair, improvement, alteration, and furnishing of the official residence and grounds, including heating, lighting, and air conditioning." *Id.* § 3. Construction of the Vice President's residence was delayed indefinitely due to "economic conditions." *The Vice President's House*, N.Y. Times (Apr. 27, 1966), https://perma.cc/E7KK-4X38. But the statutory text indicates that Congress knew how to distinguish between construction and maintenance.

19

JA479

could find the President's actions *ultra vires* on that basis alone. But to underscore Defendants' lack of statutory authority, Congress has affirmatively prohibited the "erect[ion]" of "[a] building or structure" "on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

Defendants do not dispute that, if the statute is valid and applicable, then the ballroom qualifies as a "structure" in a "park . . . of the Federal Government in the District of Columbia." Defs.' Suppl. Br. at 29. Indeed, the statute appears to be a "specific and unambiguous statutory directive." *FedEx*, 39 F.4th at 764 (quoting *Griffith*, 842 F.2d at 493). It commands, without reservation, that anyone who constructs a building on federal parkland in the District of Columbia needs the "express authority of Congress." 40 U.S.C. § 8106.

Not surprisingly, Defendants raise a number of objections to the application of § 8106. None, however, overcome the statute's clear text.

*First*, Defendants argue that the phrase "express authority of Congress" in § 8106 refers to a general "authority from Congress to *build*—not to build a *particular structure*." Defs.' Renewed Opp'n at 19. The National Trust's interpretation would, according to Defendants, implausibly require Congress to approve specific buildings on a project-by-project basis. But whether § 8106 requires general or specific authorization is beside the point because Congress has not provided *any* authorization to Defendants. Without question, Congress has not specifically authorized the ballroom construction! And, as discussed throughout this opinion, Defendants have not identified any statute giving the

20

JA480

President or any other Defendants freewheeling authority to construct buildings at the White House or in the District of Columbia. So the level of specificity that § 8106 requires is not dispositive here.

In my view, § 8106 is most naturally read to require *some form* of authorization from Congress to construct a building, and an appropriation of funds—either a lump sum for construction or a specific appropriation for a particular project—would easily satisfy that requirement. Indeed, an appropriation from Congress is authorization to use funds for a specified purpose. *See* 31 U.S.C. § 1301(a); *see also U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("The [Appropriations] Clause does not permit an agency . . . to authorize the expenditure of funds beyond what Congress has approved." (internal quotation marks omitted)). It is as simple as that.

*Second*, Defendants argue that § 8106 should not be read to constrain the President or limit construction at the White House absent a clear statement. Please! A clear statement rule makes sense when Congress is legislating in an area where the President exercises overlapping constitutional authority. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (declining to read the APA as subjecting the President to judicial review "[o]ut of respect for the separation of powers and the unique constitutional position of the President"); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). But Defendants here have disclaimed that the President has any inherent constitutional authority over construction at the White House and have conceded that Congress's constitutional authority over federal property is "exclusive." Pl.'s Suppl. Br. at 10; *see* Defs.' Suppl. Br. at 12, 30. In addition, Congress has continued to exercise, via its appropriations authority, close

21

JA481

oversight over spending at the White House—including by prescribing the number of staff and their compensation. *See generally* 3 U.S.C. § 105. I therefore decline to read § 8106 as excluding the President.[8]

*Third*, Defendants offer a series of historical points showing, Defendants contend, that § 8106 cannot really mean what it says. Defendants argue that Congress did not intend § 8106 to apply to NPS or the White House. Defendants point to examples of buildings constructed by NPS on national parkland and by the President on White House grounds to argue that § 8106 is not a viable constraint on Defendants' authority. *See* Defs.' Renewed Opp'n at 19–23. Of course, when the "text is clear," courts "need not consider . . . extra-textual evidence." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material."). In any event, Defendants' extratextual evidence is neither "uniform[]" nor "compelling." *NLRB*, 580 U.S. at 305.

Defendants first argue that Congress enacted § 8106 in 1912 to stop "unauthorized third parties" from building on federal land in Washington, D.C. and did not intend § 8106 to constrain the Government. *See* Defs.' Renewed Opp'n at 19 (explaining that at the time, D.C. federal property was "illegally used as dumps, or occupied by shacks, gardens, [and] railroad companies"). While other statutes from the era suggest "unlawful occupation" of "public lands" in D.C. was a concern of Congress, *see* Act of April 28, 1902, ch. 594, 32

---

[8] Defendants' point proves too little for yet another reason: even if § 8106 does not apply to the President himself, it still applies to EXR and the other Defendants.

Stat. 120, 152 (directing U.S. Army Corps of Engineers to prevent "unlawful occupation" of D.C. public lands), this vague historical evidence has no connection to the text of § 8106. Moreover, Defendants' argument cannot be reconciled with their suggestion that § 8106 *applies* to Government agencies besides NPS. *See* Defs.' Renewed Opp'n at 23. Nor does Defendants' reliance on post-enactment legislative history, *see id.* at 20, move the needle. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").[9]

Defendants next attempt to exclude NPS from the reach of § 8106. They point to a similar statute enacted in 1912 that applied to the Department of the Interior. *See* Defs.' Renewed Opp'n at 22 ("No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." (quoting 16 U.S.C. § 451 (1912))). At the time, federal parklands in D.C. were *not* part of the National Park System. *See* Exec. Order 6166 (June 10, 1933). So it appears that Congress enacted one rule for D.C.—no buildings without express authority of Congress—and another rule for national parks—no buildings over $1,000 dollars without express authority of Congress.[10]

---

[9] In fact, the post-enactment history cited by Defendants is consistent with the view that NPS has relied on congressional appropriations for construction authorization. Major Ulysses S. Grant III testified to the House Subcommittee on Appropriations in 1926 that § 8106 "has been never been construed to prevent such construction by the park authorities *within the limits of the appropriations*." Dist. of Columbia Appropriation Bill, 1927, Hr'g Before Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (emphasis added). The transcript goes on to reflect that the buildings in question had, in fact, been presented to Congress and that Congress had appropriated funds for their construction. *Id.*

[10] Historical practice, including the way that Congress expressly *exempted* NPS from the prohibition in what Defendants argue was a comparable statute in 16 U.S.C. § 451, *see* Defs.' Renewed Opp'n at 22, suggests that NPS has never had a blank check under the NPS Organic Act to construct buildings, regardless of the source of funds.

JA483

The existence of a separate statute governing national parks does not mean, however, that § 8106 ceased to apply once federal parks in D.C. joined the National Park System in 1933. While Congress repealed 16 U.S.C. § 451 in 1996, Congress has never repealed 40 U.S.C. § 8106, and in fact recodified it in 2002. *See* Act of Aug. 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062, 1206. The stronger reading of this history is that Congress means what it says! Congress has removed the threshold construction limitation applicable to NPS for national parks across the country, but has maintained § 8106's limitation on parks in the District of Columbia.

Undaunted, Defendants argue that NPS has erected "countless structures on national parkland" without "express congressional approval" and suggest as a result that the Court should read § 8106 as a dead letter. Defs.' Renewed Opp'n at 20. Unfortunately, that is not how statutory interpretation works—the Court must give effect to the unambiguous text of a statute even if there is contrary historical evidence. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("If we do our job of reading the statute whole, we have to give effect to this plain command, even if doing that will reverse the longstanding practice under the statute." (internal citations omitted)); *Exxon Mobil Corp.*, 545 U.S. at 568. In any case, it is not so clear that the structures identified by Defendants were built without Congress's knowledge or authorization.[11]

---

[11] For example, the National Capital Region Headquarters and U.S. Park Police Headquarters, *see* Defs.' Renewed Opp'n at 14, were constructed as part of Mission 66: a "ten-year project" "proposed . . . to Congress in 1955" and "funded by Congress." Mission 66: Birth of the Modern National Park, NPS (accessed Mar. 24, 2026), https://perma.cc/9VLT-C3V6; *see also* Act of June 13, 1956, Pub. L. No. 84-573, 70 Stat. 257, 262 (appropriating over $15 million for "construction . . . of buildings, utilities, and other physical facilities").

24

JA484

Finally, Defendants point to a handful of examples of construction at the White House since the enactment of § 8106 to argue that § 8106 does not apply to the White House. *See* Defs.' Suppl. Br. at 31. I disagree. Congress authorized the 1933 West Wing expansion and the 1942 East Wing expansion through general appropriations.[12] And to the extent President Ford's 1975 pool and President Trump's 2019 tennis pavilion are "building[s]" or "structure[s]," *see* 40 U.S.C. § 8106, they were never challenged in court, are not visible to the public, and were for the President's private use.[13] Without question, Defendants have never engaged in a construction project of *this* size and scale using donated funds. "This 'lack of historical precedent,' coupled with the breadth of authority that [Defendants] now claim[], is a 'telling indication' that [the ballroom] extends beyond [Defendants'] legitimate reach." *NFIB v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (quoting *Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)). For these reasons, the National Trust is likely to succeed on its *ultra vires* claims under both 3 U.S.C. § 105(d) and 40 U.S.C. § 8106.[14]

---

[12] In 1933, Congress authorized a "comprehensive program of public works," including "construction, repair, and improvement of . . . public buildings." National Industrial Recovery Act, ch. 90, §§ 202, 220, 48 Stat. 195, 201, 210 (1933). One such construction project was the 1934 West Wing renovations. *See* Annex at 7–8. The National Trust suggests that funding for the 1942 construction of an expanded East Wing, including a secure underground bunker, came from a national-defense appropriation. *See id.* at 9; Sixth Supplemental National Defense Appropriation Act, 1942, 56 Stat. 226, 236 (providing funds for "public buildings and grounds in the District of Columbia").

[13] To be sure, the one statute that expressly cites 40 U.S.C. § 8106—the statute authorizing the construction of bonsai facilities at the National Arboretum, *see* Act of Oct. 21, 1993, Pub. L. No. 103-11, 107 Stat. 1046, 1051—does not fit neatly into the National Trust's narrative. Congress's practice of excluding construction projects from the scope of § 8106 has not been consistent. But nothing in the text of § 8106 requires Congress to cite § 8106 in authorizing legislation, and in any event inconsistent congressional practice cannot limit the clear text.

[14] Defendants argue that the National Trust's interests "are quite plainly beyond the zone of interests protected by" 40 U.S.C. § 8106, Defs.' Renewed Opp'n at 25, and therefore the National Trust's *ultra vires*

25

JA485

## B.    Administrative Procedure Act

Defendants have not been entirely consistent in this litigation as to which entities remain involved with the ballroom. Before the Court's denial of the National Trust's first motion for a preliminary injunction, Defendants represented that EXR was "managing the [ballroom] project under the President's direction," Defs.' Suppl. Br. at 3, and that NPS was "indisputably not directing the [ballroom] project," *id.* at 17 n.7; *see also id.* at 23. I went on to hold that the National Trust was not likely to succeed on the merits as to its APA claims because EXR was likely not an "agency" within the meaning of the APA. Mem. Op. at 13–16. The National Trust added claims arguing that shifting responsibility from NPS to EXR violated separation of powers and was *ultra vires*. *See* Second Am. Compl. ¶¶ 217–24. Both the Court and the National Trust were under the impression that, as Defendants themselves stated, NPS "had (and has) no role in directing the Project." Defs.' Suppl. Br. at 23; *see* Pl.'s Renewed Reply Br. at 16.

So it came as a surprise when Defendants' most recent brief invoked NPS's construction authority as an independent basis for denying the National Trust's motion. Defs.' Renewed Opp'n at 1. Indeed, it is difficult to understand how Defendants can rely on NPS's construction authority while claiming that NPS "had (and has) no role in

---

claims premised on that statute must fail. I find it unlikely that the zone of interests test applies here. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 n.14 (D.C. Cir. 1987) (reasoning that parties "need not . . . show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to" bring *ultra vires* claims); *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48 (D.D.C. 2020) (whether the zone of interests test applies to *ultra vires* claims has not been resolved). If it were otherwise, litigants injured by *ultra vires* action would often be precluded from suit "since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest." *Haitian Refugee Ctr.*, 809 F.2d at 812 n.14; *see also Ctr. for Biological Diversity*, 453 F. Supp. 3d at 48.

26

JA486

directing" the ballroom project. Defs.' Suppl. Br. at 23. In a sleight-of-hand maneuver, Defendants argue that NPS chose to "contract" with EXR under the Economy Act, which would suggest that NPS is still involved with the ballroom project as a party to a contract, with EXR as its agent. *See* Defs.' Renewed Opp'n at 18. Therefore, in the alternative, to the extent that NPS is directing or otherwise involved in the ballroom project, the National Trust is likely to succeed on its claim under the APA that the ballroom construction is "contrary to law" in violation of 40 U.S.C. § 8106.[15]

Regarding Defendants' arguments about the NPS Organic Act, nothing in the text of the statute grants NPS blanket authority to engage in construction in national parks. The statute provides that NPS "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units[.]" 54 U.S.C. § 100101(a). Such purposes are "conserv[ing] the scenery, natural and historic objects, and wild life in the System units" and "provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.* This general statement of purpose does not say anything about NPS's authority to construct buildings.

Instead, historical practice not surprisingly shows that Congress has given *limited* authority to NPS to construct by authorizing appropriations for those purposes. *See, e.g.,* Commerce, Justice, Science; Energy and Water Development; and Interior and

---

[15] The Court must evaluate any APA claims in the alternative to the National Trust's *ultra vires* claims, because if the National Trust is able to obtain "judicial review" via the APA, nonstatutory *ultra vires* review is not available. *See Changji Esquel*, 40 F.4th at 722 (quoting *Griffith*, 842 F.2d at 492).

27

JA487

Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5, 100.[16] Defendants identify a handful of structures built with donated funds in D.C. and argue that these were authorized by only the NPS Organic Act. Defs.' Renewed Opp'n at 18. Please! Even if these buildings were somehow comparable to the ballroom project, the available evidence strongly suggests that Congress was aware of these projects and at least indirectly authorized them.[17]

The NPS Organic Act is best read for what it is—a statement of NPS's general purposes. Defendants conflate taking actions "consistent with [NPS's] enabling legislation" with affirmative construction authorization. *See* Defs.' Renewed Opp'n at 16. Particularly in light of 40 U.S.C. § 8106's express prohibition, the broad language of the NPS Organic Act cannot supply the requisite authorization for construction of the ballroom.

## II.    Irreparable Harm

To obtain injunctive relief, the National Trust must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The threat of harm must be "both certain and great, actual and not theoretical, beyond remediation,

---

[16] Defendants do not purport to be relying on NPS's construction appropriation for the White House ballroom. In any case, NPS construction appropriations in recent years expressly limit the use of "National Park Service Donations" to "adjustments and changes *within the original scope of effort for projects funded by the National Park Service Construction appropriation.*" *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 226 (emphasis added); *see also, e.g.*, 140 Stat. at 101 (same). So NPS cannot, in fact, use donations to construct buildings on national park lands outside the scope of construction appropriations. And it is highly doubtful that NPS could "contract" with EXR to avoid the limitations on NPS's construction authority.

[17] Defendants cite the new U.S. Park Police Stables on the National Mall as an NPS construction with donated funds. But it appears that *Congress* initiated this project. *See* Commemorative Works Clarification and Revision Act of 2003, Pub. L. No. 108-126, 117 Stat. 1349, 1353 (directing the Secretary of the Interior to produce a report "setting forth plans" for the "relocat[ion]" of "the National Park Service's stable and maintenance facilities").

28

JA488

and of such *imminence* that there is clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks omitted). Aesthetic and environmental injuries are typically "irreparable" because they are "seldom . . . adequately remedied by money damages" and are "often permanent or at least of long duration." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

According to the National Trust, one of its members, Professor Alison Hoagland, is a longtime D.C. resident and a professor of historic preservation who regularly visits President's Park to "enjoy the historic buildings" and take in "the beauty of the L'Enfant Plan." Decl. of Alison K. Hoagland ("Hoagland Decl.") [Dkt. #2-3] ¶ 9. Hoagland also gives walking tours and has published scholarly articles on Washington's historic architecture, to which the White House is central. *Id.* ¶ 8. Hoagland alleges that construction of "a ballroom of the proposed form and scale" would cause "permanent and irreparable harm to the White House and President's Park," thereby damaging her own "aesthetic, cultural, and historical interests." *Id.* ¶¶ 13–14.

I previously concluded that these alleged aesthetic injuries established a substantial likelihood of Article III standing. *See* Mem. Op. at 7–13.[18] The National Trust's alleged

---

[18] Defendants urge the Court to revisit its standing analysis, *see* Defs.' Renewed Opp'n at 29–33, but I decline to do so. As I previously held, the National Trust has established a substantial likelihood of associational standing to challenge the construction of the ballroom, *see* Mem. Op. at 7–13, and I reincorporate that analysis today. Defendants offer two points in response, neither of which alter my conclusion. Defendants first argue that Hoagland cannot claim aesthetic injury from the ballroom because the new structure will "scarcely be seen from any public vantage point." Defs.' Renewed Opp'n at 29. That

aesthetic injury also establishes irreparable harm for purposes of a preliminary injunction. Hoagland has adequately described the "specific ways in which, in the absence of the injunction," her "interests in . . . [the] aesthetic . . . use and enjoyment" of the White House grounds "will be irreparably injured." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987); *see also, e.g.*, *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220–22 (D.D.C. 2003) (aesthetic injury from hunting of mute swans sufficient for irreparable harm).

At the temporary restraining order stage in December 2025, I held that the National Trust had failed to demonstrate a "sufficiently imminent risk of irreparable harm" because below-grade structural work had just begun and Defendants' construction plans were still in flux. Mem. Order at 2–3. Things have changed. Above-ground construction will begin sometime in April 2026. Stanwich Decl. ¶ 20. Moreover, the design plans are nearly final. On February 27, 2026, the Commission of Fine Arts approved the ballroom's concept design submission as a "final design." *See* T. Luebke to J. Fisher, CFA 19/FEB/26-1, https://perma.cc/CV2F-VE6M (cited in Martin Suppl. Decl. ¶ 6). On March 5, 2026, Defendants submitted "preliminary and final site and building plans" to the National

---

is pure fiction. Defendants' own renderings show that the proposed ballroom will be clearly visible from Lafayette Park, *see* Exec. Director's Recommendation at 17–18, Nat'l Cap. Planning Comm'n (Mar. 5, 2026), https://perma.cc/4LFC-YDEJ (cited in Martin Suppl. Decl. ¶ 7), and even from the steps of the U.S. Capitol, *id.* at 23; *see also* Finding of No Significant Impact [Dkt. #14-2] at 6 (ballroom will "creat[e] a visual imbalance"). Defendants further argue that Hoagland's injury is not germane to the National Trust's purposes, which, Defendants insist, relate only to the acquisition of property for preservation and exclude the White House. Defs.' Renewed Opp'n at 31–33. "The bar for germaneness, however, is low." *AARP v. EEOC*, 226 F. Supp. 3d 7, 19 (D.D.C. 2016). To clear the bar, an organization need only show "a mere pertinence between [the] litigation subject and [the] organization's purpose." *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 111 (D.C. Cir. 1990) (internal quotation marks omitted). For the reasons articulated in my prior opinion, the National Trust has easily done so here. *See* Mem. Op. at 12.

Capital Planning Commission ("NCPC"). Martin Suppl. Decl. ¶ 7. The NCPC is scheduled to vote on the project at its April 2, 2026 meeting. *Id.* And once complete, the building's foundation could accommodate only "modest changes" to the size and scale of the structure. Decl. of Prof. Engineer [Dkt. #30-4] ¶ 10.

As such, the National Trust has demonstrated that injuries to its "aesthetic, cultural, and historical interests" are "imminen[t]," "certain," and "great" absent a preliminary injunction. *Mexichem*, 787 F.3d at 555 (typeface altered). If construction continues, the harm of an enormous ballroom overshadowing the White House grounds would indeed be "permanent." *Brady Campaign*, 612 F. Supp. 2d at 25. Moreover, the harm will likely materialize "before a decision on the merits can be reached." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017).[19] Above-ground construction begins in a matter of days, and continued construction will only further lock in the size, scale, and styling of the proposed building.

Defendants contend that the National Trust faces no imminent aesthetic harm because Hoagland "will not be able to see any part of the East Wing for many months." Defs.' Renewed Opp'n at 35. But Defendants cannot seriously argue that Hoagland has no claim for imminent aesthetic harm until the completed building is fully visible. Once the

---

[19] As the National Trust points out, the *Semonite* case is a cautionary tale. The *Semonite* plaintiffs sought to enjoin construction of seventeen electrical towers over a river. One of my colleagues found no irreparable harm because the project was still in its infancy and therefore denied injunctive relief. *See* 282 F. Supp. 3d at 289. After construction was completed, the court found in plaintiff's favor on the merits but concluded that the towers were too costly to remove and, therefore, no injunctive relief was available. *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 94, 100–01 (D.D.C. 2019). If I deny preliminary injunctive relief now and allow construction to continue while the case progresses, any eventual victory on the merits for the National Trust may likewise prove to be too little, too late!

31

JA491

building is complete, any aesthetic harm would be "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), and courts typically find challenges to completed projects to be moot, *see Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (noting lack of cases where courts "ordered a defendant to dismantle a completed construction project"). The National Trust need not wait until the last brick is laid to obtain injunctive relief.

## III.    The Balance of the Equities and the Public Interest

The National Trust finally must show that "the balance of equities tips in [its] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. When, as here, "the Government is the opposing party," these final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (D.C. Cir. 2022).

Here too, the National Trust has carried its burden. It has demonstrated imminent, irreparable harm in the form of ongoing construction of a ballroom that would, in its own words, "overshadow[]" the White House and disrupt the appearance of a historic and cultural icon. *See supra* Part II. The National Trust has shown that Defendants are making these irreversible changes without statutory or constitutional authority. While the National Trust would be deeply harmed in the absence of an injunction, the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

The public interest, too, weighs in favor of enjoining this project pending approval from Congress. Congress is the collective voice of the American people in our system of

32

JA492

government, *see Learning Res.*, 146 S. Ct. at 672 (Gorsuch, J., concurring) (Congress reflects "the combined wisdom of the people's elected representatives, not just that of one faction or man"), and the Constitution *itself* vests authority over federal property, including the White House, in Congress! *See* U.S. Const. Art. I, § 8, cl. 17; *id.* Art. IV, § 3, cl. 2; *cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 289–90 (1984) (noting that federal parkland in Washington, D.C. and around the White House are a "unique resource[] that the Federal Government holds in trust for the American people"). After all, the White House does not belong to any one man—not even a president!

Defendants predictably object, arguing that any delay to construction would imperil national security and expose the White House to damage. Grasping for straws, Defendants call the construction site a "coordinated and managed safety hazard" that has disrupted existing security procedures. *See* Decl. of Matthew C. Quinn [Dkt. #30-5] ¶ 8. Thus, according to Defendants, any construction delay will undermine national security. Please! While I take seriously the Government's concerns regarding the safety and security of the White House grounds and the President himself, the existence of a "large hole" beside the White House is, of course, a problem of the President's own making! Defs.' Renewed Opp'n at 34. Bald assertions of "national security" cannot excuse the Government's failure to follow the law and then insulate those failures from judicial review.[20]

---

[20] The Court has reviewed the classified *ex parte* declarations submitted by Defendants. *See* Mot. for Leave to File Decl. *Ex Parte* [Dkt. #13]; Not. of Lodging Suppl. *Ex Parte* Decl. [Dkt. #25]; Not. of Lodging Second Suppl. *Ex Parte* Decl. [Dkt. #40]; Not. of Lodging Third Suppl. *Ex Parte* Decl. [Dkt. #59]. Based on my review, I do not find that an injunction halting construction would in any way jeopardize national security. *But see TikTok Inc. v. Garland*, 604 U.S. 56, 74 (2025) (Gorsuch, J., concurring) ("Efforts to inject secret evidence into judicial proceedings present obvious constitutional concerns.").

JA493

I acknowledge that this case raises novel and weighty issues, that halting an ongoing construction project may raise logistical issues, and that Defendants intend to seek an appeal immediately. I will therefore delay enforcement of the injunction for fourteen days, as described in the attached Order.[21] I will also exclude construction necessary to ensure the safety and security of the White House from the scope of the injunction.[22]

## CONCLUSION

Where does this leave us? Unfortunately for Defendants, unless and until Congress blesses this project through statutory authorization, construction has to stop! But here is the good news. It is not too late for Congress to authorize the continued construction of the ballroom project. The President may at any time go to Congress to obtain express authority to construct a ballroom and to do so with private funds. Indeed, Congress may even choose to appropriate funds for the ballroom, or at least decide that some other funding scheme is acceptable. Either way, Congress will thereby retain its authority over the nation's property and its oversight over the Government's spending. The National Trust's interests in a constitutional and lawful process will be vindicated. And the American people will benefit from the branches of Government exercising their constitutionally prescribed roles. Not a bad outcome, that!

---

[21] The Court gives fair notice to Defendants, however, that any above-ground construction over the next fourteen days that is not in compliance with my Order is at risk of being taken down depending on the outcome of this case.

[22] I decline to exercise my "broad discretion" to require the National Trust to post a bond. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

34

JA494

For the foregoing reasons, it is hereby **ORDERED** that the National Trust's Motion

for a Preliminary Injunction [Dkt. #51] is **GRANTED**. An accompanying order will issue

contemporaneously with this opinion.


RICHARD J. LEON
United States District Judge

35

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br>    Plaintiff,<br><br>    v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Case No. 25-4316 (RJL)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

March **31** , 2026 [Dkt. #51, 55]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Second Motion for Preliminary Injunction [Dkt. #51] is

**GRANTED**; and it is further

**ORDERED** that the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher (together, "Defendants"),

1

JA496

and any agents of Defendants or any other persons working at their direction or in active concert therewith, are preliminarily **ENJOINED** from taking any action in furtherance of the physical development of the proposed ballroom at the former site of the East Wing of the White House, including but not limited to any further demolition, site preparation work, landscape alteration, excavation, foundation work, or other construction or related work, other than actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff; and it is further

**ORDERED** that, subject to the safety-and-security exception above, no such work shall proceed absent express authorization from Congress; and it is further

**ORDERED** that Defendants' counsel shall provide written notice of this Order to all officers, agents, successors, servants, employees, and attorneys of Defendants, as well as any other persons working at their direction, in active concert therewith, or subject to Defendants' control; and it is further

**ORDERED** that this Order shall take effect fourteen (14) days after its issuance; and it is further

**ORDERED** that Defendants shall file a status report apprising the Court of the status of their compliance with this Order no later than twenty-one (21) days after the date the Order takes effect; and it is further

**ORDERED** that the security requirement is hereby waived, *see* Fed. R. Civ. P. 65(c); and it is further

JA497

**ORDERED** that Defendants' Motion for Leave to File Supplemental Declarations

[Dkt. #55] is **GRANTED.**

**SO ORDERED.**

<span style="display:inline-block; margin-left:40%;">_____<br>RICHARD J. LEON<br>United States District Judge</span>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

        v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

## DECLARATION OF U.S. SECRET SERVICE
## DEPUTY DIRECTOR MATTHEW C. QUINN

I, **Matthew C. Quinn** declare as follows:

1. I am the Deputy Director of the United States Secret Service (Secret Service).

2. I previously submitted two declarations in this matter, filed on December 15, 2025, and January 15, 2026. Those declarations are incorporated herein by reference and, except as expressly stated below, to the best of my knowledge the statements contained in those declarations remain true and correct.

3. The Secret Service's mission, as codified at 18 U.S.C. §§ 3056, 3056A, is to protect the President (POTUS) and his family and secure the White House (WH) Complex. Protecting POTUS includes fortifying and strengthening structures to defend against current and future threats that our protectees visit, including WH grounds.

4. At this stage of the Project, numerous security risks are present. Specifically, the current unfinished construction site compromises the ability of Secret Service personnel, including Emergency Response Teams and tactical K-9 handlers, to readily traverse the White House Complex for evacuation or other protective security operations. Personnel also risk physical injuries from uncovered rebar and exposed cables around the site. The prolonged exposure of current obstructions creates a danger for USSS personnel to holistically provide a secure 360-degree perimeter to safely protect the President, First Family, and residence.

JA499

USCA Case #26-5134    Document #2172336    Filed: 05/07/2026    Page 506 of 525

5. The unfinished construction site also presents greater exposure to safety and security threats directed at the main White House and West Wing structures, as well as the underground construction. Specifically, Uniformed Division personnel will be hindered to effectively secure/defend the east side of the White House Building from an attack or security breach due to the current construction debris and large holes.

6. Given these security risks, along with the vulnerabilities of the already-constructed below-ground structures, leaving nothing on top of the below-ground construction is not an option.

7. The project is a single, coherent whole. An above-ground slab and topping structure is needed to ensure that key underground structures with a security purpose are properly protected and strengthened. Specifically, protective operations require an above-ground slab and topping structure that can accommodate the below ground structure with interoperable communications and infrastructure security systems relative to flood management and other utilities. In this way, below- and above-ground projects technically and structurally complement each other, and the below-ground construction has already been done with that expectation of what would go above. As the below-ground construction nears completion, it is critical to resolve the above-ground enclosure for cohesive construction that allows safe passage and accommodates the protective security measures relied upon by the Secret Service, including fortified security screening stations, barriers, gates, guard booths, and alarm and camera systems.

8. Current plans include security features that are critical to the protection of the President, his family, his staff, and the WH Complex, including security features that support below-ground elements that enhance overall safety for all WH occupants. For example, the current plans include threat resistant building materials such as bullet- and blast-proof glass and windows that enhance security measures at the WH Complex and improve upon prior East Wing capabilities.

9. Leaving the project site unfinished imperils the ability of the Secret Service to meet its statutory mission to protect the President, First Family, and White House Complex. The current unfinished construction site is, in and of itself, a coordinated and managed safety hazard for the reasons stated above. While the entire Project will not be completed for some time, the known vulnerabilities in the prior East Wing, and the ongoing vulnerabilities from entertaining foreign leaders and others in soft tents demand resolution without delay. Every day added to the Project is another day impairing full security.

10. For these reasons, completion of an enclosed above-ground structure on the East Wing will strengthen the ability of the Secret Service to protect the President and secure the Complex because it will provide a fixed structure equipped with the above-mentioned modern protective security measures, including threat-resistant building materials, and serve as a

fortified structural buffer that better insulates and supports both the main White House and West Wing structures.

11. Consistent with its statutory protection mission, the Secret Service provided fulsome input for the protective security elements of the East Wing construction project. The existing construction plan incorporates all Secret Service security requirements. Any deviations from the construction plan and its prescribed timeline may change the type of building materials, including windows, steel, and/or other security systems that are currently contemplated in the plan. Delays may cause a decrease in the overall security of the complex if the USSS is not allotted sufficient time to order, produce, and install recommended security systems and infrastructure components.

12. Uncertainty about what work is permissible and the need for constant approvals is extremely difficult. The security design was carefully developed and vetted. Stop-and-start delays as each ensuing portion of the project must get litigated would compromise the timeline of the Project and unduly prolong critically necessary security steps. Moreover, any delay in construction of the project may permit adversaries to view the elements of construction, identify vulnerabilities, and pose ongoing national security risks to a critical piece of White House infrastructure that is necessary to safeguarding the President on a prospective basis. Judicial pre-approval also might require the need to divulge classified information about presidential protection or to otherwise disclose the exact function served by each portion of the design, which raises concerns about ensuring presidential safety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2026.

Matthew C. Quinn
Deputy Director
United States Secret Service

JA501

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br><br>        Plaintiff,<br><br>    v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>        Defendants. | ) )  )  )  )  )  )  )  )  )  )  )   Civil Case No. 25-4316 (RJL) |

**MEMORANDUM OPINION**
April 16th, 2026 [Dkt. #65, 71]

On March 31, 2026, I granted the motion of the National Trust for Historic Preservation in the United States ("National Trust") for a preliminary injunction to halt construction of a ballroom on White House grounds as *ultra vires*. In recognition of the national security and presidential security concerns raised by the ongoing construction project, I excluded from the scope of the injunction "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff." Defendants now seek to turn this exception on its head and unreasonably insist that the entire ballroom project may proceed. Based on the record before me, I cannot possibly agree, but I will clarify the scope of the injunction as described below.

1

JA502

## BACKGROUND

On March 31, 2026, I granted the National Trust's motion for a preliminary injunction. *See* Mem. Op. [Dkt. #60]; Prelim. Inj. Order [Dkt. #61]. The Order preliminarily enjoined Defendants (excluding the President) from "taking any action in furtherance of the physical development of the proposed ballroom at the former site of the East Wing of the White House, including but not limited to any further demolition, site preparation work, landscape alteration, excavation, foundation work, or other construction or related work[.]" Prelim. Inj. Order at 2. My Order excluded from the scope of the injunction "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff" (the "safety-and-security exception"). *Id.*

On April 1, the National Trust, citing public statements by the President interpreting my Order, filed a motion for clarification of the preliminary injunction ("Motion to Clarify"). *See* Mot. for Clarification [Dkt. #65]. Defendants meanwhile, not surprisingly, filed an appeal and an emergency motion to stay. *See* Emergency Mot. for Stay Pending Appeal, *Nat'l Tr. for Hist. Pres. v. NPS*, No. 26-5101 (D.C. Cir. Apr. 3, 2026) [Dkt. #2167119]. On April 11, our Circuit Court remanded the case "with instructions to promptly address the pending motion to clarify how the injunction and its exception ensure safety and security pending litigation" and extended my temporary stay of the preliminary injunction to April 17, 2026. Order, *Nat'l Tr. for Hist. Pres. v. NPS*, No. 26-5101 (D.C. Cir. Apr. 11, 2026) ("Per Curiam Order") [Dkt. #2168165]. On April 13, Defendants filed their opposition ("Defs.' Opp'n") [Dkt. #69] to the National Trust's motion to clarify and

2

JA503

attached a Secret Service declaration. *See* Decl. of U.S. Secret Service Deputy Director Matthew C. Quinn ("Third Quinn Decl.") [Dkt. #69-1]. On April 14, the National Trust filed a reply in support of its motion. Reply in Supp. of Mot. for Clarification ("Reply") [Dkt. #70]. That same day, Defendants filed a motion seeking a further 14-day stay of the preliminary injunction. Mot. to Extend Administrative Stay of Prelim. Inj. [Dkt. #71]. The motions are now ripe for decision.

## DISCUSSION

Defendants argue that the entire ballroom construction project, from tip to tail, falls within the safety-and-security exception and therefore may proceed unabated. That is neither a reasonable nor a correct reading of my Order! My Order preliminarily enjoined Defendants (excluding the President) from "taking any action in furtherance of the physical development of the proposed ballroom." Prelim. Inj. Order at 2. The accompanying opinion stated that "the ballroom construction project must *stop* until Congress authorizes its completion." Mem. Op. at 1 (emphasis added). It is, to say the least, incredible, if not disingenuous, that Defendants now argue that my Order does *not* stop ballroom construction because of the safety-and-security exception!

For the reasons that follow, I will further clarify and amend my Order to stop only above-ground construction of the planned ballroom. My Amended Order does not, however, stop below-ground construction of national security facilities, work necessary to provide for presidential security, and construction necessary to protect and secure the White House and the construction site itself.

*First*, limiting the scope of the injunction to above-ground construction directly

3

JA504

addresses the National Trust's irreparable harm, which stems from the above-ground, visible construction of the ballroom. *See* Mem. Op. at 29–32; *see also* Pl.'s Mem. in Supp. of Prelim. Inj. [Dkt. #51-1] at 24–25 ("[T]he National Trust has never requested . . . that the Court enjoin construction of a *bunker*. The National Trust is simply requesting that the Court enjoin construction of the *Ballroom*."). My Order barring above-ground construction provides "complete relief" to the National Trust, while minimizing the "burden[]" to Defendants through the safety-and-security exception. *See Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

*Second*, the injunction excludes only below-ground construction because, throughout this case, Defendants raised discrete national security concerns about construction of *underground* elements. Early on, Defendants argued that "security concerns . . . warrant[ed] permitting the current below-grade construction to continue." Defs.' TRO Opp'n [Dkt. #15-1] at 27; *see also* TRO Hr'g Tr. [Dkt. #18] at 20:22-24 ("[T]he below-ground work that's occurring now has nothing to do with Plaintiff's asserted aesthetic injury, and that work must continue for national security reasons."). Specifically, Defendants indicated that national security-related facilities are being constructed below ground. *See, e.g.*, Defs.' Suppl. Br. [Dkt. #30] at 41 (referencing a "security bunker" and stating that "an injunction halting construction would endanger national security").

The exception for underground national security facilities does not include the proposed ballroom because Defendants themselves distinguished between below-ground and above-ground construction, stating that "the below-surface work is driven by national security concerns *independent of* the above-grade construction." Defs.' Suppl. Br. at 39

4

(emphasis added); *see also* Decl. of Professional Engineer [Dkt. #30-4] at ¶ 5 (referencing the "national security concerns with aspects of the below grade structure"). Defendants also repeatedly represented that the project's below-ground elements do not "lock in" the design of the above-ground ballroom. Defs.' Suppl. Br. at 4; *see also* Defs.' Mot. to Modify Schedule [Dkt. #22] ¶ 4; Defs.' Mot. to Stay [Dkt. #39] at 2; *cf.* Decl. of John Stanwich ("Stanwich Decl.") [Dkt. #14-6] ¶ 21 (noting the below-ground elements could be "constructed as planned while the above grade design is finalized").

Defendants now brazenly assert that below-ground construction has "been done with th[e] expectation of what would go above," and that the "project is a single, coherent whole." Third Quinn Decl. ¶ 7. Defendants argue that security-related elements of the ballroom, such as "missile-resistant steel columns and beams, drone-proof roofing, and bullet- and blast-proof glass windows" will "advance safety and security interests as part of an inseparable whole." Defs.' Opp'n at 3. Defendants further argue that "leaving the site as it stands poses serious safety and security threats that can only be addressed by proceeding with construction as planned." *Id.* In my view, these arguments fail to justify Defendants' extraordinary, if not disingenuous, reading of my preliminary injunction Order.

Indeed, Defendants' latest representations that "the entire project advances critical national-security objectives as an integrated whole," *see* Defs.' Opp'n at 1, are in direct conflict with Defendants' prior representations that the above-ground and below-ground portions of the project were "independent of" one another, *see* Defs.' Suppl. Br. at 39. Defendants now insist that the "overall above-ground ballroom is necessary to

accommodate and effectuate the below-ground additions (including by providing adequate, reinforced cover)." Defs.' Opp'n at 3. But Defendants do not explain why the proposed 90,000-square-foot ballroom—the source of the National Trust's claimed injury and likely unauthorized by statute—is required for security purposes *now*. Instead, the supporting declaration states merely that an "above-ground slab and topping structure is [sic] needed" to protect the underground elements. Third Quinn Decl. ¶ 7; *see also id.* ¶ 6 ("[L]eaving nothing on top of the below-ground construction is not an option."). As I clarify below, Defendants may, consistent with the injunction, cover and secure the below-ground construction while litigation proceeds. Further, while Defendants predicted in December that above-ground construction would begin, at the earliest, this month, *see* Stanwich Decl. ¶ 20, Defendants, to date, have not provided any updates on whether the below-ground facilities are ready for a "topping structure."

The fact that the ballroom is planned to include security features such as bullet-proof windows and a drone-proof roof does not bring the structure within the scope of the exception. While these features may well be beneficial, Defendants have not provided any national security justification for why these features must be installed *immediately* such that they should be excluded from the scope of the injunction. Nor does it appear Defendants could install these features immediately even if they wanted to. As noted by our Circuit Court, the ballroom's planned security features are still months, if not years, away from being realized—belying Defendants' argument that an inability to implement those features *now* imposes irreparable harm. Per Curiam Order at 3; Defs.' Opp'n at 4 (acknowledging that "the project is expected to take another two years until completion").

6

JA507

Defendants' insistence that leaving the site "dormant" poses additional security risks also fails. As an initial matter, my Amended Order permits below-ground construction, measures for presidential security, and measures to secure the grounds. Further, I previously rejected Defendants' argument that "any construction delay will undermine national security," Mem. Op. at 33, because—and here is the bottom line—Defendants themselves forged ahead and created this "coordinated and managed safety hazard" on White House grounds, *id.* (quoting Decl. of U.S. Secret Service Deputy Director Matthew C. Quinn ("Second Quinn Decl.") [Dkt. #30-5] ¶ 8).

Defendants' four classified *ex parte* declarations, all of which I reviewed and have taken into consideration, *see* Mem. Op. at 33 n.20, shed no further light on the question of whether the above-ground ballroom is necessary for national security. Without more, I cannot find that above-ground construction of the proposed ballroom *must* proceed.[1]

Apart from the below-ground national security facilities, Defendants have identified two additional categories of construction "necessary" for presidential security and the safety of the White House grounds. Second Quinn Decl. ¶ 6. Defendants indicated that the Secret Service is "coordinat[ing] with the [ballroom] contractor on . . . temporary measures to ensure the security and safety of the President, the First Family, and the White House complex." Decl. of U.S. Secret Service Deputy Director Matthew C. Quinn ("First

---

[1] To be sure, Defendants have, at times, represented that it would be "unworkable to distinguish between construction elements that are national-security related and those that are not." Defs.' Mot. to Stay [Dkt. #39] at 2; Defs.' Opp'n to Renewed Mot. for Prelim. Inj. at 36. Arguments about workability are distinct from asserting that the entire ballroom is a national security imperative. In any event, my Amended Order permitting below-ground construction mitigates at least some workability concerns.

7

JA508

Quinn Decl.") [Dkt. #14-11] ¶ 7. According to the Secret Service, "[t]hese outstanding security projects are expected to require additional weeks or months to complete." Second Quinn Decl. ¶¶ 5–6.

Defendants have also indicated a need to preserve and protect the structural integrity of the White House and to protect the construction site itself from deterioration due to the elements. *See* Second Quinn Decl. ¶ 6 (noting that "continued waterproofing and water management is necessary to maintain the integrity of security elements throughout the Complex as flooding poses risks to infrastructure, utilities, and other critical systems"); Defs.' Suppl. Br. at 40 (explaining that "below-ground work on waterproofing, security improvements, and utility infrastructure will have to take place at some point regardless of what is erected above-ground"); Defs.' Opp'n to Renewed Mot. for Prelim. Inj. [Dkt. #52] at 34 (halting all construction "would expose the Executive Mansion to damage"). Both categories of construction activities may proceed.

\*    \*    \*

In light of the National Trust's motion and the parties' arguments, and in consideration of Defendants' concerns about national security and presidential security, I will hereby clarify and amend my preliminary injunction Order to specify that *below-ground construction* may proceed, including the construction of any "top-secret excavations, bunkers, bomb-shelters, protective partitioning, military installations, and hospital and medical facilities," as well as such above-ground construction strictly

8

JA509

necessary to cover, secure, and protect such facilities. Defs.' Opp'n at 2. The Amended Order permits "temporary measures," First Quinn Decl. ¶ 7, which have already been in place, to provide for the personal security of the President. The Amended Order also permits construction necessary to protect the project site and to protect the structural integrity of the White House complex, including waterproofing, water management, and resolving construction risks such as "uncovered rebar and exposed cables around the site." Third Quinn Decl. ¶ 4. However, the injunction does *not* permit above-ground construction of the proposed ballroom.

The Court has taken Defendants' invocation of national security and presidential security seriously throughout this case, which is why I included a safety-and-security exception in my original Order. But national security is not a blank check to proceed with otherwise unlawful activity, and belated assertions that the above-ground ballroom is "inseparable" from an array of security features, *see* Defs.' Opp'n at 3, are not an occasion for this Court to reweigh the equities or reconsider the preliminary injunction! In my view, the safety-and-security exception, as clarified, permits measures critical to national and presidential security to move forward pending final resolution of this case and any appeal.[2]

---

[2] Defendants insist that their arguments about national security cannot be subject to "judicial second-guessing." Defs.' Opp'n at 4. Indeed, precedent "counsel[s] deference in national security matters." *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003). But judicial deference is not the same as withholding judicial review altogether. *See id.* at 928 (applying deference "so long as the government's declarations raise *legitimate* concerns [about] national security" (emphasis added)); *see also United States v. Zubaydah*, 595 U.S. 195, 205 (2022) (in context of military secrets privilege, a "court must decide for itself whether the occasion is appropriate for claiming the privilege"); *TikTok Inc. v. Garland*, 604 U.S. 56, 82 (2025) (Gorsuch, J., concurring in the judgment) (noting that the Supreme Court "decline[d] to consider the classified evidence the government has submitted to us"). Indeed, two of my colleagues recently granted preliminary injunctions notwithstanding the Government's invocation of national security concerns and reliance on classified declarations. *See* Hr'g Tr. at 43:11–14, 44:4–10, *Rhode Island v. U.S.*

9

JA510

I will close by noting that I have no desire or intention to be dragooned into the role of construction manager. Contrary to Defendants' suggestion, I have never required Defendants to "request and receive written approval" before proceeding with construction. Defs.' Opp'n at 4. The purpose of this opinion is merely to clarify that the injunction does, in fact, stop construction of the above-ground ballroom. I trust that Defendants will be able to implement my Amended Order in good faith and with the benefit of this clarification once my Amended Order goes into effect. In recognition of Defendants' concerns and for the reasons stated in my opinion, *see* Mem. Op. at 34, I will extend the temporary stay by seven (7) days after the issuance of this opinion and Amended Order.[3]

For the foregoing reasons, it is hereby **ORDERED** that the National Trust's Motion to Clarify [Dkt. #65] is **GRANTED**, and Defendants' Motion to Extend Administrative Stay of Preliminary Injunction [Dkt. #71] is **GRANTED** in part and **DENIED** in part. An Amended Order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge

---

*Dep't of Interior*, No. 25-cv-4328 (D.D.C. filed Jan. 12, 2026) [Dkt. #55] (noting government's "failure to explain or apply . . . [the] stated national security reason"); Min. Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-4 (D.D.C. filed Jan. 15, 2026).

[3] The Court gives fair notice to Defendants, however, that any above-ground construction over the next seven days that is not in compliance with my Amended Order is at risk of being taken down pending the resolution of this case.

10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br>    Plaintiff,<br><br>    v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Case No. 25-4316 (RJL)<br>)<br>)<br>)<br>)<br>)<br>) |

## AMENDED ORDER
April 16th, 2026 [Dkt. #65, 71]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Court's March 31, 2026 Order [Dkt. #61] is **VACATED** and

**SUPERSEDED** by this Order; and it is further

**ORDERED** that Plaintiff's Second Motion for Preliminary Injunction [Dkt. #51] is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's Motion to Clarify [Dkt. #65] is **GRANTED**; and it is

further

**ORDERED** that the National Park Service; Jessica Bowron, in her official capacity

as Acting Director, National Park Service; John Stanwich, in his official capacity as

Superintendent, the White House and President's Park; the Department of the Interior;

Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services

1

JA512

USCA Case #26-5134   Document #2172336   Filed: 05/07/2026   Page 519 of 525

Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher (together, "Defendants"), and any agents of Defendants or any other persons working at their direction or in active concert therewith, are preliminarily **ENJOINED** from taking any action in furtherance of the above-ground, physical construction of the proposed ballroom at the former site of the East Wing of the White House; and it is further

**ORDERED** that this Order does not prohibit below-ground construction, including below-ground construction of national security facilities, as well as above-ground construction short of constructing the proposed above-ground ballroom that is strictly necessary to cover, secure, and protect such national security facilities, provided that any such construction will not lock in the above-ground size and scale of the ballroom; and it is further

**ORDERED** that this Order does not prohibit measures strictly necessary to provide for the personal safety of the President and his staff short of constructing the proposed above-ground ballroom and provided that any such construction will not lock in the above-ground size and scale of the ballroom; and it is further

**ORDERED** that this Order does not prohibit construction strictly necessary to ensure the safety, security, and structural integrity of the White House, the White House grounds, and the below-ground construction site—including waterproofing, water management, structural reinforcement, and sealing off exposed construction areas—short

JA513

of constructing the proposed above-ground ballroom and provided that any such construction will not lock in the above-ground size and scale of the ballroom; and it is further

**ORDERED** that, subject to the safety-and-security exceptions above, no such work shall proceed absent express authorization from Congress; and it is further

**ORDERED** that Defendants' counsel shall provide written notice of this Order to all officers, agents, successors, servants, employees, and attorneys of Defendants, as well as any other persons working at their direction, in active concert therewith, or subject to Defendants' control; and it is further

**ORDERED** that Defendants' Motion to Extend Administrative Stay of Preliminary Injunction [Dkt. #71] is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that this Order shall take effect seven (7) days after its issuance; and it is further

**ORDERED** that Defendants shall file a status report apprising the Court of the status of their compliance with this Order no later than twenty-one (21) days after the date the Order takes effect; and it is further

**ORDERED** that the security requirement is hereby waived, *see* Fed. R. Civ. P. 65(c).

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

3

JA514

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's Order entered at ECF No. 73.

    Dated: April 16, 2026           Respectfully submitted,

1
JA515

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

BRANTLEY T. MAYERS
Counsel

/s/ *Eitan R. Sirkovich*
JOSEPH E. BORSON
Assistant Branch Director
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Eitan.R.Sirkovich@usdoj.gov
(202) 353-5525

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

MARISSA A. PIROPATO
Deputy Chief

MICHELLE RAMUS
MARK WIDERSCHEIN
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov
(202) 598-0414

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES**,

*Plaintiff*,

v.

**NATIONAL PARK SERVICE**, *et al.*,

*Defendants*.

Civil Action No. 25-4316

<u>**NOTICE OF CONDITIONAL CROSS-APPEAL**</u>

Notice is hereby given that Plaintiff National Trust for Historic Preservation in the United States (the "National Trust") conditionally cross-appeals to the United States Court of Appeals for the District of Columbia Circuit from the Opinion and Order denying the National Trust's first motion for a preliminary injunction (ECF Nos. 47, 48), entered by this Court on February 26, 2026.

In its Opinion and Order, the District Court held that the National Trust was unlikely to succeed on its constitutional claims. The District Court also did not enter a preliminary injunction on the National Trust's Administrative Procedure Act claims. The District Court, however, granted the National Trust leave to amend its complaint, and subsequently entered a preliminary injunction in the National Trust's favor via an Opinion and Order issued on March 31, 2026, *see* ECF Nos. 60, 61, which it later vacated and superseded in an Opinion and Order issued on April 16, 2026, *see* ECF Nos. 72, 73. The government has since appealed that preliminary injunction ruling. *See* ECF No. 74.

The National Trust therefore files this conditional cross-appeal of the February 26, 2026 Opinion and Order to protect its rights in the event that the United States Court of Appeals for the

JA517

District of Columbia Circuit reverses, vacates, or otherwise declines to affirm the April 16, 2026

Opinion and Order.

Dated: April 21, 2026                              Respectfully submitted,

                                                   NATIONAL TRUST FOR HISTORIC
                                                   PRESERVATION IN THE UNITED STATES

                                                   By its attorneys,

                                                    */s/Matthew F. Casassa*
                                                   Gregory B. Craig (164640)
                                                   FOLEY HOAG LLP
                                                   1717 K Street N.W.
                                                   Washington, DC 20006
                                                   Tel: (202) 223-1200

                                                   Thaddeus A. Heuer (*pro hac vice*)
                                                   Matthew F. Casassa (*pro hac vice*)
                                                   Jack C. Smith (1725229)
                                                   FOLEY HOAG LLP
                                                   155 Seaport Boulevard
                                                   Suite 1600
                                                   Boston, MA 02210
                                                   Tel: (617) 832-1000

## CERTIFICATE OF SERVICE

I certify that on April 21, 2026, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent via first class mail to those indicated as non-registered participants.

*/s/ Matthew F. Casassa*