

**U.S. Department of Justice**
Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20530

June 12, 2026

Clifton Cislak, Clerk of Court
U.S. Court of Appeals for the District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue NW
Washington, D.C. 20001

> RE:   *National Trust for Historic Preservation v. National Park Service et al.*, Nos. 26-5123, 26-5134

Dear Mr. Cislak:

Defendants write to advise the Court of two recent decisions that further undermine Plaintiff's claim to Article III standing.

First, earlier today, Judge Mehta denied an application for a TRO against an Ultimate Fighting Championship (UFC) event scheduled to occur at the White House and Lincoln Memorial. *Douglas v. National Park Service*, No. 1:26-cv-2016 (D.D.C. June 12, 2026) (Exh. A). Judge Mehta concluded that plaintiffs had not shown a likelihood of success in demonstrating standing. *Id.* at 6-10. Although plaintiffs "aver that they regularly observe the White House and Lincoln Memorial and cherish them for their beauty," the one plaintiff with "definite plans" to be at those sites at the relevant time "does not plan to visit the White House or the Lincoln Memorial … *for* their aesthetic value." *Id.* at 6-7. That reduced her "aesthetic injury" to a mere "generalized grievance." *Id.* at 6, 8. In this case, too, Ms. Hoagland says only that she expects to have "reason to be in the area" going forward—not that she intends to visit specifically to enjoy the aesthetic value of the White House, let alone its East Wing. JA76-77. That incidental injury is not cognizable.

Second, earlier this week, an Eleventh Circuit panel unanimously affirmed the dismissal on standing grounds of a challenge to certain Confederate memorials. *Johnson v. Mayor, City of Jacksonville*, No. 23-11937 (11th Cir. June 10, 2026) (Exh. B). The plaintiff there was a "descendant of slaves" who identified Confederate monuments he had visited and which left him "deeply repulsed." *Id.* at 2-3. The panel called this "a hallmark generalized grievance," because Article III does not permit a "concerned bystander … to vindicate his 'value interests.'" *Id.* at 9. The panel also explained why, "[s]tretched to its logical end, this theory of standing is limitless." *Id.* at 12. Here too, Hoagland objects to the Project's "statement," JA77, but "disagreement with government action (or inaction), no matter how strong or sincerely held, is not a concrete injury," Exh. B at 8. This dispute should likewise be left "to the political process, not the courts." *Id.* at 12.

Sincerely,

*/s/ Brantley T. Mayers*
Brantley T. Mayers

*Counsel for Appellants*

cc:    All counsel

# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SUSAN DOUGLAS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 26-cv-02016 (APM) |
| NATIONAL PARK SERVICE, et al., | ) ) | |
| Defendants. | ) ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

**I.    INTRODUCTION**

Plaintiffs Susan Douglas and Paul Romano move for a temporary restraining order (TRO) or expedited preliminary injunction to prevent Defendants[1] from using the South Lawn of the White House and the Lincoln Memorial as venues for an Ultimate Fighting Championship ("UFC") event that is scheduled to start on the evening of June 12, 2026.  For the reasons that follow, the motion is denied.

**II.    BACKGROUND**

    *1.    UFC Freedom 250*

Mixed martial arts ("MMA") is a combat sport that blends fighting techniques from boxing, kickboxing, Brazilian jiu-jitsu, and other disciplines.  Compl. for Declaratory and Injunctive Relief, ECF No. 1 [hereinafter Compl.], ¶ 54.  The UFC promotes MMA fights and has by far the largest market share among such organizations.  *Id.* ¶ 58.  UFC fights famously take place in an

---

[1] Defendants are the National Park Service (NPS), Acting Director of the National Park Service Jessica Bowron, Regional Director of the National Capital Region of the National Park Service Jennifer T. Nersesian, the U.S. Department of the Interior, and Secretary of the Interior Doug Burgum.

"Octagon," an eight-sided enclosure marked by a six-foot-tall, vinyl-coated chain-link fence.  *Id.* ¶ 60.  Dana White is the President and CEO of the UFC.  *Id.* ¶ 64.  He also happens to be a long-time friend and supporter of President Donald J. Trump.  *Id.*

The UFC is scheduled to host an MMA event called "UFC Freedom 250" on the White House's South Lawn on June 14, 2026.  *Id.* ¶ 62.  President Trump first proposed hosting such an event in July 2025 as part of a series of events celebrating the 250th anniversary of American independence.  Defs.' Mem. in Opp'n to Pls.' Mot., ECF No. 11 [hereinafter Defs.' Opp'n], at 10; Defs.' Opp'n, Decl. of Jessica Bowron, Comptroller of NPS, ECF No. 11-3 [Bowron Decl.], ¶ 8.  The UFC confirmed its participation shortly thereafter.  Defs.' Opp'n at 10.  The event coincides with President Trump's 80th birthday.  Compl. ¶ 65.

Although promoted as a 250th anniversary event, neither the congressionally authorized planning commission nor the President's corresponding task force established by executive order, named "Freedom 250," is involved in planning UFC Freedom 250.  *See* Pls.' Emergency Appl. for a TRO or, in the Alternative, an Expedited Prelim. Inj., ECF No. 3 [hereinafter Pls.' Mot.], Pls.' Mem. of P. & A. in Supp. of Pls.' Mot., ECF No. 3-1 [hereinafter Pls.' Mem.], at 13–14; Celebrating America's 250th Birthday, 90 Fed. Reg. 8849, 8849 (Jan. 29, 2025).  Earlier reporting had indicated control by Freedom 250, but a spokesperson denied involvement on June 4, 2026.  Pls.' Mem. at 14.

On May 26, 2026, construction of a 92-foot-tall, 154-foot-wide staging structure, known as "the Claw," began on the South Lawn of the White House.  Compl. ¶¶ 70–72.  The Claw will house the Octagon and provide vantage points for cameras and lighting.  *Id.* ¶ 74.  The Claw is a temporary structure—disassembly is set to begin at 10:00 the morning after the event.  Defs.' Opp'n, Decl. of Joshua Fisher, Director for White House Management and Administration,

ECF No. 11-4 [hereinafter Fisher Decl.], ¶ 8.  Recently, however, President Trump suggested in a TikTok video that the Claw may "never" be taken down.  Compl. ¶ 75.

The UFC also will hold smaller events before the fights.  On June 12, the UFC will hold a press conference at the Lincoln Memorial, which will include "face-offs" between fighters.  Defs.' Opp'n, Decl. of Marisa Richardson, Chief of the National Mall and Memorial Parks Division of Permits Management, ECF No. 11-2 [hereinafter Richardson Decl.], ¶ 14; Suppl. Decl. of Marisa Richardson, ECF No. 12 [hereinafter Suppl. Richardson Decl.], ¶ 5.  The face-offs and the press conference will occur within the area between the Lincoln Memorial and the reflecting pool.  Richardson Decl. ¶ 16.  Fighters involved in the face-offs will walk through and emerge from the Lincoln Memorial chamber accompanied by a child and descend the steps immediately in front of the statue of President Lincoln to a staging area.  Suppl. Richardson Decl. ¶ 6.  The UFC plans to use sound amplification equipment for the press conference.  *See* Compl. ¶ 92.  The resulting sound may be audible at the nearby Vietnam Veterans Memorial.  *Id.* ¶ 93.  Then, on June 13, the UFC will hold "weigh-ins" at the Ellipse.  Richardson Decl. ¶ 14; Suppl. Richardson Decl. ¶ 5.  The staging for these two events is also temporary.  The UFC is expected to remove all equipment from the Lincoln Memorial by June 14, 2026, and from the Ellipse by June 23, 2026.  Richardson Decl. ¶ 21.

All three events have required intensive planning.  The UFC has invested over $60 million in total.  Fisher Decl. ¶ 15.  More than 700 subcontractors have been hired to assist with construction.  *Id.* ¶ 11.  The White House and Secret Service have screened and cleared both thousands of individuals to participate and hundreds of truckloads of equipment.  *Id.* ¶¶ 10, 13.  And the athletes "began physical preparations months in advance."  *Id.* ¶ 14.  Come June 14, about

4,000 guests are expected to attend UFC Freedom 250 on the South Lawn and an additional 120,000 spectators are expected to watch from the Ellipse.  *Id.* ¶¶ 9, 15.

> 2.    *Plaintiffs' Challenge*

Plaintiffs are longtime residents of the Washington, D.C. area.  *See* Pls.' Mot., Decl. of Susan Douglas, ECF No. 3-2 [hereinafter Douglas Decl.], ¶ 2; Pls.' Mot., Decl. of Paul Romano, ECF No. 3-3 [hereinafter Romano Decl.], ¶ 4.  Douglas visits the White House grounds and Lincoln Memorial "very frequently," but construction of the Claw and other UFC Freedom 250 structures has diminished her enjoyment of these places.  *Id.* ¶¶ 3, 7–10.  Douglas also suffers from osteoarthrosis in her knees, and the closures put in place during construction "have caused [her] to have to take circuitous routes" when walking nearby.  *Id.* ¶¶ 11–14.  As an activist and organizer focused on "preserving the physical beauty and cultural sanctity of our national capital and its monuments," she plans to visit both locations for protests on June 13 and 14.  *Id.* ¶¶ 4–6.  She believes street closures will impact these activities, too, as they will make it more difficult for her and others to transport the large props they intend to bring with them.  *Id.* ¶¶ 15–16.

Romano regularly travels past the same areas for his work as a rideshare driver and when he drives to visit his family.  Romano Decl. ¶ 5.  He similarly values the "aesthetic beauty and coherence of President's Park,[2] the White House, and the monuments on the National Mall."  *Id.* ¶ 18.  As a Vietnam War veteran, Romano attaches particular significance to the Vietnam Veterans Memorial.  *Id.* ¶¶ 2, 5–6.  He worries that the sound amplification equipment used for the press conference will disturb its "quiet tranquility," which is a "powerful aspect[]" of the Memorial.  *Id.* ¶¶ 7, 10–12.  He avers that "[t]here is a high likelihood" he will be near these locations again on June 13 and 14.  *Id.* ¶¶ 15, 17.

---

2 President's Park is the area consisting of the White House and its grounds, including the South Lawn, Lafayette Park, and the Ellipse.  Compl. ¶ 25.  The National Park Service has oversight responsibility for President's Park.  *Id.* ¶ 27.

Plaintiffs filed this action on June 6, 2026, *see* Compl., six days before UFC Freedom 250 kicks off at the Lincoln Memorial. They ask to the court to stop it from happening.[3] Plaintiffs advance four grounds. First, they allege UFC Freedom 250 runs afoul of restrictions on hosting "special events"—such as "sporting events"—on White House grounds and in certain parts of the Lincoln Memorial. *See* Compl. ¶¶ 161–175 (citing 36 C.F.R. § 7.96(g)). Second, they assert that the Claw was unlawfully constructed without congressional authorization. *See id.* ¶¶ 176–186 (citing 40 U.S.C. § 8106). Third, they claim Defendants' failure to prepare a report evaluating the events' potential environmental impacts violates the National Environmental Policy Act (NEPA). *See id.* ¶¶ 187–198 (citing 42 U.S.C. § 4332(C)). Finally, they allege that Defendants' actions are "*ultra vires* and in excess of delegated powers." *See id.* ¶¶ 199–202.

## III.    LEGAL STANDARD

TROs and preliminary injunctions are "extraordinary" remedies. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party moving for either must make four showings: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of emergency relief, (3) the balance of equities supports emergency relief, and (4) emergency relief is in the public interest. *Id.* at 20. Where, as here, the government is the opposing party, the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    DISCUSSION

The court first evaluates whether Plaintiffs are likely to succeed in demonstrating standing to bring suit. At least one of them must have standing to maintain their suit in federal court. The court then considers whether Plaintiffs have demonstrated irreparable harm absent emergency

---

[3] In moving for emergency relief, Plaintiffs challenge only the events occurring at the Lincoln Memorial and the South Lawn, but not on the Ellipse. *See* Pls.' Notice of Correction & Stmt. of Further Compliance with LCvR 65.1(a), ECF No. 7, ¶ 7.

relief.  Finally, it weighs the equities.  Concluding that Plaintiffs have not satisfied their burden as to these elements, the court does not reach the merits.

## A.    Likelihood of Success in Demonstrating Standing

As part of establishing a likelihood of success, Plaintiffs "must show a 'substantial likelihood' of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015) (citation omitted).  To have standing, Plaintiffs must satisfy three requirements: (1) "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of," in that the injury must be "fairly traceable" to Defendants' conduct; and (3) "redress[ability] by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).  Plaintiffs fail at the first.

*Aesthetic and Dignitary Injuries.*  Plaintiffs rest primarily on alleged aesthetic injuries. An aesthetic injury ordinarily is the loss of enjoyment that a plaintiff experiences at a particular location due to some government action.  *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972).  It is well established that aesthetic injuries can satisfy the injury-in-fact requirement. *See id.* at 734.  But a "generalized grievance" is not enough.  *Lujan*, 504 U.S. at 575 (internal quotation marks omitted).  Plaintiffs must be "directly affected" by the alleged actions, in that they have "concrete plans" to "return to the places they had visited before," *id.* at 563–64, and that their injury is more than "mere incidental viewership of something unappealing," *Env't Def. Fund v. FERC* (*EDF*), 2 F.4th 953, 970 (D.C. Cir. 2021).

Both Plaintiffs aver that they regularly observe the White House and Lincoln Memorial and cherish them for their beauty.  Douglas Decl. ¶¶ 3–4; Romano Decl. ¶¶ 5, 18.  And they say that the Claw—which they describe as "hideous," "grotesque," and "disgusting"—and other

6

structures built for UFC Freedom 250 will continue to "diminish the personal enjoyment" and "experience of beauty" associated with viewing the monuments over the coming days. Douglas Decl. ¶¶ 8–10; Romano Decl. ¶¶ 17–19. This is an ostensible injury to their aesthetic interests. But Plaintiffs fall short of showing they are "directly affected" by Defendants' actions.

Start with Romano. He states that there is a "high likelihood" that he will be "by" both the White House and Lincoln Memorial on June 13 and 14 because of his "work as a driver." *See* Romano Decl. ¶¶ 15, 17. He does not say, however, that there is any likelihood, even a "high" one, that he will be "by" the Lincoln Memorial on *June 12*, when the press conference and face-offs are scheduled to occur. As for the fight itself, Romano does not assert "concrete plans" to be near the South Lawn of the White House. Only a serendipitous rideshare trip would place him in a position to see the Claw on the night of the fights. A "threatened injury must be certainly impending to constitute injury in fact." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (internal quotation marks omitted). Romano's allegations do not meet that threshold.

Douglas, meanwhile, arguably has more definite plans to be at both the Lincoln Memorial and White House for upcoming protests on June 13 and 14 (although she, too, has not said that she will be visiting the Lincoln Memorial on June 12). Douglas Decl. ¶ 6. She alleges that, while protesting, she "expect[s] to observe" the structures on the South Lawn and National Mall. *Id.* ¶ 7. But unlike cases in which courts have found aesthetic injuries sufficient for standing, Douglas does not plan to visit the White House or the Lincoln Memorial in the coming days *for* their aesthetic value. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–85 (2000); *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025). Rather, she plans to be there primarily to protest the events. Douglas Decl. ¶ 6. The aesthetic-injury cases that Plaintiffs

7

cite are thus inapposite. *See* Pls.' Mem. at 27–28 (citing cases); *see also* Pls.' Reply in Supp. of Pls.' Mot, ECF No. 13 [hereinafter Pls.' Reply], at 11–12 (citing cases). None involve, as here, a plaintiff whose aesthetic injury is *subordinate* to the purpose for which they plan to visit the affected area. *Cf. EDF*, 2 F.4th at 970 ("[W]e can find nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing."). Plaintiffs thus have not satisfied their burden at this stage to show a substantial likelihood of a cognizable aesthetic injury.

Plaintiffs' alternative framing of their injuries fares no better. Plaintiffs assert that "[i]t is the for-profit nature of the event that creates the aesthetic and dignitary harms that confer standing." Pls.' Reply at 16. They state that, "as individuals who care deeply about preserving the physical beauty and cultural sanctity of the national capital and its monuments, they will be harmed by the use of those for corrupt purposes." *Id.* at 11; *see also* Pls.' Mem. at 28. But "general emotional harm, no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (internal quotation marks omitted). Once again, Plaintiffs must be "directly affected" by the challenged action. *Lujan*, 504 U.S. at 564. Neither Plaintiff has "concrete plans" to be present for the press conference and face-offs at the Lincoln Memorial on June 12; they speak only to their plans on June 13 and 14. *See* Douglas Decl. ¶ 6; Romano Decl. ¶¶ 15, 17. And each Plaintiff's allegations as to the South Lawn on June 14 fail for the reasons already described.

Romano also alleges distinct dignitary and emotional harms from the activities at the Lincoln Memorial and the potential disturbance of the tranquility of the nearby Vietnam Veterans Memorial. *See* Romano Decl. ¶¶ 12, 16. Here, too, his failure to allege that he will be present at

either monument renders his grievance a "generalized" one insufficient for standing.  *See Lujan*, 504 U.S. at 575.

    *Physical Harm.*  In her declaration and in the background section of Plaintiffs' opening brief, Douglas references how road closures associated with construction will cause her both physical injuries and, relatedly, inhibit her ability to participate in protests.  *See* Douglas Decl. ¶¶ 11–16; Pls.' Mem. at 23–24.  But Plaintiffs do not devote any of their argument in their opening brief to explaining how this injury confers standing.  *See* Pls.' Mem. at 26–29.  That is enough to dispose of it, notwithstanding a brief mention in their reply.  *See* Pls.' Reply at 12; *Strobos v. RxBio, Inc.*, 221 F. Supp. 3d 21, 23 (D.D.C. 2016) (noting both that arguments undeveloped and "unsupported by pertinent authority" and arguments raised for the first time in reply are waived (citing cases)).

    Still, the court would not find these injuries sufficient for standing.  An injury in fact cannot be conjectural—it must be "definable and discernible."  *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 667 (D.C. Cir. 1987).  Plaintiff alleges that the "circuitous routes" the event-related road closures cause her to take "will continue to magnify the pain [she] suffers."  Douglas Decl. ¶ 14.  But Plaintiff offers little more detail.  Plaintiff suffers from a pre-existing, "painful" condition in both knees.  *Id.* ¶ 13.  She does not specify the added distance she will have to walk due to UFC Freedom 250–related road closures; nor does she elaborate on how walking that additional distance will affect her, except to assert some unspecified increase in pain.  *Id.*  Such claimed injury is not sufficiently "definable and discernable."  Plaintiffs cite no case in which such nondescript allegations suffice for a cognizable injury.

    As for her ability to participate in protests, Plaintiff alleges that the props she intends to bring with her "are heavy and are already difficult to move because of [her] osteoarthritis."  *Id.*

¶ 16.  She does not claim, however, that this difficulty cannot be easily overcome, such as by having another protestor carry the prop she intends to use.  Where "an easy means for alleviating the alleged" injury exists, a plaintiff has not alleged a cognizable injury.  *See Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).  Plaintiffs accordingly have not shown a substantial likelihood that either injury associated with the road closures can support their standing to sue.

 *Procedural Injury.*  Finally, Plaintiffs allege a procedural injury under NEPA.  They allege that, had Defendants gone through the process of preparing an environmental impact statement, Plaintiffs would have submitted comments opposing the project.  Douglas Decl. ¶¶ 17–18; Romano Decl. ¶ 19.  "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *EDF*, 2 F.4th at 970 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  Because Plaintiffs have not otherwise alleged a concrete injury, the procedural injury alone cannot confer standing.  Plaintiffs' resulting failure to show a substantial likelihood of standing weighs against emergency relief.

### B.   Irreparable Harm

 Even if Plaintiffs had established standing, the court still would deny emergency relief because Plaintiffs have not proven irreparable harm.  To establish irreparable harm for purposes of obtaining injunctive relief, the movant must make two showings.  First, the injury must be "both certain and great."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  That is, the alleged harm must "be actual and not theoretical" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'"  *Id.* (alteration in original) (citation omitted).  Second, the harm "must be beyond remediation."  *League of Women Voters of U.S. v.*

*Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted). If a movant fails to demonstrate irreparable harm absent emergency relief, that is "sufficient" grounds on which a court may deny the motion. *See CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Plaintiffs' unreasonable delay in filing suit, though not dispositive, undercuts their claims of irreparable harm. *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (observing that an "unexplained" "lack of diligence" "undercuts claims of irreparable harm"); *see also Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (holding that delay alone is not a valid basis to deny injunctive relief). The public has known that the White House would be hosting a UFC fight event since President Trump first announced it in July 2025. *See* Defs.' Opp'n at 10; Bowron Decl. ¶ 8. Equipment and materials for the event began arriving at the White House around May 20, 2026, Fisher Decl. ¶ 20, and construction of the Claw began six days later, Compl. ¶ 70. Plaintiffs, however, waited until June 7, 2026—more than two weeks after visible preparations commenced at the White House—to seek emergency relief. Plaintiffs justify their delay based on newly received information. They offer that they only recently learned that "no official semiquincentennial commission is planning, organizing, and executing the event,"—neither "America 250, the congressionally authorized commission" nor Freedom 250. Pls.' Mem. at 13–14. Specifically, a spokesperson for Freedom 250 confirmed on June 4, 2026, it "is *not* behind UFC Freedom 250." *Id.* at 14; Compl. ¶ 103. Plaintiffs add that their "aesthetic and dignitary harms" did not ripen until learning of the "corruption" throughout the entire organizational apparatus. Pls.' Reply at 16.

11

The problem with Plaintiffs' explanation is that their suit does not rest solely on the claim that UFC Freedom 250's approvals are contrary to governing regulations. Count II protests Defendants' "decisions authorizing the construction of UFC Freedom 250 event facilities," which according to Plaintiffs, cannot be done without express congressional approval. Compl. ¶¶ 178–179. Count III contests Defendants' authorization of UFC Freedom 250 "without an environmental assessment or environmental impact statement," in contravention of NEPA. *Id.* ¶¶ 191–195. And Count IV challenges Defendants' authorization of the event as *ultra vires*. *Id.* ¶¶ 200–202. The timing of bringing these claims is not tethered to Plaintiffs' newfound understanding that Freedom 250 was not "planning, organizing, and executing the event." Plaintiffs explain away this observation by insisting that "[i]t is the for-profit nature of the event that creates the aesthetic and dignitary harms that confer standing." Pls.' Reply at 16. But the court does not see how that explains the delay. The for-profit elements of UFC Freedom 250 have long been known, and the absence of congressional approval and a NEPA review is not new information.

Plaintiffs' declarations confirm that their claimed aesthetic injuries likely existed before June 4, 2026. Romano states he "travel[s] along the National Mall and past the Lincoln Memorial several times a week," Romano Decl. ¶ 5, and that he saw the Claw "under construction on the White House lawn ten to fifteen times," *id.* ¶ 17. Douglas offers similar facts. She estimates visiting "the White House and National Mall areas at least one time per week since this spring," Douglas Decl. ¶ 5, and she has "observed the construction connected with UFC Freedom 250, including in particular the so-called 'Claw,'" during "recent past visits to the White House," *id.* ¶ 7. Plaintiffs' claimed aesthetic injuries therefore likely accrued not long after construction of the Claw began on May 26, yet they waited nearly two weeks to file suit. In the context of an

emergency application—and coupled with the fact that the UFC fight date was long ago known—it is fair to say Plaintiffs unreasonably delayed bringing suit, undercutting their claims of irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).

Plaintiffs' asserted harms also are not irreparable because they are both ancillary and temporary. *See* Pls.' Mem. at 34–35; Pls.' Reply at 16–17. As discussed, neither Plaintiff claims they will be in the vicinity of the White House or Lincoln Memorial for the primary purpose of enjoying their architectural grandeur, natural beauty, or historical import. Rather, Romano's reason is work-related, and Douglas's is to exercise her First Amendment rights. *See* Romano Decl. ¶¶ 15, 17; Douglas Decl. ¶ 6. Their claimed aesthetic harms are thus ancillary to the main reasons for their presence. Their harms are also decidedly temporary. The Claw will be disassembled beginning at 10:00 a.m. on June 15, 2026. Fisher Decl. ¶ 8. And any staging equipment at the Lincoln Memorial must be removed before then. *See* Richardson Decl. ¶ 21. The President's musings about permanency of the Claw does not move the dial in the face of a White House official's clear representation. Fisher Decl. ¶ 8. Such ancillary and ephemeral harm is not sufficiently "great" to warrant extraordinary relief. *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969). And as discussed below, any significant environmental damage is doubtful.

### C.    Equities and Public Interest

The equities and the public interest "merge" where, as here, the opposing party is the government. *See Nken*, 556 U.S. at 435. They, too, weigh against the requested emergency relief. Plaintiffs offer two arguments. Because the agency action authorizing the event was "unlawful," Defendants cannot claim a "legitimate interest in authorizing or otherwise allowing an event and a construction project that their own regulations and federal statutory law both forbid." Pls.' Mem. at 35. And second, they argue that they "and the public have a profound interest in protecting" the

13

President's Park, National Mall, and Lincoln Memorial from "unauthorized, commercial exploitation and from the environmental damage inflicted on them." *Id.* Neither contention is persuasive.

As to the former, the public concededly has an interest in the Executive Branch's compliance with the law. But that public interest also extends to courts resolving disputes only when Article III's "case or controversy" requirement is satisfied. *Cf. Warth v. Seldin*, 422 U.S. 490, 498 (1975) (discussing standing limitations as "founded in concern about the proper—and properly limited—role of the courts in a democratic society"). As discussed, Plaintiffs have not established a substantial likelihood of standing. *See supra* Section IV.A. The public interest weighs against the court wading into a dispute when jurisdiction is less than certain.

As to the latter, the court agrees that the public has an interest in preventing the "unauthorized, commercial exploitation" and "environmental damage" of protected national landmarks. But again, given doubtful standing, the public interest weighs against deciding these issues. As for the environmental damage, Plaintiffs have not identified any environmental harm that would come from the press conference and face-offs at the Lincoln Memorial. *See* Pls.' Mem. at 12, 35; Pls.' Reply at 17–18. And the UFC estimates it will spend $700,000 to remediate grass damaged by the Claw on the South Lawn. *See* Pls.' Mem. at 20 (citing Mary Whitfill Roeloffs, *90-Degree Heat Expected for Trump's UFC Fight—And Maybe Rain*, Forbes (Jun. 10, 2026, at 3:34 PM ET), https://perma.cc/87T7-QNXX). The risk of any significant environmental damage therefore appears remote.

On the other side of the ledger, a grant of emergency relief on the eve of UFC Freedom 250 would cause substantial harm to other interests. Defendants point to the considerable "time, labor, and funding" that has gone into organizing the UFC fight and lead-up events. *See* Defs.'

Opp'n at 10–13, 17–18; Fisher Decl. ¶¶ 9–15.   Specifically, they point to the near year-long planning of the event; coordination with multiple government agencies, including the Secret Service; site work that began May 20 and has involved between 700 to 900 workers; multiple equipment deliveries; event ticketing logistics; and preparations of the contracted UFC fighters. Defs.' Opp'n at 17–18.   Defendants also point to the reliance interests of thousands of expected spectators, some of whom have planned visits to the District of Columbia, and "millions of Americans watching remotely."   *Id.*   And then there is the $60 million that the UFC and UFC-affiliated organizations have expended to put on the event.   Fisher Decl. ¶ 15.   The potential loss of those dollars resulting from a last-minute, court-ordered stoppage cannot be ignored.   *Cf. Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804–05 (D.C. Cir. 2022) (considering private actors' dollars invested and potential losses in determining whether to vacate an administrative action).   The balance of the equities therefore also weighs against emergency relief.

## IV.   CONCLUSION AND ORDER

Because Plaintiffs fail to establish both a substantial likelihood of standing and irreparable harm, and because the equities and public interest weigh against emergency relief, Plaintiffs' Emergency Application for a Temporary Restraining Order or, in the Alternative, an Expedited Preliminary Injunction, ECF No. 3, is denied.

Dated:  June 12, 2026

Amit P. Mehta
United States District Judge

15

# Exhibit B

FOR PUBLICATION

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11937
_____

EARL M. JOHNSON, JR.,

*Plaintiff-Appellant,*

*versus*

MAYOR, CITY OF JACKSONVILLE,
GOVERNOR, STATE OF FLORIDA,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cv-00726-MMH-PDB
_____

Before JILL PRYOR, GRANT, and TJOFLAT, Circuit Judges.

GRANT, Circuit Judge:

Confederate memorials are a pressure point. Some say they are significant historical markers that should remain undisturbed—preserved, even. Others are deeply offended by what they see as

USCA11 Case: 23-11937 Document: 89-1 Date Filed: 06/18/2026 Page: 2 of 15

outdated and offensive reminders of a shameful time in our history. Still others likely give the question little thought. Earl M. Johnson, Jr. falls in the middle group, and he asked for a judicial decree that any use of city or state tax dollars supporting a public place with a Confederate name—streets, schools, and the like—violates his statutory and constitutional rights.

Like those who came before him seeking to force the government to preserve these memorials, Johnson lacks standing to sue. The political branches—not the federal courts—are the forum for his challenge. His disgust, no matter how deep and how sincere, is not the kind of injury that can give rise to a lawsuit. Indeed, what Johnson seeks is not the removal of the monuments or street names, but a declaration that they are wrong. Because he has not suffered a concrete injury unique to him, he does not have standing to ask for that relief. And with no case or controversy before us, even a statement that we agreed with Johnson would be hollow. We affirm the district court's dismissal of his lawsuit.

## I.

Earl M. Johnson, Jr., a black resident of the Middle District of Florida, is a descendant of slaves "then-held in Confederate states."[1]     In his complaint, Johnson points to nearly fifty

---

[1] Because this case comes to us in a facial challenge on a motion to dismiss, we evaluate Johnson's standing "based on the facts alleged in the complaint." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001). We accept the factual allegations as true, construing them in his favor. *Morrison v. Amway Corp.*, 323 F.3d 920, 924–25 n.5 (11th Cir. 2003).

"monuments and naming tributes to the Confederacy and White supremacists on tax-funded public land." The list includes parks, schools, streets, a courthouse mural, and a government building flying the Confederate battle flag. Nine of these are in Duval County, which forms a consolidated government with the City of Jacksonville. *See* Jacksonville Charter, § 1.101; Ordinance 2010-616-E. Among them are the Florida Confederate Soldiers Memorial Pedestal at City Park, Monument to Women of the Confederacy at City Park, Yellow Bluff Fort Monument at State Park, Confederate Point Road, Confederate Street, Stonewall (Jackson) Street, (Stonewall) Jackson Street, (Jefferson) Davis Street, and Jefferson (Davis) Street.[2]

Johnson says that he has visited or traveled on most of the locations identified in the complaint. Doing so left him "deeply repulsed, disheartened, and intimidated by" what he calls "governmental celebrations of White supremacy," affirmations that "encourage the incitement of intimidation and violence against Black Americans." But Johnson alleges no specific connection between a violent incident and any of these landmarks; nor does he claim to have taken any alternate routes to avoid the displays or roadways.

---

[2] The City points out that two memorials, the Florida Confederate Soldiers Memorial Pedestal and Monument to Women of the Confederacy, were removed in 2023. Constrained as we are by the facial nature of the City and State's attack on Johnson's complaint, however, we accept his allegations as true. *See Morrison*, 323 F.3d at 924–25 n.5.

In a five-count complaint, proceeding pro se, Johnson sued Florida Governor Ron DeSantis and Jacksonville Mayor Lenny Curry in their official capacities under 42 U.S.C. § 1983.[3] He sought a declaratory judgment that both the City and the State violated Title II of the Civil Rights Act, the Thirteenth Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as 42 U.S.C. § 1981, by maintaining the Confederate memorials on public land with taxpayer dollars.[4] *See* Declaratory Judgment Act, 28 U.S.C. § 2201(a).

A magistrate judge recommended dismissing Johnson's complaint for lack of standing, concluding that he had failed to satisfy Article III's requirement of a particularized injury because he alleged only a generalized grievance. Were it otherwise, the magistrate judge warned, "any traveler in the Middle District of Florida offended by any Confederate-related street name, school name, or county name or by any Confederate-related memorial, monument, mural, building, or program on government property" could sue the government for violating his rights. The magistrate judge also determined that Johnson lacked standing to sue as a state or municipal taxpayer because he had neither shown a direct injury

---

[3] Lawsuits against public officials in their official capacities operate as the functional equivalent of suits against the government when the government is the "real, substantial party in interest." *Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990) (quotation omitted).

[4] Johnson has abandoned his § 1981 claim on appeal. *See United States v. Campbell*, 26 F.4th 860, 872–73 (11th Cir. 2022) (en banc).

USCA11 Case: 23-11937 Document: 89-1 Date Filed: 06/10/2026 Page: 5 of 15

23-11937                 Opinion of the Court                          5

nor demonstrated that taxpayer funds were used to maintain the memorials.[5]

Johnson filed objections to the magistrate judge's report and recommendation, but provided no legal or factual basis for any of his disagreements. Instead, he listed the magistrate judge's conclusions and stated that he objected. Consider objection number two: "Plaintiff objects to the finding that 'Mr. Johnson fails to allege facts sufficient to establish ordinary or taxpayer standing, this Court lacks subject-matter jurisdiction, and dismissal is warranted.'" And so on, for each of Johnson's objections.

The district court adopted the magistrate judge's report and recommendation in large part, dismissing Johnson's complaint. The court first observed that Johnson had not properly objected to the report, because his objections to the magistrate judge's recommendation were not specific enough under Federal Rule of Civil Procedure 72(b)(2). *See United States v. Schultz*, 565 F.3d 1353, 1359–60 (11th Cir. 2009); 11th Cir. R. 3-1.

Even so, the court analyzed Johnson's standing de novo and agreed that his allegations were insufficient. The court then declined to address whether Johnson failed to state a claim or to consider the defendants' alternative arguments.

After some procedural back and forth—including dismissal of Johnson's appeal for lack of prosecution—this appeal followed.

---

[5] In the alternative, the magistrate judge concluded that Johnson failed to state a claim.

6                     Opinion of the Court                    23-11937

## II.

We review jurisdictional questions de novo.  *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999).

## III.

"Jurisdiction is power to declare the law." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).  Without it, we "cannot proceed at all." *Id.* "[N]o matter how weighty or interesting" a lawsuit may be, Article III requires us to evaluate our jurisdiction before turning to the merits. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc).  One bedrock part of that requirement is that each plaintiff must have standing to sue—an appropriate "personal stake" in the case.  U.S. Const. art. III, § 2; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotation omitted).

To have standing, a plaintiff must show three things: (1) an injury in fact (2) that was caused by the defendant and (3) that can be redressed by a court. *See United States v. Texas*, 599 U.S. 670, 676 (2023).  This case, like so many others, is primarily about the injury requirement, especially the need for the alleged harm to be "concrete and particularized." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242 (11th Cir. 2022) (en banc) (quotation omitted).  An injury is concrete "if it actually exists— that is, if it is real, and not abstract." *Id.* (quotation omitted). Federal courts are not "vehicle[s] for the vindication of the value interests of concerned bystanders." *Allen v. Wright*, 468 U.S. 737, 756 (1984) (quotation omitted).

23-11937                Opinion of the Court                    7

An injury must also be particularized in the sense that it affects the plaintiff "in a personal and individual way"—the alleged harm, in other words, cannot be generalized or undifferentiated. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation omitted). So when a plaintiff's asserted injury is "shared in substantially equal measure by all or a large class of citizens," that's not enough. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Simply put, a "generalized grievance, no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (internal quotation marks omitted).

And standing is more than a procedural speed bump before the merits: it is a constitutional mandate "built on a single basic idea—the idea of separation of powers." *Allen*, 468 U.S. at 752. Resolving only those disputes where a plaintiff has standing ensures that the judiciary stays in our constitutional lane, not encroaching on the prerogatives of the political branches. *See United States v. Texas*, 599 U.S. at 675–76.

**A.**

Johnson's asserted injury is neither concrete nor particularized. First, concreteness. Johnson alleges that he feels "deeply repulsed" and "disheartened" by the "governmental celebrations of White supremacy" embodied in the monuments and tributes. The same goes for streets with Confederate monikers, which he says burden his liberty because they "abridge central precepts of equality." But the "psychological consequence presumably produced by observation of conduct with which one

disagrees" has long been held insufficient to establish an Article III injury. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982). Johnson's sweeping allegations of harm are the very sort of abstract and non-concrete injury that federal courts have rejected time and again. *E.g.*, *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (en banc); *Gardner v. Mutz*, 962 F.3d 1329, 1341 (11th Cir. 2020).

Our decision in *Ladies Memorial Ass'n v. City of Pensacola* drives home the point. 34 F.4th 988 (11th Cir. 2022). There, we rejected the argument that the removal of a Confederate memorial inflicted a concrete injury. *See id.* at 993. "[P]urely psychic injuries, like disagreeing with government action," or "a mere recitation that the Government is violating one's constitutional rights," we explained, "fall short of the concreteness standard" required to confer standing. *Id.*; *see also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80–81 (2019) (Gorsuch, J., concurring in the judgment). So too here.

To be sure, that those plaintiffs sought to *preserve* a Confederate monument offers a factual distinction between their claim and Johnson's. But that viewpoint differential changes nothing about the nature of the claimed injuries; each is based on disagreement with government action. And pure disagreement with government action (or inaction), no matter how strong or sincerely held, is not a concrete injury.

Nor is Johnson's injury particularized—it's a hallmark generalized grievance. The "repulsion" and "intimidation" that he experienced are felt by *all* those offended by Confederate memorials, and Johnson pleaded nothing distinguishing him "from other interested observers" or placing him "among the injured." *Gardner*, 962 F.3d at 1343 (quotation omitted). Though he attempts to "describe a personal, emotional injury," the core of his claim is that he is upset by the local government's failure to excise Confederate symbolism and names from public places. *See Quinn v. Sec'y of State, Ga.*, 175 F.4th 1309, 1315 (11th Cir. 2026). Put differently, Johnson cannot show that he is more than a concerned bystander seeking to vindicate his "value interests"—again, no matter how deeply held. *Allen*, 468 U.S. at 756 (quotation omitted).

Once more, the Confederate memorial cases from the other direction are instructive. Take *Gardner v. Mutz*. There, we concluded that plaintiffs who opposed the removal of a Confederate memorial lacked standing because their alleged injuries were "undifferentiated, collective," and "not distinct to any of the plaintiffs." 962 F.3d at 1342–43 (quotation omitted). Other courts have reached the same conclusion. *See, e.g., McMahon v. Fenves*, 946 F.3d 266, 271–72 (5th Cir. 2020); *Albert Sidney Johnston Chapter, Chapter No. 2060 v. City of San Antonio*, 14 F.4th 329, 332 (5th Cir. 2021). The same is true here, where Johnson has not identified any fact that makes his alleged injury different from that of scores of other would-be plaintiffs who feel hurt by the memorials.

Relying on slender support from some of our precedents, Johnson disagrees.  He says the district court's conclusion that he has not suffered a concrete and particularized injury flouts this Court's precedent in *Sierra v. City of Hallandale Beach*, 996 F.3d 1110 (11th Cir. 2021), as well as our now-vacated decision in *Laufer v. Arpan LLC*, 29 F.4th 1268 (11th Cir. 2022), *opinion vacated and appeal dismissed as moot*, 77 F.4th 1366 (11th Cir. 2023).  We take the cases in reverse order.  Though we disagree with Johnson's *Laufer* argument, we need not consider it because, as this Court has explained, vacated opinions "have no legal effect whatever" and "are void"—it is as if they were never written.  *See United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc).  Moving on to *Sierra*, that opinion held that a "humiliated, embarrassed, and frustrated" deaf plaintiff had standing to sue under the Americans with Disabilities Act and Rehabilitation Act because a city did not include closed captioning on some of its online videos.  996 F.3d at 1111–12, 1114 n.4.  That, we said, inflicted a "stigmatic" injury on Sierra.  *Id.* at 1114.  Building on that already expansive holding, Johnson insists that "looming tributes" to the Confederacy in the Middle District inflict comparable stigmatic harm on him as an African American.

We do not agree.

Although discrimination can inflict non-economic "stigmatic harm," that injury is only concrete if the person is "personally subject to discriminatory treatment."  *Allen*, 468 U.S. at 757 n.22; *see also Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984).  In

*Allen v. Wright*—the Supreme Court's paradigmatic stigmatic-harm case—the plaintiff parents lacked standing to sue over the tax-exempt status of racially discriminatory private schools because they failed to "allege a stigmatic injury suffered as a *direct result of having personally been denied* equal treatment."  468 U.S. at 755 (emphasis added).  So those very sympathetic plaintiffs could not bring suit to stop discrimination because their own children had not been denied admission to a school on the basis of their race.

In *Sierra*, the plaintiff was on a different footing for a few reasons.  To start, Sierra at least alleged that he was denied information, rather than relying only on his psychological harm.  *See* 996 F.3d at 1111–12.  We also underscored that the plaintiff was "*personally* and *directly* subjected to discriminatory treatment when Hallandale Beach published videos on its website that he accessed but could not understand."  *Id.* at 1114 (emphasis added).  In other words, unlike in *Allen*, the plaintiff had (at least arguably) suffered the alleged harm in a concrete and individual way.  Moreover, the panel emphasized that this Court had "already recognized" damages for emotional distress under the Rehabilitation Act.  *Id.* at 1114 n.4.

Not so here.

Though we do not question the sincerity of Johnson's objections, his "deep repulsion and intimidation" at Confederate-named "parks, buildings, schools, courthouses, streets, [and] roads" do not personally subject him to "discriminatory treatment."  *Id.* at 1114.  Far from it.  Disagreement with the names of public

thoroughfares and the like is the very definition of an insufficiently personal, generalized grievance—"no matter how sincere" Johnson's pain may be. *Hollingsworth*, 570 U.S. at 706.

Stretched to its logical end, this theory of standing is limitless. *See Allen*, 468 U.S. at 756 n.21. To take but one example, say a county names a bridge after a famed local mayor. Does any person within that county who is "deeply repulsed" by the mayor's policy decisions have standing to sue? Of course not. And though we have no doubt that Johnson's reaction to the Confederate monikers is more deeply held than this hypothetical citizen's, psychological injuries do not become more concrete as they get stronger. *See, e.g.*, *Valley Forge*, 454 U.S. at 485–86. "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Id.* at 486; *see also Quinn*, 175 F.4th at 1315–16.

In sum, the "Framers deliberately left many disputes to the political process, not the courts." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1247 (11th Cir. 2025) (Tjoflat, J., concurring in part and dissenting in part). This is one of them. Because Johnson has neither a concrete nor a particularized injury, he lacks standing under Article III.[6]

---

[6] Because Johnson lacks standing, we do not address his formulaic and conclusory objections to the magistrate judge's report and recommendation. *See* 11th Cir. R. 3-1; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

23-11937            Opinion of the Court            13

**B.**

Johnson also argues for taxpayer standing, which has developed its own parameters.  We apply those doctrines here.

As any taxpayer knows, there are three possible pipers to pay: federal, state, and local.  Johnson raises no federal taxpayer claim for various reasons, but we still note that, at least outside the Establishment Clause context, a plaintiff cannot sue the federal government just because he pays federal taxes.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 343 (2006).  State taxpayers face an uphill battle too, and cannot "challenge state tax or spending decisions simply by virtue of their status as taxpayers."  *Id.* at 346.  At the very minimum, a state taxpayer needs to show a direct injury in a "good-faith pocketbook action"—not that he "suffers in some indefinite way in common with people generally."  *Doremus v. Bd. of Educ.*, 342 U.S. 429, 433–34 (1952) (quotation omitted).

But we need not linger on Johnson's state taxpayer claim for a simple reason: he forfeited the issue by not raising it in his initial brief.  *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc); Fed. R. App. P. 28(a).  Instead, Johnson's briefing focused solely on his standing to sue as a municipal taxpayer.[7]

---

[7] Johnson's pro se status does not change our conclusion, as pro se litigants are "subject to the relevant law and rules of court."  *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989).  We need not consider whether Johnson's status as a formerly licensed attorney subjects him to an even higher standard.

Municipal taxpayer standing indeed offers yet an easier road for plaintiffs.  A municipal taxpayer can sue to stop the illegal use of local tax dollars because the "interest of a taxpayer of a municipality in the application of its moneys is direct and immediate." *Frothingham v. Mellon*, 262 U.S. 447, 486 (1923).  Some jurists have expressed reservations about the continuing vitality of this doctrine, describing it as "increasingly anomalous" and "a relic in the modern landscape of standing."  *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 733 (7th Cir. 2020) (Barrett, J.); *see also Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 221 (6th Cir. 2011) (en banc) (Sutton, J., concurring).  Bound by precedent, however, we must apply it.  *See Pelphrey v. Cobb County*, 547 F.3d 1263, 1280 (11th Cir. 2008).  We thus proceed to the two-part test for municipal taxpayer standing, and conclude that Johnson cannot meet even that lighter burden.

To prove standing as a municipal taxpayer, the plaintiff must be "a resident who can establish that tax expenditures were used for the offensive practice."  *Id.*  Johnson contends that he has standing to sue because the City of Jacksonville "enact[s] general budgetary allocations inuring to the presence, maintenance, preservation and protection of" Confederate memorials on public land through "tax-based funding."  And his injuries differ "from those suffered by taxpayers in general," Johnson says, because he is African American and left feeling like a "second-class citizen" from the "tax-supported Confederate tributes on public land."

These allegations fall far short.  To start, Johnson alleged no facts showing that the City devoted taxpayer funds to maintain or preserve the Confederate memorials that he identified in the complaint.  It is "not enough to simply allege that the City is spending money" in an unlawful way to establish standing as a municipal taxpayer.  *Protect Our Parks, Inc.*, 971 F.3d at 735.  So generally claiming, as Johnson does, that the City's mayor "continues to maintain public funding for tributes to the Confederacy" does not show that the City used taxpayer funds in an unconstitutional way.  Assuming that the spending is happening, without alleging any facts to support the claim, is not enough.  *Cf. Pelphrey*, 547 F.3d at 1280–81.  Because Johnson did only that, he does not show that he is, "will, or possibly can be out of pocket because of it."  *Doremus*, 342 U.S. at 433.  He thus lacks standing on this basis, too.

⋆      ⋆      ⋆

Earl Johnson strenuously objects to the continued presence of Confederate memorials and tributes on public land.  But the "presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986).  That touchstone resolves this case.  Because Johnson does not have standing to sue, we **AFFIRM** the district court's dismissal of his lawsuit.